IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| AMY RACHEL, as Administratrix of the<br>Estate of GREGORY RACHEL, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF MOBILE, ALABAMA;<br>MICHAEL T. WILLIAMS, individually and<br>in his official capacity as Chief of Police of<br>the City of Mobile; CHRISTOPHER<br>MCCANN; JOHN JACKSON; GERALD<br>RIPPLE; and EDWARD ELIA,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. 1:13-CV-00522-WS-M |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court on a motion for summary judgment filed by Defendant Officer John Jackson on February 6, 2015. After consideration of the content of the filing, all responses thereto, the evidence presented, and the controlling case law, and all applicable and proper circumstances, this Court enters these Findings of Fact and Conclusions of Law and, by separate written Order, **GRANTS** the motion for summary judgment.

## FINDINGS OF FACT

### The Parties

Plaintiff Amy Rachel (now known as "Amy Fresh") is the personal representative of the estate of Gregory Rachel ("Mr. Rachel"). (Doc. 41, p. 2 ¶ 5).

According to the autopsy report, Gregory Rachel at the time of his death on May 1, 2012 was 6 feet, three-and-a-half inches tall and weighed 252 pounds. (Ex. 1). The death certificate lists Mr. Rachel's cause of death as excited delirium. (Ex. 2).

Defendant John Jackson ("Officer Jackson") is a police officer with the Department, initially working for the Department from 1985 until 1991, returning to the Department as a police officer in August of 2011. (Jackson Depo, p. 11, line 12 to p. 12, line 15). Officer Jackson stands 5'10", 185 pounds. (Jackson Depo, p. 32, lines 15-21).

In May of 2012, Officer Jackson was assigned to the Fifth Precinct, with Sgt. Ripple as his sergeant and Lt. Elia as his lieutenant. (Jackson Depo, p. 20, lines 13-18).

Defendant Christopher McCann ("Officer McCann") is a police officer with the City of Mobile Police Department ("the Department"). (Doc. 41, p. 4 ¶ 20). Officer McCann, as of May 2012, was about 6'2" and between 245 and 250 pounds. (McCann Depo, p. 30, lines 1-5).

In May of 2012, Officer McCann's supervisors were Sgt. Ripple and Lt. Elia. (McCann Depo, p. 37, lines 20-24).

Defendant Gerald Ripple ("Sgt. Ripple") is a sergeant with the Department. (Doc. 41, ¶ 16). Sgt. Ripple has been with the Department for 24 years, and has been a sergeant for approximately twelve years. (Ripple Depo, p. 8, line 19 to p. 9, line 1). Sgt. Ripple also spent twelve years in the Army, receiving medical training and becoming a combat medic. (Ripple Depo, p. 29, line 21 to p. 30, line 11).

Edward Elia ("Lt. Elia") is a lieutenant with the Department. (Elia Depo, p. 9, lines 6-10); Doc. 41, ¶ 17). Lt. Elia has been with the Department for 18 years. (Elia Depo, p. 9, lines 15-16).

Lt. Elia joined the Mobile Police Department in 1996 as a patrolman, progressing through the ranks and eventually being promoted to lieutenant in 2011. (Elia Depo, p. 11, line 22 to p. 12, line 19). As of April/May of 2012, Lt. Elia was supervising Sgt. Ripple. (Elia Depo, p. 20, lines 11-18).

Defendant City of Mobile ("the City") employed Defendants Jackson, McCann, Ripple and Elia within the Department at the time of the events made the basis of this suit.  (Doc. 41, ¶ 19).

All came on board as police officers with the Department by completing training through the City of Mobile's police academy.  (Barber affidavit, Ex. 3).

## Events at the Rachel House

In 2012, Plaintiff Amy Rachel ("Plaintiff") and her husband, Gregory Rachel, lived at 9782 Estate Drive in Mobile, Alabama.  (Fresh Depo, p. 21, line 25 to p. 22, line 5).  They had two children, now 9 and 11.  (Fresh Depo, p. 15, lines 5-10). The incident of Tuesday, May 1, 2012 involving the individual Defendant police officers took place in the front yard of the Estate Drive home.  (Ex. 5).

As described by Plaintiff, Mr. Rachel began acting out of the ordinary for him just a couple of days before.  On Sunday, April 29, he had told Plaintiff that he would join her and her family at a local golf tournament, but never showed up.  (Fresh Depo, p. 40, lines 5-24).

On Monday evening (April 30), Plaintiff sent Mr. Rachel a text asking about dinner, but he did not respond.  (Fresh Depo, p. 43, lines 5-8; p. 44, lines 18-23).  Ms. Fresh also tried to call him, but he did not answer. (Fresh Depo, p. 46, lines 12-15).

Ms. Fresh was both worried and angry when the calls and texts went unanswered.[1] (Fresh Depo, p. 46, lines 9-24).

Mr. Rachel eventually came home to the Estate Drive residence that evening.  (Fresh Depo, p. 48, line 7 to p. 49, line 17).  Plaintiff describes him as confused, agitated, taking deep

---

[1] Without detailing each and every call and text, one text sent by Plaintiff to her husband on the evening of April 30 read: "I'm tired of this shit.  You're not answering my phone.  I'm your wife, taking care of your little girls.  You need to answer the F'ing phone.  What if we need you?  Irresponsible.  When I'm sick, I still have the phone by me all day...".  (Fresh Depo, p. 182, line 15 to p. 183, line 14.)

breaths, and real anxious. (*Id.*). He would not answer Plaintiff's questions about where he had been. (*Id.*).

Mr. Rachel claimed when he arrived that he was on a phone call with the police, but when Plaintiff was handed his cell phone, there was nobody on the line. (*Id.*). Plaintiff asked Mr. Rachel where he had been and what was wrong with him, but she could not get him to answer her questions. (*Id.*). It was about 9:00 p.m. when he arrived. (Fresh Depo, p. 96, line 9). Plaintiff asked her husband if he had been drinking or taking any drugs, which he denied. (Fresh Depo, p. 103, lines 10-21).

Mr. Rachel told his wife that he wanted to lay down and they would talk about it in the morning. (Fresh Depo, p. 97, lines 23-24; p. 104, lines 16-17; p. 185, line 25). Plaintiff eventually went to her bed, where the two children were already asleep.

Plaintiff was scared, alarmed and confused. (Fresh Depo, p. 105, lines 2-9). She continued questioning her husband and giving him instructions through text messages. (Fresh Depo, p. 105, line 18 to p. 107, line 10; p. 184, line 19 - p. 187, line 13).

Plaintiff heard her husband up and walking around the house at 3:00 a.m. early on May 1, 2012. (Fresh Depo, p. 48, line 7 to p. 50, line 17). After Plaintiff checked to see what he was doing, Mr. Rachel came into her bedroom and knelt beside her bed.

She again asked him what was wrong, but he again did not answer. (*Id.*). Plaintiff followed Mr. Rachel back through the kitchen area to where Mr. Rachel sat on the couch. (Fresh Depo, p. 48 to p. 51, line 8).

She stood in front of him, pulling his head into her chest, rubbing it, and telling him that everything would be okay. (*Id.*). Mr. Rachel then began telling his wife that she needed to protect herself. (*Id.*). He did not answer her questions about what or who she needed to protect herself from, though he one time said "the devil." (*Id.*; Fresh Depo, p. 59, lines 9-20).

Plaintiff told Mr. Rachel that he should simply get his keys and go if he wanted her to protect herself. (Fresh Depo, p. 51, lines 9-15; p. 59, line 14 to p. 60, line 1). When saying this, she was very scared because she felt that something was "fixing to go down." (Fresh Depo, p. 191, line 11 to p. 192, line 13).

After she told her husband to get his keys and go, she began to walk back down the hallway. Mr. Rachel grabbed his wife by the face and they tumbled to the ground. (Fresh Depo, p. 111, line 21 to p. 112, line 10).

Plaintiff remembers her husband choking her and twisting her neck. (Fresh Depo, p. 170, lines 13-22). In her words, "I can't believe he did not kill me. I can't believe it." (Fresh Depo, p. 170, lines 17-22). She thought, "I'm fixing to die and my kids are right here watching me."[2] (Fresh Depo, p. 171, lines 3-13).

The children got up from bed and began screaming for Mr. Rachel to stop. (Fresh Depo, p. 195, lines 9-24). Plaintiff thought that Mr. Rachel was going to kill both her and her kids. (Fresh Depo, p. 194, line 20 to p. 195, line 7).

Mr. Rachel stopped eventually, and Plaintiff and the children fled the home. Plaintiff at the time was wearing no shoes, but only a T-shirt and underwear. (Fresh Depo, p. 136, lines 11-19).

Plaintiff knocked on a window of a neighbor's house, and the neighbor woke up and let them in the front door. (Fresh Depo, p. 128, line 24 to p. 129, line 13). Plaintiff told the neighbor that her husband had attacked her, that he was out of his mind, and that she needed them to call 911 for help. (Fresh Depo, p. 129, lines 9-13).

After the call to 911 made by the neighbor, Plaintiff called her parents and told them that she had been attacked by Mr. Rachel. (Fresh Depo, p. 131, line 13 to p. 132, line 3).

## Arrival of Officers
## McCann and Jackson

When the police arrived at the neighbor's house, they came inside and asked Plaintiff what had happened. (Fresh Depo, p. 134, lines 13-21). Plaintiff told them that her husband had attacked her, and that he was out of his mind. (*Id.*).

After telling the officers what had happened inside the home, the officers asked Plaintiff for permission to enter the home, which she gave. (*Id.*; Fresh Depo, p. 254, lines 18-25; p. 256, line 22 to p. 258, line 4).

Officers Jackson and McCann had been dispatched to the neighbor's house on Plantation Court in response to the 911 domestic violence call, with both arriving at approximately the same time.[3] (Jackson Depo, p. 126, line 15 to p. 127, line 18).

Officer McCann, the primary officer on the call, has worked for the Mobile Police Department for seven and a half years. (McCann Depo, p. 11, line 21 to p. 12, line 2). Prior to joining the Department, Officer McCann spent five years in the U.S. Army. (McCann Depo, p. 12, line 25 to p. 13, line 12).

Officer McCann attended the Mobile Police Academy for sixteen weeks in 2007, receiving training in a variety of areas including use of a Taser. (McCann Depo, p. 34, line 1 to p. 35, line 1). McCann's time at the academy gave him an overview of how to function and perform as a police officer, learning criminal and state laws, getting training on Taser, baton, and other weapons at the firing range, basic officer survival training, etc. (McCann Depo, p. 38, line 9 to p. 39, line 14).

---

[2] Photographs taken of Plaintiff shortly after depict some cuts and some blood on Plaintiff's mouth and chin, some red marks on Plaintiff's neck, and a broken finger. (Fresh Depo, p. 136, line 24 to p. 137, line 22; Ex. 6).
[3] As of April-May of 2012, domestic violence calls probably made up 15% - 20% of Officer McCann's calls on the night shift. (McCann Depo, p. 84, lines 8-18).

Following graduation from the academy, Officer McCann was assigned to a Field Training Officer to ride along with each month for a period of three months. (*Id.*). If McCann passed those evaluations then essentially that is when his career as a police officer started. (*Id.*).

The Department also conducts roll call training for fifteen minutes per shift at the beginning of each shift, and then one week a year of in-service training from a number of different instructors. (McCann Depo, p. 40, line 8 to p. 41, line 17). Officer McCann has been trained on the Taser Policy and Use Report of the Mobile Police Department. (McCann Depo, p. 293, lines 9-20).

Prior to becoming a police officer, Jackson attended the police academy in Mobile. (Jackson Depo, p. 20, lines 6-7). The training that Officer Jackson has received through the Mobile Police Department on use of a Taser has been from a certified Taser instructor. (Jackson Depo, p. 119, lines 4-10).

Officer Jackson has also been through in-service training once a year, and roll call training which occurs every night. (Jackson Depo, p. 22, line 16 to p. 23, line 13).

Officers Jackson and McCann arrived on the scene around 3:22 a.m. on the morning of May 1, 2012. (Jackson Depo, p. 69, line 20 to p. 70, line 3). Officer Jackson met with Plaintiff about the encounter with her husband, and recalls Plaintiff stating that Mr. Rachel had tried to kill her and had tried to break her neck. (Jackson Depo, p. 60, line 16 to p. 61, line 20).

The information from Amy Rachel, combined with her visible injuries, led Officer Jackson to conclude that Mr. Rachel had committed a felony offense. (Jackson Depo, p. 128, line 22 to p. 129, line 2). Plaintiff's expert agrees that the officers had probable cause to arrest Mr. Rachel and, in fact, had no choice but to arrest him. (Kirkham Depo, p. 197, lines 6-10; p. 237, line 20 to p. 238, line 10).

Before going to the Rachel residence to arrest Mr. Rachel, Officer Jackson suggested contacting Sgt. Ripple based upon the information learned from Plaintiff that Mr. Rachel had tried to kill her, had told her to protect herself, and that he had tried to break her neck. (Jackson Depo, p. 71, line 4 to p. 72, line 13). Officer Jackson also recalls being told that Mr. Rachel was a big guy. (*Id.*).

Officer McCann contacted Sgt. Ripple because Ms. Rachel was pretty beaten up with some marks on her, because Mr. Rachel was a big guy who was inside the house, and because Mr. Rachel might not be in his right mind. (McCann Depo, p. 147, line 24 to p. 148, line 11). Officer McCann felt that this domestic call was more serious than domestic calls that he had previously. (McCann Depo, p. 148).

Sgt. Ripple advised Officer McCann not to go into the residence until some other officers were over there, as they did not know if the suspect was armed. (McCann Depo, p. 148, line 2 to p. 149, line 5). Sgt. Ripple confirms advising McCann not to enter the Rachel residence, to secure the scene and to wait for him and Lt. Elia to arrive. (Ripple Depo, p. 41, lines 4-18).

Officers McCann and Jackson then went outside to watch the Rachel house and make sure Mr. Rachel didn't try to leave. (McCann Depo, p. 148, line 2 to p. 149, line 17).

### Attempts to Arrest Rachel and Rachel's Active Resistance

As Officers Jackson and McCann stood in the street, Mr. Rachel came out into the front yard and had his hands raised, yelling at the sky. (Jackson Depo, p. 72, lines 14-21; McCann Depo, p. 152, line 12 to p. 153, line 2).

Mr. Rachel then laid down on his back in the yard. (Jackson Depo, p. 74, line 22 to p. 75, line 6). Officers McCann and Jackson then began to approach Mr. Rachel while he was outside the home on the ground, with the intent to arrest him. (McCann Depo, p. 158, lines 4-12).

On approaching Mr. Rachel while he was on the ground, the officers identified themselves and instructed him to stay on the ground. (Jackson Depo, p. 93, lines 13-17). Officer Jackson removed his Taser from his holster, but did not then activate it. (Jackson Depo, p. 75, line 10 to p. 76, line 2).

Mr. Rachel suddenly jumped up and got into a crouched, combat stance with his fists balled up, jockeying for position between Officer McCann and Officer Jackson. (Jackson Depo, p. 76, lines 5-19).

Officer Jackson had moved in the direction of the front door as he was not going to give Mr. Rachel an opportunity to get back into the house, assuming there may be some type of weapon inside.[4] (Jackson Depo, p. 91, lines 11-22; Jackson Depo, p. 94, line 7 to p. 95, line 4).

The officers then told Mr. Rachel to get back on the ground in a directed, loud tone. (Jackson Depo, p. 132, lines 8-16; McCann Depo, p. 163, lines 13-18). Mr. Rachel did not comply with that direction. (Jackson Dep., p. 132, lines 17-18).

Mr. Rachel remained in a fighting stance, which Officer Jackson perceived as a threat to both he and to Officer McCann. (Jackson Depo, p. 132, line 23 to p. 133, line 17).

Despite being told to get on the ground multiple times, Mr. Rachel did not comply, instead lunging at the officers. (Jackson Depo, p. 134, lines 4-23).

When Mr. Rachel made these aggressive moves toward the officers, Officer Jackson deployed his Taser, momentarily dropping Mr. Rachel to the ground before he sprang right back up, pulling the Taser probes out. (Jackson Depo, p. 77, lines 4-16). Office Jackson had

---

[4] After Plaintiff and her children fled the residence, Mr. Rachel had armed the house alarm. (Fresh Depo, p. 122, lines 4-15). More importantly, a number of steak knives had been placed in the foyer. (Fresh Depo, p. 63, line 13 to p. 64, line 17; Ex. 7). Additional knives were found on a table in the dining room. (Fresh Depo, p. 66, line 14 to p. 67, line 13; Ex. 7). Plaintiff agrees that no one other than Mr. Rachel could have put those knives out, which came from a knife block in the kitchen. (Fresh Depo, p. 64, lines 7-17; p. 67, lines 9-13; p. 72, lines 9-23).

deployed his Taser because he had taken Mr. Rachel's lunge at the officers as a threat to their safety. (Jackson Depo, p. 134, line 24 to p. 135, line 20).

The officers made additional verbal commands for Mr. Rachel to get back on the ground, but still he did not comply. (Jackson Depo, p. 136, lines 18-25). Officer McCann then deployed his own Taser. (Jackson Depo, p. 77, lines 17-19).

The officers again gave commands to Mr. Rachel to get on the ground, but he did not comply. (Jackson Depo, p. 137, line 16 to p. 138, line 8).

Mr. Rachel actively resisted arrest during the entire encounter with the officers. (Jackson Depo, p. 138, lines 12-19). Mr. Rachel continued to yell at the officers. (Jackson Depo, p. 78, lines 4-5).

Officer Jackson attempted to touch-tase Mr. Rachel twice, one of which failed to connect and neither of which had any effect, and Officer Jackson got tased himself by the wires from Officer McCann's Taser.[5] (Jackson Depo, p. 78, lines 11-20).

As he proceeded to the scene, Sgt. Ripple heard the phrase "Code Zebra" over the radio which denotes a Taser deployment.[6] (Ripple Depo, p. 41, line 23 to p. 42, line 12). Sgt. Ripple then heard the words "step it up" over the radio. (Ripple Depo, p. 42, lines 13-23).

---

[5] Prior to the incident involving Mr. Rachel, Officer Jackson had never used his Taser on a subject before. (Jackson Depo, p. 55, lines 5-7). Among Officer Jackson's options when Mr. Rachel took the combat stance were Taser, Monadnock, and pepper spray. (Jackson Depo, p. 92, lines 11-22). Officer Jackson chose Taser because of Mr. Rachel's size, because he had tried to break his wife's neck, and because the Taser would incapacitate Mr. Rachel and allow them to handcuff him without further incident. (Jackson Depo, p. 95, lines 5-17). Similarly, Officer McCann has used his Taser on a suspect only twice, including the encounter with Mr. Rachel. (McCann Depo, p. 97, lines 16-23). Officer McCann considers whether the subject is in imminent danger of harming himself or others in deciding whether to use a Taser. (McCann Depo, p. 100, lines 20-24).

[6] When "Code Zebra" is broadcast, the Fire Department is notified to have a medical unit respond to the scene. (Ex. 3-A, Taser Policy and Use Report, p. 3). However, as Plaintiff's expert George Kirkham explained, in a situation like the one here where there is "a person who's emotionally disturbed, whose status is unknown," the medical unit is not supposed to come to the scene until it is secured. (Kirkham Depo, p. 235, lines 13-23). Kirkham admits that there is no "way whatsoever to predict what a person fitting that description is going to do in the next minute." (Kirkham Depo, p. 235, lines 8-12).

Sgt. Ripple and Lt. Elia raced to the scene as speeds exceeding 90 miles an hour, and arrived at the scene a couple of minutes after hearing "step it up." (Ripple Depo, p. 43, lines 8-18).

The officers realized their Tasers weren't working, and determined that they needed to physically engage Mr. Rachel. (McCann Depo, p. 175, line 24 to p. 176, line 18).

Mr. Rachel was then in a kneeling position trying to stand up, and his 6'4", 250+ pound frame was extremely strong compared to Officer Jackson's 5'10", 185-pound frame. (Jackson Depo, p. 79, lines 5-15). Officer McCann assisted Officer Jackson in trying to get Mr. Rachel on the ground on his stomach so they could handcuff him. (Jackson Depo, p. 140, lines 3-18).

Mr. Rachel continued to fight and resist these efforts, kicking and otherwise not complying with the officers' directives. (*Id.*). Officer McCann took out his Monadnock (baton), striking Rachel three to five times in the legs because Mr. Rachel was kicking at him, and they were trying to get him to turn over so they could get him handcuffed.[7] (McCann Depo, p. 177, line 10 to p. 178 line 9; Jackson Depo, p. 78, line 21 to p. 79, line 15).

During the struggle, Officer Jackson told Mr. Rachel, "We are the police. Stop resisting. We'll help you." (Jackson Depo, p. 74, lines 5-21). Mr. Rachel screamed, "No," and started fighting again. (*Id.*).

Mr. Rachel actively resisted arrest, keeping his hands and arms underneath him so the officers could not pull them out and cuff him. (Jackson Depo, p. 140, line 19 to p. 141, line 14; McCann Depo, p. 176, lines 19-25). Eventually, Officer Jackson was able to handcuff his left arm and use the chain and open cuff to pull Mr. Rachel's left arm back behind him. (*Id.*).

---

[7] Officer McCann has never used his Monadnock in the line of duty on a suspect prior to the incident with Mr. Rachel. (McCann Depo, p. 261, lines 4-7).

11

Mr. Rachel continued to actively fight the officers, tucking his right arm underneath his stomach and not allowing the officers to get the other handcuff on him.  (Jackson Depo, p. 142, lines 3-20).

The officers began to get very tired at this point and, realizing they were unable to cuff him, decided to hold him down until Sgt. Ripple and Lt. Elia arrived.  (Jackson Depo, p. 142, line 10 to p. 143, line 4).   Officer Jackson did not want Mr. Rachel getting back up off the ground because Mr. Rachel still had plenty of strength, and might have been able to overpower one of the officers.[8]  (Jackson Depo, p. 143, lines 5-15; p. 80, lines 9-19).

During this time, Mr. Rachel continued to yell, cuss, and tell the officers to get off of him, while the officers instructed him to stop resisting.  (Jackson Depo, p. 80, line 24 to p. 81, line 5).  Just as with his wife earlier, Mr. Rachel was yelling "Protect me."  (*Id.*)  Officer Jackson in response said: "We're the police.  Stop fighting us.  Roll over," with Mr. Rachel yelling "No" and then yelling something about Obama.  (Jackson Depo, p. 81, lines 6-17).

### The Arrival of Sgt. Ripple and Lt. Elia

Mr. Rachel continued to fight through the time that Sgt. Ripple arrived, continuing to pose a threat to the officers up to and through the time that even Lt. Elia arrived.  (Jackson Depo, p. 143, line 16 to p. 144, line 17).

On arrival, Sgt. Ripple saw the two officers in the ditch directly in front of the Rachel residence and could tell that both of the officers were spent.  (Ripple Depo, p. 43, line 24 to p. 44, line 9).

---

[8] According to George Kirkham, one of Plaintiff's expert, the officers would tire more easily than Mr. Rachel both because of the officers' heavy gear and because Mr. Rachel, in his excited state, would not know when to quit, making it seem he had superhuman strength.  (Kirkham Depo, p. 254, line 23 to p. 256, line 12).

Officer McCann was down by Mr. Rachel's legs, and Officer Jackson was on Mr. Rachel's left side. (Ripple Depo, p. 44, line 19 to p. 45, line 2). Sgt. Ripple then got on the right side of Mr. Rachel, as that area was open. (Ripple Depo, p. 45, lines 3-5).

Sgt. Ripple was concerned that they could not get Mr. Rachel's right arm out from underneath him, as he had been trained to always make sure the suspect's hands are clear to be certain there are no weapons.[9] (Ripple Depo, p. 46, line 17 to p. 47, line 5).

Sgt. Ripple tried to get Mr. Rachel's arm dislodged from underneath him, but he had it locked in. (Ripple Depo, p. 47, line 24 to p. 48, line 22).

Sgt. Ripple asked Mr. Rachel several times to give them his arm, but Mr. Rachel would not do that, leaving Sgt. Ripple uncertain whether or not Mr. Rachel had a weapon. (*Id.*).

Sgt. Ripple used a closed fist punch to the solar plexus three to five times as a stun technique to try to get Mr. Rachel to release his arm, but it was ineffective.[10] (Ripple Depo, p. 47, line 18 to p. 49, line 20).

Lt. Elia was the last officer to reach the Rachel residence, having been preceded by Officers McCann and Jackson and Sgt. Ripple. (Elia Depo, p. 23, lines 16-24).

Like Sgt. Ripple, Lt. Elia attempted a couple of techniques to try to get Mr. Rachel to release his arm so that he could be handcuffed. (Elia Depo, p. 24, line 3 to p. 26, line 3).

First, Elia attempted to employ a brachial stun technique, slapping Mr. Rachel with the back of his hand across an artery. (*Id.*). Lt. Elia explained that his attempts were ineffective because due to his close proximity to the other officers already present, Lt. Elia kept inadvertently contacting Sgt. Ripple during the swing, taking the momentum out. (*Id.*).

---

[9] Plaintiff's expert Kirkham agrees that the officer's first priority is self-safety and protecting the public, with the suspect's safety coming after that of the officers and the public. (Kirkham Depo, p. 230, line 9 to p. 231, line 2). An officer must protect his own weapons, and needs to be in control of the situation. (Kirkham Depo, p. 232, line 11 to p. 233, line 8).

Secondly, Lt. Elia attempted to push on a pressure point -- a nerve between Mr. Rachel's ear and his jaw -- for ten to fifteen seconds. (Elia Depo, p. 26, lines 4-22).

About this time, Sgt. Ripple put his left knee into Mr. Rachel's right shoulder and pushed down in order to gain leverage and dislodge the arm from underneath him. (Ripple Depo, p. 50, line 25 to p. 51, line 18).

Sgt. Ripple believes that from the time he arrived on the scene, they were able to get Mr. Rachel secured within one to one and a half minutes. (Ripple Depo, p. 66, lines 13-20).

About the time that the officers got the second handcuff on Mr. Rachel, Lt. Elia received a call from his corporal about a five-month-old infant that had passed away. (Elia Depo, p. 27, line 24 to p. 29, line 1). Lt. Elia prepared to leave and later did leave the scene to address the death of the infant. (Elia Depo, p. 30, lines 7-11).

Because of the size of Mr. Rachel, the nature of the call, and the facts that he was still continuing to kick and resist even after being handcuffed, Sgt. Ripple made the decision to place Mr. Rachel in four-point restraints. (Ripple Affidavit, Ex. 4 at ¶10; Jackson Depo, p. 145, lines 4-11).

The Department allows officers discretion whether to use a four-point restraint in such circumstances. (Ripple Depo, p. 52, lines 21-23; p. 53, line 21 to p. 54, line 6). Mr. Rachel continued to struggle and fight and resist and kick all the way up to the point that the four-point restraint was applied. (Jackson Depo, p. 145, line 23 to p. 146, line 8).

Officer Jackson went over to lean on a police car because he was afraid he was going to pass out from exertion. (Jackson Depo, p. 84, line 19 to p. 85, line 2).

---

[10] Plaintiff's other expert, George Kirkham, agreed that police officers use maneuvers that would not result in harm to the average person, but which might to a lay bystander resemble a beating of a suspect. (Kirkham Depo, p. 290, line 24 to p. 291, line 14).

Sgt. Ripple walked to his patrol car and grabbed leg shackles and walked back over to where Mr. Rachel was laying on the ground. (Ripple Affidavit, Ex. 4 at ¶11). Officer McCann placed his knee near Mr. Rachel's lower back as he and Sgt. Ripple placed the leg shackles on Mr. Rachel's ankles. (Ripple Affidavit, Ex. 4 at ¶11).

The leg shackles consisted of a chain between two shackles and the chain was approximately two feet in length. (Ripple Affidavit, Ex. 4 at ¶11).

Officer McCann and Sgt. Ripple then pulled Mr. Rachel's legs up and connected the chain from the leg shackles to the chain of the handcuffs around Mr. Rachel's wrists. (Ripple Affidavit, Ex. 4 at ¶11). They made this connection by using an additional set of handcuffs to connect the chain between the leg shackles to the chain between the handcuffs on the wrists. (Ripple Affidavit, Ex. 4 at ¶11).

This method of four point restraint allowed Mr. Rachel to have some movement with his legs but also precluded him from kicking or continuing to fight with the officers. (Ripple Affidavit, Ex. 4 at ¶11).

After the four-point restraint was put on Mr. Rachel, he continued to yell at the officers for a little while longer. (McCann Depo, p. 181, line 23 to p. 183, line 13). Mr. Rachel was still talking after the four-point restraint was applied. (McCann Depo, p. 183, lines 9-13).

After placing Mr. Rachel in the four point restraints, the offices turned him at a 45 degree angle to his side and made sure that his head was turned to the side and that he was breathing. (Ripple Affidavit, Ex. 4 at ¶12).

Sgt. Ripple then instructed Officer McCann to get his patrol car and pull it closer so that they could place Mr. Rachel in the back of the patrol car while they continued to secure the scene. (Ripple Affidavit, Ex. 4 at ¶12).

Sgt. Ripple stood next to Mr. Rachel and continued to monitor him and watched his breathing.  (Ripple Affidavit, Ex. 4 at ¶12).  Sgt. Ripple continued to observe Greg Rachel breathing as he could see his chest and back rise and fall, because Rachel was still talking and mumbling and because he could see what appeared to be snot bubbles coming in and out of his nose. (Ripple Affidavit, Ex. 4 at ¶12; Ripple Depo. p. 58, lines 25 to p. 59, line 9).

Officer McCann's patrol car was not very far away so he returned in less than one minute. (Ripple Affidavit, Ex. 4 at ¶13).

At that point, Officers McCann and Jackson assisted Sgt. Ripple in picking Mr. Rachel up to carry him to the patrol car.  (Ripple Affidavit, Ex. 4 at ¶13).  As they were moving him toward the edge of pavement and the patrol car, Sgt. Ripple noticed that he appeared to be limp and got concerned that Mr. Rachel might not be breathing.  (Ripple Affidavit, Ex. 4 at ¶13).

They had only carried Mr. Rachel approximately ten to fifteen feet when Sgt. Ripple noticed that he was limp.  (Ripple Affidavit, Ex. 4 at ¶13).  Sgt. Ripple instructed the other officers to place Mr. Rachel on the ground so that he could check on him.  (Ripple Affidavit, Ex. 4 at ¶13).

Sgt. Ripple checked for a pulse and checked to see if he was breathing.   (Ripple Affidavit, Ex. 4 at ¶13).  Mr. Rachel did not appear to be breathing.  (Ripple Affidavit, Ex. 4 at ¶13; Ripple Depo. p. 61, line 25 to p. 62 line 15).

Sgt. Ripple also shined a flashlight into Mr. Rachel's eyes and his eyes appeared fixed and dilated so Sgt. Ripple called for paramedics. (Ripple Affidavit, Ex. 4 at ¶13; Ripple Depo. p. 62, lines 16-23).

Right at that time, a neighbor who was also a paramedic, walked up and asked if he could help.  (Ripple Affidavit, Ex. 4 at ¶14; Ripple Depo. p. 63, lines 13-24).  Sgt. Ripple told him that

Mr. Rachel had been fighting but was now not breathing and asked him to check on Mr. Rachel. (Ripple Affidavit, Ex. 4 at ¶14).

The officers quickly removed the leg shackles and handcuffs and this neighbor/paramedic immediately checked for vital signs and then initiated CPR by doing chest compressions. (Ripple Affidavit, Ex. 4 at ¶14).   He continued to do these chest compressions until the paramedics arrived on the scene and took over for him.   (Ripple Affidavit, Ex. 4 at ¶14).

Sgt. Ripple last observed Mr. Rachel breathing less than a minute before they picked him up to try and move him to Officer McCann's patrol car.   (Ripple Affidavit, Ex. 4 at ¶14).   Had Sgt. Ripple noticed that Mr. Rachel was unconscious before picking him up, he would have had him unhandcuffed and unshackled in order to check his pulse, do CPR if necessary, and check his ABC's (airway, breathing and circulation).   (Ripple Depo, p. 61, lines 17-24).

Lt. Elia turned his vehicle around and returned to the scene when he was informed that there was a medical issue with Mr. Rachel. (Elia Depo, p. 56, line 25 to p. 57, line 6).   When Lt. Elia arrived back at the scene, he saw the neighbor paramedic performing compressions on Mr. Rachel. (Elia Depo, p. 57, line 15 to p. 58, line 5).

### Plaintiff's Medical Expert Dr. Carl Adams

Mr. Rachel was transported to the hospital where he was pronounced dead, and his body was extensively photographed. (Adams Depo, p. 203, lines 18- 22; p. 211, lines 23-24).

Plaintiff designated as their medical expert Dr. Carl Adams, a cardiovascular and thoracic surgeon.   Though the officers struggled with Mr. Rachel for an extensive period of time, Dr. Adams testified that Mr. Rachel had very little bruising, leaving it evident that the officers had not beaten Mr. Rachel.[11]   (Adams Depo, p. 182, lines 4-6; p. 183, lines 7-13).

---

[11] Likewise, Plaintiff's other expert, George Kirkham, agreed that the photographs and the medical examiner's report would contain evidence of a beating had one occurred.  (Kirkham Depo, p. 190, lines 10-22).

The local medical examiner declared the cause of Mr. Rachel's death to be Excited Delirium. (Adams Depo, p. 219 line 14 to p. 220, line 3).

Dr. Adams disagreed, testifying that the cause of death was not Excited Delirium but rather cardiac arrest due to asystole induced by the tasering. (Adams Depo, p. 25, lines 22-25; p. 219, line 14 to p. 220, line 3; p. 222, lines 16-20).

Mr. Rachel was tasered three to four times collectively in both prong and drive-stun mode, but Dr. Adams deemed the drive-stun deployment to be irrelevant to causation. (Adams Depo, p. 226, lines 8- 12).

Dr. Adams also opined that Tasers do not cause cardiac ischemia and death. (Adams Depo, p. 229, lines 21-22).

Dr. Adams testified that the fact that Mr. Rachel was handcuffed and shackled did not cause him to suffer cardiac arrhythmia or arrest. (Adams Depo, p. 200, line 22 to p. 201, line 4).

Other than the taser application, in assessing the police actions in this case, there is nothing else to which Dr. Adams attributes Mr. Rachel's cause of death. (Adams Depo, p. 289, lines 5-9).

### Training of City of Mobile Police Officers and Policies on Use of Force, Tasers, and Emotionally Disturbed Persons

James Barber has been Chief of Police for the City of Mobile Police Department since late 2013. (Barber affidavit, Ex. 3, ¶ 2).

Chief Barber joined the Department as a recruit in 1988, going through the Mobile police academy. (*Id.*). He served as a Deputy Chief from 2006 to 2013. (*Id.*).

The Department maintains its own police academy to provide minimum standards training to prospective police officers and additional training to existing officers on the force. (*Id.* at ¶ 3). This training meets and generally exceeds the minimum standards required under the Alabama Peace Officers Standards and Training Commission (APOST), which by statute sets the

minimum standards applicable to law enforcement officers in the State of Alabama, including the training required for those officers. (*Id.* at ¶ 3).

The officers involved in the arrest of Mr. Rachel all received their minimum standards training through the Department's academy. (*Id.* at ¶ 4).

The minimum standards training covers many different areas of law enforcement, including specific training with regard to arrest, custody, use of force and continuum of force, and the use of restraints. (*Id.* at ¶ 5). It also includes training regarding handling of mentally ill and emotionally disturbed persons as required by APOST standards. (*Id.* at ¶ 5).

Once officers complete minimum standards training, Mobile police officers are then required to ride with a Field Training Officer (FTO) for several months before they are allowed to work on their own. (*Id.* at ¶ 5).

While they ride with an FTO, the new officers continue to receive training in the field regarding the handling of suspects, arrests, use of force, use of restraints, and other matters. (*Id.* at ¶ 5). This field training can be extended depending on the FTO's decision. (*Id.* at ¶ 5).

City of Mobile police officers also receive training on criminal laws of the State of Alabama, provisions of the Constitution of the United States related to law enforcement, and city ordinances. (*Id.* at ¶ 6).

These officers receive both classroom and hands-on training in the use of force, and in dealing with the mentally ill and/or emotionally disturbed persons. (*Id.* at ¶ 6). While there is no way for training to cover every circumstance that an officer will encounter, it attempts to provide guidance to law enforcement officers regarding the issues they will confront in the field. (*Id.* at ¶ 6).

The minimum standards training and field training are provided by sworn law enforcement officers. (*Id.* at ¶ 6).

The Department also maintains procedural General Orders and other Memorandum Orders applicable to its sworn law enforcement officers. (Barber affidavit, ¶ 7; Ex. 3 A-E). Each officer is issued a copy of these procedural General Orders and Memorandum Orders, and is expected to be familiar with them in the performance of their job duties. (*Id.* at ¶ 7).[12]

These officers are further required to complete twelve hours of continuing education annually provided through the Mobile police academy on various issues, including appropriate use of force. (Id. at ¶ 7).

City of Mobile police officers who are issued a Taser or electronic control device (ECD) are required to complete an initial certification course, and to have that training updated on an annual basis. (*Id.* at ¶ 8). Both the initial certification training and annual renewal training are provided by sworn law enforcement officers certified by Taser International to provide such training. (*Id.* at ¶ 8).

In addition, law enforcement officers are trained on and expected to be familiar with Memorandum Order No. 2010-01 dated January 26, 2010 which concerns the use of Tasers and reporting of their use. (Id. at ¶ 8; Ex. 3-A).[13]

Though officers are trained to recognize signs and symptoms of individuals who may be mentally ill or emotionally disturbed, they are not trained to make any medical or psychological diagnoses in the field. (*Id.* at ¶ 8).

---

[12] Lt. Elia testified that the Department allows officers discretion to deviate from these as there are so many unanticipated situations that officers may have to deviate from them in order to handle such situations. (Elia Depo, p. 52, line 22 to p. 53, line 14). Sgt. Ripple likewise testified that officers retain discretion to deviate from these if needed for the same reason. (Ripple Depo, p. 18, lines 3-8).

[13] Officer McCann testified in accordance with this Memorandum Order, agreeing that "the Taser may be used to controlled dangerous or violent subjects when deadly physical force does not appear to be justified and/or necessary," and when "attempts to subdue the subject by other conventional tactics have been or will likely be ineffective in the situation, or there is a reasonable expectation that it will be unsafe for officers to approach within contact range of the subject." (McCann Depo, p. 294, lines 8-22).

When officers encounter an individual who they suspect may be mentally ill or emotionally disturbed, but who is subject to arrest and is violently or otherwise resisting arrest, those officers are trained to follow their training and the department's policies on use of force and restraints in order to take that person into custody and to request medical assistance to evaluate that individual. (*Id.* at ¶ 8).

The policies and procedures of the Department allow officers to use maximum restraints, which are sometimes also referred to as four point restraints, five point restraints and/or hog-tying. (*Id.* at ¶ 9; Ex. 3-B and 3-C).

These Memorandum Orders, together with certain portions of General Order No. 70 dated June 28, 2011, address handling encounters with mentally ill and/or emotionally disturbed persons and provide guidance to officers about recognizing and dealing with individuals experiencing an excited state or excited delirium.[14] (*Id.* at ¶ 9; Ex. 3-D).

These Memorandum Orders, General Orders, and the other training provided to officers regarding the handling of mentally ill and emotionally disturbed persons give the officers some guidance about how to identify mentally ill and emotionally disturbed persons; however, there are times when force must be employed in order to place a suspect under arrest, and a suspect must be placed in restraints, regardless of whether that suspect is determined to be mentally ill or emotionally disturbed. (*Id.* at ¶ 9).

Here, where the officers had probable cause to arrest Mr. Rachel for domestic violence and attempted murder, the objective circumstances were such that a reasonable police officer would conclude that Mr. Rachel posed a danger to the officers, to the victim, to the wider community, and even to himself. (*Id.* at ¶ 9).

---

[14] Officer Jackson acknowledges receiving in his possession from the Department the Memorandum Order dealing with emotionally disturbed persons dated March 24, 2011, though he had not read it before the night in question. (Jackson Depo, p. 25, line 24 to p. 26, line 13).

The procedural General Orders and Memorandum Orders of the Department do not prohibit the use of a Taser to aid in the arrest of, or the use of maximum or four-point restraints to restrain, a mentally ill or an emotionally disturbed suspect when it is deemed appropriate by the arresting officers based on the behavior of the suspect. (*Id.* at ¶ 10).

If a suspect is resisting arrest and continues to resist arrest, law enforcement officers may within their discretion deploy a Taser against the suspect and use maximum restraints in taking such suspect into custody in order to protect themselves or another from physical harm, to restrain or subdue the suspect, and to bring the situation safely and effectively under control for the safety of the officers, the victim, the public, and the suspect being arrested. (*Id.* at ¶ 10).

The Department also maintains General Order No. 1 dated June 25, 2008, which concerns the use of force including the use of less lethal weapons such as a Taser. (*Id.* at ¶ 11; Ex. 3-E).

The purpose of using lethal force is to subdue or render a "suspect nonthreatening with a lower probability of effecting fatal consequences," which recognizes that there is still a degree of risk. (*Id.* at ¶ 11).

Officers are authorized to use their discretion to employ less lethal force when a subject is displaying behavior or performing actions that the officer determines threaten bodily injury to officers, to the victim, to the wider public, or to the suspect himself. (*Id.* at ¶ 11).

## CONCLUSIONS OF LAW

Under the Federal Rules of Civil Procedure, summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." A factual dispute is genuine if "a reasonable jury could return a verdict for the non-moving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991).

The moving party bears the burden of proving that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the district court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999).

Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions must show that there are specific facts demonstrating that there is a genuine issue for trial. FED.R.CIV.P. 56(e); *Celotex*, 477 U.S. at 324.

The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004).

"An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010)(en banc).

Where the City's liability for "neglect, carelessness, or unskillfulness" rests upon the acts of its police officers under *respondeat superior* principles, the City is entitled to summary judgment on such claim to the same extent that Officer Defendants McCann, Jackson, Ripple and Elia are so entitled.

It is well established that, if a municipal police officer is immune pursuant to ALA.CODE § 6-5-338(a), then pursuant to ALA.CODE § 6-5-338(b), the city by which he is employed is also

immune. *Ex parte Dixon*, 55 So. 3d 1171, 1179 (Ala. 2010); *see also Ex parte City of Tuskegee*, 932 So. 2d 895 (Ala. 2005); *City of Bayou La Batre v. Robinson*, 785 So. 2d 1128 (Ala. 2000).

Peace officers are "generally immune from state-law tort liability under Alabama Code § 6-5-338." *Gaillard v. Commins*, 562 Fed.Appx. 870, 877-878 (11th Cir. 2014).

This immunity from civil liability extends to acts "arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." ALA.CODE § 6-5-338(a). This includes acts arising from the "enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons." *Ex parte Butts*, 775 So. 2d 173, 178 (Ala. 2000).

"An exception applies for acts committed 'willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.'" *Gaillard*, 562 Fed.Appx. at 878 (*quoting Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000)).

As stated recently by this Court:

> Under *Cranman*, state-agent immunity is subject to a burden-shifting framework. The police officer bears the burden of demonstrating that the plaintiff's claims arise from a function that would give rise to immunity. When the police officer has shown this, the burden shifts to the plaintiff to show that the police officer "'acted willfully, maliciously, fraudulently, in bad faith, or beyond his authority.'"

*Howard v. Hudson*, Civil Action No. 13-0247-KD-N, 2014 WL 5500731 (S.D. Ala. Oct. 30, 2014)(citations omitted).

Under the doctrine of state agent immunity, a public actor, such as a law enforcement official, who is exercising discretionary authority is immune from claims that merely allege negligence, unskillfulness, or carelessness with respect to injuries arising out of those functions. *Carver v. City of Pell City*, No. 4:13-cv-00906-VEH, 2015 WL 114198, *13 (N.D.Ala. Jan. 8, 2015).

In addition, "poor judgment or wanton misconduct, an aggravated form of negligence, does not rise to the level of willfulness and maliciousness necessary to put the State agent beyond the immunity recognized in *Cranman*." *Ex parte Randall*, 971 So. 2d 652, 664 (Ala. 2007).

The Alabama Supreme Court has held that immunity applies to the conduct of officers in the effectuation of an arrest. *See Ex parte City of Montgomery*, 758 So. 2d 565, 570 (Ala. 1999); *Borders v. City of Huntsville*, 875 So. 2d 1168 (Ala. 2003); *Telfare v. City of Huntsville*, 841 So. 2d 1222 (Ala. 2002); *see also Wood v. Kesler*, 323 F.3d 872, 884 (11th Cir. 2003)(performing an arrest is discretionary act); *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004)(making arrest is within discretionary authority).

The manner of arrest including the use of force is also discretionary. *Thurmond v. City of Huntsville*, 904 So. 2d 314, 325-326 (Ala. 2004); *City of Birmingham v. Sutherland*, 834 So. 2d 755, 762 (Ala. 2002).

The evidence is undisputed that Defendants McCann, Jackson, Ripple, and Elia were police officers with the City of Mobile police department and on duty in the early morning hours of May 1, 2012 when they responded to the Rachel residence, and the actions they undertook referenced previously in the Findings of Fact were undertaken in the course of their duties as sworn law enforcement officers in order to effect the lawful arrest of Mr. Rachel.

The actions of the officers in attempting to arrest Mr. Rachel, in determining the degree of force to be used in such effort in light of Mr. Rachel's resistance, as well as the measures needed to restrain Mr. Rachel from being a danger to himself, the officers, and others, are all discretionary functions entitling the officers and the City to immunity under ALA.CODE § 6-5-338 and its case law progeny. *See, e.g., Thurmond, supra*, 904 So. 2d at 325-326; *City of Birmingham v. Sutherland, supra*, 834 So. 2d at 762.

25

Officer McCann having met his burden of showing that the claims against the him arise from functions which give rise to immunity, the burden shifts to Plaintiff to demonstrate that the evidence falls within one of the above exceptions.

Plaintiff cannot meet this burden, and summary judgment is therefore due to be granted in favor of Officer McCann on immunity grounds under ALA.CODE § 6-5-338.

The City has an established police academy which conducts the training of new officers which meets established state statutory standards (ALA.CODE § 36-21-41 *et seq.*), and each of the defendant police officers attended this academy. Following successful completion of academy training, the new officers ride along with a Field Training Officer (FTO) for three months for additional training before being allowed to work as a police officer "solo." This training is conducted by sworn law enforcement officers.

Officer Jackson is entitled to qualified immunity as to Plaintiff's claims against him in his individual capacity for excessive force and deliberate indifference.

"Qualified immunity protects government officials performing discretionary functions from civil trials and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Perkins v. City of Creola,* 713 F. Supp. 2d 1326, 1337 (S. D. Ala. 2010); *see also Black v. City of Mobile*, CIV.A. 12-0413-CG-B, 2013 WL 4009655 (S. D. Ala. Aug. 5, 2013)(quoting *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1149 (11th Cir.1994)).

"The qualified immunity analysis consists of two separate components: first, the government official must establish that . . . he acted within the scope of discretionary authority when the alleged wrongful acts occurred, and second, the plaintiff must demonstrate that the official's actions violated clearly established rights." *Griswold v. Alabama Dept. of Indus. Relations*, 903 F.Supp. 1492, 1497 (M.D. Ala. 1995).

26

The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation. *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987). *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

Officer McCann was acting within the scope of his discretionary authority when the alleged wrongful acts occurred.

"Discretionary authority" includes all actions of a government official that 1) "were undertaken pursuant to the performance of his duties," and 2) were "within the scope of his authority." *Griswold v. Alabama Dept. of Indus. Relations,* 903 F.Supp. at 1497.

"Making an arrest is clearly within the official responsibilities of a police officer." *Christman v. Pietrzak*, 296 F. App'x 783, 786 (11th Cir. 2008); *see also Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004).

Responding to 911 calls are also discretionary acts. *Schwartz v. Gwinnett Cnty., Ga.*, 924 F. Supp. 2d 1362, 1377 (N.D. Ga. 2013).

Likewise, using force to make an arrest on a noncompliant suspect is discretionary. (Kirkham Depo., p. 149, lines 3-12).

The Supreme Court has set forth a two-part analysis for determining whether qualified immunity is appropriate. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). First, the court must ask this *threshold question*: Do the facts alleged show the Defendant's conduct violated a constitutional right? *Id.* Second, the Court must determine if this constitutional right was clearly established? *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003).

This inquiry is "undertaken in light of the specific context of the case, not as a broad general proposition." *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012).

Officer John Jackson having met his burden that he was performing discretionary functions of his job at the time the wrongful acts occurred, the burden shifts to Plaintiff to show

that Officer Jackson violated Mr. Rachel's constitutional rights, nor can she establish that the right was clearly established under the facts of this case.

Officer Jackson had probable cause to arrest Mr. Rachel for Domestic Violence. A person commits the crime of domestic violence under Alabama law if the person commits the crime of assault and the victim is the current spouse. ALA. CODE § 13A-6-21.

Police officers may arrest a person without a warrant, on any day and at any time when an offense involves domestic violence. ALA. CODE § 15-10-3 (1975).

An arrest does not violate the Fourth Amendment if a police officer has probable cause. *Lee v. Ferraro,* 284 F.3d 1188, 1194-95 (11th Cir. 2002). "In order for probable cause to exist, 'an arrest [must] be objectively reasonable under the totality of the circumstances.'" *Rankin v. Evans,* 133 F.3d 1425, 1435 (11th Cir.1998)." *Shortz v. City of Montgomery,* 267 F. Supp. 2d 1124, 1127 (M.D. Ala. 2003).

"The objectively reasonable standard is met when the facts and circumstances within the officer's knowledge of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Shortz v. City of Montgomery,* 267 F. Supp. 2d 1124, 1127 (M.D. Ala. 2003)(internal quotes omitted).

Officer Jackson rightly concluded that the crime of domestic violence had been committed after he spoke with Mrs. Fresh and observed the bruises around her neck and blood on her lip and fingers.

Officer Jackson was also informed that Mr. Rachel was a big guy and currently out of his mind. (Fresh Depo., p. 134, lines 13-21).

A reasonable officer would conclude that Mr. Rachel had committed the crime of domestic violence and presented a danger to Mrs. Fresh and possibly others. (*See* Jackson Depo., p. 60, line 16 to p. 61, line 20).

Plaintiff's expert does not dispute that the officers had probable cause to arrest Mr. Rachel and, in fact, agrees that the officers had no choice but to arrest him. (Kirkham Depo., p. 197, line 6-10; p. 237, line 20 to p. 238, line 10).

Officer Jackson's use of force to make the arrest was not only not excessive, but reasonable in light of the severity of the crime and the immediate threat of safety to the officers and others.

"When determining whether the force used to effect [an arrest] is reasonable . . ., a court must carefully balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests.' " *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1305 -1306 (11th Cir. 2009) (internal citations omitted).

"To balance the necessity of the use of force used against the arrestee's constitutional rights, a court must evaluate several factors", including 1) the severity of the crime at issue, 2) whether the suspect poses an immediate threat to the safety of the officers or others, and 3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.*

"Additional factors include: 4) the need for the application of force, 5) the relationship between the need and the amount of force used, 6) the extent of the injury inflicted and, 7) whether the force was applied in good faith or maliciously and sadistically. *Borton v. City of Dothan*, 734 F.Supp.2d 1237, 1248 (M.D. Ala. 2010).

"The use of force must be judged on a case-by-case basis from the perspective of a reasonable officer on the scene," rather than "with the 20/20 vision of hindsight." *Id.*

The determination of reasonableness "must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving[.]" *Beshers v. Harrison*, 495 F.3d 1260, 1266 (11th Cir. 2007).

Courts in the Eleventh Circuit have found that the use of force was neither excessive nor unconstitutional when the arrestee actively resisted arrest.

In *Mann v. Taser Intern., Inc.*, 588 F.3d 1291, 1305 -1306 (11th Cir. 2009), deputies responded to a 911 call where the arrestee was in an agitated state and experiencing a case of excited delirium brought about from methamphetamine use. *Id.* at 1299.

The deputies requested the arrestee to put her hands behind her back and the arrestee initially complied, but began to resist when the deputies attempted to handcuff her. She became combative: screaming, kicking, and attempting to head butt the deputies.

The deputies managed to handcuff and shackle her, but she continued to resist. *Id.* at 1299-1300.

After a warning, a deputy tased the arrestee three times. *Id.* at 1300. The Taser did not have the intended effect and the arrestee continued her aggressive resistance. *Id.*

The arrestee continued to talk, breathe, and respond. Although the arrestee did not appear injured, she subsequently died.

The court held that the use of the Taser was appropriate given the countervailing government interest of safety and compliance, and reasoned that the arrestee's behavior was violent, aggressive, and prolonged, and the evidence demonstrated that she was clearly a danger to herself and others. *Id.*

In *Buckley v. Haddock*, 292 Fed. Appx. 791 (11th. Cir. 2008)(qualified immunity granted), the court held that the deputy's graduating use of force culminating with the repeated

use of a Taser, to move the arrestee to the patrol car was not unconstitutionally excessive because the arrestee resisted arrest. *Id.* at 798-799.

In *Magee v. City of Daphne,* 2006 WL 3791971, cv. 05-0633-WS-M, *10 (S.D. Ala. Dec. 20, 2006) (qualified immunity granted), this Court stated that the use of force to arrest a non-compliant suspect for a crime of domestic violence reported minutes earlier was "far from being constitutionally unreasonable and excessive". *Id.* at * 10.

There was a clear need to apply force under the circumstances and there is no reason to believe that the officers were proceeding in bad faith, maliciously, or sadistically.   Given the circumstances, no reasonable officer on the scene could have concluded that the officers used excessive force.

In *Draper v. Reynolds,* 369 F.3d 1270 (11th Cir. 2004)(qualified immunity granted), the court held that use of a Taser was reasonably proportionate to the difficult, tense and uncertain situation the arrestee created when he refused multiple times to comply with the officer's commands, used profanity, and repeatedly yelled.

Based on the totality of the circumstances, the officer's single use of a taser gun did not constitute excessive force and may have prevented a physical struggle and serious harm to either the arrestee or the officer.  *Draper v. Reynolds,* 369 F.3d 1270, 1278 (11th Cir. 2004).

Examination of the relevant factors inexorably lead to the conclusion that the force applied was reasonable in this case.

*Domestic Violence is a severe crime.*   Mr. Rachel was being arrested for Domestic Violence, a class B Felony.  (Kirkham Depo, p. 142, lines 24-25).  The violence was so severe that Ms. Fresh thought she was going to die and she told that to Officer McCann before Officer McCann attempted to arrest Mr. Rachel.  (Fresh Depo, p. 171, lines 3-13).  Ms. Fresh fled her home with her children in the middle of the night.  (Fresh Depo, p. 136, lines 11-19).  Ms. Fresh

woke up her neighbors seeking their help and refuge in their home because of Mr. Rachel's criminal actions. (Fresh Depo, p. 128, line 24 to p. 129, line 13). Officer McCann was dispatched to the scene in response to a 911 call of domestic violence. After talking with Mrs. Fresh and observing her injuries, Officer McCann approached Mr. Rachel to arrest him for domestic violence. (Jackson Depo, p. 126, line 15 to p. 127, line 18; McCann Depo, p. 158, lines 4-12). Based on these facts, a reasonable officer would conclude that the domestic violence in this case was very severe.

*Delusional suspects pose an immediate threat to the safety of officers and others.* Mr. Rachel was experiencing excited delirium at the time of the encounter with the officers like the arrestee in *Mann*. Mr. Rachel was delusional and "out of his mind". A delusional suspect presents a "heightened possibility of threat to the officers and others." *Green v. Garris*, 2008 WL 2222321, *6 (M.D. Fla., May 28, 2008). Based on this fact, a reasonable officer would conclude that Mr. Rachel posed an immediate threat to safety.

*Mr. Rachel was attempting to resist the officers.* Like the arrestees in *Mann, Buckley, Magee*, and *Draper*, Mr. Rachel resisted arrest. Mr. Rachel was given several warnings and commands to get on the ground, stop resisting, put his hands behind his back, etc. The refusal of lawful commands constitutes active resistance. *Magee v. City of Daphne,* 2006 WL 3791971, *10 (S.D. Ala. Dec. 20, 2006). Based on these facts, a reasonable officer would conclude that Mr. Rachel was actively resisting arrest.

*Mr. Rachel's resistance created a need for force.* Officer Jackson did not use force until Mr. Rachel got combative with the officers and failed to comply with their commands. (Jackson Depo, p. 77, lines 4-16). Officer Jackson tased Mr. Rachel, but when the tasing did not prompt Mr. Rachel to comply, Officer McCann attempted to physically handcuff him (McCann Depo, p. 175, line 24). Mr. Rachel began kicking Officer McCann, which led to Officer McCann striking

Mr. Rachel in the legs three times with the Monadnock. (McCann Depo, p. 177, line 10 to p. 178 line 9)  Based on these facts, a reasonable officer would conclude that Mr. Rachel's resistance created a need for force.

*Mr. Rachel's visible injuries were de minimis.*  Mr. Rachel sustained a few lacerations, which were consistent with the struggle he had with his wife and the subsequent struggle with the officers.  However, it was evident from the autopsy photos that he did not sustain a beating. (Adams Depo, p. 182, lines 4-6; p. 183, lines 7-13).  Unfortunately, like the arrestee in *Mann,* Mr. Rachel passed away shortly after he was handcuffed.

*Officer Jackson applied force in good faith, and not maliciously for the purpose of inflicting pain.*  There was a need to arrest Mr. Rachel for the safety of Ms. Fresh and others, but due to his combative and aggressive disposition, Officer Jackson could not arrest him without force.  Officer Jackson gave Mr. Rachel several warnings and several chances to comply with the lawful commands.   The force applied to Mr. Rachel was done to accomplish the task of handcuffing and shackling Mr. Rachel.   Once Mr. Rachel was cuffed and shackled, Officer Jackson discontinued use of force.  Moreover, Officer Jackson did not know Mr. Rachel, nor had he heard anything about him, before that date and therefore had no personal malice against him. On these facts, a reasonable officer would conclude that the force was applied in good faith.

Applying the rules in *Mann, Buckley, Magee,* and *Draper* to the above circumstances, the Court finds that the use of force in this case was neither excessive nor unconstitutional.

Officer McCann was not deliberately indifferent to Mr. Rachel's serious medical needs.

In order to prevail on a deliberate indifference to serious medical need claim, Plaintiff must show: 1) a serious medical need; 2) the defendants' deliberate indifference to that need; and 3) causation between the indifference and the plaintiff's injury. *Mann,* 588 F.3d at 1306.

Although excited delirium has been recognized as a serious medical need, Plaintiff has failed to show that excited delirium was the cause of death. *See Id.* at 1307.

Although the death certificate listed excited delirium as the cause of death, Plaintiff's medical expert, Dr. Adams stated that Mr. Rachel was not suffering from excited delirium because "he wasn't taking a man-made substance." (Adams Depo, p. 202, lines 14-16). Therefore, Plaintiff has to establish that Mr. Rachel had a serious medical need.

"A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mann*, 588 F.3d at 1307.

Alternatively, a serious medical need is established where a delay in treatment worsens the condition. *Id.*

"[T]he medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Id.*

With regard to the second element, Plaintiff has to prove that the officers were deliberately indifferent to Mr. Rachel's medical needs. This requires Plaintiff to show: 1) the officer's subjective knowledge of a risk of serious harm, 2) disregard of that risk; and 3) conduct that is more than mere negligence. *Mann*, 588 F.3d at 1307.

In order to have subjective knowledge, the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Rodriguez v. Secretary for Department of Corrections*, 508 F.3d 611, 617 (11th Cir. 2007).

"[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference.

In *Mann,* the Court held that officers could not be responsible for deliberate indifference where they did not have prior knowledge that excited delirium carries a risk of death. *Mann,* 588 F.3d at 1307.

Although Officer McCann had knowledge that Mr. Rachel was "out of his mind", he did not know the medical cause (i.e. mental illness, physical injury, drug – induced). Officer McCann was not aware that Mr. Rachel suffered from excited delirium, nor did he know of that excited delirium accompanies a risk of death. (McCann Depo. p. 112, lines 10-13).

Mr. Rachel's resistance and verbal communication was such that Mr. Rachel appeared to be agitated but not that he was in immediate medical danger. (McCann Depo, p. 202, lines 4-5). "The Constitution does not require an arresting police officer or jail official to seek medical attention for every arrestee or inmate[.]" *Mann,* 588 F.3d at 1308.

Further, an officer can only disregard the risk of serious harm by "failing to take reasonable measures to abate it." *Chandler v. Crosby,* 379 F.3d 1278, 1296 (11th Cir. 2004). Officer McCann took the precautionary measure of calling his Sergeant regarding Mr. Rachel and expressed to him that the suspect was delusional. (McCann Depo, p. 148 lines 8 - 19).

Far from being deliberately indifferent, Officer McCann took reasonable and responsible actions once he deployed his Taser. Moreover, it is undisputed that Officer McCann followed established Mobile Policed Department policy by calling "Code Zebra" promptly after he deployed his Taser, which informs the unit that someone had been tased and prompts the dispatcher to send a paramedic to the scene. (McCann Depo, p. 199 line 23 - p. 200 line 5; Ripple Depo, p. 62, lines 16-25). The Plaintiff must prove more than "mere negligence or a mistake in judgment". *Mann,* 588 F.3d at 1308.

On these facts, Plaintiff cannot show Officer Jackson's actions constituted deliberate indifference.

Officer Jackson is entitled to qualified immunity because the preexisting law does not give him fair and clear notice that his conduct would violate the law (*clearly established*). *See Buckey v. Haddock,* 292 Fed. Appx. 791 (11th Cir. 2008).

Even if an officer's use of force is found to be excessive, he is entitled to qualified immunity if no *clearly established* federal rights were violated. *Buckley v. Haddock,* 292 Fed. Appx. 791, 796 (11th Cir. 2008).

When faced with critical decisions, police officers are not required to err on the side of caution. *Id.* at 797.

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* To prevail, Plaintiff must show that there is "fair and clear notice that an official's conduct will violate federal law." *Id.*

Given the law cited in *Mann, Buckley, Magee,* and *Draper,* which supports the use of force on these facts, Plaintiff cannot meet her burden. Further, it is also not *clearly established* that officers should be held liable for deliberate indifference when the officer does not know that an arrestee has a serious medical need accompanied by a risk of death. Officer McCann is entitled to qualified immunity as to Plaintiff's § 1983 claim.

"[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 166 (1985) (citing *Brandon v. Holt,* 469 U.S. 464, 471-72 (1985); *see also Owens v. Fulton County,* 877 F.2d 947, 951, n. 5 (11th Cir.1989).

"[T]here no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly. . . ." *Busby v. City of Orlando,* 931 F.2d 764, 776 (11th Cir. 1991).

Thus, when a suit is filed against both a governmental entity and the entity's employees in their official capacities, it is appropriate for the Court to dismiss the named individual defendants in their official capacities as "redundant and possibly confusing to the jury." *Id.*

Since the § 1983 claims against the City of Mobile was voluntarily dismissed by Plaintiff, the remaining official capacity claim against the individual defendants should also be deemed dismissed.

Pursuant to ALA. CODE § 6-5-338, every peace officer shall have immunity from tort liability arising out of his conduct in performance of any discretionary function within the line and scope of his law enforcement duties.   Statutory immunity is analyzed under the same framework as the state agent immunity. *Magee,* 2006 WL 3791971, * 15 (S.D. Ala. 2006).

Pursuant to common law, "a State agent shall be immune from civil liability in his . . . personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's exercising judgment in the enforcement of the criminal laws of the State including, but not limited to, law enforcement officers' arresting or attempting to arrest person." *Ex parte Cranman,* 792 So.2d 392, 405 (Ala. 2000).

The sole exception to state-agent immunity is "when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Id.* at * 15.

There is no dispute that Officer Jackson is a police officer/peace officer whose duties includes enforcement of criminal laws, nor is there any question that the conduct made the basis of plaintiff's claims against him is based on his exercise of judgment in arresting or attempting to arrest Mr. Rachel.

Therefore, Officer Jackson  is entitled to statutory (peace officer) immunity and common law (state-agent) immunity.  Furthermore, Officer Jackson's actions show that he was acting in

good faith, without fraud or malice.  Therefore, Officer Jackson is entitled to peace officer and state-agent immunity as to Plaintiff's state law claims.

       **DONE** and **ORDERED** on this the ___ day of _____, 2015.


_____
UNITED STATES DISTRICT JUDGE