# EXHIBIT "C"

**CHRISTOPHER McCANN**

```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF ALABAMA
                     SOUTHERN DIVISION


AMY RACHEL, as Administratrix    *
of the Estate of GREGORY RACHEL,*
Deceased,                        *
                                 *
          Plaintiff,             *
                                 *
vs.                              *   CASE NUMBER:
                                 *   1:13-CV-00522-WS-M
CITY OF MOBILE, ALABAMA,         *
et al.,                          *
                                 *
          Defendants.            *
```

```
      The video deposition of CHRISTOPHER McCANN was
taken before Patsy C. Poteat, CCR, as Commissioner,
on December 17, 2014, by the Plaintiff, commencing at
1:40 p.m., at the law offices of Burr & Forman, LLP,
located at 11 North Water Street, Suite 22200,
Mobile, Alabama.
```

**CHRISTOPHER McCANN**

1        Is that fair?

2  A    That's fair enough.

3  Q    Okay.  Where do you -- Well, where are you

4        from?  Where did you grow up?

5  A    I'm from the Mobile area.

6  Q    What part?

7  A    Grew up in the Saraland/Satsuma area.

8  Q    Did you go to high school or anything?

9  A    I did.

10  Q    Where did you go?

11  A    Satsuma High School.

12  Q    When did you graduate high school?

13  A    1996.

14  Q    And that would make you how old?

15  A    I am 37.

16  Q    So if we take from the moment you graduated --

17        from the time you graduated high school up

18        until today, is that going to be a lot of

19        jobs, if I ask you, that you've held?

20  A    No, it wouldn't be that many.

21  Q    You work for the Mobile Police Department now

22        -- or the City of Mobile?

23  A    City of Mobile, yes, sir.

24  Q    How long have you worked there?

25  A    Seven and a half years.

**CHRISTOPHER McCANN**

12

| | | |
|---|---|---|
| 1 | Q | All right.  Which would start when? 2007? |
| 2 | A | Yes, sir.  July 23. |
| 3 | Q | All right.  Before being employed with the |
| 4 | | City of Mobile, where did you work? |
| 5 | A | Prior to that, I worked as an assistant |
| 6 | | manager at Rich's Car Wash. |
| 7 | Q | Where is that? |
| 8 | A | Well, there are several branches.  The one I |
| 9 | | was at was in Saraland. |
| 10 | Q | How long were you there? |
| 11 | A | I was just there a few months.  Probably six |
| 12 | | months. |
| 13 | Q | Did you have a job before assisting at Rich's |
| 14 | | Car Wash? |
| 15 | A | I did.  I was at Industrial Valve for about |
| 16 | | three months prior to that. |
| 17 | Q | What did you do at Industrial Valve? |
| 18 | A | I worked in customer service there. |
| 19 | Q | Like answering phones? |
| 20 | A | Yeah.  More or less.  Inside sales. |
| 21 | Q | I can't believe that only lasted three months. |
| 22 | A | It wasn't for me. |
| 23 | Q | I guess so.  All right.  What about before |
| 24 | | Industrial Valve, did you have a job? |
| 25 | A | I spent five years in the U.S. Army. |

## CHRISTOPHER McCANN

```
 1   Q      How tall are you?

 2   A      Six-two.

 3   Q      And as of May of 2012, how much did you weigh?

 4   A      I was less then.  Probably -- I was probably

 5          250 -- 245, 250.

 6

 7                 (Exhibit Number 32 was marked for

 8                  identification.)

 9

10   Q      I'll show you what I'm going to mark as

11          Plaintiff's Exhibit 32, and I'll ask you if

12          that's a photograph of you?

13   A      Yeah, that's me.

14   Q      It is Bates-stamped --

15                 MR. HENINGER:

16                     Mark, what is that Bates stamp at the

17                     bottom?

18                 MR. NEWELL:

19                     City 231.

20

21                 (Exhibit Number 33 was marked for

22                  identification.)

23

24   BY MR. HENINGER:

25   Q      Let me show you what I'm going to mark as
```

CHRISTOPHER McCANN

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And that training involved providing medical |
| 3 | | attention to someone that's in custody? |
| 4 | A | Medical attention, no. |
| 5 | Q | Did any of that training involve how you deal |
| 6 | | with people that are suspected to be on drugs? |
| 7 | A | Yes. |
| 8 | Q | Did any of that material cover how you were to |
| 9 | | respond to people that you suspect may be |
| 10 | | emotionally disturbed? |
| 11 | A | No, not at the time. |
| 12 | Q | If you will, Officer McCann, preserve that |
| 13 | | material, because I'm going to ask your lawyer |
| 14 | | to provide what it is in your trunk that |
| 15 | | applies to my questions.  Okay?  And I'll get |
| 16 | | something more specific for it.  All right? |
| 17 | | Just don't do anything with it.  Okay? |
| 18 | A | Okay. |
| 19 | Q | Any reason that you keep it in the trunk of |
| 20 | | your car? |
| 21 | A | Well, if I ever needed to reference it at some |
| 22 | | point, it will be there.  I mean, we get |
| 23 | | issued general orders, memorandum orders, and |
| 24 | | things like that, regulations involving a |
| 25 | | department, as far as what -- what our |

**CHRISTOPHER McCANN**

36

```
 1              protocol is on certain situations.  And I
 2              would say probably 90 percent of what I
 3              retained from the academy and keep in the
 4              trunk of my car would be that stuff.  It would
 5              be memorandum and general orders.  It would be
 6              regulations.  It would be --
 7     Q        So the material in your trunk is not all from
 8              the academy; part of it is from the police
 9              department?
10     A        That's correct.  And it was given to us during
11              the police academy originally.  And those --
12              Those regulations get updated from time to
13              time.
14     Q        So does the Mobile Police Department run the
15              Mobile Police Academy?
16     A        Yes.
17     Q        Okay.  So there's going to be consistency
18              between the guidelines for the Mobile Police
19              Department and the training you received at
20              the academy?
21     A        Yes, sir.
22     Q        Same people?
23     A        Um-hum.  Yes, sir.
24     Q        All right.  What is your current position,
25              Mr. McCann?
```

## CHRISTOPHER McCANN

1     let's say, you know, they will go over and

2     say, "Hey, this is how this needs to be done.

3     If it was done this way, it needs to be done

4     this way." That sort of thing.

5         And then we also get one week a year out

6     at the firing range, where we requalify with

7     our handgun. We get some hand-to-hand combat

8     training now with it one week a year. And we

9     also requalify, obviously, with our handgun

10    during that time. And we also get a series of

11    classes from a number of different instructors

12    with the police department on any laws that

13    have changed, any new regulations within the

14    department, anything that's been updated,

15    anything that we need to know about that's

16    different from this year as opposed to last

17    year. And we get that one week a year.

18  Q   I don't remember where I saw it, Mr. McCann.

19    But it looks like there was some in-service

20    training?

21  A   That's what I'm referring to.

22  Q   That's to take classes from an instructor one

23    week a year?

24  A   Yeah. That's -- That's when you requalify

25    your weapon and you go for those classes.

**CHRISTOPHER McCANN**

42

```
 1          It's called in-service.
 2    Q     All right.  So that in-service is one time a
 3          year for a week you're -- That's right?
 4    A     Um-hum.
 5    Q     Once a week, one week, one time a year.  And
 6          that includes requalifying for the firearm?
 7    A     Um-hum.
 8    Q     Say "yes."
 9    A     Yes, sir.
10    Q     And you said you receive training now on
11          hand-to-hand combat?
12    A     Yes, sir.
13    Q     And you also -- The instructor comes in and
14          instructs you on law changes or changes in
15          policy from the past year?
16    A     That's correct.  We also -- we also get -- We
17          also get taser recertification during that
18          week every year.
19    Q     Okay.  Anything else?
20    A     I think that -- I think that's it.
21    Q     When does this usually occur?
22    A     When does it usually occur?  It's different
23          for every officer.  They can't send every
24          officer out there at once, because they need
25          so many on the street.
```

CHRISTOPHER McCANN

```
 1   Q     Right.
 2   A     So they'll send a group of us.  And they just
 3         pretty much randomly assign us to, you know --
 4         you know, a group of officers that go one week
 5         during the year.  And in-service pretty much
 6         goes anywhere from March all the way to
 7         August.  And they'll assign you a week during
 8         those six or seven months.  My week is in
 9         June.
10   Q     When you have these in-service training weeks,
11         do they provide you written material?
12   A     Some.
13   Q     If the law changes or policy changes, do they
14         give it to you?
15   A     Yes.
16   Q     And you stick that in your car?
17   A     That's correct.
18   Q     Is there an individual that typically leads
19         these in-service training programs?
20   A     Is there -- yes, there is -- Well, there is
21         range instructors that are out there that
22         pretty much are over the range.  They don't
23         lead every class per se.  They pretty much
24         are, you know, groundkeepers, as far as, you
25         know, keeping positive control of the range
```

**CHRISTOPHER McCANN**

44

| | | |
|---|---|---|
| 1 | | and so forth.  And they run it.  You know, |
| 2 | | they do -- They do provide instruction on |
| 3 | | firearms and requalifying with our weapons. |
| 4 | | But as far as any laws or department policies |
| 5 | | that have been changed, they'll bring in |
| 6 | | different officers -- |
| 7 | Q | Is there any officer -- |
| 8 | A | -- from the department to do that. |
| 9 | Q | Is there any officer or administrator at the |
| 10 | | Mobile Police Department that oversees the |
| 11 | | classes of instruction on changes in the law |
| 12 | | or new policies? |
| 13 | A | Yeah, Judge -- Actually, they don't use a |
| 14 | | police officer.  Actually, it's Judge Wanda |
| 15 | | Rahman, who generally does that. |
| 16 | Q | Rahman, is that R-A-M-O-N? |
| 17 | A | I'm not sure how it's spelled. |
| 18 | Q | Is there an individual that is in charge of |
| 19 | | making sure the hand-to-hand combat |
| 20 | | certification or training is completed? |
| 21 | A | Yes. |
| 22 | Q | Who is that? |
| 23 | A | Well, last year was the first year we did |
| 24 | | that.  And they just -- They just instituted |
| 25 | | that last year.  And it was Corporal Partridge |

**CHRISTOPHER McCANN**

```
1    A    I doubt it.
2               MR. NEWELL:
3                    Object to the form.
4    Q    So does Mobile Police Department keep up with
5         when you go to training, when you get
6         recertified or requalified with your firearm
7         and the taser recertification?
8    A    Yes, they keep up with that.
9    Q    Is that in your personnel file?
10   A    Yes.
11   Q    Do you know that you have one?
12   A    I'm sure I have one.
13   Q    Do you know where it's kept?
14   A    I think Internal Affairs keeps it.
15   Q    Is it called a personnel file?
16   A    I believe so.
17   Q    Have you seen it?
18   A    No, I've never asked them to look at it.
19   Q    This roll call that you mentioned that happens
20        every evening with your squad, --
21   A    Um-hum.
22   Q    -- have you ever had any of those meetings in
23        which you discussed other officers' encounters
24        with emotionally-disturbed persons?
25   A    Yes.
```

**CHRISTOPHER McCANN**

1   Q     Is that the policy of the Mobile Police

2         Department?

3              MR. NEWELL:

4                   Object to the form.

5              MS. COLLINS:

6                   Object to the form.

7   A     I don't know.

8   BY MR. HENINGER:

9   Q     You're a member of the Mobile Police

10        Department; correct?

11  A     Yes.

12  Q     And you don't know the policy?

13  A     I haven't read that one.  There's a lot of

14        policies.

15  Q     Well, I agree.  Have you been trained by the

16        Mobile Police Department on how to address

17        emotionally-disturbed persons?

18             MS. COLLINS:

19                  Object to the form.

20  A     Yes.  But it's been very little training.

21  Q     What training have you received?

22  A     I would say -- I would say if it's been

23        covered, it's been covered in in-service.  You

24        know, it's covered about once a year, and it's

25        pretty vague, you know.  We don't get a lot of

**CHRISTOPHER McCANN**

1          training on how to -- on how to deal with

2          emotionally-disturbed people.  Primarily

3          because, you know, we're not -- We're not

4          psychologists; we're police officers.  You

5          know, emotionally-disturbed people go to

6          psychologists.  They don't come to the police.

7    Q     In your experience, do you believe that there

8          have been times where you have encountered

9          people that you would describe as being

10         emotionally disturbed?

11   A     Yes.

12   Q     As you sit here right now, do you know if the

13         Mobile Police Department has a policy covering

14         how their officers are to engage or recognize

15         EDPs?

16              MR. NEWELL:

17                 Object to the form.

18   A     No, I don't know.

19

20              (Exhibit Number 34 was marked for

21                 identification.)

22

23   Q     I show you what I'm going to mark as

24         Plaintiff's Exhibit 34.  It is Bates-stamped

25         City 367 through 378.  It's the General Order

**CHRISTOPHER McCANN**

1   BY MR. HENINGER:

2   Q     And apply them when you're in the field?

3   A     Yes.

4   Q     And follow them to the best of your ability?

5              MS. COLLINS:

6                   Object to the form.

7              MR. NEWELL:

8                   Object to the form.

9   A     Yes.

10  BY MR. HENINGER:

11  Q     If it is a rule that's in writing, do you have

12        the authority to disregard it?

13             MR. NEWELL:

14                  Object to the form.

15  A     No.

16  Q     When you do these in-service trainings and

17        they issue new orders, how often do you review

18        them outside of those in-service training

19        weeks?

20  A     Once in a while.

21  Q     Is there a particular time that you find

22        yourself going back to them?

23  A     No.

24  Q     And I would imagine, and please tell me if I'm

25        wrong, because I'm not a police officer.  That

CHRISTOPHER McCANN

```
 1        you receive training as an officer and your
 2        fellow officers because you are making
 3        decisions quickly?
 4            MS. COLLINS:
 5                Object to the form.
 6   A    Yes.
 7   Q    And is training important to instill a method
 8        or an approach to each situation as best as
 9        they can guide you?
10   A    Yes.
11   Q    Is it imperative to you as an officer with the
12        Mobile Police Department that if there is a
13        rule out there that they expect you to follow,
14        that you know about the rule?
15            MR. NEWELL:
16                Object to the form.
17            MS. COLLINS:
18                Object to the form.
19   A    Yes.
20   BY MR. HENINGER:
21   Q    And is it their responsibility -- In your
22        mind, is it their responsibility to give you
23        the rule?
24            MR. NEWELL:
25                Object to the form.
```

CHRISTOPHER McCANN

```
 1              MS. COLLINS:
 2                   Object to the form.
 3              MR. NEWELL:
 4                   Object to the form.
 5     A     Yes.
 6     BY MR. HENINGER:
 7     Q     When you were at the academy, did you receive
 8           any training on recognizing
 9           emotionally-disturbed persons?
10     A     If I did, I don't remember.  It was seven and
11           a half years ago.
12     Q     Have you received any training while at the
13           Mobile Police Department on addressing or
14           recognizing emotionally-disturbed persons?
15     A     Yes.
16     Q     Tell me what that has been.
17     A     I mean -- Well, I mean, what it was was during
18           -- was during in-service training, or it was
19           briefly covered during -- you know, during a
20           roll call at some point in the past.  I mean,
21           it was basically -- you know, if you're
22           dealing with somebody who's, I don't know, out
23           of their mind, for whatever particular reason,
24           you know, approach with caution, make sure you
25           have a backing unit.  Try not to incite them
```

CHRISTOPHER McCANN

| | | |
|---|---|---|
| 1 | | if you can.  Try to keep them calm.  You know, |
| 2 | | if -- You know, if you can get them to agree |
| 3 | | to go be transported to the Mobile Infirmary |
| 4 | | to talk to psych intake down there, if you can |
| 5 | | get them to agree to that, get them to do it. |
| 6 | | You know, that sort of thing.  That's pretty |
| 7 | | much as far as it goes. |
| 8 | Q | All right.  And what you're telling me, I |
| 9 | | think, is how you are trained to address |
| 10 | | people that you have identified as emotionally |
| 11 | | disturbed? |
| 12 | A | Yes. |
| 13 | Q | Have you received any training on how to |
| 14 | | recognize a person that's emotionally |
| 15 | | disturbed? |
| 16 | A | No. |
| 17 | Q | Do they have leave it to you to figure it out? |
| 18 | | MR. NEWELL: |
| 19 | | Object to the form. |
| 20 | Q | When I say "they," I'm talking about does the |
| 21 | | Mobile Police Department leave it to their |
| 22 | | officers to figure out who is emotionally |
| 23 | | disturbed and who isn't? |
| 24 | | MS. COLLINS: |
| 25 | | Object to the form. |

**CHRISTOPHER McCANN**

```
 1   A    Are we talking about -- Does that include the
 2        Rachel incident, or is that --
 3   Q    Sure.
 4   A    Okay.
 5   Q    Let me tell you what.  I'm going to be fair to
 6        you.  What I'm looking for is when you arrived
 7        on the scene and you see something happening,
 8        what are the things that may be occurring that
 9        make you think "I'm dealing with somebody who
10        may not be all there"?  Does that question
11        make sense?
12   A    Yeah, it makes sense.
13             MS. COLLINS:
14                Object to the form.
15   A    Well, I mean, the Rachel incident is why we're
16        here.  So I'll go ahead and use that as an
17        example.  I mean, when a guy comes out of his
18        house and he's screaming and talking, you
19        know, to the top of his lungs and he is making
20        a lot of noise and speaking a language that's
21        not understandable to a rational person and is
22        incoherent and not making any sense, is
23        holding his phone in one hand to the sky and
24        holding his drink in another hand to the sky
25        and yelling at the sky, that to me would be a
```

**CHRISTOPHER McCANN**

```
 1          person that's not in their right mind.
 2    Q     He may be emotionally disturbed?
 3    A     Yes.
 4    Q     Did you have that feeling when you approached
 5          him that evening?
 6    A     Yes.
 7    Q     And there have been other times -- Again, not
 8          being specific, but there have been other
 9          times that you've encountered people that you
10          felt "This is an emotionally-disturbed
11          person"?
12    A     Yes.
13    Q     And is that when the training has to kick in,
14          this is how I address the emotionally-
15          disturbed person?
16    A     Yes.
17    Q     Okay.  Do you believe that, as a police
18          officer with the Mobile Police Department, it
19          is important to be able to recognize people
20          that would be characterized as emotionally
21          disturbed?
22    A     Yes.
23    Q     And it's also important for you to have the
24          tools available to you or the training
25          available to you to know how to address them?
```

**CHRISTOPHER McCANN**

```
 1    A    Yes.
 2    Q    All right.  Now, tell me why you think it's
 3         important to be able to recognize it?
 4    A    Well, you're not dealing with a normal person,
 5         you know.  So I'm -- I mean, the same things
 6         that work with a normal person are not going
 7         to work with someone who's out of their mind.
 8         I mean, that's -- I think we can all agree on
 9         that.
10    Q    And so that would change the way that you are
11         going to address that individual?
12    A    Sometimes.
13    Q    You told me earlier that you rarely
14         differentiate between the two in the manner
15         that you handle them?
16    A    That's true.
17    Q    And that's still your practice today?
18    A    Yeah.
19    Q    Why is that?
20    A    Because the ultimate -- The bottom line for
21         police officers is we deal in the area of
22         crime.  We don't deal in the area of the
23         mentally disturbed.  If a crime has been
24         committed and the person that committed the
25         crime is mentally disturbed, we are required
```

**CHRISTOPHER McCANN**

```
 1        to take the same actions towards the mentally
 2        disturbed as we are the people who are not.
 3        Because just because the person is mentally
 4        disturbed does not make it any less or more a
 5        crime.  It's still the same crime.  There's no
 6        discrimination involved between someone who's
 7        mentally disturbed and someone who is not.
 8        That's why.
 9   Q    Can you appreciate that there is a higher risk
10        of injury to an emotionally-disturbed person
11        if you're handling it the same way as you
12        would another violent criminal that's not
13        suffering from any emotional disturbance?
14             MS. COLLINS:
15                  Object to the form.
16             MR. NEWELL:
17                  Object to the form.
18   A    Yes, I suppose so.  I mean, certain -- I mean,
19        in some circumstances, yes.
20   BY MR. HENINGER:
21   Q    Regardless of that potential, you have made
22        the election to handle them the both way
23        (sic), because, again, you don't want to
24        differentiate between the two because -- I'm
25        trying to think of the word that you used.
```

**CHRISTOPHER McCANN**

```
 1    A    Yes.
 2    Q    So if you get any resistance, you have what
 3         level of force at your disposal?
 4              MS. COLLINS:
 5                   Object to the form.
 6    A    What level of force?
 7    Q    Let me stop.  Let me stop.  I want to -- When
 8         I ask you that question, I want to talk about
 9         May of 2012.  Okay?
10    A    I understand that.
11    Q    Okay.  So, yeah, if you get resistance under
12         the fact that you see no distinction between
13         active and passive, what use of force do you
14         have at your disposal to get the situation
15         under control?
16              MS. COLLINS:
17                   Object to the form.
18              MR. NEWELL:
19                   Object to the form.
20    A    Whatever I see fit at that moment in time.
21    BY MR. HENINGER:
22    Q    Okay.  Let me ask you this, then:  Is it fair
23         to say that a police officer should only
24         utilize force when it's necessary?
25    A    Yes.
```

## CHRISTOPHER McCANN

1    Q    And that the level of force used should be

2          consistent with the threat that the police

3          officer faces?

4    A    Yes.

5    Q    If t he level of force is not consistent with

6          the threat, it could be deemed excessive

7          force?

8              MR. NEWELL:

9                  Object to the form.

10   A    Yes.

11   Q    And in order to make that decision about what

12         level of force to use, you rely on your

13         training?

14   A    Yes.

15   Q    And you employ your training?

16   A    Yes.

17   Q    When relying on your training, should a police

18         officer control their emotions in

19         confrontations?

20   A    Yes.

21   Q    If they are not able to control their

22         emotions, what is the risk?

23             MS. COLLINS:

24                Object to the form.

25

1          a gun or a taser a use of force?

2               MS. COLLINS:

3                    Object to the form.

4               MR. NEWELL:

5                    Object to the form.

6     A    What does "brandishing" mean?

7     BY MR. HENINGER:

8     Q    Pulling out, pointing.

9     A    Re -- re -- Ask the question again.

10    Q    Yeah, I'll try to.

11          When you are considering the levels of

12         force that you have available to you, in your

13         opinion, is simply showing your firearm or

14         taser a demonstration of force, or is that in

15         and of itself a use of force?

16              MR. NEWELL:

17                   Object to the form.

18    A    I would -- I would say -- I would say yes,

19         based on the circumstances that you're

20         threatening to use it if they don't comply.

21         Which means -- I mean, which basically means

22         you're giving them one more -- Hey, comply or

23         else.  Based on that, yes.

24    Q    Okay.  So it's not a situation as, you know,

25         I've got it available to me.  As soon as it

CHRISTOPHER McCANN

```
 1         comes out of my holster, it's going off.
 2         Again, merely brandishing it or showing it is
 3         a use of force, in your opinion?
 4              MS. COLLINS:
 5                   Object to the form.
 6              MR. NEWELL:
 7                   Object to the form.
 8    A    Yes.  I mean, yes and no.  I mean, you're not
 9         using it.  You haven't used it yet.  I mean --
10    BY MR. HENINGER:
11    Q    Are you using it as a threat?
12              MR. NEWELL:
13                   Object to the form.
14    A    A threat to what?
15    Q    To use it?
16    A    Yeah.
17    Q    Okay.  So is a threat to use a gun taser by
18         pulling it out a use of force?
19              MS. COLLINS:
20                   Object to the form.
21              MR. NEWELL:
22                   Object to the form.
23    A    Yeah, I guess so.
24    BY MR. HENINGER:
25    Q    And I've never had a taser, but -- And can
```

**CHRISTOPHER McCANN**

```
 1         look at the pictures if we need to.  But a
 2         taser looks like a gun?
 3    A    Yeah.
 4              MS. COLLINS:
 5                   Object to the form.  Object to
 6                   testimony.
 7    Q    Okay.  Does a taser look like a gun?
 8    A    It depends on the taser.
 9    Q    Well, let's look at the pictures, then.  Did
10         your taser look like a gun?
11    A    I think I had a big one at the time.  So,
12         yeah, holstered it does.  I've had -- I've had
13         civilians mistake my taser for a gun.  They
14         ask me, "Hey, is that your gun?"  Like, "No."
15
16              (Exhibit Number 35 was marked for
17                   identification.)
18
19    Q    I'll show you what I marked as Plaintiff's
20         Exhibit 35, City 263.  Is that your taser?
21    A    I cannot remember if this is mine or not.
22         Because back -- I used to have a large one,
23         like the one in that picture.  And I had it
24         changed out for a smaller one.  And I'm not
25         sure -- I'm not sure if I got the smaller one
```

**CHRISTOPHER McCANN**

1  A     No.

2  Q     If you encounter a situation and you suspect

3        that there is a mental illness or there is an

4        emotionally-disturbed person, does that alter

5        your consideration of use of force?

6              MR. NEWELL:

7                 Object to the form.

8  A     No.

9  Q     Have you had much experience in domestic

10       calls?

11 A     Yes.

12 Q     If you had to put it in a percentage of the

13       calls that you have to respond to, where would

14       that fall?

15 A     Where would the Rachel call fall if --

16 Q     No, that's a bad question.  That's my fault.

17       If you had to give me a percentage, like

18       "Erik, 25 percent of what I do is responding

19       to domestic calls" -- I'm looking for -- I'm

20       not asking for it to be specific.  I just want

21       to get an idea of what you do on a day-to-day

22       basis.

23 A     Okay.  I do -- Well, in patrol you get the

24       benefit or the misfortune, depending on how

25       you look at it, of dealing with a little bit

**CHRISTOPHER McCANN**

1   A   Yes, sir.

2   Q   Nothing unusual about that for you?

3   A   Not domestic violence.

4   Q   And is it fair to say that you have

5       encountered situations that deal with

6       emotionally-disturbed persons as of 2012 -- or

7       April/May 2012?

8   A   Yes.

9   Q   Again, that's nothing new for you?

10  A   No.

11  Q   Unfortunately?

12  A   That's correct.

13  Q   We've talked about use of force.  And I want

14      to get very specific with you and talk about

15      use of taser.  Okay?  Tell me about your

16      training with uses of tasers.  Did you get any

17      training at the academy?

18  A   Yes.

19  Q   All right.  And have you also gotten training

20      at Mobile Police Department?

21  A   Yes.

22  Q   Has it been consistent?

23  A   Yes.

24  Q   All right.  Tell me how you've been trained on

25      tasers.

### CHRISTOPHER McCANN

1     de-escalation tactics or not?

2  A  I don't know.  I don't -- If I was, I don't

3     remember.

4  Q  Have you ever been trained in verbal control

5     tactics?

6  A  Yes.

7  Q  Tell me what -- Tell me what that involved.

8  A  Basically officer presence and officer

9     command.  You know, getting -- trying to get

10    someone to comply with verbal communication.

11    We cover that quite a bit in the academy, if I

12    remember correctly.

13  Q  Did you ever get any more training, whether

14    in-service or roll call?

15  A  No, we don't -- We don't really touch on that

16    much.

17  Q  We talked a little bit about your training and

18    your experience in addressing individuals with

19    -- or EDPs, emotionally-disturbed people -- or

20    persons.

21      Let me ask if you agree with some of

22    these concepts.  When you're dealing with a --

23    an EDP, do you need to pace your contact;

24    meaning, I think what you told me, slow steady

25    movements?

CHRISTOPHER McCANN

```
 1              MS. COLLINS:

 2                   Object to the form.

 3              MR. NEWELL:

 4                   Object to the form.

 5    A     Yeah.

 6    BY MR. HENINGER:

 7    Q     You agree with that?

 8    A     Yeah.  I would -- I would -- I mean, I use

 9          more caution with someone I know who's

10          emotionally disturbed than someone I presume

11          to be normal.

12    Q     Does it need to be a calm, calculated, and

13          controlled approach?

14              MR. NEWELL:

15                   Object to the form.

16    A     It depends on the circumstances.

17    Q     All right.  Do you agree that individuals that

18          are suffering from a mental illness or can be

19          deemed EDP, that their perceptions can differ

20          widely?

21              MR. NEWELL:

22                   Object to the form.

23              MS. COLLINS:

24                   Object to the form.

25    A     Yes.
```

CHRISTOPHER McCANN

```
1   A    Well, you may be able to come up with a better
2        solution.
3   Q    What do you mean by that?
4            MR. NEWELL:
5                Object to the form.
6   A    Well, it depends on the circumstance.  I mean,
7        there's a lot of different scenarios that can
8        go on with someone who is EDP.  There's a
9        million different circumstances that can go
10       on.  And a million different circumstances
11       require a million different answers.
12  Q    Fair enough.  Is it fair to say that patience
13       is important when you're dealing with an EDP?
14  A    Yes.
15  Q    Is it helpful for a police officer such as
16       yourself to get as much information as
17       possible prior to contacting -- or prior to
18       contact with an EDP?
19  A    Yes.
20  Q    Officer, I think I'm pretty close to my --
21       finishing my training questions.  And if you
22       need to, we'll take a break. Okay?  About 10
23       more minutes.  All right?
24  A    All right.
25  Q    You good?
```

## CHRISTOPHER McCANN

111

```
 1   A    No.
 2   Q    Do you know what hypoxia is?
 3   A    No.
 4   Q    So I assume you've never been trained on
 5        hypoxia?
 6   A    That would be correct.
 7   Q    Do you know what "excited delirium" is?
 8   A    Yes, I'm familiar with the term.
 9   Q    Have you ever been trained in observing or
10        recognizing the sign and symptoms of excited
11        delirium?
12   A    Ever had training on it?
13   Q    Yes, sir.
14   A    No.
15   Q    What is your understanding of what excited
16        delirium is?
17   A    My best understanding is someone has worked
18        themselves up into a frantic or a panic of
19        some kind to the point where they get
20        themselves so worked up that their --
21        Basically, their heart or their bodily
22        functions can't keep up the pace, can't handle
23        it, and their body shuts down on them.
24   Q    Is that something explained to you through the
25        Mobile Police Department?
```

**CHRISTOPHER McCANN**

```
 1          hog-tied an individual before; correct?
 2               MR. NEWELL:
 3                    Object to the form.
 4    A     Yes.
 5    Q     Is Rachel the only time?
 6    A     No.
 7    Q     Do you agree that the police officer, such as
 8          yourself, has an obligation to monitor the
 9          person that has been forcibly restrained?
10    A     Yes.
11    Q     Is that important?
12    A     Yes.
13    Q     Why?
14    A     For their safety.
15    Q     What are you looking for?
16    A     Just to make sure they're -- you know, they're
17          still responsive.  You know, they're still
18          breathing, and so forth.
19    Q     So as far as being responsive, you're looking
20          for breathing?
21    A     Um-hum.  Yes.
22    Q     Anything else?
23    A     That would be about it.
24    Q     Have you been trained in cardiopulmonary
25          resuscitation or CPR?
```

**CHRISTOPHER McCANN**

```
 1    Q    It's about eight or nine lines down.  I didn't
 2         count.  Sorry.  It starts off, "Is Gregory the
 3         name?"
 4              Do you see where I am at?
 5    A    Yes.
 6    Q    The question, "Can you tell us from the
 7         beginning what happened?"
 8              You say, "Okay, um, at 311, me and my
 9         partner, uh, Officer Jackson, Unit 256, were
10         dispatched to a listed address on Plantation
11         Court."
12              Let me stop there.  311 is when you got
13         the call?
14    A    Yes.
15    Q    And is that through your radio?
16    A    Yes.
17    Q    The dispatcher saying what?
18    A    The dispatcher is just telling us that there
19         is a domestic violence call at the listed
20         address.
21    Q    All right.  And you say your partner, Officer
22         Jackson.  Did y'all have partners?
23    A    Well, we -- You know, the way Mobile operates
24         is when you're on a squad, you have multiple
25         partners.  Everybody on your squad is your
```

**CHRISTOPHER McCANN**

```
 1           partner.  So -- I mean, me and Officer Jackson
 2           just happened to be the two officers that got
 3           dispatched that night to this particular
 4           incident.
 5     Q     Okay.
 6     A     So he was my partner on this incident.
 7     Q     But you're solo in your car?
 8     A     That's correct.
 9     Q     He happened to respond to the call with you?
10     A     That's correct.
11     Q     Were you primary on this call?
12     A     Yes, sir.
13     Q     And what does that mean?
14     A     That means I got the call.  Whoever the
15           dispatcher gives the call to first, that's the
16           primary officer.  That's just understood that
17           you're the primary unit.  And, you know, on a
18           domestic call, we're always given a backing
19           unit.  So a second officer will be dispatched.
20           And that's just -- That's the backing unit.
21           That's the way things go.  The primary officer
22           -- Basically the responsibility of the primary
23           officer is to write the report and take the
24           lead on the call, you know.  And the backing
25           officer is there in case you need him.
```

**CHRISTOPHER McCANN**

139

| | | |
|---|---|---|
| 1 | Q | Okay.  So as far as what's going to happen in |
| 2 | | this call, both of you will be present, but |
| 3 | | you're the lead? |
| 4 | A | That's correct. |
| 5 | Q | Does that mean you make the decisions? |
| 6 | A | Yes. |
| 7 | Q | Okay.  And his unit is 256? |
| 8 | A | Yes.  I would like to elaborate on that. |
| 9 | Q | Sure. |
| 10 | A | I make the decisions and it's my call.  But we |
| 11 | | always include our backing unit in the |
| 12 | | decision-making process.  I'm not just going |
| 13 | | to go -- I'm going to do this without |
| 14 | | consulting with him.  You know, I'm going to |
| 15 | | make -- you know, on any call we're going to |
| 16 | | make sure we're on the same page. |
| 17 | Q | Sure.  You're a team? |
| 18 | A | Yeah.  Correct. |
| 19 | Q | Okay.  Same paragraph.  It goes on to say, |
| 20 | | "-- right across the street, and they were |
| 21 | | both Signal 39, and they were involving the |
| 22 | | same person." |
| 23 | | What does Signal 39 mean? |
| 24 | A | That's -- That's Alabama signal code for |
| 25 | | domestic violence. |

**CHRISTOPHER McCANN**

| | | |
|---|---|---|
| 1 | Q | Do you have an independent recollection of |
| 2 | | this morning or evening?  Without looking at |
| 3 | | this, do you remember what happened? |
| 4 | A | Yes. |
| 5 | Q | And -- Well, it goes on to say, "-- both |
| 6 | | Signal 39, and they were involving the same |
| 7 | | person.  We figured out pretty much over the |
| 8 | | radio -- or figured that out pretty much over |
| 9 | | the radio." |
| 10 | | So is that the intuition you were talking |
| 11 | | about? |
| 12 | A | Yes, that's when the intuition kicks in.  I |
| 13 | | mean, you've got a computer screen in front of |
| 14 | | you.  You're able to pull both addresses up on |
| 15 | | your computer.  And when they -- they're right |
| 16 | | across the street from each other, on your |
| 17 | | computer, it pretty much gives you a clue, |
| 18 | | yeah.  So -- |
| 19 | Q | So you go in -- I think you said you go into |
| 20 | | the Plantation residence where the victim was; |
| 21 | | is that right? |
| 22 | A | That's correct. |
| 23 | Q | And you wanted to find out what was going on, |
| 24 | | and you talked to the victim? |
| 25 | A | That's correct. |

**CHRISTOPHER McCANN**

1   Q      Amy Rachel?

2   A      That's correct.

3   Q      And it looks like -- I'm going to start where

4          it says "she."  "She told us that her husband

5          had basically just flipped out for on (sic)

6          apparent reason, and in the middle of the

7          night he was -- he was pacing the floor.  She

8          walked in to see what was wrong with him and,

9          you know, he was talking crazy.  And she told

10         him he needed to go somewhere to work it out,

11         you know, and then come back.  And at that

12         point he physically assaulted her.  He tackled

13         her onto the floor and according -- according

14         to what she said, he --" And then there's a

15         period.

16             I want to get a time line if I can.  This

17         is the conversation that was occurring before

18         you made contact with Greg Rachel?

19  A      That's correct.

20  Q      So she told you all those things that you just

21         mentioned?

22  A      Yes, sir.

23  Q      So reflecting back, when you get history from

24         a victim, a wife in this case, that the

25         subject flipped out for no apparent reason,

**CHRISTOPHER McCANN**

143

1         pacing the floor, talking crazy, and then he
2         comes back and physically assaults her -- You
3         follow me so far?
4    A    That's correct.
5    Q    Are you thinking I could have some
6         emotionally-disturbed person on my hands?
7              MS. COLLINS:
8                   Object to the form.
9    A    Not at that point, no.
10   Q    Are you considering it?
11   A    Yes.  But any time somebody does something
12        like that -- Any time somebody does something
13        like that, you're thinking they're not
14        thinking clear, they're obviously not in the
15        right frame of mind.  You know, whether
16        they're mentally disturbed or not, at least at
17        that moment in time there's a chance they may
18        be temporarily insane.
19   Q    So are you saying on every domestic call
20        involving a physical assault, you think the
21        aggressor, something is messed up in his head?
22             MR. NEWELL:
23                  Object to the form.
24   A    At that moment in time.  I mean, you just
25        don't -- you don't beat -- You don't attack

**CHRISTOPHER McCANN**

| | | |
|---|---|---|
| 1 | | your wife at 3 a.m. in the morning and there |
| 2 | | not be something wrong with you. |
| 3 | Q | Okay. |
| 4 | A | You know. |
| 5 | Q | So you're thinking you may have an EDP on your |
| 6 | | hands?  At least that's going through your |
| 7 | | mind at this point? |
| 8 | | MR. NEWELL: |
| 9 | | Object to the form. |
| 10 | A | No. |
| 11 | Q | No? |
| 12 | A | No. |
| 13 | Q | You didn't consider it? |
| 14 | A | I didn't know what -- First off, EDP, I wasn't |
| 15 | | even familiar with that term. |
| 16 | Q | Mentally ill? |
| 17 | A | Mentally ill, yeah.  You know -- Well, no, I |
| 18 | | didn't -- I thought I -- I mean, I thought I |
| 19 | | was dealing with somebody with some serious |
| 20 | | anger-management issues.  Let me put it to you |
| 21 | | that way. |
| 22 | Q | All right.  And you based that opinion just on |
| 23 | | what she told you at that time? |
| 24 | A | Yeah. |
| 25 | Q | Okay.  I'll go to Page -- Page 3, Mr. McCann. |

CHRISTOPHER McCANN

| | | |
|---|---|---|
| 1 | A | Okay. |
| 2 | Q | Basically you continue talking to her.  She's |
| 3 | | recalling the events at the house. |
| 4 | A | Okay. |
| 5 | Q | And about six lines down, it starts, "And, uh, |
| 6 | | when we arrived and you know she -- She told |
| 7 | | us that he was still across the street inside |
| 8 | | the house.  So at that point we immediately |
| 9 | | called Sergeant Ripple, 5 Sam 2."  Is that |
| 10 | | right? |
| 11 | A | That's correct. |
| 12 | | MR. NEWELL: |
| 13 | | Let me object to the form.  And also |
| 14 | | on the basis that you told him you |
| 15 | | would give him a chance to give a |
| 16 | | complete story.  And you just skipped |
| 17 | | about a third of the page on the |
| 18 | | bottom of the previous page, where |
| 19 | | she told him about how he was trying |
| 20 | | to kill her. |
| 21 | | MR. HENINGER: |
| 22 | | You can go back and ask him.  It's |
| 23 | | your witness. |
| 24 | | MR. NEWELL: |
| 25 | | Well, you told the witness you would |

**CHRISTOPHER McCANN**

148

```
 1    A    That's correct.

 2    Q    And what was the reason for wanting to call

 3         him?

 4    A    Well, my -- My victim, Mrs. Amy Rachel, was,

 5         you know, pretty beaten up.  She had some

 6         marks on her.  And she told us, you know, that

 7         he was a big guy.  And she told us that he was

 8         inside the house.  And she thinks there's

 9         something seriously wrong with him and, you

10         know, that he's not in his right mind.  And

11         it's obvious to us, by the marks on her face.

12         And 90 -- I'd say 95, 96 percent of domestics

13         we go on, you know, we handle without

14         notifying our supervisor.  But intuition, I

15         guess, maybe.  You know, something told me

16         that this is more serious than the normal

17         domestic or the average domestic that we go

18         on, and I need to make my sergeant aware of

19         what we've got and what's going on.  And, you

20         know, and I made the suggestion to him when I

21         called him, you know -- You know, based on the

22         fact that Amy's been beaten up, me and Officer

23         Jackson prepared to go in the house and arrest

24         the subject.  Sergeant Ripple said, "Negative.

25         Do not do that.  Wait until we get other
```

CHRISTOPHER McCANN

1   officers over there, because we don't know if

2   he's in there armed or whatever.  You know, we

3   don't know if he's watching all across the

4   street.  We don't know what he's going to do."

5   So I said, "Okay."

6           So basically at that point we walked

7   outside to watch the house and to see if he

8   came outside.  And the reason for that was on

9   a lot of domestics, the subject will flee the

10  scene because they don't want to be arrested.

11  So our main -- Me and Officer Jackson's main

12  objective at that point was just to basically

13  go outside, watch the house, make sure he

14  didn't try to come out and get in his car and

15  leave.  And we -- At that point we sat there

16  and waited for backup to get there before we

17  were going to make entry into the house.

18           MR. NEWELL:

19               Okay.  I think you've answered the

20               question.

21           THE WITNESS:

22               Okay.

23  BY MR. HENINGER:

24  Q   You mentioned that there was something about

25      this call, your intuition was raised, that

**CHRISTOPHER McCANN**

1            caused you to call him.  Do you remember
2            telling me that?
3    A       Yes.
4    Q       What was it about this call that raised your
5            intuition?
6    A       That, I don't -- I don't necessarily remember,
7            other than what I've described to you.  I
8            mean, she had marks.  But I've seen -- I've
9            been on domestics where people had marks
10           before.  So that really -- That really didn't
11           alarm me.  It was -- But she got the kids and
12           ran across the street and called from the
13           neighbor's house.  And she told us he'd never
14           done anything like this before.  And she told
15           us he was a big guy; you know, six-four, 300
16           pound, whatever.  And -- And she made the
17           indication that she thought, you know, he was
18           outside of his mind, you know, at that point.
19           She didn't know what was wrong with him.  She
20           said he wasn't acting himself or normal.
21                So, you know, based on that, I just
22           thought maybe, you know, my sergeant might --
23           might want to know what we got.
24   Q       And did you take what she was giving you --
25           the information that she was giving you to

**CHRISTOPHER McCANN**

```
 1         heart?
 2    A    Yes.
 3    Q    Do you think she was telling you the truth?
 4    A    Yeah.
 5    Q    So is it -- It's not the injuries that you
 6         observed -- that you observed that raised your
 7         intuition?  You'd seen those things before?
 8    A    That's correct.
 9    Q    It's not the fact that this is a domestic call
10         that raised your intuition, because you've
11         been on them before?
12    A    That's correct.
13    Q    So was it what she told you that raised your
14         intuition?
15    A    Yes.
16    Q    Things like he's talking crazy, he's never
17         done this before?  The history that we went
18         through that she gave you?
19    A    That's correct.
20    Q    That's what raised your intuition?
21    A    Yes.
22    Q    At that point in time are you considering I
23         might have an EDP or mentally-ill person on my
24         hands?
25    A    I don't remember.  Probably.
```

**CHRISTOPHER McCANN**

154

| | | |
|---|---|---|
| 1 | | he was yelling? |
| 2 | A | That's correct. |
| 3 | Q | And when you say "across the street" were you |
| 4 | | still in the -- Where were you across the |
| 5 | | street? |
| 6 | A | I can't remember -- I don't recall her name. |
| 7 | | Y'all mentioned her when y'all -- |
| 8 | Q | Christy Adams? |
| 9 | A | Christy Adams, yes.  We were at Christy Adams' |
| 10 | | house across the street, where we originally |
| 11 | | responded. |
| 12 | Q | Let me help you with this.  Exhibit 1.  And I |
| 13 | | don't know -- it looks like -- Have you seen |
| 14 | | this before? |
| 15 | A | Yes.  But not this close up, no.  I was down |
| 16 | | there kind of watching. |
| 17 | Q | All right.  So -- And if you need to twist it |
| 18 | | around, whatever way it helps you.  I'm going |
| 19 | | to ask you the questions. |
| 20 | A | Okay. |
| 21 | Q | So this house -- Don't write on it because |
| 22 | | it's not my exhibit. |
| 23 | A | Oh, okay. |
| 24 | Q | We can point and I can try and describe it so |
| 25 | | we know what we're talking about on the |

**CHRISTOPHER McCANN**

1   Q    Okay.  You told me -- You talked about some of

2        this before.  But then it goes on.  You say,

3        "That we were outside at this point."  And

4        this is after she had given you the history?

5   A    Yes.

6   Q    Do you remember that?

7   A    That's correct.

8   Q    So I don't want to jump around on you.  So if

9        you lose me or I lose you, say, "Stop,

10       Heninger, you're losing me." Fair?

11  A    Okay.

12  Q    It says, "We were outside at this point.  We

13       saw the male subject, Gregory Rachel, come

14       outside the house.  He came outside in the

15       front yard.  And as he came out, he had his

16       hands raised up in the air and he had a phone

17       in one hand, a cell phone in one hand, and he

18       had a drink in the other.  And he started

19       raising his hands to the sky and started

20       looking up and yelling at the skies.  He was

21       coming out yelling, screaming at the top of

22       his lungs."

23          That's what you observed?

24  A    Yes.

25  Q    And do you recall observing that, as you sit

**CHRISTOPHER McCANN**

153

| | | |
|---|---|---|
| 1 | | here today? |
| 2 | A | Yes. |
| 3 | Q | So based on what she had told you -- what Amy |
| 4 | | Rachel had told you, this intuition that you |
| 5 | | mentioned -- |
| 6 | A | Um-hum. |
| 7 | Q | -- and now what you observed? |
| 8 | A | Yes. |
| 9 | Q | Now do you think you're dealing with somebody |
| 10 | | that's mentally ill or an EDP? |
| 11 | A | Yes. |
| 12 | Q | And that's based on, again, to be specific, |
| 13 | | the history that she gave you; correct? |
| 14 | A | Yes. |
| 15 | Q | And then the fact that you observed him come |
| 16 | | outside the house with his hands raised in the |
| 17 | | air and yelling at the sky and screaming at |
| 18 | | the top of his lungs? |
| 19 | A | Yes. |
| 20 | Q | You go on to say, "-- we were across the |
| 21 | | street, so we couldn't make out exactly what |
| 22 | | he was saying." |
| 23 | | Is that true? |
| 24 | A | That's correct. |
| 25 | Q | So you could just hear him yelling, not what |

1   between the "A" and the "C."

2 Q Gotcha.  Somewhere -- Is that the front yard

3   or the backyard?

4 A That's the front yard.

5 Q Okay.  So at that point in time, you got back

6   on the radio and let 5 Sam 2, who is Ripple,

7   --

8 A That's correct.

9 Q -- know that subject is now outside the house

10   and he is extreme -- acting extremely a

11   Signal 31?

12 A That's correct.

13 Q What is Signal 31?

14 A That means emotionally -- mentally disturbed.

15 Q Is that the same thing as EDP?

16 A Yes.

17 Q "So at that point, me and Officer Jackson

18   started approaching him to see what he was

19   saying and see if we could calm him down, see

20   what was going on with him.  And at this point

21   he started yelling at us, 'Protect me, protect

22   me, protect me.'"

23     I'm going to stop there and get back to

24   that in a second.  But your decision at that

25   point is he's outside of the house?

CHRISTOPHER McCANN

| | | |
|---|---|---|
| 1 | | goals was to go over there and try and calm |
| 2 | | him down? |
| 3 | A | That's correct. |
| 4 | Q | Because he was, as you say, acting extremely a |
| 5 | | Signal 31?  Is that extremely mentally |
| 6 | | disturbed? |
| 7 | | MR. NEWELL: |
| 8 | | Object to the form. |
| 9 | A | Yeah, I would say -- Yeah, I would say so. |
| 10 | Q | All right.  So you go on to say he was -- You |
| 11 | | get close enough to hear him yelling, "Protect |
| 12 | | me, protect me, protect me.  Protect me from |
| 13 | | Obama"? |
| 14 | A | Yes. |
| 15 | Q | You heard that? |
| 16 | A | Yes. |
| 17 | Q | At this time is he still yelling it to the sky |
| 18 | | with his hands raised? |
| 19 | A | At this -- As we approached him, he started |
| 20 | | looking at us.  Actually, he did some things |
| 21 | | before that, too.  He had a phone and a drink |
| 22 | | in his hand when he was yelling to the sky. |
| 23 | Q | Okay. |
| 24 | A | He threw his phone across the street.  He set |
| 25 | | his glass down on the ground, from what I |

CHRISTOPHER McCANN

160

1     remember, threw himself on the ground.  And if
2     I remember correctly, that's when me and
3     Officer Jackson decided to approach him.  And
4     started going across the street.
5  Q  So make sure I understand.  Before you even
6     crossed the street he threw his phone across?
7  A  We observed him doing this from across the
8     street.
9  Q  And before you even crossed the street he was
10    down on the ground?
11 A  That's correct.
12 Q  Laying on his back or his stomach?
13 A  He was laying on his back.
14 Q  Did he continue to yell when he was laying on
15    his back?
16 A  Yes.
17 Q  The same thing?
18 A  Yes but he wasn't on his back very long.
19    We're talking like a few seconds.
20 Q  I'm going to get to that.
21 A  All right.
22 Q  When he laid down -- Sorry.  Strike that.
23       When he threw his phone, had he seen you?
24 A  I don't know.
25 Q  Which way was he facing when you observed him

CHRISTOPHER McCANN

1        started across the street, he got back up.

2   Q    Did he see you coming across the street?

3   A    I believe so, at this point.

4   Q    How do you know that?

5   A    He turned and faced us.

6   Q    Okay.  And you -- It's your opinion that the

7        lighting was good enough, you are visible

8        enough that he could see you?

9   A    Yes.

10  Q    And you base that on the simple fact that he

11       turned in your direction?

12  A    Correct.

13  Q    Okay.  And at that point, you commanded him to

14       get on the ground.  Did you yell?  Were you

15       forceful about it?

16  A    Yeah, we were -- We were forceful.  We were

17       both giving him verbal commands to get back on

18       the ground.

19  Q    And at the same time, were you pulling your

20       tasers out?

21  A    No.

22  Q    Okay.  It says, "-- we commanded him to get on

23       the ground, we pulled our tasers out."

24  A    It may say that, but that's not -- That's not

25       how I remember it now.  I mean, I don't -- I

CHRISTOPHER McCANN

164

1      don't -- You know, I don't know if what I

2      wrote there is inconsistent with what I'm

3      telling you about how I remember it now.

4      But --

5  Q  Well, tell me how you remember it now.

6  A  We came across the street.  We started giving

7      him verbal commands to get back on the ground

8      and he wouldn't.  And he started talking

9      crazy.  "Protect me.  Protect me.  Protect me

10     from Obama."  And --

11  Q  But he had already been doing that; right?

12  A  Yeah.  He continued.

13  Q  He continued doing that?

14  A  Yeah, he continued it.

15  Q  Okay.  I'm sorry.  Go ahead.

16  A  He was a big guy.  And he -- and he -- He got

17     in an -- He positioned himself at this point

18     in an aggressive stance or an aggressive

19     manner, like he -- looked like he was about to

20     -- like he was prepared to fight or wanted to

21     fight.  And that is when we drew our tasers.

22  Q  Okay.  You've read this?

23  A  Yes.

24  Q  Is your recollection now different than what

25     you said back on May 1st?

**CHRISTOPHER McCANN**

| | | |
|---|---|---|
| 1 | Q | Okay.  When you were talking about -- When you |
| 2 | | are contemplating the fact that he's staying |
| 3 | | on the ground, you want to leave him like that |
| 4 | | until help gets there, how far away from him |
| 5 | | were you at that point in time? |
| 6 | A | I don't remember.  Five or ten feet. |
| 7 | Q | And how long do you think he was on the ground |
| 8 | | before he got back up? |
| 9 | A | Just a few seconds. |
| 10 | Q | As you -- I'm sorry, I didn't mean to |
| 11 | | interrupt you. |
| 12 | A | 10 seconds or less. |
| 13 | Q | While he was laying on the ground and you were |
| 14 | | contemplating the next steps and what you were |
| 15 | | going to do, did you continue to approach him? |
| 16 | A | No. |
| 17 | Q | You just stayed put and observed him? |
| 18 | A | Correct. |
| 19 | Q | Did you talk to him? |
| 20 | A | We probably -- we probably -- We probably gave |
| 21 | | him some voice commands to stay on the ground, |
| 22 | | but nothing besides that. |
| 23 | Q | Is your taser still out? |
| 24 | A | Yes, I would think so -- I would -- Let's see. |
| 25 | | Does it say that?  Where are you at? |

**CHRISTOPHER McCANN**

1        Obama," no.

2   Q    Do you think he was saying that directly to

3        the two of you?

4   A    I don't know.  I don't know what -- I don't

5        know what he saw when he was looking at us.

6        He may have been looking right through us, for

7        all I know.  I mean, I don't know what he

8        thought he -- I don't who -- I don't know if

9        he knew he was talking to the police or who he

10       thought he was talking to.

11  Q    All right.  Let's continue on.  You then say

12       that, "Well, then, he started to get back up.

13       When he got back up, we said 'Get back on the

14       ground.  Get back on the ground.  Get back on

15       the ground.' And he refused."

16  A    That's correct.  I remember that.

17  Q    Again, yelling loud commands at him?

18  A    Yes.

19  Q    No questioning what the command was?

20  A    No.  Not in our minds.

21  Q    "At that point he started coming at us."

22       Running?

23  A    No, he didn't run.  He got -- He got in a

24       fighting position or looked like an aggressive

25       stance and started just coming towards us at

**CHRISTOPHER McCANN**

172

| | | |
|---|---|---|
| 1 | | a, you know, pretty strong walking pace. |
| 2 | Q | What is a strong walking pace? |
| 3 | A | I'd have to give you a physical example.  I |
| 4 | | mean, he walked -- He walked towards us.  I |
| 5 | | mean, he walked with purpose.  It looked like |
| 6 | | he was walking with purpose towards us. |
| 7 | Q | What is an aggressive stance? |
| 8 | A | You know, like this.  (Indicating.) |
| 9 | Q | Fists closed? |
| 10 | A | Yeah.  Like he's getting ready to fight. |
| 11 | Q | And he's looking at your or Officer Jackson? |
| 12 | A | I don't remember if he was looking at me or |
| 13 | | Officer Jackson.  I just -- I took it as he |
| 14 | | was looking at both of us.  It was -- You |
| 15 | | know, me and Officer Jackson weren't very far |
| 16 | | apart.  We were just a few feet from one |
| 17 | | another. |
| 18 | Q | At this time when he gets back up on his feet, |
| 19 | | how far away are the two of you from him? |
| 20 | A | We were still within five to ten feet. |
| 21 | Q | Is he talking anymore coherently at that time? |
| 22 | A | No. |
| 23 | Q | Are you guys saying anything other than, "Get |
| 24 | | back on the ground get back on the ground get |
| 25 | | back on the ground"? |

CHRISTOPHER McCANN

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | The next thing -- Taser still brandished? |
| 3 | A | Yes. |
| 4 | Q | Next thing, "We told him to stand -- to stop, |
| 5 | | stop.  Stop where you're at.  Stop where |
| 6 | | you're at." |
| 7 | | Again yelling? |
| 8 | A | That sounds accurate. |
| 9 | Q | Still pointing the taser? |
| 10 | A | Yes. |
| 11 | Q | And he's still doing the purposeful walk? |
| 12 | A | Yes. |
| 13 | Q | When he's walking, does he still have the |
| 14 | | aggressive stance? |
| 15 | A | I don't know.  That was two and a half years |
| 16 | | ago.  I mean, he's coming towards us.  That's |
| 17 | | aggressive enough to me. |
| 18 | Q | You go on and say, "He kept coming.  Officer |
| 19 | | had to taser him tip because he refused to |
| 20 | | Jackson had to tase him at this point because |
| 21 | | he refused to comply." |
| 22 | | And the refusal to comply was to -- |
| 23 | A | He wouldn't get back on the ground. |
| 24 | Q | "When he hit -- When he tased him, he |
| 25 | | immediately hit the ground." |

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

**CHRISTOPHER McCANN**

174

 1          How far away was Officer Jackson when he
 2      first tased him?
 3  A   Five to ten feet.
 4  Q   All right.
 5  A   I'm not -- I'm not sure if me and Officer
 6      Jackson were walking backwards at that point
 7      when he was walking towards us.  We were
 8      holding our ground.  You know, we may have
 9      been walking backwards.  And, you know, "Get
10      on the ground, get on the ground, get on the
11      ground" as we are walking back.  There were,
12      you know -- I don't know.
13  Q   Fair enough.  "-- immediately hit the ground.
14      But then he got right back up, almost unfazed.
15      And at that point I tased him."
16          Then you tased him?
17  A   That's correct.
18  Q   So what's the time difference there?  Officer
19      Jackson hits him, down, up, you tase him.
20      What are we talking about?
21  A   We're talking seconds.  Under five.
22  Q   Under five seconds.
23          "He fell down, he got right back up
24      unfazed.  At this point, he started pulling
25      the taser probes off of himself, and at that

CHRISTOPHER McCANN

1      point we knew we were -- at that point, oh

2      shit, you know.  And at this point, we -- you

3      know, we had to aggressively tackle the

4      subject."

5    A   That's correct.

6    Q   And that's accurate?  That's what you recall?

7    A   That's accurate.

8    Q   Tasers weren't working?

9    A   No.

10   Q   You go on to say, "We had to take him, try to

11       put him on the ground because he wasn't

12       complying with our commands."

13           Is that, again, to get on the ground?

14   A   Yeah -- When we tackled him?

15   Q   I don't know.  It says, "We had to take him,

16       try to put him on the ground because he wasn't

17       complying with our commands."

18   A   Right.

19   Q   What commands?

20   A   I'm assuming get on the ground.  I mean, we

21       were trying -- We were trying to get him back

22       on the ground at that point, trying to put him

23       in handcuffs, arrest him.

24   Q   "And we had to physically put him on the

25       ground and he -- We started wrestling with him

CHRISTOPHER McCANN

184

```
1    A    Another minute or two.

2    Q    Another minute or two?

3    A    (Witness nods head.)

4    Q    All right.  It goes on to say, "And then when

5         he -- Sergeant Ripple said, 'Okay, let's go

6         ahead and put him in the car.  Let's go ahead

7         and take him to jail.'  So we lifted him up

8         and started taking him over to my police car

9         to put him in the back seat to go ahead and

10        take him to jail."

11             Was it at this point he's out?

12   A    Yes.

13   Q    And y'all hadn't noticed yet?

14   A    We haven't -- yeah, we -- Yeah, we haven't

15        noticed that he's got a medical problem, no.

16        We just thought he was exhausted.  Because we

17        -- We were exhausted at this point.  So we're

18        -- We're trying to gather ourselves at this

19        point, on top of trying to do our job.  So --

20        And, you know, watching him at the same time.

21        So it took a couple of minutes to really

22        regroup and do all that.

23   Q    Said, "He weighed so much, being a 300-pound

24        guy.  It was about 20 feet from us to the car.

25        So right before we got to the car, we sat him
```

**CHRISTOPHER McCANN**

| | | |
|---|---|---|
| 1 | | down." |
| 2 | | Do you remember that? |
| 3 | A | Yeah, I do. |
| 4 | Q | So you were able to carry him 20 feet? |
| 5 | A | Yes. |
| 6 | Q | And there were four of you? |
| 7 | A | Yes. |
| 8 | Q | One on each limb? |
| 9 | A | Yes. |
| 10 | Q | And at that point, after carrying him 20 feet, |
| 11 | | before you sat him, y'all still hadn't noticed |
| 12 | | that he wasn't breathing? |
| 13 | A | No. |
| 14 | Q | And then it says you sat him down.  "And at |
| 15 | | that point when we sat him down to take a |
| 16 | | breath before we picked him back up and put |
| 17 | | him in the car -- At that point we realized, |
| 18 | | like, hey, I don't -- is he breathing?" |
| 19 | A | That's correct. |
| 20 | Q | And that's the way you remember it? |
| 21 | A | That's the way I remember it. |
| 22 | Q | You sat him down because y'all were tired of |
| 23 | | carrying him -- |
| 24 | A | Yes. |
| 25 | Q | -- for those 20 feet? |

**CHRISTOPHER McCANN**

1       and Officer Jackson, it would have been my

2       responsibility.  Because I was the primary

3       officer.

4  BY MR. HENINGER:

5  Q    Okay.

6  A    These are special circumstances, because the

7       two officers that came to help us were

8       Sergeant Ripple and Lieutenant Elia, who

9       outranked us.

10          I've always been under the understanding,

11      you know, when somebody outranks you shows up

12      on the scene, you know, they're in charge.

13 Q    Okay.

14 A    Anyway, you know.  So I guess Sergeant Ripple

15      or Lieutenant Elia would have been responsible

16      for that.

17 Q    It goes on to say, "At that point I said I

18      don't know, so we kind of rolled him over to

19      see if he was breathing."

20          He didn't appear to be breathing; right?

21 A    No.

22 Q    And it's about -- Well, it says, "He didn't

23      appear to be breathing.  He appeared to be

24      unconscious, unresponsive.  At this point a

25      paramedic, who is next door, who was down the

**CHRISTOPHER McCANN**

| | | |
|---|---|---|
| 1 | | street, was kind of observing from a distance |
| 2 | | everything that was going down.  Ran down |
| 3 | | there to us, 'Hey, do you need any help?'" |
| 4 | | Is that the way you remember it? |
| 5 | A | Yes. |
| 6 | Q | So a very timely appearance on the paramedic? |
| 7 | A | He did -- He showed up almost instantaneously. |
| 8 | Q | And he started doing CPR after y'all hog-tied |
| 9 | | him? |
| 10 | A | Chest compressions and CPR and whatever he |
| 11 | | could to try to revive him, yes. |
| 12 | Q | At any point in time, up until you recognized |
| 13 | | that you had an EDP on your hands until the |
| 14 | | paramedic starts doing CPR, had you called for |
| 15 | | any medical assistance? |
| 16 | | MR. NEWELL: |
| 17 | | Object to the form. |
| 18 | A | No. |
| 19 | Q | Once CPR was started on Mr. Rachel, at that |
| 20 | | point was medical assistance called? |
| 21 | A | Yes. |
| 22 | Q | Who called? |
| 23 | A | That, I don't remember.  I think Sergeant |
| 24 | | Ripple did, but I'm not sure. |
| 25 | Q | You go on to talk about Patrick Phillips, the |

**CHRISTOPHER McCANN**

202

```
 1   Q    And you didn't think anything of it?
 2   A    No.  I mean, we just thought he gave up and
 3        passed out from exhaustion at that point.  We
 4        didn't -- We didn't have any reason to think
 5        anything different at that particular moment
 6        in time.  We just thought he passed out and
 7        was tired.  You know, we handcuffed him, you
 8        know.  So we figure, well -- We thought, well,
 9        he knows he's hog-tied.  He knows he's
10        handcuffed.  He's given up.
11   Q    Going back to that very first contact with
12        Greg Rachel when he is in the yard and he is
13        yelling at the sky.  You follow me?
14   A    Yes.
15   Q    What is the threat to the public at that time
16        with what he is doing?
17             MR. NEWELL:
18                  Object to the form.
19   A    There was no objective -- there was no --
20        There was no danger for the public at that
21        point.
22   Q    What was the danger to you at that point?
23   A    There wasn't any danger to me at that point
24        when he was yelling at the sky and I'm
25        observing him from across the street.
```

CHRISTOPHER McCANN

1        whole goal.

2    Q    What if it's not a typo, if the audio says,

3        "We had to slam on him," what does that mean?

4    A    Slam him to the ground.

5    Q    Then it goes on to say, "When you

6        touch-stunned him, he didn't respond at all?"

7            You didn't touch-stun him, though, did

8        you?

9    A    No.

10   Q    On down, Mr. McCann -- It's like one, two,

11       three, four, five, six, seven -- eight lines

12       from the bottom.  Officer Pears is asking you,

13       "And when he was --"  "And what he was doing

14       out there, you're saying he was acting bizarre

15       and everything.  But did he ever strike either

16       one of y'all?"

17           Your answer, "No, he never -- he never --

18       He attempted to.  He did when we got him on

19       the ground once time he started kicking at

20       me."

21           Again, accurate?

22   A    Yeah, I think that's -- Yeah.  If I remember

23       right, that's right.

24   Q    "He started kicking and, you know, I was

25       trying to get him on top of -- get on top of

**CHRISTOPHER McCANN**

196

| | | |
|---|---|---|
| 1 | A | Yeah. |
| 2 | Q | "And at that point we physically engaged him |
| 3 | | and we tried to take him down on the ground |
| 4 | | and tried --" |
| 5 | A | Yeah, that's right. |
| 6 | Q | "-- tried to hit him on his stomach." |
| 7 | | Should that be tried to "get" him on his |
| 8 | | stomach or "hit" him on his stomach? |
| 9 | A | Well, we were trying to get him on his |
| 10 | | stomach.  We weren't trying to hit him.  We |
| 11 | | were trying to roll him over. |
| 12 | Q | Okay.  But it says, "We engaged him." |
| 13 | | Is that accurate? |
| 14 | A | Yes.  At this point, yes. |
| 15 | Q | "And we --" you and Officer Jackson "-- tried |
| 16 | | to take him down? |
| 17 | A | Yes. |
| 18 | Q | Looking at Page 8 about 10 lines down, your |
| 19 | | response to -- it looks like some stunning two |
| 20 | | or three times.  You said, "At that point --" |
| 21 | | "And that didn't work at that point, so we had |
| 22 | | to -- we had to get on top of him.  We had to |
| 23 | | slam on him." |
| 24 | | What does that mean? |
| 25 | A | I'm looking -- I'm trying to figure out where |

**CHRISTOPHER McCANN**

```
 1   Q     Go ahead.  I'm sorry.
 2   A     It felt -- I mean, it felt like a good 10
 3         minutes.  That's all -- I mean, that's the
 4         best I can tell you.
 5   Q     That's fine.  I just want your best -- your
 6         best answer.
 7               Going on, I'm going to paraphrase a
 8         little bit.  Ripple arrived, Elia arrived.  So
 9         they both were there and they were able to
10         assist you.
11               Then it goes on to say, "Then all four of
12         us started struggling with him on the ground,
13         and we struggled to get him handcuffed and
14         that -- you know, with their help.  So
15         probably another five to ten minutes to get
16         him handcuffed."
17   A     At least another five, yeah.
18   Q     So once they get there, it's another five?
19   A     Yeah.
20   Q     Okay.
21   A     Yeah, we continued to fight him for a little
22         while afterwards.
23   Q     All right.  Got handcuffs on him.  "At that
24         point, you know, we kind of got off -- You
25         know, we hog-tied him.  You know, where we
```

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

**CHRISTOPHER McCANN**

182

```
1              cuffed his ankles with ankle locks, you know,
2              and put him on his back.  You know, he was
3              just -- He was a big guy, he was strong, and
4              we had something to get him down.  And at that
5              point, still yelling at us -- still yelling
6              for a little while at us."
7                    So you hog-tied him.  When you hog-tie
8              somebody, they're on their stomach?
9         A    Yes.
10        Q    And that's fine.  You've got their hands
11             behind their back?
12        A    That's correct.
13        Q    And you've got their ankles shackled and you
14             tie the two together?
15        A    That's correct.
16        Q    So they're in a position of a "U" or a "V"?
17        A    Yes.
18        Q    And that's what you did to Rachel?
19        A    Yes.
20        Q    All right.  And you went on to say, "He was a
21             big guy, he was strong, and we had to do
22             something to get him down.  And at that point
23             he was still yelling at us for a little while.
24             All of a sudden, he quit and just stopped and
25             he was laying on the ground.  At that point we
```

**CHRISTOPHER McCANN**

183

1        just thought maybe he passed out or he was

2        just exhaust himself because we -- we damn

3        sure were, you know, and uh -- so we didn't

4        think much of it at first."

5            All true?

6    A   That's true.

7    Q   He was hog-tied before he got quiet?

8    A   Yes.

9    Q   In other words, he got quiet after he was

10       hog-tied?

11   A   Sometime afterwards, yes.  It all happened

12       pretty quick, but -- yeah, he was -- He was

13       still talking after we hog-tied him.

14   Q   And you didn't think anything of it at first,

15       you thought he had just worn himself out?

16   A   Yes.  Thought he just passed out -- or just

17       was tired and gave up.

18   Q   And how long do you think it was between the

19       time that he was hog-tied and when he went

20       silent?

21   A   I don't know.  a couple of minutes, three

22       minutes, maybe, at the most.

23   Q   How long do you think it was between the time

24       that he went silent and y'all noticed he

25       wasn't breathing?

**CHRISTOPHER McCANN**

1   Q    It goes on down.  "Before we moved him, he

2        quit, he quit, he passed out."

3            And Quinnie says, "Okay."

4            And you go on, "Before we moved him --

5        before we tried to move him actually, he

6        actually seized.  But the last thing that came

7        out of his mouth was 'Gestapo'  I don't know

8        what the hell that -- you know, that's --

9        that's what he said, 'Gestapo.'  That's the

10       last thing he yelled.  And then he -- then all

11       of a sudden he was just out."

12           Correct?

13   A    That's correct.

14   Q    And that's what you remember?

15   A    Yes.

16   Q    And "When he yelled that, where were y'all?"

17           And your answer was, "We were standing

18        right over him."

19   A    That's correct.

20   Q    "Just standing over him at that time?"

21           And your answer was, "Yeah."

22           Correct?

23   A    Yes.

24   Q    So did you observe him actually black out?

25   A    Yeah, we observed him passing out.

**CHRISTOPHER McCANN**

```
 1                    C E R T I F I C A T E

 2

 3   STATE OF ALABAMA   )

 4   COUNTY OF MOBILE   )

 5

 6        I, Patsy C. Poteat, CCR, as Commissioner,

 7   hereby certify that the above proceedings were taken

 8   down by me and transcribed by me using computer-aided

 9   transcription and that the above is a true and

10   correct transcript of said proceedings taken down by

11   me and transcribed by me.

12        I further certify that I am neither of kin nor

13   of counsel to any of the parties nor in anywise

14   financially interested in the outcome of this case.

15        I further certify that I am duly licensed by

16   the Alabama Board of Court Reporting as a Certified

17   Court Reporter as evidenced by the ACCR number

18   following my name found below.

19        So certified on this, the 17th day of December,

20   2014.

21

22

23

24   Commission Expires:      Patsy C. Poteat, ACCR #236

     December 18, 2016        Freelance Court Reporter

25
```

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

**CHRISTOPHER McCANN- VOLUME II**

208

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION


AMY RACHEL, as Administratrix     *
of the Estate of GREGORY RACHEL,*
Deceased,                         *
                                  *
            Plaintiff,            *
                                  *
vs.                               *   CASE NUMBER:
                                  *   1:13-CV-00522-WS-M
CITY OF MOBILE, ALABAMA,          *
et al.,                           *
                                  *
            Defendants.           *


        The continuation of the video deposition of
CHRISTOPHER McCANN was taken before Patsy C. Poteat,
CCR, as Commissioner, on December 18, 2014, by the
Plaintiff, commencing at 8:43 a.m., at the law
offices of Burr & Forman, LLP, located at 11 North
Water Street, Suite 22200, Mobile, Alabama.

## CHRISTOPHER McCANN- VOLUME II

```
 1              MR. NEWELL:
 2                   Object to the form.
 3   A     Yes.
 4              MS. COLLINS:
 5                   Have you heard your client's
 6                   testimony this week?
 7   BY MR. HENINGER:
 8   Q     How do you know that?
 9   A     How do I know that?  Because they're in his
10         home.
11   Q     Okay.  That's the only reason that you believe
12         that?
13              MS. COLLINS:
14                   Object to the form.
15   A     Yes.
16   Q     Out in the yard when you did confront
17         Mr. Rachel, did he physically attack you?
18   A     He was coming towards me at one point during
19         the altercation.  He was coming towards me and
20         Officer Jackson.
21   Q     That was the hard walk that you described --
22   A     Yes.
23   Q     -- or the purposeful walk, I think you --
24   A     Yeah.
25   Q     -- described?
```

## CHRISTOPHER McCANN- VOLUME II

```
 1  A    Correct.
 2  Q    Did he ever reach for your gun?
 3  A    No.
 4  Q    Did he ever attempt to remove the taser from
 5       you and use it on either you or Officer
 6       Jackson?
 7  A    No.
 8  Q    Did he ever attempt to obtain your baton?
 9  A    No.
10  Q    Did he ever attempt to use this cup that he
11       had as a weapon?
12  A    No.
13  Q    Did he ever attempt to use the phone that he
14       had as a weapon?
15  A    No.
16  Q    Did he ever threaten you or Officer Jackson
17       verbally?
18  A    No.
19  Q    Did he ever attempt to elude you?
20  A    No.
21  Q    Do you know what an exigent circumstance is?
22            MR. NEWELL:
23                Object to the form.
24  A    I have an idea.  But go ahead and --
25  Q    And what's your understanding of what an
```

**CHRISTOPHER McCANN- VOLUME II**

| | | |
|---|---|---|
| 1 | Q | Okay.  Any other active criminal activity |
| 2 | | occurring? |
| 3 | A | No. |
| 4 | Q | When he was on his knees, after he had thrown |
| 5 | | his phone and after he had put the cup down, |
| 6 | | was there any criminal activity occurring? |
| 7 | A | No. |
| 8 | Q | I asked you a couple of questions yesterday |
| 9 | | about tasers and your understanding of the |
| 10 | | risk associated with those, with the using on |
| 11 | | people.  Do you remember those questions? |
| 12 | A | Yes. |
| 13 | Q | And I don't want to go back through it again. |
| 14 | | But I want to change it a little bit and see |
| 15 | | if this changes your opinion at all. |
| 16 | | Have you -- Do you understand if there is |
| 17 | | any risk to a person that is mentally ill |
| 18 | | being tased multiple times in a short span of |
| 19 | | time, -- |
| 20 | | MR. NEWELL: |
| 21 | | Object to the form. |
| 22 | Q | -- any risk of injuries that you are aware of? |
| 23 | | MS. COLLINS: |
| 24 | | Object to the form. |
| 25 | | |

**CHRISTOPHER McCANN- VOLUME II**

```
 1   A     (Witness examines document.)  It actually
 2         starts over here.  (Witness examines
 3         document.)
 4              MR. NEWELL:
 5                  How far do you want him to read here?
 6              MR. HENINGER:
 7                  My question is just going to cover
 8                  that first full paragraph.
 9              MR. NEWELL:
10                  Okay.
11              MS. COLLINS:
12                  When you say first full one, the one
13                  that began on two or --
14              MR. HENINGER:
15                  Correct.
16   A     Okay.
17   BY MR. HENINGER:
18   Q     All right.  Since you read it, I am just going
19         to jump to my question.
20              Some part of this statement in that first
21         paragraph on Page 3 where you say, "Um, when
22         we were -- you know, at that point, once we
23         realized what we had, we asked her, 'Well,
24         does he have any weapons in the house?  Does
25         he have any guns?' is what he asked.  She said
```

CHRISTOPHER McCANN- VOLUME II

```
 1           no."
 2                So you were armed with that knowledge
 3           when you went into the yard?
 4                MS. COLLINS:
 5                     Object to the form.
 6    A      Based on -- Yeah, we -- We took her at her
 7           word, that there were no guns in the house.
 8    Q      Then you said, "And we asked, 'Has he been
 9           drinking, is he on an type of narcotic?'"
10                Stop there.  When you asked is he on
11           narcotic, what are you asking for?
12    A      We're asking just that.  We're asking if he's
13           on any type of drugs.
14    Q      Okay.
15    A      Anything that would alter his personality.
16    Q      So you're wanting to know is he on Zoloft or
17           BP meds, with that question?
18                MS. COLLINS:
19                     Object to the form.
20    A      No, we're wanting to know if he's on any kind
21           of medication, which would include Zoloft.
22    Q      Okay.  Had you been told he was on Zoloft,
23           would it have changed your approach?
24    A      No.
25    Q      Had you been told he was on BP meds, would it
```

CHRISTOPHER McCANN- VOLUME II

```
 1           understand, Mr. McCann.  I'm just wanting to
 2           know how long do you think you were out there
 3           just watching the home before he came out?
 4           That's what I'd like to know.
 5     A     Okay.  It wasn't very long.  I mean, we -- I
 6           would say me and Officer Jackson, when we
 7           walked out of Christy Adams' house in the
 8           front yard and starting observing the -- the
 9           Rachel house, it was probably five, maybe --
10           five or six minutes.  It wasn't long.
11     Q     Mr. McCann, go to Page 4, if you want to
12           follow me.  This middle section right here.
13     A     Yes, sir.
14     Q     It starts with "McCann."
15              So you're talking about you're observing
16           him hollering and yelling.  So you and Jackson
17           advised the operator to let 5 Sam know that we
18           have not entered the house but subject has
19           come outside.  Do you follow me there?
20     A     Yes.
21     Q     And he's extremely Signal 31.  We talked about
22           that.  We know what Signal 31 is; right?
23     A     Yes.
24     Q     Basically EDP?
25     A     Yes.
```

## CHRISTOPHER McCANN- VOLUME II

```
 1    Q    All right.  "So at that point in time, me and
 2         Jackson decided that on the way up to his yard
 3         to confront him."
 4              Have I read that correctly?
 5    A    Yes.
 6    Q    So the goal -- The ultimate goal was to arrest
 7         him?
 8    A    Yes.
 9    Q    The goal in walking up to him at that time is
10         to confront him in order to allow you to
11         arrest him?
12    A    Yes.
13    Q    "See what he was yelling and to see if we
14         could get him until (sic) control by talking
15         to him."
16              Is that "under control"?  Is that what
17         that should have been?
18    A    Yes.
19    Q    All right.  I think we've talked about the
20         rest of that yesterday in the other statement.
21         So I'm not going to do that again.
22              Going on to the next page, Page 5.
23         Corporal March asked you at the time -- you
24         were talking about him showing aggression to
25         you.  And then that's when you said, "He was
```

CHRISTOPHER McCANN- VOLUME II

```
 1            acting like a crazy man.  He was yelling and

 2            hollering.  We didn't know what his intentions

 3            were when he was coming at us."

 4                 And we're talked about that; right?

 5   A    Yes.

 6   Q    Corporal March asked you, "Was he saying

 7            anything to y'all at that point?"

 8                 Your response was, "No, he wasn't saying

 9            anything direct.  Yeah, he was yelling -- He

10            was yelling, 'Protect me from Obama.'  A lot

11            of crazy things that were totally irrational

12            that didn't make any sense."

13                 Do you remember that?

14   A    Yes.

15   Q    And, again, he wasn't talking to you or

16            Officer Jackson?

17                 MS. COLLINS:

18                     Object to the form.

19                 MR. NEWELL:

20                     Object to the form.

21   A    No.  No, he wasn't.  I mean, he -- I mean, he

22            looked at us -- He looked at us, you know,

23            when we approached him, but -- And he was

24            rambling and making a lot of incoherent

25            statements that I allude to in this statement,
```

**CHRISTOPHER McCANN- VOLUME II**

1          that I allude to here.  But I'm not sure who

2          he was talking to or what he was talking to.

3          Even though he may have been looking at us at

4          some point.

5     BY MR. HENINGER:

6     Q    So when he said "protect me," you --

7               Let me ask you.  Did you get the

8          impression that he was actually asking you or

9          Officer Jackson to protect him?

10              MS. COLLINS:

11                   Object to the form.

12              MR. NEWELL:

13                   Object to the form.

14    A    Yes.  But I thought he was out of his mind.

15    BY MR. HENINGER:

16    Q    There's been some description of people who

17         are mentally ill or EDPs that have that

18         thousand-yard stare.  Do you know what I'm

19         talking about?

20              MS. COLLINS:

21                   Object to the form.

22    A    Yes.

23    Q    Would you qualify his look in his eyes like

24         that?

25

CHRISTOPHER McCANN- VOLUME II

1           MR. NEWELL:

2                Object to the form.

3    A    Yes.  It seems to me like he was looking

4         through us.

5    Q    Going on down talking about the stunning of

6         him, the tasers and they weren't working.  And

7         you say that at that point we knew that you're

8         going to have to take him down and put him on

9         the ground physically.  And Officer Jackson

10        got tied up with him, dry-stunned him two or

11        three times while he was standing up to try to

12        knock him down again, and that worked.

13             Let me stop a second.  Do you remember

14        that?

15             MR. NEWELL:

16                Object to the form.

17   A    Once -- Once the physical engagement started,

18        we actually started having to, you know,

19        physically get tied up with him and tangled up

20        with him and went to the ground.  It is hard

21        for me to recall exactly what all transpired

22        during that struggle.  And when I gave

23        Sergeant March this statement, I recalled from

24        the best I could remember then.  And my best

25        memory now is I don't remember how many times

## CHRISTOPHER McCANN- VOLUME II

```
 1           physical confrontation with y'all?"
 2                Your answer was, "No."
 3                Correct?
 4    A    That's correct.
 5    Q    Corporal March asked, "Did he swing at you?".
 6                And your answer was, "No.  He never swung
 7           his fist at me.  I can't say he did."
 8                Did I read that correctly?
 9    A    That's correct.
10    Q    Do you believe that was truthful at the time
11           of giving this statement?
12    A    Yes.
13    Q    Going to Page 10, Mr. McCann.  You there?
14    A    Yeah.
15    Q    Corporal March asked, "Did anybody check on
16           him after he passed out?  You said it appeared
17           he may be passed out or just gave up or
18           relaxed."
19                Your response, "No, we didn't check on
20           him, but we're not medics, either."
21                Correct?
22    A    That's correct.
23    Q    And that's a truthful statement?
24    A    That's a truthful statement.
25    Q    I may have asked you this yesterday, and I
```

CHRISTOPHER McCANN- VOLUME II

```
 1              MR. NEWELL:
 2                   Object to the form.
 3  BY MR. HENINGER:
 4  Q    -- who was observing Mr. Rachel to see if he
 5       was responsive?
 6              MS. COLLINS:
 7                   Object to the form.
 8              MR. NEWELL:
 9                   Object to the form.
10  A    Myself, Officer Jackson, and Sergeant Ripple
11       were observing him.  I can't remember if
12       Lieutenant Elia had left the scene at that
13       point or not.  He may -- He may have left at
14       that point.  I don't remember.
15  BY MR. HENINGER:
16  Q    So is it your testimony, Mr. McCann, that you
17       watched him pass out?
18  A    Yes.
19  Q    And you observed him being passed out for
20       three to five minutes?
21              MS. COLLINS:
22                   Object to the form.
23              MR. NEWELL:
24                   Object to the form.
25  A    Yes.
```

**CHRISTOPHER McCANN- VOLUME II**

```
 1   BY MR. HENINGER:

 2   Q     And during that entire time no one went to

 3         check on him to see if he was breathing?

 4              MR. NEWELL:

 5                   Object to the form.

 6   A     No.  We thought he was breathing.

 7   Q     You thought -- What gave you the impression

 8         that he was breathing if you didn't check on

 9         him?

10   A     Because nobody has ever passed out on us when

11         we handcuffed them and died.

12   Q     So you're just going on what has happened in

13         the past, not what's going to be consistent

14         with this individual?

15              MR. ROSSLER:

16                   Object to the form.

17   A     Yes.

18   Q     Go to Page 8, Mr. McCann.  About the middle of

19         the page.  It's going to be down here, just to

20         help you out.

21   A     Okay.

22   Q     Talk about again he was yelling.  I'm not

23         going to go into that again.  Corporal March

24         asked you, "Other than him trying to kick you,

25         did he do anything else, as far as any kind of
```

## CHRISTOPHER McCANN- VOLUME II

255

```
 1          apologize.  But have you ever been trained to

 2          observe subjects that you have arrested to

 3          ensure that they are breathing?

 4               MS. COLLINS:

 5                    Object to the form.

 6     A    No.

 7     Q    Do you believe that you have any obligation to

 8          monitor a suspect that's in your custody to

 9          ensure that he's breathing?

10               MS. COLLINS:

11                    Object to the form.

12               MR. NEWELL:

13                    Object to the form.

14     A    Yes.

15     BY MR. HENINGER:

16     Q    But that wasn't done here?

17               MS. COLLINS:

18                    Object to the form.

19               MR. NEWELL:

20                    Object to the form.

21     A    He was breathing, to my knowledge.  As far as

22          I -- As far as I could tell, he was breathing,

23          until I couldn't tell he was breathing.

24     BY MR. HENINGER:

25     Q    What signs or symptoms did you see that told
```

**CHRISTOPHER McCANN- VOLUME II**

```
 1        side, tell me what that means.

 2   A    Well, he was -- He was in the four-point

 3        restraint at that point.  And it's easy to

 4        rock a guy and lean them over, especially a

 5        big guy, to where their stomach can breathe in

 6        and out and they have a clear passage of

 7        airway and their face is not directed in the

 8        mud.

 9             And that's how we had him.  We had him

10        tilted.  He was on his stomach, but we had him

11        tilted at an angle, like this.  (Indicating.)

12   Q    And his head is turned?

13   A    His head is turned that way.  (Indicating.)

14   Q    Okay.

15             MR. ROSSLER:

16                  Indicating sideways?

17             THE WITNESS:

18                  Sideways, yes.

19   BY MR. HENINGER:

20   Q    It goes on to talk about when you picked him

21        up.  And I think we talked about this

22        yesterday.  But the four of you picked up,

23        each man on a limb?

24   A    Yes.

25   Q    And when you picked him up, he was totally
```

**CHRISTOPHER McCANN- VOLUME II**

| | | |
|---|---|---|
| 1 | | limp? |
| 2 | A | Yes. |
| 3 | Q | And at that point, I think you told me |
| 4 | | yesterday you carried him about 20 feet? |
| 5 | A | I don't remember telling you I carried him 20 |
| 6 | | feet.  Maybe -- I don't remember that |
| 7 | | question.  Maybe I did. |
| 8 | Q | All right.  How far did you carry him, then? |
| 9 | A | (No response.) |
| 10 | Q | Sir? |
| 11 | A | Yeah, that's probably about right.  I probably |
| 12 | | carried him about -- I probably did carry him |
| 13 | | -- We probably did carry him about 20 feet. |
| 14 | Q | All right.  And you stopped because y'all were |
| 15 | | tired? |
| 16 | A | That's correct. |
| 17 | Q | Put him down? |
| 18 | A | Yes. |
| 19 | Q | And at that point, somebody says, "Is he |
| 20 | | breathing?" |
| 21 | A | Yeah, we put him back down, yes.  That's when |
| 22 | | we kind of realized there was something wrong. |
| 23 | Q | I don't know who Lewis is in this statement or |
| 24 | | this questioning-and-answer period, |
| 25 | | Mr. McCann.  But he chimes in and says, "Did |

CHRISTOPHER McCANN- VOLUME II

263

```
 1          recognizing and handling persons with mental
 2          illness.  And it's to all personnel.  That
 3          would mean you?  You're included in that;
 4          correct?
 5   A      Yes.
 6   Q      So this entire policy, you're subject to it?
 7   A      Yes.
 8   Q      Required to follow it?
 9   A      Yes.
10   Q      The purpose is to "Enhance officers' ability
11          to recognize, understand, and deal with a
12          person with mental illness."
13               See where I have read that?
14   A      Yes.
15   Q      So it sounds to me like there's three
16          problems.  One, recognizing people with mental
17          illnesses; true?
18   A      Yes.
19   Q      Two, understand people with mental illnesses;
20          correct?
21               MS. COLLINS:
22                    Object to the form.
23   A      Yes.
24   Q      And deal with people that are suffering from
25          mental illness; correct?
```

## CHRISTOPHER McCANN- VOLUME II

```
1              before you get to, "Approaching and
2              interacting with a person with mental
3              illness."
4                   THE WITNESS:
5                        Show me, if you know where he's
6                        talking about.
7    Q    I'll show you.  It's this last sentence, "As
8         indicated above --"
9    A    Okay.  (Witness examines document.)  Yeah, I
10        would agree with that.
11   Q    Okay.  It goes on to say, "Approaching and
12        interacting with a person with mental
13        illness."
14             Do you see where I've read that?
15   A    (No response.)
16   Q    It's the next sentence.
17   A    Okay.  Yeah.  Okay.
18   Q    And then it goes on to say, "Officers should
19        do the following."  And it lists several
20        things that should be done.  Okay?
21   A    Okay.
22   Q    Were you trained on the things that you should
23        do?
24   A    Yes.
25   Q    Are you supposed to follow them?
```

**CHRISTOPHER McCANN- VOLUME II**

```
 1   A   Yes.
 2   Q   Next page.  "Behaviors that the officer should
 3       avoid."
 4           Do you see where I'm reading from?
 5   A   Yes.
 6   Q   "Officers should not do the following."  And
 7       when it says "should not," what do you take
 8       that to mean?
 9   A   It means don't do it.
10   Q   Had you been trained on the things that you
11       should not do?
12   A   Yes.
13   Q   Are you supposed to follow these --
14   A   Yes.
15   Q   -- rules?
16   A   Yes.
17   Q   And I'd just like you just to read "A" through
18       "J" silent, aloud, or whatever you want to do.
19   A   Okay.
20   Q   I want to ask you some questions about them.
21   A   All right.  (Witness examines document.)
22       Okay.
23   Q   All right.
24   A   Let me say, these general orders, --
25   Q   Yes, sir.
```

```
 1            there's any signs of violence and the subject
 2            is on the scene to be arrested.  Because that
 3            is state law.  And if we don't, and we cut
 4            that person loose, whether they're crazy or
 5            not, and they kill their spouse later, we're
 6            liable.  It's that simple.  I can't make it
 7            any clearer.  That's what we did -- That's
 8            what we tried to do.
 9   BY MR. HENINGER:
10   Q    When a police officer encounters a subject in
11        an effort to make an arrest, is an officer
12        allowed to do something which precipitates the
13        need for increased force?
14            MR. NEWELL:
15                Object to the form.
16            MS. COLLINS:
17                Object to the form.
18   A    Precipitates need for -- Rephrase the
19        question.
20   BY MR. HENINGER:
21   Q    Instigate the need for use of force?
22            MS. COLLINS:
23                Object to the form.
24            MR. NEWELL:
25                Object to the form.
```

CHRISTOPHER McCANN- VOLUME II

278

1    A     Are we allowed to do that?

2    BY MR. HENINGER:

3    Q     Yes, sir.

4    A     No.

5    Q     I'll ask you to go to Page 3 of -- It should

6          be the next page, Mr. McCann.  It will starts

7          off with "Communication."  And I simply want

8          to ask you this.  In the two statements that

9          we've read and the conversations that we've

10         had over the past several hours, have you told

11         us everything that was said, to the best of

12         your ability, between you and Mr. Rachel on

13         that particular morning?

14              MS. COLLINS:

15                   Object to the form.

16              MR. NEWELL:

17                   Object to the form.

18   A     Yes.

19   BY MR. HENINGER:

20   Q     The next heading is "Symptoms of Mental

21         Illness."  I just want to ask you, have you

22         been trained on this list of possible signs

23         and symptoms of mental illness in an

24         individual?

25   A     Yes.

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

**CHRISTOPHER McCANN- VOLUME II**

279

```
 1    Q    Are you competent to follow these guidelines
 2         or rules?
 3    A    Yes.  Based on my knowledge and what I have
 4         been told, yes.
 5    Q    Are you required to follow these rules?
 6              MR. NEWELL:
 7                  Object to the form.
 8    A    I'm required to follow state law first.
 9    Q    Okay.  So, in your opinion, as far as the
10         hierarchy is concerned, state law is at the
11         top?
12    A    That's correct.
13    Q    Mobile Police Department policies and
14         procedures second?
15    A    That's correct.
16    Q    So then at the bottom, Mr. McCann, reads
17         "Recognizing characteristics of mental
18         illness."
19              I am going to ask you, have you been
20         trained on recognizing characteristics of
21         mental illness?
22    A    Yes.
23    Q    Do you believe you're competent to do so?
24    A    Yes.
25    Q    Do you believe you're supposed to follow it?
```

**CHRISTOPHER McCANN- VOLUME II**

| | | |
|---|---|---|
| 1 | A | Yes. I believe we're supposed to make an |
| 2 | | effort, yes. |
| 3 | Q | And under that heading -- And it has two |
| 4 | | subheadings. One is "Cognitive symptoms of a |
| 5 | | serious mental illness." |
| 6 | A | Okay. |
| 7 | Q | Same question. Have you been trained how to |
| 8 | | recognize cognitive symptoms of a mental |
| 9 | | illness? |
| 10 | | MR. NEWELL: |
| 11 | | Object to the form. |
| 12 | A | We have, but it's been -- It's been, you know, |
| 13 | | very limited. |
| 14 | Q | What do you mean it's been very limited? |
| 15 | A | I mean, it's -- I mean, we don't have doctor |
| 16 | | degrees in psychology. We're not trained to |
| 17 | | go out there and diagnose every crazy person |
| 18 | | that we come across that has committed a |
| 19 | | crime. We're required to put them in jail. |
| 20 | | They give us minimum training to recognize if |
| 21 | | somebody's outside of their mind. But the |
| 22 | | objective is to put them in jail if they have |
| 23 | | committed a crime. It's not to counsel them |
| 24 | | or rehabilitate them mentally. That's what I |
| 25 | | mean. |

CHRISTOPHER McCANN- VOLUME II

```
 1   A      I don't know.
 2   Q      Are you competent to recognize confusion?
 3          MR. NEWELL:
 4              Object to the form.
 5   A      Yeah, I can recognize that.
 6   Q      It goes on to say -- and it lists, "In
 7          addition --" On Section C, next page.  "In
 8          addition to the symptoms outlined above --"
 9          You know, there are some more symptoms that
10          you might want to be looking for.  "1, changes
11          in behavioral patterns and attitudes."
12              Do you think you are trained and
13          competent to pick up severe changes in
14          behavior patterns and attitudes?
15          MR. NEWELL:
16              Object to the form.
17   A      You don't really need training in that.  All
18          you need is a little bit of common sense.  You
19          can tell when somebody's mood has changed.  I
20          think everybody in this room can do that.
21   Q      All right.  Are you -- Have you been trained
22          and competent in the ability to recognize
23          unusual/bizarre behaviors or mannerisms?
24          MR. NEWELL:
25              Object to the form.
```

**CHRISTOPHER McCANN- VOLUME II**

1  A    I don't think any training in that, either.

2       You can pretty much recognize when somebody's

3       acting bizarre or unusual.

4  Q    Same question with Number 3.  Have you been

5       trained and competent to recognize

6       threatening, aggressive, or hostile behavior?

7            MR. NEWELL:

8                 Object to the form.

9  A    You don't need training for that, either.  You

10      know if somebody is trying to harm you.

11 Q    What about suicidal or self-injurious

12      behavior?

13           MR. NEWELL:

14                Object to the form.

15 A    No, I've never been -- never -- You know, I've

16      never had any training on -- You can recognize

17      it.  You don't need -- You don't need train --

18      I mean, if somebody is trying to harm

19      themselves, trying to take their own life, you

20      know, and they've -- and they've articulated

21      that to you or someone else -- a witness has

22      articulated that to you, you don't need

23      training to know that they're trying to commit

24      suicide.  You just need somebody's word for

25      it.

## CHRISTOPHER McCANN- VOLUME II

1   Q      Did we have that in this situation, suicidal
2          efforts?
3   A      No, we didn't.
4   Q      Okay.  Episodes of excessive spending.  Can
5          you recognize that?  Can you be trained on
6          that?
7   A      Episodes of excessive spending.  I'm not sure
8          what that means.
9               MS. COLLINS:
10                   It happens to me all the time.
11  A      Other than, yeah, spending money, I'm not sure
12         what that means.
13              MR. HENINGER:
14                   Evidence of mental illness, Betsy.
15              MS. COLLINS:
16                   Well, that was a given.
17  BY MR. HENINGER:
18  Q      Withdrawn behavior or refusal to speak.
19         Again, common sense?
20  A      You can clearly recognize that.
21  Q      Talking to themselves or one-sided
22         conversations.  You can recognize that?
23  A      Yes.
24  Q      Been trained on how to deal with that?
25  A      If we have, I don't remember.

CHRISTOPHER McCANN- VOLUME II

```
 1   Q    One through eight, what we have been through,
 2        we can agree that common sense, living amongst
 3        people, you can recognize these things?
 4   A    Yes.
 5   Q    Have you been trained as a police officer on
 6        how to deal with these things when you
 7        encounter a subject?
 8   A    I would -- I would say no.  I would say -- I
 9        would say the police department probably
10        depends on us to use our common sense and our
11        good -- and better judgment on how to deal
12        with certain situations, certain
13        personalities, at certain times.  That's just
14        part of the job.  It comes with it.
15   Q    Okay.  "Symptoms to be aware of from subjects
16        in custody and the police response to persons
17        in an excited state."
18             Have you been trained on how to recognize
19        these symptoms?
20             MR. NEWELL:
21                  Object to the form.
22   A    No, I can't say I have.  If I have, I don't
23        remember.  You know, I don't remember anybody
24        like going over with me how you deal with this
25        person who is, you know, high.  You know, this
```

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969

CHRISTOPHER McCANN- VOLUME II

1        is how you better handle them.  I don't -- I

2        don't remember.

3  Q    We've talked about excited delirium yesterday.

4        Again, I apologize if I've asked this question

5        already.  I don't remember it.  Have you been

6        trained on dealing with individuals that are

7        suffering from excited delirium?

8           MR. NEWELL:

9              Object to the form.

10  A    No, I have not.

11  Q    It lists -- This is in Subparagraph E, if you

12       want to look at it.  It lists several symptoms

13       or signs which may be present to indicate

14       excited delirium.  So let me just ask you if

15       they applied to Mr. Rachel at the time you

16       encountered him.  Okay?

17  A    Okay.

18  Q    Bizarre and/or aggressive behavior?

19  A    Yeah, that applied to him.

20  Q    Self-inflicting injury?

21  A    No.

22  Q    Shouting?

23  A    Yes.

24  Q    Dilated pupils?

25  A    I don't know.

**CHRISTOPHER McCANN- VOLUME II**

| | | |
|---|---|---|
| 1 | Q | Paranoia? |
| 2 | A | Yes. |
| 3 | Q | Hallucinations? |
| 4 | A | I don't know if he was -- I don't know if he |
| 5 | | was hallucinating or not.  I think he was. |
| 6 | Q | Panic? |
| 7 | A | Yes. |
| 8 | Q | Undressing in public? |
| 9 | A | No. |
| 10 | Q | Violence towards others? |
| 11 | A | Yes. |
| 12 | Q | Hearing voices? |
| 13 | A | I don't know if he was or not. |
| 14 | Q | Unexpected physical strength? |
| 15 | A | Yes. |
| 16 | Q | Seizures? |
| 17 | A | No, he didn't have any seizures that night. |
| 18 | Q | Sudden tranquility? |
| 19 | A | What is sudden tranquility? |
| 20 | Q | That's a good question.  I take that to mean |
| 21 | | they stop all of a sudden and become very |
| 22 | | peaceful.  And that's my definition.  If you |
| 23 | | know it to be something else, I want to use |
| 24 | | yours. |
| 25 | A | Okay.  No, he -- That didn't apply to him. |

**CHRISTOPHER McCANN- VOLUME II**

```
 1   Q    High pulse rate?

 2   A    I don't know.  I didn't check his pulse.

 3   Q    Hypothermia -- hyperthermia?  Excuse me.

 4   A    Where they get real cold?

 5            MS. COLLINS:

 6                Hot.

 7   Q    Hot.

 8   A    Hot.  Okay.  I don't know.

 9   Q    Fair enough.  Thrashing after restraint?

10   A    Thrashing after restraint.  That's pretty

11        vague, thrashing after restraint.

12   Q    Is that an "I don't know"?

13   A    I don't know.

14   Q    Okay.  I don't want to try and interpret

15        these, Mr. McCann.

16            So hiding behind bushes, trees, or cars?

17   A    No.

18   Q    Yelling incoherently?

19   A    Yes.

20   Q    Feeling bugs on or under skin?

21   A    No.

22   Q    Prone to break glass?

23   A    No.

24   Q    Aggression towards objects?

25   A    Well, he threw his phone out in the street.
```

## CHRISTOPHER McCANN- VOLUME II

1       So I guess so.

2  Q   And jumping into water?

3  A   No.

4  Q   All right.  A few more questions on this.

5       It says, "To  help ensure safety and

6      minimize the risk of sudden in-custody death,

7      officers should be aware of these symptoms."

8       Did you know or were you aware of these

9      symptoms before your encounter with

10     Mr. Rachel?

11  A   No.

12  Q   "When these symptoms are recognized, a medical

13     unit shall be started to the location

14     immediately."

15      Based on your statement and what we've

16     talked about, a medical unit wasn't started

17     until Sergeant Ripple recognized that he

18     wasn't breathing?

19      MR. NEWELL:

20        Object to the form.

21  Q   Is that fair?

22      MR. NEWELL:

23        Object to the form.

24  A   That's correct.

25  Q   Next to the last paragraph.  "Certain persons

## CHRISTOPHER McCANN- VOLUME II

```
 1        all you want to add?
 2   A    Yes.
 3   Q    I'm sorry.  Okay.  Do you want to change any
 4        answers that you've given me?
 5   A    No.
 6   Q    When you are effectuating that arrest, does
 7        state law also require you to do it safely?
 8            MS. COLLINS:
 9                Object to the form.
10            MR. NEWELL:
11                Object to the form.
12   A    I don't know.
13   BY MR. HENINGER:
14   Q    Does the Mobile Police Department require you
15        to effectuate an arrest safely?
16            MR. NEWELL:
17                Object to the form.
18   A    I don't know.  But I believe that they would
19        -- they would want us to do it as safely as we
20        can.
21   Q    And so that's why you have other rules or
22        general orders to go by so that you can
23        effectuate the domestic violence arrest that
24        you spoke about, in a safe manner?
25
```

MR. NEWELL:

Object to the form.

A That's fair.

Q Okay.

(Exhibit Number 40 was marked for identification.)

Q I show you what I've marked as Exhibit 40, which is the -- I'm sorry, it's the City 401 through 409. It is the Taser Policy and Use Report.

Mr. McCann, have you seen Exhibit 40 before?

A Yes.

Q Have you been trained on Exhibit 40?

A Yes.

Q Essentially, this is use of a taser in the line and scope of your duty; correct?

A Yes.

Q And I am not going to belabor the point. But we talked about your training involving using taser?

A Yes.

Q Okay. It says in this policy -- Let me see if

**CHRISTOPHER McCANN- VOLUME II**

```
 1         lethal weapons.  Okay?
 2    A    Um-hum.
 3    Q    Which, my understanding -- To move this on
 4         quickly, less lethal weapons are the shotgun
 5         -- or bean bag shotgun?
 6    A    Yes.
 7    Q    And tasers?
 8    A    Yes.
 9    Q    And I would suspect, in self-defense,
10         hand-to-hand.  Would that include lethal --
11         excuse me, less lethal force?
12              MS. COLLINS:
13                   Object to the form.
14              MR. NEWELL:
15                   Object to the form.
16    A    Yes.
17 BY MR. HENINGER:
18    Q    So 1.3.5, Medical Aid, "Appropriate medical
19         aid shall be rendered after the use of lethal
20         or less lethal weapons or tactics in order to
21         minimize the severity of injury."
22              Have I read that correctly?
23    A    Yes.
24    Q    Have you been trained on that aspect of the
25         rules of the Mobile Police Department?
```

## CHRISTOPHER McCANN- VOLUME II

300

| 1 | A | Yes. |
|---|---|---|

 2  Q    Were you trained and aware of that before the
 3       Rachel incident?
 4  A    Yes.
 5  Q    It goes on to say, "Appropriate medical aid
 6       includes increased observation to detect
 7       obvious changes in condition."
 8            Have I read that correctly?
 9  A    Yes.
10  Q    Have you been trained on that as of the time
11       of the Rachel incident?
12  A    Yes.
13  Q    Were you competent to perform that rule?
14  A    I thought we were.
15  Q    All right.  And it also talks about "flushing
16       chemical agents from the eyes, applying first
17       aid, evaluation by the paramedics, or
18       immediate aid by medical professionals."
19            Have I read that correctly?
20  A    Yes.
21  Q    Are you trained to follow those rules?
22  A    Yes.
23  Q    Were you competent to do so at the time of the
24       Rachel incident?
25  A    Yes.

CHRISTOPHER McCANN- VOLUME II

```
 1   Q     At any time before the four officers put
 2         Mr. Rachel down and Sergeant Ripple checked
 3         his eyes to see if they were dilated, had any
 4         medical aid been requested?
 5               MR. NEWELL:
 6                    Object to the form.
 7   A     I'm not sure when Sergeant Ripple called for
 8         medical.
 9   Q     Then I'll ask him about that.
10   A     Okay.
11   Q     But at any time before Sergeant Ripple called
12         for medical, did you request medical aid?
13   A     No.
14   Q     Did you ever say that you would request
15         medical aid be put on standby?
16   A     No.
17   Q     Did Officer Jackson?
18   A     No.
19   Q     Did Elia?  Did I pronounce his name right?
20   A     Did you say Elia?
21   Q     Elia.
22   A     Not to my knowledge.
23   Q     So Ripple would have been the only one, as you
24         are aware, that would have requested medical
25         aid?
```

**CHRISTOPHER McCANN- VOLUME II**

```
 1                    C E R T I F I C A T E

 2

 3    STATE OF ALABAMA   )

 4    COUNTY OF MOBILE   )

 5

 6         I, Patsy C. Poteat, CCR, as Commissioner,

 7    hereby certify that the above proceedings were taken

 8    down by me and transcribed by me using computer-aided

 9    transcription and that the above is a true and

10    correct transcript of said proceedings taken down by

11    me and transcribed by me.

12         I further certify that I am neither of kin nor

13    of counsel to any of the parties nor in anywise

14    financially interested in the outcome of this case.

15         I further certify that I am duly licensed by

16    the Alabama Board of Court Reporting as a Certified

17    Court Reporter as evidenced by the ACCR number

18    following my name found below.

19         So certified on this, the 18th day of December,

20    2014.

21

22

23

24    Commission Expires:       Patsy C. Poteat, ACCR #236

      December 18, 2016         Freelance Court Reporter

25
```