# EXHIBIT "D"

JOHN FRANKLIN JACKSON

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

AMY RACHEL, as Administratrix     *
of the Estate of GREGORY RACHEL, *
Deceased,                         *
                                  *
          Plaintiff,              *
                                  *
vs.                               *   CASE NUMBER:
                                  *   1:13-CV-00522-WS-M
CITY OF MOBILE, ALABAMA,          *
et al.,                           *
                                  *
          Defendants.             *

        The video deposition of JOHN FRANKLIN JACKSON
was taken before Patsy C. Poteat, CCR, as
Commissioner, on December 18, 2014, by the Plaintiff,
commencing at 1:33 p.m., at the law offices of Burr &
Forman, LLP, located at 11 North Water Street, Suite
22200, Mobile, Alabama.

### JOHN FRANKLIN JACKSON

```
 1        We've looked at -- Is a memorandum order
 2        started with M.O.?
 3   A    Yes.
 4   Q    All right.  Are those just as significant as
 5        general orders?
 6   A    Yes.
 7   Q    Supposed to be followed just the same?
 8   A    Yes.
 9   Q    And how often do, if you know, memorandum
10        orders come out?
11   A    It varies.  Some days -- We get them in an
12        email.  And some days you'll log into your
13        email and there may not be any, and there may
14        be five or six or one or two.  It just --
15        There's no rhyme or reason to it.  It's just
16        when they put them out.
17   Q    So if you get a memorandum order in an email,
18        are you expected to review it?
19   A    Yes.
20   Q    Are you expected to understand it?
21   A    I would imagine so, yes.
22   Q    Are you given opportunities to ask questions
23        about it?
24   A    Not at that time.
25   Q    At a later time?
```

### JOHN FRANKLIN JACKSON

16

| | | |
|---|---|---|
| 1 | A | Well, that would usually come up during your |
| 2 | | in-service training. |
| 3 | Q | So they send you an email prior to in-service |
| 4 | | so you'll know what you're to be in-servicing |
| 5 | | about? |
| 6 | A | Yes. |
| 7 | Q | All right.  And is it during that in-service |
| 8 | | training that you get, I guess trained on the |
| 9 | | M.O.s? |
| 10 | A | Yes. |
| 11 | Q | When I say "M.O." we're talking about a |
| 12 | | memorandum order; right? |
| 13 | A | Yes. |
| 14 | Q | Okay.  What about the general orders, do you |
| 15 | | have to be retrained on general orders? |
| 16 | A | If new ones come out, they'll do the same |
| 17 | | procedure with them. |
| 18 | Q | Okay.  I interrupted you.  You said you looked |
| 19 | | at some of the memorandum orders and general |
| 20 | | orders, right, in preparation for today? |
| 21 | A | Right.  Just there were a couple of memorandum |
| 22 | | orders. |
| 23 | Q | Okay.  So you didn't look at the general |
| 24 | | orders? |
| 25 | A | No. |

JOHN FRANKLIN JACKSON

26

 1        Exhibit 39, until after the Rachel incident?
 2   A    Correct.
 3   Q    But you had received the M.O.?
 4   A    Correct.
 5   Q    And had you had an opportunity to read it?
 6   A    I would say no.
 7   Q    YOu hadn't?  Did you read it?
 8   A    I have read it, but --
 9   Q    Before the Rachel incident did you read it?
10   A    No, I had not read it.  They gave me -- When I
11        came on, they gave me the memorandum orders
12        and the general orders, which are probably
13        about the size of your binder.
14   Q    Right.
15   A    And, in addition, I was supposed to read
16        through those as I did my job.
17   Q    Okay.  So let me make sure I have got my dates
18        right.  I'm kind of lost on my notes.  But
19        this comes on March 24, 2011.  You come on the
20        force for the second time when?
21   A    August --
22   Q    August?
23   A    -- 3 or 4, 2011.
24   Q    Okay.  And they hand you a notebook with the
25        general orders and memorandum orders and say,

### JOHN FRANKLIN JACKSON

| | | |
|---|---|---|
| 1 | Q | As far as what the MPD expected you to do in |
| 2 | | April/May of 2012, regarding this memorandum |
| 3 | | order about dealing with people with mental |
| 4 | | illness, you wouldn't be able to tell me what |
| 5 | | specifically was in there? |
| 6 | | MR. BRANDYBURG: |
| 7 | | Object to the form. |
| 8 | A | Right.  At that time, no. |
| 9 | Q | Was there such an order in effect during those |
| 10 | | first six years that you were with MPD? |
| 11 | A | No. |
| 12 | Q | So when you came on in August, this was a -- a |
| 13 | | new set of rules for you, as far as dealing |
| 14 | | with mentally-ill people? |
| 15 | A | Correct. |
| 16 | Q | That's not something that you had been exposed |
| 17 | | to the first six years that you were with the |
| 18 | | force? |
| 19 | A | Correct. |
| 20 | Q | The general orders from the Mobile Police |
| 21 | | Department, as a police officer, you're |
| 22 | | required to follow? |
| 23 | A | Correct. |
| 24 | Q | The memorandum orders from the Mobile Police |
| 25 | | Department, as a police officer, you're |

JOHN FRANKLIN JACKSON

```
 1          required to follow?
 2    A     Correct.  My understanding of the memorandum
 3          orders, they are a guideline that, in best
 4          circumstances, we should follow.
 5    Q     And where did you obtain that understanding
 6          that they are simply a guideline?
 7    A     I'm not going to be able to tell you who told
 8          me that.  But it just -- Things have been
 9          explained.  And it may not have been
10          instructors.  It was just something that I was
11          told.
12    Q     By whom?
13    A     I could not recall that.
14    Q     Do you think it's somebody that's in
15          authority?
16    A     I couldn't even tell you if it was a
17          supervisor.
18    Q     I'm just -- I mean, you mentioned that you've
19          been through now Exhibit 39 pretty closely --
20    A     Right.
21    Q     -- as a result of this litigation?
22    A     True.
23    Q     Do you see anywhere in there in Exhibit 39
24          where it says this is simply a guideline under
25          best circumstances?
```

## JOHN FRANKLIN JACKSON

```
 1              MR. BRANDYBURG:
 2                  Object to the form.
 3   A    No.
 4   Q    Okay.
 5   A    But it doesn't state that this is what must be
 6        done.
 7   Q    So when it says, "Officer should do the
 8        following," what does that mean to you?
 9   A    It -- My understanding is you would do this if
10        at all possible.
11   Q    If it says, "Officer should not do the
12        following," what does that say to you?
13   A    That, if at all possible, that should be
14        avoided.
15   Q    The in-service training that you received,
16        were there ever any videos shown or used in
17        those training methods?
18   A    There are.
19   Q    Do you remember if there are any videos used
20        to help train the police officers in those
21        four categories that we talked about:  EDPs,
22        mentally-disturbed persons, people with mental
23        illness, or Signal 31s?
24   A    I don't remember.
25   Q    Is the -- Strike that.
```

JOHN FRANKLIN JACKSON

32

| | | |
|---|---|---|
| 1 | A | (No response.) |
| 2 | Q | For example, would your supervisor know who it |
| 3 | | is that's going to be the supervisor to make |
| 4 | | sure that everyone's trained? |
| 5 | A | She might. |
| 6 | Q | Okay.  Would any of your fellow officers other |
| 7 | | than McCann know? |
| 8 | A | They might. |
| 9 | Q | Elia or Ripple? |
| 10 | A | They might. |
| 11 | Q | You just don't know who it is? |
| 12 | A | I just don't know who is assigned to oversee |
| 13 | | the -- It's going to be probably -- I would |
| 14 | | imagine a lieutenant or a captain. |
| 15 | Q | How tall are you? |
| 16 | A | Five-ten. |
| 17 | Q | How much do you weigh? |
| 18 | A | 185. |
| 19 | Q | Was that how much you weighed in April/May of |
| 20 | | 2012? |
| 21 | A | Yes, sir. |
| 22 | Q | You've been able to maintain your weight? |
| 23 | A | I wish I'd be able to do that.  Let me show |
| 24 | | you what I'm marking as Plaintiff's -- excuse |
| 25 | | me, just Exhibit 46. |

JOHN FRANKLIN JACKSON

```
 1              (Exhibit Number 46 was marked for
 2              identification.)
 3
 4    Q    Is that a photograph of yourself?
 5    A    It is.
 6    Q    Was that taken the day of this particular
 7         incident with Mr. Rachel?
 8    A    It was.
 9    Q    Did you receive any injuries in this
10         confrontation?
11    A    No, sir.
12    Q    I meant to ask you this.  With regard to the
13         general orders -- And I'll really get a little
14         bit more specifically later -- But do you have
15         permission by your supervisors to disregard
16         any of the general orders or memorandum
17         orders?
18            MS. COLLINS:
19                Object to the form.
20    A    No.
21    Q    Do you have discretion to disregard any of the
22         orders?
23    A    That would depend on the specific situation.
24    Q    So you think there is a situation or there
25         could arise a situation where you are -- could
```

JOHN FRANKLIN JACKSON

```
 1            directly violate a general order or a
 2            memorandum order?
 3                   MS. COLLINS:
 4                        Object to the form.
 5    A      There are a lot of situations that could
 6            occur.  It's possible.
 7    Q      Were there any -- Did a supervisor give you
 8            permission to violate any general orders or
 9            memorandum orders in the Rachel incident?
10    A      No.
11                   MR. BRANDYBURG:
12                        Object to the form.
13    Q      Did any circumstances arise where you think
14            you are allowed to use discretion in violating
15            any of these general orders or memorandum
16            orders?
17                   MR. BRANDYBURG:
18                        Object to the form.
19    A      I -- I don't believe we violated any.
20    Q      Okay.  You -- It's your opinion that you
21            complied with every aspect of the general
22            orders and the memorandum orders?
23                   MR. BRANDYBURG:
24                        Object to the form.
25
```

**JOHN FRANKLIN JACKSON**

38

| | | |
|---|---|---|
| 1 | Q | Is it important for a police officer to |
| 2 | | recognize when they are dealing with someone |
| 3 | | that is mentally ill or Signal 31? |
| 4 | | MS. COLLINS: |
| 5 | | Object to the form. |
| 6 | A | Yes. |
| 7 | Q | Why? |
| 8 | A | That may be part of the problem that they're |
| 9 | | experiencing. And if we can address them in a |
| 10 | | manner to keep them calm, it makes the whole |
| 11 | | situation easier. |
| 12 | Q | Helps keep you safe? |
| 13 | A | Yes. |
| 14 | Q | The public safe? |
| 15 | A | Yes. |
| 16 | Q | The suspect safe? |
| 17 | A | Yes. |
| 18 | Q | It's a win-win for everybody? |
| 19 | A | Absolutely. |
| 20 | Q | But in order to be able to handle it |
| 21 | | appropriately, you have to be able to |
| 22 | | recognize what you're dealing with; is that |
| 23 | | fair? |
| 24 | A | True. |
| 25 | Q | Have you ever heard of the Americans With |

## JOHN FRANKLIN JACKSON

```
1    A    Well, there's always public.  If he gets away

2         from us, there's the public beyond our

3         location that comes into play.

4    Q    Okay.  So it sounds to me like there's -- in

5         that analysis, the suspect will never move up

6         from the bottom?

7    A    He's the reason we're there.

8    Q    It sounds likes there are so many

9         circumstances, there's always public?

10             MS. COLLINS:

11                  Object to the form.

12   A    True.

13   Q    Unless you're in a desert somewhere?

14             MS. COLLINS:

15                  Is that a question?

16   Q    I guess it's the public?

17   A    Possibly.

18   Q    Okay.  As far as the use of force, are you

19        allowed to utilize force only when it's

20        needed?

21             MS. COLLINS:

22                  Object to the form.

23   A    Yes.

24   Q    Level of force should be consistent with the

25        threat?
```

**JOHN FRANKLIN JACKSON**

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | Threat to you? |
| 3 | A | Public. |
| 4 | Q | Threat to you or the public? |
| 5 | A | Yes. |
| 6 | Q | The level of force is not consistent with the |
| 7 | | threat, can it be deemed excessive force? |
| 8 | A | True. |
| 9 | Q | In determining which level of force you want |
| 10 | | to use, do you rely on your training? |
| 11 | A | Yes. |
| 12 | Q | You don't want to rely on your emotions, do |
| 13 | | you? |
| 14 | A | No. |
| 15 | Q | Would it ever be appropriate for a police |
| 16 | | officer's actions to instigate the need to |
| 17 | | increase the level of force needed? |
| 18 | | MR. BRANDYBURG: |
| 19 | | Object to the form. |
| 20 | A | No. |
| 21 | Q | In other words, you don't want to do something |
| 22 | | to increase the problem, do you? |
| 23 | A | No. |
| 24 | Q | And that's what -- Hopefully, that's what your |
| 25 | | training is about, de-escalation? |

JOHN FRANKLIN JACKSON

```
1              MR. HENINGER:
2                  What's the basis of that objection?
3              MR. BRANDYBURG:
4                  I think you mischaracterized the way
5                  he responded to that.
6   BY MR. HENINGER:
7   Q    Okay.  Do you try and use real world
8        experience?
9   A    My real world experience, yes.
10  Q    Sure.  Do you try to use your common sense?
11  A    Yes.
12  Q    So when you are facing a situation where you
13       think somebody is suffering from a mental
14       illness or a Signal 31, does your real world
15       experience or common sense suggest to you that
16       you need to pace contact with that individual?
17             MS. COLLINS:
18                 Object to the form.
19  A    I wouldn't think so.
20  Q    No.  Okay.  Do you think that you ought to
21       approach that individual or that subject in a
22       calm, calculated, and controlled manner?
23  A    If the situation allows, yes.
24  Q    In your experience dealing with people that
25       you believe are suffering from a mental
```

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969

JOHN FRANKLIN JACKSON

```
 1          illness a Signal 31, it would have been your
 2          impression that their perceptions of reality
 3          are wildly different than yours?
 4               MR. BRANDYBURG:
 5                    Object to the form.
 6               MS. COLLINS:
 7                    Object to the form.
 8    A     Yes.
 9    BY MR. HENINGER:
10    Q     Have you been in situations before
11          Mr. Rachel's that you've been dealing with
12          subjects that may be hearing voices?
13    A     Not that I'm aware of.
14    Q     What about hallucinations?
15    A     Yes.
16    Q     This is before Mr. Rachel?
17    A     Yes.  Well, this would be -- Some of it
18          possibly may be previous experience as a
19          police officer.
20    Q     Yeah, at any time that you were a police
21          officer, --
22    A     Yes.
23    Q     -- before Mr. Rachel is what I'm asking about.
24    A     Yes.
25    Q     And I don't want to limit it to just that
```

JOHN FRANKLIN JACKSON

1       second tour before you encountered Mr. Rachel.

2       I was talking about everything from '85

3       forward.

4    A  True.

5    Q  Okay.  Let me make sure we're on the same

6       page.

7            When you're dealing with people that have

8       mental illness or a Signal 31, would you agree

9       that patience is priceless?

10           MR. BRANDYBURG:

11               Object to the form.

12           MS. COLLINS:

13               Excuse me?

14   A  If the situation allows it, yes.

15   BY MR. HENINGER:

16   Q  Would you want to get as much information as

17      possible prior to contacting that individual?

18   A  If possible.

19   Q  Did you have the opportunity with Mr. Rachel

20      to get information from his wife?

21   A  Some limited information.

22   Q  What limited you and your ability to gain

23      information from her?

24   A  Possibly her -- I don't want to say

25      truthfulness, but didn't give us as much

JOHN FRANKLIN JACKSON

1          of when a four-point restraint is used, but
2          not specifically for someone possibly
3          suffering from mental illness.
4     Q    Let me make sure that we understand.  So you
5          understood when it's appropriate to do it and
6          how to do it?
7     A    Correct.
8     Q    You didn't understand the dangers associated
9          with the actual doing it?
10              MS. COLLINS:
11                  Object to the form.
12    A    Yes, but not specifically how it would relate
13         to someone with mental illness.
14    Q    Okay.  Regardless of whether or not the person
15         is mentally ill or not, do you agree that a
16         police officer who has hog-tied a subject has
17         an obligation to monitor the person to make
18         sure he's breathing?
19    A    Yes.
20    Q    Does that ever end?
21    A    Once he's out of your custody.
22    Q    Sure.  As long as he's in your custody, where
23         you are responsible for that subject, you are
24         to be monitoring him?
25

JOHN FRANKLIN JACKSON

| | | |
|---|---|---|
| 1 | Q | And you said that you got there, it was around |
| 2 | | 3:22; correct? |
| 3 | A | Correct. |
| 4 | Q | In those 11 minutes between the time the call |
| 5 | | came in and the time that you arrived at the |
| 6 | | scene, are you aware of any crimes that |
| 7 | | transpired between that time? |
| 8 | | MR. ROSSLER: |
| 9 | | Are you aware of any what?  I'm |
| 10 | | sorry. |
| 11 | | MR. HENINGER: |
| 12 | | Crimes. |
| 13 | A | There are other calls being dispatched. |
| 14 | BY MR. HENINGER: | |
| 15 | Q | Were you aware of them at the time? |
| 16 | A | I heard them on the radio. |
| 17 | Q | Were those the calls from Mr. Rachel? |
| 18 | A | There was a "nature unknown" that came in for |
| 19 | | the house across the street from where we were |
| 20 | | dispatched.  But there were other calls in |
| 21 | | addition to that.  Not to that neighborhood, |
| 22 | | but in the fifth precinct. |
| 23 | Q | Okay.  That's a good point.  So at this |
| 24 | | address, between the time you got the call and |
| 25 | | the time that you arrived, are you aware if |

JOHN FRANKLIN JACKSON

| | | |
|---|---|---|
| 1 | | there were any other criminal activities |
| 2 | | ongoing in those 11 minutes? |
| 3 | A | No. |
| 4 | Q | Look at Page 2 now.  It says in your statement |
| 5 | | that you suggested to Officer McCann to call |
| 6 | | Sergeant Ripple. |
| 7 | A | Correct. |
| 8 | Q | So it was your idea to call Ripple? |
| 9 | A | I believe it was. |
| 10 | Q | And why did you think it was a good idea to |
| 11 | | call Sergeant Ripple? |
| 12 | A | We had had a "nature unknown" call that we |
| 13 | | determined came from the proximity -- We knew |
| 14 | | that there was a neighbor at 318 Plantation |
| 15 | | Court, that the resident at that address had |
| 16 | | called for the neighbor.  And it was in |
| 17 | | reference to her and her husband getting into |
| 18 | | an altercation of some kind.  Then there's a |
| 19 | | "nature unknown" dispatched to the house |
| 20 | | across the street.  I believed that would be |
| 21 | | the other half of the domestic situation. |
| 22 | Q | And so that's why you thought it would be a |
| 23 | | good idea to call Ripple? |
| 24 | A | Not at that point.  I knew that, okay, we've |
| 25 | | got both parties calling the police.  We get |

JOHN FRANKLIN JACKSON

72

| | | |
|---|---|---|
| 1 | | to the scene, speak to Mrs. Rachel, she |
| 2 | | instructs us that he tried to kill her, that |
| 3 | | he told her to protect herself, and he tried |
| 4 | | to break her neck.  And then as we're walking |
| 5 | | out, her father tell us, "Guys," --I don't |
| 6 | | remember the exact wording. -- "you need to be |
| 7 | | careful.  He's a big guy."  With that -- With |
| 8 | | the force he's used, the limited information |
| 9 | | she gave us that night, it's going to be more |
| 10 | | than a, quote, unquote, routine domestic.  So |
| 11 | | at that point, I suggested that we contact |
| 12 | | Sergeant Ripple and make him aware of the |
| 13 | | situation. |
| 14 | Q | Okay.  You go on to talk about how you're |
| 15 | | standing in the street and you observed Rachel |
| 16 | | come out in the yard and I think we been over |
| 17 | | probably a hundred times, hands raised and |
| 18 | | yelling at the sky; correct? |
| 19 | A | Correct. |
| 20 | Q | You observed that? |
| 21 | A | Yes. |
| 22 | Q | And you said that he was yelling and it |
| 23 | | appeared to be incoherently.  You couldn't |
| 24 | | understand what he was saying? |
| 25 | A | Could not.  He was facing away from us. |

JOHN FRANKLIN JACKSON

```
 1   Q    Mr. McCann said somewhere in this juncture he
 2        knew that y'all were dealing with a certified
 3        nut.
 4             MR. NEWELL:
 5                 Object to the form.
 6   A    He was acting oddly, but I've seen many an
 7        intoxicated person act the same way.
 8   Q    I'm not asking you about to make a
 9        determination whether he was intoxicated or on
10        drugs.
11             Do you agree or disagree with McCann's
12        characterization, "That we're dealing with a
13        certified nut"?
14             MS. COLLINS:
15                 Object to the form.
16             MR. BRANDYBURG:
17                 Object to the form.
18             MR. NEWELL:
19                 Object to the form.
20   A    At that point, yes.
21   BY MR. HENINGER:
22   Q    You also heard me talk about, with Mr. McCann,
23        that his use of the term, we knew we had a
24        Signal 31, at the time he was yelling at the
25        sky with his hands raised.  Do you agree with
```

JOHN FRANKLIN JACKSON

1      that?

2   A  Not at that point.

3   Q  You didn't agree at that point?

4   A  No.

5   Q  What point did you ever come to the conclusion

6      that this guy is Signal 31?

7   A  In the midst of our confrontation with him.

8   Q  At that point?

9   A  I just --During the struggle.  The things I

10     could hear that he was saying really meant --

11     had no meaning to them.  The few clear moments

12     that he had, he didn't seem to understand what

13     we were saying.  He would yell, "Protect me,

14     protect her, protect us."  He -- I never heard

15     him yell, "Protect me from Obama."  I heard

16     him say the name Obama.  But I don't know what

17     he was saying with it.

18         And at one point I told him, "We are the

19     police.  Stop resisting.  We'll help you."

20     And he screamed, "No."  And then starts

21     fighting again.

22  Q  After you talk about him being -- speaking

23     incoherently, you say, "We approached the

24     yard.  He laid down in the yard.  At that

25     point Officer McCann and I approached him.  I

JOHN FRANKLIN JACKSON

```
 1            removed my taser from its holster.  As we
 2            approached, we told Mr. Rachel to stay on the
 3            ground."
 4                 So he got on the ground on his own?
 5    A       My recollection is he got on the ground on his
 6            own.
 7    Q       Okay.  And with him laying on the ground, did
 8            he see you?
 9    A       I don't believe so.
10    Q       So he didn't see you.  He's laying on the
11            ground.  You and Officer McCann are
12            approaching him, and you go ahead and remove
13            your taser?
14    A       I believe I did.
15    Q       And, you know, I went through with McCann how
16            that taser works.  There's a switch, you flip
17            it up and the laser comes on and it's
18            activated?
19    A       Yes.
20    Q       Is that the same thing with the one that you
21            had?
22    A       Yes.
23    Q       Is that what you did with the one that you
24            had?
25    A       No.
```

JOHN FRANKLIN JACKSON

```
 1   Q    So you just pulled it out of your holster?

 2   A    Yes.

 3   Q    Didn't do anything else with it?

 4   A    Would have set it down beside -- by my leg.

 5   Q    All right.  "At that point, he jumped up,

 6        turned around, and got into a crouched, kind

 7        of a combat stance."

 8             Mr. McCann said he kind of had his fists

 9        balled up and looked at y'all?

10   A    That's -- Yes.

11   Q    Did he say anything to you?

12   A    His initial -- he -- We ordered him -- When he

13        was on the ground, we approached him.  He was

14        given instruction to stay on the ground.  At

15        which point he yelled, "No," and jumped up and

16        got into a combative stance, and kind of

17        jockeyed his position between both of us.

18        Toward Mr. McCann, then he would shift toward

19        me, and then back and forth.

20   Q    When y'all approached him from behind, with

21        the taser pulled, and you commanded him to

22        stay on the ground, did you say it loudly?

23             MS. COLLINS:

24                  Object to the form.

25   A    Forcefully.
```

JOHN FRANKLIN JACKSON

```
 1   Q    Forcefully.  Enough that you're sure he was
 2        going to hear it?
 3   A    Yes.
 4   Q    You go on to say, "At that point he made an
 5        aggressive move towards us.  I deployed my
 6        taser, he dropped to the ground immediately,
 7        but then sprang right back up."
 8   A    Correct.
 9   Q    And then you go on to explain that a little
10        bit more.  Got back up, you felt -- You felt
11        that he pulled one of them out at that point?
12   A    He -- I saw him -- When he got back up off the
13        ground from when I deployed my taser, he
14        pulled the probes out of his chest.
15   Q    So now your taser is no longer effective?
16   A    Correct.
17   Q    As a gun.  That's when Officer McCann deployed
18        his?
19   A    Correct.
20   Q    And you say he started stumbling trying to get
21        away from you?
22   A    Correct.
23   Q    Explain that to me.
24   A    He started backing up away from us toward the
25        street.
```

JOHN FRANKLIN JACKSON

```
 1   Q     Stumbling that way?
 2   A     He was feeling the effects of the taser to
 3         some point.
 4   Q     Still incoherent?
 5   A     Just yelling at us.
 6   Q     Said, "Went out to near the street where
 7         there's a ditch.  He fell to the ground
 8         between the ditch and the street and was on
 9         his back"?
10   A     Correct.
11   Q     So he was already on his back when you got to
12         him?
13   A     He -- We were within arm's reach the whole
14         time.
15   Q     That's when you attempted to touch-tase him?
16   A     Correct.
17   Q     Which it didn't have an effect, either?
18   A     It didn't appear so.  So I tried a second time
19         and got tased myself by Officer McCann's
20         wires.
21   Q     At the very bottom it says after the tasers
22         weren't working, it didn't look like the stuns
23         were working, "McCann pulled out his
24         Monadnock, struck him two or three times on
25         the leg.  It didn't have any effect."
```

JOHN FRANKLIN JACKSON

```
 1            Do you remember that?
 2    A    Yes.
 3    Q    "He threw it down, got on -- got on to him
 4         with me."
 5            Explain that to me.
 6    A    He is in more of a kneeling position, trying
 7         to stand up.
 8    Q    So he's not on his back anymore?
 9    A    No.  He has worked his way back up onto his
10         knees.  Like I say, he was six-four, 300
11         pounds, extremely strong.  I'm five-ten, 180
12         -- 185.  He's trying to stand up.  I believe
13         that's when Chris struck him.  And then Chris
14         and I together are able to get him back down
15         onto the ground.
16    Q    Then you talk about using the arm bar, you
17         actually were able to get a handcuff on him?
18    A    Correct.
19    Q    Then you say, "Officer McCann had advised at
20         one point that code Zebra --" And that's when
21         the taser is being used?
22    A    Right.  That was the first opportunity he had
23         to notify the operator that we had deployed
24         our tasers.
25    Q    And then he advised the operator to have
```

**JOHN FRANKLIN JACKSON**

```
 1         Sergeant Ripple step it up?
 2    A    It was -- There was a few moments in there.  I
 3         don't believe he said Sergeant Ripple.  I
 4         believe he just said have them step it up.
 5         But I knew Sergeant Ripple was on his way.  I
 6         don't recall if he actually said, "Have
 7         Sergeant Ripple step it up or have the unit
 8         step it up."
 9    Q    Okay.  You say, "At which point --" You were
10         pretty much done, spent?
11    A    Yep.
12    Q    You said, "I'm holding onto the handcuff and I
13         told Chris, 'Just lay on him, just hold him.'"
14              So the objective was to sit on him -- not
15         sit on him, but keep him from moving around
16         until Ripple and Elia arrive?
17    A    Keep him from getting up.  Because nothing had
18         worked.  If he got back up, in our conditions,
19         I don't know what would have happened.
20    Q    Then you go on to say Sergent Ripple gets
21         there.  You say, "I don't know how long it
22         was.  Several minutes."
23    A    Probably.
24    Q    "During all this time, he's yelling, cussing,
25         telling us to get off of him"?
```

**JOHN FRANKLIN JACKSON**

```
 1              that.
 2    Q         All right.  So there wasn't one officer on
 3              each limb?
 4    A         Correct.
 5    Q         Who was where?
 6    A         I --
 7    Q         Do you remember --
 8    A         I believe --
 9    Q         -- what part you had?
10    A         I believe I had his right arm.  I believe
11              Sergeant Ripple had his left arm.  And I think
12              Chris was more or less standing between
13              holding his knees.
14    Q         Do you know if he passed out before or after
15              y'all picked him up to move him?
16    A         I know once the four-point restraint was
17              placed on him, that's when I believe he got
18              quiet.
19    Q         So it would have been before you moved him?
20    A         Right before we moved him.
21    Q         And it appears that -- It's your belief that
22              Sergeant Ripple is the one that called for the
23              paramedics?
24    A         Yes.  He is the one that -- We were carrying
25              him, and Sergeant Ripple at some point said,
```

JOHN FRANKLIN JACKSON

| | | |
|---|---|---|
| 1 | | "Is this guy even breathing?"  And we sat him |
| 2 | | down.  He checked his vitals.  And at that |
| 3 | | moment is when the EMT just approached out of |
| 4 | | nowhere.  Just all of a sudden, he's there, |
| 5 | | identifies himself, asks if we need any |
| 6 | | assistance.  And Sergeant Ripple says, "Will |
| 7 | | you check this guy's vitals?"  And he checks |
| 8 | | them. |
| 9 | Q | Did you hear Amy's dad testify that before |
| 10 | | anyone said, "Is he breathing?" -- any of the |
| 11 | | officers said, "Is he breathing?" -- that he |
| 12 | | actually asked an officer, "Is he okay?" |
| 13 | A | I heard him say that. |
| 14 | Q | Did you hear that that morning? |
| 15 | A | No, sir. |
| 16 | Q | So it wouldn't have been you that he said that |
| 17 | | to? |
| 18 | A | No, sir. |
| 19 | Q | Who was monitoring Mr. Rachel after he was |
| 20 | | hog-tied? |
| 21 | A | I had walked away.  Once they -- As Sergeant |
| 22 | | Ripple finished applying the four-point |
| 23 | | restraint, I told him I was going to go lean |
| 24 | | on the police car, because I was afraid I was |
| 25 | | going to pass out.  So -- At that point him |

JOHN FRANKLIN JACKSON

```
 1              and Chris McCann were still standing there.
 2              Lieutenant Elia had already left.
 3      Q       Okay.  Did you ever use your Monadnock?
 4      A       I did not.  Mine was left in the police car.
 5              I used Officer McCann's at one point.
 6      Q       After he dropped it?
 7      A       Correct.
 8      Q       Did you ever strike?
 9      A       I did not.
10      Q       I'm looking at Page 5, if you want to look at
11              it with me.  Talking hog-tying.  It looks like
12              the investigating officer asked, "What time
13              did you notice that he was unresponsive?"  And
14              you respond, "Right.  It was after he had been
15              shackled.  He had gotten quiet.  Once he was
16              shackled in the -- Around the time he was
17              being shackled he yelled something about
18              'Gestapo.'"
19                  And at that point in time you think he
20              passed out?
21      A       I never thought he passed out.  I just -- He
22              got quiet.  I remember thinking -- At this
23              point I'm over by the police car and thinking,
24              "Good.  This guy is finally going to just
25              relax and chill out."
```

JOHN FRANKLIN JACKSON

86

1    Q    How far away were you when you had those

2         thoughts?

3    A    (No response.)

4    Q    How far were you away from Rachel?

5    A    10 or 15 feet.  Sergeant Ripple had pulled his

6         police car up right to the edge of the road

7         facing us in the ditch.

8    Q    Was anyone sitting on Rachel after he was

9         hog-tied?

10   A    No, it's not possible.

11   Q    That would be inappropriate if somebody did

12        that?

13   A    Absolutely.

14             MS. COLLINS:

15                  Object to the form.

16   Q    Tell me why it's impossible.

17   A    His hands are behind his back and his feet are

18        pulled up to them -- to his wrists.

19   Q    So it would be impossible to sit right on him?

20   A    You'd have to sit -- You'd have to sit on his

21        shoulders, because his hands and his feet are

22        you and you wouldn't be able to sit on him.

23   Q    Without sitting on his hands and feet?

24   A    Right.  And as big as he was, that wasn't

25        going to be possible.

JOHN FRANKLIN JACKSON

```
 1          "Crap, we've got a nut on our hands"?
 2              MR. BRANDYBURG:
 3                  Object to the form.
 4              MS. COLLINS:
 5                  Object to the form.
 6    A   No.  Just probably at the point when I tell
 7        him almost face to face that we're the police,
 8        stop fighting, we're here to help you.  And
 9        screams "no" at me and starts fighting again.
10        At that point I realized this guy is not --
11        he's not all here.
12  BY MR. HENINGER:
13    Q   Is this after you tased him the first time?
14    A   Yes, this is when we're in the ditch.
15    Q   Okay.  Do you remember what he was wearing
16        that evening?
17    A   I do not.  I believe it was just a shirt and
18        pants -- long pants.
19    Q   Prior to you tasing Mr. Rachel, did he
20        physically attack you?
21    A   He made an aggressive approach.
22    Q   Did he physically attack you?
23    A   He did not touch me physically at that point.
24    Q   Did he ever reach for your gun?
25    A   No.
```

**JOHN FRANKLIN JACKSON**

| | | |
|---|---|---|
| 1 | Q | Did he ever reach for your baton? |
| 2 | A | No. |
| 3 | Q | Did he ever threaten you verbally? |
| 4 | A | I don't believe so. |
| 5 | Q | Did you have any discussion with Amy Rachel |
| 6 | | about there being knives in the house? |
| 7 | A | No. |
| 8 | Q | Did you ever go into the house before your |
| 9 | | encounter with Mr. Rachel? |
| 10 | A | I never went into the house. |
| 11 | Q | Did he ever attempt to go into the house? |
| 12 | A | He wasn't given an opportunity. |
| 13 | Q | Do you remember being told that there were no |
| 14 | | guns in the house? |
| 15 | A | Yes.  But we -- we -- We asked that question. |
| 16 | | We always assume that there's some type of |
| 17 | | weapon in the house.  Once he's outside the |
| 18 | | house, he's not going to be given the |
| 19 | | opportunity to go back in. |
| 20 | Q | So whatever is in the house was not going to |
| 21 | | come into play with you two out there? |
| 22 | A | Absolutely. |
| 23 | Q | When you are out there and you and McCann are |
| 24 | | approaching Mr. Rachel from behind, he's |
| 25 | | laying on the ground, what options of force |

JOHN FRANKLIN JACKSON

92

| | | |
|---|---|---|
| 1 | | are available to you at that time? |
| 2 | | MS. COLLINS: |
| 3 | | Object to the form. |
| 4 | A | At that point, it's our command presence and |
| 5 | | verbal commands. |
| 6 | Q | When he sees you and gets up, what are your |
| 7 | | options? |
| 8 | A | The same. |
| 9 | Q | When he -- Do you know a combat stance? |
| 10 | A | Yes. |
| 11 | Q | When he gets in that combat stance, what are |
| 12 | | your options for use of force? |
| 13 | A | They are progressing to the next level. |
| 14 | Q | Okay.  What are they? |
| 15 | A | At that point, I chose to deploy my taser. |
| 16 | Q | And -- |
| 17 | A | That would have been my next option, due to |
| 18 | | his size. |
| 19 | Q | One of your options is taser? |
| 20 | A | Yes. |
| 21 | Q | Any other options? |
| 22 | A | Monadnock and there's the pepper spray. |
| 23 | Q | Pepper spray.  And what would have to occur |
| 24 | | for the level of force to increase beyond |
| 25 | | those three options? |

JOHN FRANKLIN JACKSON

96

```
1   A   I believe that's it.
2   Q   I covered these with Mr. McCann and some
3       degree you.  And I just want to ask you.
4       Prior to the physical confrontation that you
5       got in, including the initial deployment of
6       the taser, -- Do you follow me so far?
7   A   Yes, sir.
8   Q   -- did you observe some bizarre behavior from
9       Rachel?
10  A   It can be characterized that way.
11  Q   Did you observe any aggressive behavior before
12      you tased him?
13  A   Yes.
14  Q   And that's the combat stance?
15  A   And his lunge towards us.
16  Q   And I guess what the report was from Amy;
17      correct?
18  A   Right.
19  Q   You didn't observe that, but you got that
20      information?
21  A   Yes.
22  Q   Did you observe him acting, in your mind,
23      strangely?
24  A   Yes.
25  Q   Just general behaving very oddly, I think is
```

**JOHN FRANKLIN JACKSON**

| | | |
|---|---|---|
| 1 | | what you may have used -- some different term, |
| 2 | | but that's the gist of it? |
| 3 | A | Basically, yes. |
| 4 | Q | I don't remember who it was.  I think it may |
| 5 | | have been Officer McCann say something about |
| 6 | | praying to the sky? |
| 7 | A | I -- |
| 8 | Q | I'm not going to ask you to remember. |
| 9 | | Did you see anything that you would have |
| 10 | | thought this guy has some weird religious |
| 11 | | preoccupation at that time? |
| 12 | A | No. |
| 13 | Q | Okay.  Did you observe him having any what you |
| 14 | | would think would be hallucinations? |
| 15 | A | No. |
| 16 | Q | You heard us talk this morning about the |
| 17 | | thousand-yard stare? |
| 18 | A | Yes. |
| 19 | Q | Did he have that? |
| 20 | A | I will agree with that.  He did appear to be |
| 21 | | at times -- At times, he made direct eye |
| 22 | | contact with me in this struggle.  But then |
| 23 | | there were times when he did appear to be just |
| 24 | | staring through us. |
| 25 | Q | What you observed, again, prior to the tase, |

**JOHN FRANKLIN JACKSON**

98

```
 1        disorganized or random thoughts?
 2    A   There were -- Yes, there were.
 3    Q   Was he extremely agitated?
 4    A   That would fall in that category.
 5    Q   What is a solar plexus blow?
 6    A   I believe that's to the kidneys, this side.
 7    Q   I'm scratching -- I'm just scratching.
 8    A   No, I believe it's -- I'm thinking --
 9            MR. ROSSLER:
10                I thought you were asking for one.
11                Right here.
12    A   I'm thinking either maybe the -- I'm thinking
13        side kidney area.
14    Q   Okay.  And do you know what it does?
15    A   I believe -- It's probably going to good --
16        No, I guess not.  Actually, I don't.
17    Q   Have you ever done it?
18    A   No, I don't believe so.
19    Q   Do you know if anyone attempted solar plexus
20        blows on Mr. Rachel on this particular evening
21        -- or morning?
22    A   I've heard, but I do not -- I don't remember
23        witnessing any of it.
24    Q   So we've got a guy that is exhibiting all
25        these symptoms before he's tased.  And you
```

JOHN FRANKLIN JACKSON

```
 1        breathing.
 2   BY MR. HENINGER:
 3   Q    You don't have a clue?
 4             MS. COLLINS:
 5                  Object to the form.
 6   Q    Is it fair?
 7   A    I don't know.  Because after he was shackled
 8        -- They put the leg restraints on him and he
 9        got quiet, as that was going on I stepped away
10        from him.  And then when Sergeant Ripple said,
11        "Let's get him out of the ditch" I stepped
12        back over and assisted them.
13   Q    Okay.  Let me ask my question again.  Do you
14        have any clue how long he went not breathing?
15             MS. COLLINS:
16                  Object to the form.
17   A    No.
18   Q    The general order -- That's Exhibit 34.  And
19        if I understand you correctly, a general order
20        is followed to the letter?
21             MS. COLLINS:
22                  Excuse me.  Is what?
23   A    Pretty much.
24   Q    Were you trained on how to deliver medical aid
25        to individuals that are in custody?
```

JOHN FRANKLIN JACKSON

105

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Tell me what you were trained to do. |
| 3 | A | I was trained in CPR and first aid. |
| 4 | Q | All right.  So if -- You use a less lethal |
| 5 | | weapon.  And is a taser less lethal weapon? |
| 6 | A | Yes. |
| 7 | Q | What are your obligations, as a police |
| 8 | | officer, with regard to medical aid once |
| 9 | | you've deployed a less lethal weapon? |
| 10 | A | He is -- You were going to call for medical -- |
| 11 | | paramedics or ambulance, depending on the city |
| 12 | | where at.  Because at certain points, unless |
| 13 | | it's an extreme emergency, paramedics don't |
| 14 | | respond, they send an ambulance.  They are |
| 15 | | going to come there, stand by as we remove |
| 16 | | taser probes. |
| 17 | Q | You have to call them? |
| 18 | A | I believe so.  But in this instance, there |
| 19 | | were no taser probes removed. |
| 20 | Q | So you think the only reason if you're going |
| 21 | | to call for medical aid is to remove the taser |
| 22 | | probes? |
| 23 | A | They're going to come by and -- I'm sure |
| 24 | | they're going to assess him just as medical is |
| 25 | | going to when they show up. |

JOHN FRANKLIN JACKSON

1   Q    So if there weren't taser probes, was there

2        still a need to call for medical aid just

3        because less lethal was deployed?

4   A    I believe that's the protocol.

5   Q    Based on what I've heard, paramedics weren't

6        called until Sergeant Ripple noticed that he

7        wasn't breathing.  Is that true or not true?

8   A    True.

9   Q    It says, "Appropriate medical aid includes

10       increased observation."

11            Do you agree with that?

12  A    (No response.)

13  Q    If you want to read it, you can.

14            Do you remember that being part of the

15       general order?  (Showing.)  1.5 -- 1.3.5.

16  A    (Witness examines document.)  It says

17       appropriate medical aid.

18  Q    Right.  That's that I read.  Does appropriate

19       medical aid include observation?

20  A    Yes.

21  Q    So when you've got someone in custody, like

22       Mr. Rachel was, this particular morning, which

23       officer was supposed to be delivering

24       appropriate medical aid, which included

25       increased observation?

**JOHN FRANKLIN JACKSON**

107

| | | |
|---|---|---|
| 1 | A | It would -- |
| 2 | | MS. COLLINS: |
| 3 | | Object to the form. |
| 4 | A | Typically would be the primary officer, I |
| 5 | | would imagine. |
| 6 | Q | Officer McCann? |
| 7 | A | In that situation. |
| 8 | Q | He said that he thought it could have been the |
| 9 | | sergeant, because once the sergeant arrives on |
| 10 | | the scene, they are the person in charge.  Do |
| 11 | | you remember him saying that? |
| 12 | A | Yes. |
| 13 | Q | What do you think about that? |
| 14 | | MR. NEWELL: |
| 15 | | Object to the form. |
| 16 | A | I'm not sure about that. |
| 17 | Q | You have no idea? |
| 18 | A | In certain situations, a sergeant is going to |
| 19 | | be in charge. |
| 20 | Q | In this situation, you think it was probably |
| 21 | | the primary? |
| 22 | A | I'm -- I'm not sure.  This is -- Like I said, |
| 23 | | this is the first instance where I had |
| 24 | | deployed my taser. |
| 25 | Q | I understand.  Regardless of who it was, |

## JOHN FRANKLIN JACKSON

156

```
 1                    C E R T I F I C A T E

 2

 3    STATE OF ALABAMA   )

 4    COUNTY OF MOBILE   )

 5

 6         I, Patsy C. Poteat, CCR, as Commissioner,

 7    hereby certify that the above proceedings were taken

 8    down by me and transcribed by me using computer-aided

 9    transcription and that the above is a true and

10    correct transcript of said proceedings taken down by

11    me and transcribed by me.

12         I further certify that I am neither of kin nor

13    of counsel to any of the parties nor in anywise

14    financially interested in the outcome of this case.

15         I further certify that I am duly licensed by

16    the Alabama Board of Court Reporting as a Certified

17    Court Reporter as evidenced by the ACCR number

18    following my name found below.

19         So certified on this, the 18th day of December,

20    2014.

21

22

23

24    Commission Expires:      Patsy C. Poteat, ACCR #236

      December 18, 2016        Freelance Court Reporter

25
```