# EXHIBIT "E"

M-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.C
Page 1 of 11

MOBILE POLICE DEPARTMENT
STATEMENT NARRATIVE FORM

STATEMENT OF:                OFFICER CHRIS MCCANN

REFERENCE:                OFFICER INVOLVED

MAJOR CRIMES PERSONNEL:     CORPORAL DON PEARS

TRANSCRIBED BY:        Sharon Nolen, Office Assistant II

| | |
|---|---|
| PEARS: | The time is 7:01AM and I'm Corporal Donald Pears with the Mobile Police Department, present with me is Detective Kent Quinnie and the person to be interviewed? |
| McCANN: | Officer McCann. |
| PEARS: | Officer McCann, what's your first name? |
| McCANN: | Christopher. |
| PEARS: | C.a.n.n. |
| McCANN: | M.c.C.a.n.n. |
| PEARS: | What's your employee number? |
| McCANN: | 13832. |
| QUINNIE: | McCann. |
| McCANN: | Yeah McCann. |
| QUINNIE: | Spell it. |
| McCANN: | Yeah, M.c.C.a.n.n. |
| PEARS: | What's your unit number? |
| McCANN: | 254. |
| PEARS: | Ok, Officer McCann we'll be talking with you in reference to the uh incident that happened on Estate Drive tonight and before we do that we have to advise you of your Miranda first, if you would just read that along with me. You must understand your rights before we ask you any questions. You have the right to remain silent. Anything you say can be used against you in court or other proceedings. You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning. If you cannot afford a lawyer and want one, a lawyer will be appointed for you by the court. If you decide to answer questions now without a lawyer present, you will still have the right to stop the questioning at any time. You also have the right to stop the questioning at any time until you talk to a lawyer. Do you understand those rights? |
| McCANN: | Yes sir. |
| PEARS: | If you're willing to talk to us just sign and date it and time it for me. |
| McCANN: | What time is it? |
| PEARS: | 8:02. |
| McCANN: | (inaudible). |


EXHIBIT
37

CONFIDENTIAL
Produced Pursuant to Protective Order

Rachel v. City of Mobile, etal.
CITY 00534

M-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.C
Page 2 of 11

| | |
|---|---|
| PEARS: | This is the waiver, I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or force of any kind has been used against me. I hereby voluntarily and intentionally waive my rights and am willing to make a statement and answer questions. |
| McCANN: | Yes sir. |
| PEARS: | You willing to talk to us. |
| McCANN: | Yes sir. |
| PEARS: | Alright did, did uh, it's about the the, call that you responded to today on uh Gregory Rachel, no I'm sorry. |
| McCANN: | That's him. |
| PEARS: | Is Gregory the name? Ok, on Estate Drive. Tell us from the beginning what happened. |
| McCANN: | Ok, um at 0311, me and my partner uh Officer Jackson, unit 256 were dispatched to uh a listed address on Plantation Court and uh actually two addresses came out, right across the street and they were both signal 39 and they were involving the same person. We figured that out pretty much over the radio. So we responded to the scene and uh once we got there we. |
| PEARS: | Which address did y'all respond to first? |
| McCANN: | Um, I believe it was Plantation if I'm not mistaken, (inaudible) let's see if I can find it. Um yes we responded to 3318 Plantation Court, the other address where the actual domestic occurred was 9782 Estate Drive which was across the street from there but when we got there, we got on the scene we respond, we responded to the address on Plantation where the victim was and um once we walked, once the owner of the house was (inaudible) to find out what happened um we immediately saw the victim, she uh, she had some blood and a bad, pretty bad scratch underneath her mouth right above her chin and she had blood on her fingers and she had scratches on her neck and so forth and she was crying and pretty, pretty hysterical. She told us that her husband had uh basically just flipped out for on apparent reason and in the middle of the night he was uh, he was up pacing the floor. She walked in to see what was wrong with him and you know he was talking crazy and she told him he needed to go somewhere to work it out you know and then come back and at that point he physically assaulted her. He tackled her onto the floor and uh according, according to what she said he uh. |
| QUINNIE: | (inaudible). |
| McCANN: | I'm sorry. |
| QUINNIE: | Turn your radio off. |
| McCANN: | Oh, according to what she said he put his palms around her neck to try to choke her to death and uh do to the evidence on her, on her neck with all the marks, it was obvious that's what happened. She also thought that maybe her fingers were broke, she had some fingers on her right hand that were bloody, plus the blood on, right above her chin. Uh that I mentioned earlier. So it was obvious it was, that some kind of domestic struggle and she stated that he was still in the house across the street and she was, you know she was able to free |

CONFIDENTIAL
Produced Pursuant to Protective Order

Rachel v. City of Mobile, etal.
CITY 00535

M-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.C
Page  3  of  11

herself from him even though he was on top of her, she doesn't recall how
exactly she was able to do it, at that point her 2 kids ran into the room and they
were witnessing what happened and she managed to get away from him, get
her kids out of the house, so they ran across the street. Went over to the
neighbor's house on Plantation. Knocked on the door luckily they woke up
and answered the door and let her in and that's where they called the police.
And uh when we arrived and you know she, she told us that he was still across
the street inside the house, so at that point we immediately called Sgt. Ripple,
5 Sam 2, told him what we had and he said he was going to come over there
and um the um, the wife the victim, she, she gave us authority to go in the
house to apprehend the subject because he was still there and uh Sgt. Ripple
wanted us to wait until he got there before we did that, we wanted to have
some reinforcements before we went in there. Um the victims' father showed
up on the scene and he, he about the time you know, about the time all this
was happening and he warned us that this, the subject was a big dude. Really
big guy, really strong and um the wife told us that he, that her husband had
never acted out this like before. He'd never showed any signs of violence.
They had been married 10 years, he had never laid a hand on her before and all
of a sudden he just absolutely flipped out for no apparent reason. So anyway
after we got off the phone with Sgt. Ripple, he told us to stand by and not go
in the house until he got there. We were outside at this point we saw the male
subject Gregory Rachel come outside the house, he came outside in the front
yard and as he came out he had his hands raised up in the air and he had a
phone in one hand, a cell phone in one hand and he had a drink in the other
and he started raising his hands to the sky and started looking up and yelling at
the skies. He was coming out yelling, screaming at the top of his lungs. What
was he saying it, from my vantage point we were across the street so we
couldn't make out exactly what he was saying, but at this point I got on the
radio and advised the operator let 5 Sam 2 know that the subject is now has
come outside the house and uh he is extreme, acting extremely a signal 31. So
at that point me and Officer Jackson started approaching him to see what he
was saying and see if we could calm him down, see what was going on with
him and at this point he started yelling at us protect me, protect me, protect
me. Protect me from Obama, protect me from Obama. Just weird stuff and
all, all of a sudden we at that point we knew we had a genuine nut on our
hands so we, so at that point we commanded him to get on the ground, you
know and as we, as we commanded him to get on the ground we pulled our
tasers out, said get on the ground, get on the ground, get on the ground and as
we started yelling at him get on the ground he was yelling back at us protect
me, protect me, protect me. Well he complied at first and he actually, he
chunked his phone across the street, then he sets his drink down and then he
lays down on his back on the ground and continues to yell to the sky while
he's on the ground. At that point we said if he stays on the ground we'll just
leave him like this and we'll just you know tell him to stay on the ground
where he's at till we, till we get some help here. Well then he started to get

CONFIDENTIAL
Produced Pursuant to Protective Order

Rachel v. City of Mobile, etal.
CITY 00536

M-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.C
Page 4 of 11

back up, when he got back up, we said get back on the ground, get back on the
ground, get back on the ground and he refused. At that point he started
coming at us. We told him to stand, to, to stop, stop, stop where you're at,
stop where you're at. He kept coming, Officer Jackson had to tas him at this
point because he refused to comply. When he hit, when he tased him he
immediately hit the ground. But then he got right back up, almost unfazed and
at that point I tased him. He fell down he got right back up unfazed. At this
point he started pulling the taser probes off of himself and at that point we
knew we were, at that point oh shit, you know and um at this point we, you
know we had to aggressively tackle the subject. We had to take him, try to put
him on the ground because he wasn't complying with our commands and we
had to physically put him on the ground and he, we started wrestling with him
all over the ground and he, he was fighting us and struggling and refusing to
comply and was resisting and so forth and at that point I had to pull
Monadnock out because he was starting to swing at us and I hit him 3 or 4
times with my Monadnock to try to get him to comply. He didn't feel that at
all and at that point my Monadnock I kind of lost it in the struggle it fell on the
ground, Officer Jackson picked it up and used it to kind of you know wrap
around shirt where we could maintain him on the ground. Um you know he'd
be better, he'll be better able to say what he did than I could but anyway the
two of us were on top of him at this point trying to hold him down and trying
to pull his arms back behind his back to put the cuffs on him. Trying to
simply, simply trying to contain him. You know and um this struggle went on
for a good 10 or 15 minutes, when we were on the ground with him. Um at
that point Sgt. Ripple arrived on the scene, he came on the scene and Ed, 505
showed up with him at the same time, Lt. Elia. They both arrived on the scene
one behind the other and they both came to assist us and then all 4 of us
started struggling with him on the ground and we struggled to get him
handcuffed and that, you know with their help so probably another 5 to 10
minutes to get him handcuffed. But we finally got him handcuffs and once,
once we got him handcuffed at that point you know we, you know we kind of
got off, you know we hog tied him, you know where we cuffed his ankles with
ankle locks you know and put him on his back, you know he was just, he was
a big guy he was strong and we had to do something to get him down and uh
at that point he still was yelling for a little while at us. And all of a sudden he
quit and he just stopped and he was laying on the ground at that point we just
thought maybe he passed out or he was just exhaust himself because we, we
damn sure were you know and uh so we didn't think much of it at first. And
then when he, Sgt. Ripple said ok let's go ahead and put him in the car, let's
go ahead and take him to jail. So we lifted him up and started taking him over
to my police car to put him in the back seat to go ahead and take him to jail.
Well he weighed so much, being a 300 pound guy, it was about 20 feet from
us to the car so right before we got to the car we set him down. And at that
point when we set him down to take a breath before we picked him back up
and put him in the car at that point we realized like hey he, I don't, is he

CONFIDENTIAL
Produced Pursuant to Protective Order

M-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.C
Page 5 of 11

breathing? You know and uh at that point uh I said I don't know so we kind of rolled him over to see if he was breathing. He didn't appear to be breathing he appeared to be unconscious, unresponsive, at this point um a paramedic who is a next door neighbor who is down the street, who was kind of observing from a distance everything that was going on ran down there to us hey do you need any help? And his name I got a statement from him, his name is uh Patrick Phillips, he uh he rushed down to us and he had his paramedic uniform on, he was about to go to work. And now I said well I said we had a domestic here with we got, we got into a big struggle with this, with this guy and he's uh, he's not responding, he seems to be unconscious, we you know he just we don't, we don't know if he's alive, you know and he's like ok, well he started doing CPR and proceeded to try to revive him. And we at that point he started doing that we called for medical assistance, (inaudible) Fire and Rescue at this point came on the scene, Lt. Elia had left the scene when we got him detained, when we got the cuffs on him, he went ahead and decided he was going to leave cause he had to go handle something else. He did not, he was unaware at the time that we had a signal 80, a medical emergency at this point. 5 Sam 2 stayed on the scene. Once we (inaudible) we had a medical emergency 5 Sam 2 notified 505 by phone, 505 then returned to the scene and uh he got there before the Fire Department responded. When the Fire Department and Lt. Elia got there the paramedic, that was a neighbor was already working on the subject, paramedical. And uh at this point um that was pretty much the end of it, at this point we had when the paramedic and the Fire Department started working on him medically we unhandcuffed him, we unhog tied him because we (inaudible) paramedic, you know to try to make it easier for them to resituate but at that point once the Fire Department got there I started taking statements from all the people, cause there was probably 3 or 4 people who were out of their house, you know on Plantation Court and the victim's father had showed up, her brother had showed up. They watched certain parts of the struggle so we got statements from all them. That's what I did, I got statements from all them and the victim and I started working on the event report. And that's pretty much it. Next thing I heard the subject did go. You want to me to continue or wait for him.

PEARS:     Wait he should come right back.
QUINNIE:  (inaudible) go ahead and go to DFS.
PEARS:     He can go to DFS.
QUINNIE:  Ok.
McCANN:  Ok and anyway once I started working on the report, on the statements I got a, came unengaged from the actual body because the Fire Department was handling it at that point but when I get all the statements and I got you know got (inaudible) getting all organized as far as the paperwork is concerned I found out through word of mouth that the subject was probably 10-7 and the only thing that we can assume, the only, the only thing I can assume is maybe he had a massive heart attack or he OD'd there in the middle of the struggle. I mean his behavior gave me the impression that he was probably on something

CONFIDENTIAL
Produced Pursuant to Protective Order

M-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.C
Page 6 of 11

even though his wife says in the 10 years that she's been married to him he's never been drunk, he's never been on any drugs to her knowledge. Uh we did find out that he had, after the fact that he had high blood pressure and he was on some kind of anti-depressant but um as far as any kind of narcotic um we're unaware but the way he was acting he was acting like a crazy man. So he acted like somebody that was high, that's the way he was acting and the fact that he was totally unresponsive to the taser um on multiple occasions, he was able to get up it was obvious he was on something or just completely out of his frigging mind, one or the other but as far as, as far as the, as far as him ending up dying in the struggle we didn't do anything to my knowledge that would have killed him. We tased him, I hit him a few times with the baton in the thigh and we just got on top of him and tried to get his hand behind his back to handcuff him and at some point or another after we cuffed him and finally got him detained after about 20, 25 minute struggle at some point after that it's my understanding that he uh, you know when he became unconscious and it's my understanding that he was pronounced death right after that.

| | |
|---|---|
| PEARS: | (inaudible) you didn't know him nor his wife before all this? |
| McCANN: | No sir. |
| PEARS: | Have you ever been to their house on a domestic before that you can remember? |
| McCANN: | No sir. |
| PEARS: | Now you say when you got to the um when you came to the first house was on uh Plantation. |
| McCANN: | That's correct. |
| PEARS: | Where y'all responded first and you were waiting on Sgt. Ripple to respond to the scene. |
| McCANN: | Correct. |
| PEARS: | And while you were waiting he came outside. |
| McCANN: | Yes sir. |
| PEARS: | Ok. Uh when he came outside y'all were still at the house across the street or were y'all in front of the house on Estate. |
| McCANN: | We were still at the house across the street. |
| PEARS: | Alright, y'all just walked over to where he was. |
| McCANN: | Correct. Yeah he was, at that point he was, he came out of the house and he had his phone and his drink and he had his hands raised up in the air with each phone and his drink in each hand and he was yelling at the sky. He was staring at the sky, he was yelling at the top of his lungs act, just acting like an absolute crazy man. So at that point we, we left the house on Plantation for the front yard over there and came across the street to see what he was actually saying and to see if we could actually get him to calm down. |
| PEARS: | Did y'all walk up in the driveway? |
| McCANN: | No we didn't walk up in the driveway we walked in the front yard. He came in, he came out of the house in his front yard. |
| PEARS: | In his front yard. Was he still up the hill or down the hill at this time? |
| McCANN: | He was up the hill. |

CONFIDENTIAL
Produced Pursuant to Protective Order

M-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.C
Page 7 of 11

PEARS:      He was still up the hill then.
McCANN:     Uh-huh.
PEARS:      And uh you said he complied to begin with he got down on the ground, you said he got back up again.
McCANN:     That is correct.
PEARS:      And he started approaching y'all.
McCANN:     That is correct.
PEARS:      Who tased him?
McCANN:     Officer Jackson tased him the first time.
QUINNIE:    Turn your radio off (inaudible).
McCANN:     Oh.
PEARS:      And Officer Jackson tased him first.
McCANN:     First.
PEARS:      Do you know how many times he was tased?
McCANN:     He was tased 4 or 5 times he was, he was tased initially by Officer Jackson, then he was tased, then when that didn't work, when he (inaudible) he got back up, I tased him at that point. That was the second tas, he fell down he got back up, at this point he started approaching us and Officer Jackson dry tased him 2 or 3 times to try to you know.
PEARS:      When you tased him the first time was the probes still in him?
McCANN:     That I'm not aware of cause it was dark.
PEARS:      Ok.
McCANN:     It was kind of hard, it was kind of hard to see.
PEARS:      Yeah.
McCANN:     I mean I do know he, I do know that after the second tas he started pulling some probes off of him.
PEARS:      This happened when you tased him.
McCANN:     That's correct.
PEARS:      Then he started pulling them out.
McCANN:     That's correct.
PEARS:      Ok. And uh then when he got then what happened after that? After he pulled the probes out what happened?
McCANN:     At that point we, we realized we had a fight on our hands and at that point we physically engaged him and we tried to take him down on the ground and tied to hit him on his stomach and pull his hands behind his back where we can handcuff him. We wanted to immobile him is what we wanted to do. That was the goal and he uh, he was extremely strong, he weighed, he probably 6'4, 285 pound man. Very strong, I mean so it was very hard for me and Jackson to do that by ourselves but we, you know we kept him on the ground and stayed on top of him and kept trying you know we got one cuff on one hand but we never could get the other back there until Sgt. Ripple made it on the scene.
PEARS:      During the time that he was on the ground when y'all got this struggle going on you're dry tasing him then?
McCANN:     No.

CONFIDENTIAL
Produced Pursuant to Protective Order

Rachel v. City of Mobile, etal.
CITY 00540

M-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.C
Page 8 of 11

| | |
|---|---|
| PEARS: | He never was tased any at all? |
| McCANN: | No he wasn't tased after we got him on the ground. |
| PEARS: | Ok.  When was the time when you touch stunned him then?  When did you do that? |
| McCANN: | He was still mobil at that point, he, it was right after he got up after I tased him.  Me and Officer Jackson went over there to try and engage him and Officer Jackson stunned him 2 or 3 times to try to get him to drop. |
| PEARS: | To drop down. |
| McCANN: | To drop him. |
| PEARS: | And that didn't work. |
| McCANN: | And that didn't work at that point we had to, we had to get on top of him.  We had to slam on him. |
| PEARS: | When you touch stunned him he didn't respond to it at all? |
| McCANN: | No. |
| PEARS: | Ok. |
| McCANN: | Not at all. |
| PEARS: | So then that's when the struggle starts. |
| McCANN: | That's correct. |
| PEARS: | Did the struggle end up down the hill? |
| McCANN: | Yeah we actually went up, we, well it went down the hill but the way the house sits on Plantation to give you a good example, uh Estate, Estate Drive is like this and Plantation sits kind of like, kind of like, this, this is Plantation and this, this is Estate, or excuse me this is Plantation, this is Estate.  The neighbors house was over here and, and the uh and the victim and the subjects' house was right here.  So he came out the front yard we have a clear view from that direction.  So we just kind of walked over to him.  He was out in the front yard.  His house, his front yard does go down hill as it goes, as you go out on to Estate Drive, so we did actually roll him down hill into the gutter and that's how I got the dirt all over me. |
| PEARS: | That's during the time of the struggle going down the hill. |
| McCANN: | Correct.  Yeah we were in the rain gutter at that point.  There and it had grass, it was muddy cause a little water. |
| PEARS: | Yeah.  (inaudible). |
| McCANN: | But um that's where we ended, that's where the struggle ended up, that's where most of the struggle occurred on the ground, was actually in that little gutter right by the road which is at the very edge of the front yard right before you get to the road. |
| PEARS: | And what he was doing out there, you're saying he was acting bizarre and everything, but did he ever strike either one of y'all. |
| McCANN: | No, he never, he never, he attempted too.  He, he, he did when we got him on the ground once time he just started kicking at me. |
| PEARS: | Ok. |
| McCANN: | He started kicking and you know I was trying to get on top of him and he was, he was kicking at me and the guy probably has size 12, 13 shoe that's when I got my you know at that point the taser didn't work that's when I got my |

CONFIDENTIAL
Produced Pursuant to Protective Order

Rachel v. City of Mobile, etal.
CITY 00541

M-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.C
Page 9 of 11

Monadnock out and started hitting him in the thigh to get him to try and kick at me. And at that, and I hit him like 3 or 4 times and you know I only did it cause I had to, I didn't want to do it. I actually just wanted to get on top of him and handcuff him, that really was the goal from start to finish was to handcuff him and get him contained. And uh just getting to that point took 20 to 25 minutes and it took the assistance of Sgt. Ripple and Lt. Elia. We actually couldn't get, we couldn't get him handcuffed fully. We had one cuff on him and we couldn't get the other cuff on him until Sgt. Ripple and Lt. Elia got there and we had 4 people working on him at once to try to get his hands behind his back.

PEARS:      Ok. And uh you were the only one using the baton.
McCANN:     That's correct.
PEARS:      And you hit him about 3 or 4 times, hit him on the thigh.
McCANN:     Uh-huh
PEARS:      Never, he was never struck in the head or anything?
McCANN:     No sir.
PEARS:      Ok.
McCANN:     I made it a point not to.
PEARS:      Yeah. Was he ever uh kicked or stomped or anything like that?
McCANN:     No.
PEARS:      Ok. Anything?
QUINNIE:    You deployed, did you deploy your taser first or second?
McCANN:     I deployed second.
QUINNIE:    You deployed the second time after (inaudible).
McCANN:     Officer Jackson.
QUINNIE:    Did you see where your probes struck?
McCANN:     (inaudible) I did not originally cause it was dark.
QUINNIE:    Uh-huh.
McCANN:     But Officer Jackson told me no you hit him because when, when I went after him initially he goes it electrocuted me cause your probes went in him.
QUINNIE:    Uh-huh.
McCANN:     He goes it popped me. And I said he just wasn't feeling it, (inaudible) ok well I'll say I was wondering because I didn't you know during, I mean all this stuff was going on so fast you know. (inaudible) I pulled mine out and hit him and I went code Zebra over the radio before I popped him and um I knew I hit him with at least one prong. I didn't know if both of them hit.
QUINNIE:    Uh-huh.
McCANN:     So.
QUINNIE:    So after y'all got him restrained how was, how was he laying?
McCANN:     He was, he was.
QUINNIE:    (inaudible).
McCANN:     He was on his stomach.
QUINNIE:    Uh-huh.
McCANN:     He was on his stomach the whole. I mean the whole time pretty much, pretty much the whole time, almost the whole time we had him on the ground we

CONFIDENTIAL
Produced Pursuant to Protective Order

Rachel v. City of Mobile, etal.
CITY 00542

M-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.C
Page 10 of 11

|  |  |
|---|---|
|  | had him on his stomach. We just couldn't get his hands, he would not, he would not comply at all as far as getting his hands behind his back so we could cuff him. He never quit, he never quit struggling with us, never. Until he, until we, until Sgt. Ripple and Lt. Elia got on the scene and we got him handcuffed and hog tied. |
| QUINNIE: | Uh-huh. |
| McCANN: | And then at that he continued to yell a little bit and then all of a sudden he just blacked out. We thought he passed out at that point. We just figured he had given up, he's tired, he's finally, he's finally giving up. Thank God, you know that's kind of the way we were feeling and then, then a few minutes later we started taking and carrying him to my car to put him in jail we realized he had a medical, it was something medical wrong with him because he, he didn't appear to be breathing and that was the first sign of trouble. Is he breathing? And we're like I don't know and fortunately for us the paramedic down the street showed up on the scene about that same time. And we were like dang we're not sure he's breathing will you, can you check him out? He said yeah. So he did and then you know started checking his pulse and seeing if he was responsive and I think he medically to see if he had a heart beat and then at that point he started performing CPR on him. Shortly there after Lt. Elia arrived back on the scene. Once we got him cuffed then Lt. Elia left and then Lt. Elia had to go back and then the Fire Department and the uh ambulance showed up, they started doing medical work on him also and but by that time I was working on this the report and statements. |
| QUINNIE: | So when y'all got him restrained he was still responsive? |
| McCANN: | He was. |
| QUINNIE: | Until y'all moved him, that's when. |
| McCANN: | No he, he actually. |
| QUINNIE: | He was (inaudible). |
| McCANN: | Before we moved him he quit, he quit, he passed out. |
| QUINNIE: | Ok. |
| McCANN: | Before we moved him, before we tried to move him he actually, he actually seized. But the last thing that came out of his mouth according to Sgt. Ripple was Gestapo. I don't know what the hell that, you know that's, that's what he said Gestapo, that's the last thing he yelled and then he, then all of a sudden he just, he was out. |
| PEARS: | When he yelled that where were y'all I mean. |
| McCANN: | We were. |
| PEARS: | (inaudible). |
| McCANN: | We were standing right over him. |
| PEARS: | Just standing on over him at that time. |
| McCANN: | Yeah, when we were standing over him and cause we just, at that point we just got him hog tied and after fighting for 20 minutes you know once we got him hog tied, we had him demobilized, we all had to step back and (taking a deep breath), you know breath, you know cause it really, it was, it was tough I ain't going to lie. I mean it was hard just getting him handcuffed was a major |

CONFIDENTIAL
Produced Pursuant to Protective Order

Rachel v. City of Mobile, etal.
CITY 00543

M-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.C
Page 11 of 11

|  |  |
|---|---|
| | ordeal. |
| PEARS: | But once he, he was cuffed and he was secured on the ground was uh at any time was anybody pressing his head in the ground or sitting on him or any kind of way after he was restrained still holding, holding him down? |
| McCANN: | No. |
| PEARS: | Ok. Anything else you want to add to tell us about. |
| McCANN: | No that's pretty much everything. Um you know, everything I've told y'all pretty much (inaudible) interdepartmental yet, I mean I'm, (inaudible) I'm pretty much gonna put everything in there to use that as cliff notes do my inter departmental cause I worked on that for probably a good hour and a half, trying to remember everything that transpired between the time we got there until the time the Fire Department got there. |
| PEARS: | Yeah. |
| McCANN: | That's pretty much all the details I can remember. |
| PEARS: | Alright appreciate it. |

END OF INTERVIEW.

CONFIDENTIAL
Produced Pursuant to Protective Order

Rachel v. City of Mobile, etal.
CITY 00544