# EXHIBIT "F"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

AMY RACHEL, as Administratrix of )
the Estate of GREGORY RACHEL, )
Deceased, )
                 )
      **Plaintiff,** )
                  )
**v.** )
                  )
**CITY OF MOBILE, ALABAMA;** )   **CASE NO. 1:13-CV-00522-WS-M**
**MICHAEL T. WILLIAMS,** )
**individually and in his official** )
**capacity as Chief of Police of the City** )
**of Mobile; CHRISTOPHER** )
**MCCANN; JOHN JACKSON;** )
**JERALD RIPPLE; and EDWARD** )
**ELIA,** )
                  )
      **Defendants.** )

## AFFIDAVIT OF SGT. JERALD RIPPLE

STATE OF ALABAMA

COUNTY OF MOBILE

      Before me, the undersigned authority, personally appeared Sgt. Jerald Ripple, who, being by me first duly sworn deposed on oath and states as follows:

      1.    My name is Jerald Ripple, and I am over the age of twenty-one (21) years and I have personal knowledge of the information stated herein.

2.      I am employed as a sergeant with the Mobile Police Department and I have held that position for approximately twelve years.  Prior to being appointed as a sergeant with the Mobile Police Department, I also worked as a patrolman and as a corporal.  In total, I have been employed with the Mobile Police Department for approximately 24 years.  I was initially hired on with the Mobile Police Department and planned to attend the Mobile Police Academy in 1990, but I was deployed with the United States Army to Desert Storm from 1990 to 1991.  I was a combat medic in the Army.  When I returned from Desert Storm, I attended the Mobile Police Academy and continued my career with the Mobile Police Department.  I also continued to serve the Army in the National Guard as a sergeant until I was honorably discharged in 1998.

3.      During the course of my career with the Mobile Police Department, I have received extensive training in various areas related to my job as a law enforcement officer.  Initially, I received my minimum standards training in compliance with the Alabama Peace Officers Standards and Training Commission (APOST) through the Mobile Police Academy.  In the Academy, we are trained on various aspects of law enforcement, including making arrests, the use of force and use of restraints.

4.      Officers with the Mobile Police Department also receive annual in-service training on various issues, including the appropriate use of force.  I have

Case 1:13-cv-00522-WS-M   Document 121-4   Filed 02/06/15   Page 4 of 9

also attended law enforcement training outside of the Mobile Police Academy through courses provided online and at other locations.

5.     In late April and early May of 2012, I was a sergeant in the 5th Precinct for the Mobile Police Department.  Lieutenant Edward Elia was my supervisor for the shift I was working at that time.  In the early morning hours of May 1, 2012, Lt. Elia and I were parked next to each other in our patrol vehicles in the parking lot of the Home Depot on Schillinger Road.  The Home Depot parking lot was a central location within that precinct where we could position ourselves if we were needed in response to a call.  While we were sitting there, I received a call on my cell phone from Officer Chris McCann explaining that he and Officer John Jackson had responded to a domestic violence call near Plantation Court and Estate Drive and they wanted to go inside the residence to arrest Greg Rachel.  Officer McCann explained to me that the victim had been assaulted by her husband who had choked her and tried to kill her.  I told Officer McCann not to approach the residence because I was not sure whether Mr. Rachel had any weapons in the home or was barricaded inside the home with any other individuals.  I advised Officer McCann to stay put and secure the scene and wait for me and Lt. Elia to arrive.

6.     While Lt. Elia and I were driving to the scene, I heard Officer McCann call out over the radio "Code Zebra" which indicates that someone has

used their Taser.  Officer McCann also said to "step it up."  Lt. Elia and I then increased our speed to try and get to the scene more quickly.

7.      When I arrived at the scene, I saw Officer McCann and Officer Jackson in a ditch near the street in front of the Rachel residence.  They were struggling with Greg Rachel.  I could tell at that time both officers were spent.  I immediately went over to assist and saw how big Greg Rachel was and I told him several times to comply and give me his hand.  He refused to give me his right hand.

8.      I tried to pull Greg Rachel's right arm from underneath his body but he still refused to comply.  I grabbed the back of his neck with one hand and tried to pull his right arm from underneath him.  He still would not comply.  I was concerned he might have a weapon underneath him.  At that point, I struck him three or four times on his right side in the area above his hip and below his rib cage near his lower back.  These blows were with my fist and were a stun technique. These blows appeared to have no effect on Mr. Rachel.

9.      He never lost his wind and continued talking and mumbling and rambling.  I then put my knee on his shoulder for a few seconds and pushed down which allowed me to pull his right arm from underneath his body. Officer Jackson had been able to remove his left arm and had placed one of the handcuffs on his

left wrist.  Once I got the right arm out from under his body, we were also able to place the other handcuff on his right wrist.

10.    At that point, I was not aware of what specifically had occurred prior to my arrival.  However, I did know that there had been a struggle and Officers McCann and Jackson appeared to be physically exhausted. Because of the size of Mr. Rachel, the nature of the call, and the fact that he was still continuing to kick and resist even after being handcuffed, I made the decision to place Greg Rachel in four point restraints.  At this time, Officer Jackson went over to lean up against his patrol car because he appeared exhausted.

11.    I walked to my patrol car and grabbed leg shackles and walked back over to where Mr. Rachel was laying.  Officer McCann placed his knee near Mr. Rachel's lower back as we placed the leg shackles on his ankles.  The leg shackles consisted of a chain between two shackles and the chain was approximately two feet in length.  Officer McCann and I then pulled Mr. Rachel's legs up and connected the chain from the leg shackles to the chain of the handcuffs around his wrists. We made this connection by using an additional set of handcuffs to connect the chain between the leg shackles to the chain between the handcuffs on his wrists.  This method of four point restraint allowed Mr. Rachel to have some movement with his legs, but also precluded him from kicking or continuing to fight with the officers.

12.     After placing Mr. Rachel in the four point restraints, we turned him at a 45 degree angle to his side and made sure his head was turned to the side and that he was breathing. I then instructed Officer McCann to get his patrol car and pull it closer so that we could place Mr. Rachel in the back of the patrol car while we continued to secure the scene. I stood next to Mr. Rachel and continued to monitor him and watch his breathing. I continued to observe Greg Rachel breathing as I could see his chest and back rise and fall and I could see what appeared to be snot bubbles coming in and out of his nose. Other than placing my knee on his shoulder for a few seconds to get Mr. Rachel to release his right arm, at no other time during this incident did I sit, kneel or stand on Gregory Rachel.

13.     Officer McCann's patrol car was not very far away so he returned in less than one minute. At that point, Officers McCann and Jackson assisted me in picking Mr. Rachel up to carry him to the patrol car. As we were moving him toward the edge of the pavement and the patrol car I noticed that he appeared to be limp and got concerned that he might not be breathing. We had only carried Mr. Rachel approximately ten to fifteen feet when I noticed that he was limp. Prior to that point, I did not observe Mr. Rachel to be in any medical distress. I instructed the other officers to place him on the ground so I could check on him. I checked for a pulse and checked to see if he was breathing. He did not appear to be

breathing.  I also shined a flashlight in his eyes and his eyes appeared fixed and dilated so I called for paramedics.

14.    Right at that time, a neighbor, who was also a paramedic, walked up and asked if he could help. I told him that Mr. Rachel had been fighting but was now not breathing and asked him to check on him.  We quickly removed the leg shackles and handcuffs and this neighbor/paramedic immediately checked for vital signs and then initiated CPR by doing chest compressions.  He continued to do these chest compressions until the paramedics arrived on the scene and took over for him.  The paramedics then transported Greg Rachel from the scene to the hospital.  I last observed Mr. Rachel breathing less than a minute before we picked him up to try and move him to Officer McCann's patrol car.

FURTHER, AFFIANT saith not.

_____
JERALD RIPPLE

STATE OF ALABAMA

COUNTY OF MOBILE

Before me, the undersigned authority, a Notary Public in and for said State and County, personally appeared Jerald Ripple, who has been made known to me, and after being duly sworn doth deposes and says that the facts set forth in the foregoing Affidavit are true and correct to the best of his knowledge, information and belief.

Sworn to and subscribed to before me on this 5th day of February, 2015.

_____

NOTARY PUBLIC

My Commission Expires: _____

**Penni B. Smith**
1325 Dauphin Street
Mobile, Alabama 36604
Notary Public State of Alabama at Large
My Commission Expires January 14, 2018

8