# EXHIBIT "J"

**JERALD WAYNE RIPPLE**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

AMY RACHEL, as Administratrix      *
of the Estate of GREGORY RACHEL,*
Deceased,                          *
                                   *
          Plaintiff,               *
                                   *
vs.                                *   CASE NUMBER:
                                   *   1:13-CV-00522-WS-M
CITY OF MOBILE, ALABAMA,           *
et al.,                            *
                                   *
          Defendants.              *


          The deposition of JERALD WAYNE RIPPLE was taken
before Patsy C. Poteat, CCR, as Commissioner, on
December 18, 2014, by the Plaintiff, commencing at
4:20 p.m., at the law offices of Burr & Forman, LLP,
located at 11 North Water Street, Suite 22200,
Mobile, Alabama.

**JERALD WAYNE RIPPLE**

8

```
1                    JERALD WAYNE RIPPLE,
2
       the witness, after having first been duly
3
sworn to tell the truth, the whole truth, and nothing
4
but the truth, was examined and testified as follows:
5
6
7                       EXAMINATION
8
9  BY MR. HENINGER:
10  Q    Can we have your full name, please?
11  A    Jerald Wayne Ripple.
12          THE COURT REPORTER:
13              Usual stipulations; is that correct?
14          MR. GAILLARD:
15              That's fine.
16          MR. HENINGER:
17              That's fine with me.
18  BY MR. HENINGER:
19  Q    Mr. Ripple, where are you currently employed?
20  A    Mobile Police Department.
21  Q    How long have you been employed there?
22  A    24 years.
23  Q    What is your current title?
24  A    Sergeant.
25  Q    How long have you been a sergeant?
```

JERALD WAYNE RIPPLE

```
 1        then if that occurred, then we would go over
 2        that.  I would with my squads, and I always
 3        did.  Now, do I remember going over that
 4        particular memorandum order with my squad at
 5        fifth present, I do not.
 6     Q  So if they -- If police officers have
 7        testified that they were never trained on the
 8        memorandum order about dealing with
 9        individuals with mental illness, would you
10        tend to agree or disagree with them?
11            MS. COLLINS:
12                Object to the form.
13            MR. NEWELL:
14                Object to the form.
15     A  I would agree.  Because there are some times
16        that I do not have the time to go over all
17        M.O.s or general orders because of the call
18        volume that may be that day.  So I would not
19        get to go over it.  They would just get put in
20        their boxes.  And then they would be
21        responsible to go over their own general
22        orders or M.O.s.
23  BY MR. HENINGER:
24     Q  Is it your experience that officers will go
25        over the M.O.s as you expect them to?
```

**JERALD WAYNE RIPPLE**

```
 1   A     They are told and directed by me and the
 2         lieutenant, whoever is in charge that day, to
 3         go over.  They do sign for the M.O.s.
 4             MR. HENINGER:
 5                 Do we know where the orders are?
 6                 They have escaped.
 7                 (Off the record.)
 8   BY MR. HENINGER:
 9   Q     I apologize.  I was looking for that and I
10         didn't -- I was not concentrating on your
11         answer.  And that's my fault.
12   A     That's okay.
13   Q     I know you expect them to read the emails
14         containing the memorandum orders; true?
15   A     Correct.
16   Q     It's their responsibility to do so?
17   A     Yes.
18   Q     If they don't read the orders, as they're
19         required to do, does that give them any excuse
20         for not adhering to those orders?
21             MS. COLLINS:
22                 Object to the form.
23             MR. NEWELL:
24                 Object to the form.
25   A     I would say no.  It's still your
```

**JERALD WAYNE RIPPLE**

```
 1          responsibility.
 2     BY MR. HENINGER:
 3     Q    Absolutely.  Are those general orders to be
 4          followed by police officers?
 5     A    Yes.  But there's discretion.
 6     Q    Are those memorandum orders to be followed by
 7          police officers?
 8     A    Again, yes.  But with discretion.
 9     Q    Explain to me what you mean "with discretion."
10     A    Individuals that get M.O.s, like myself even
11          as a sergeant of 24 years on, discretion would
12          be that you take the information that's
13          provided to you by the general order or M.O.
14          and adhere to that to the best of your ability
15          in the situation that you have that's arisen
16          at that particular call.  Every call would be
17          different.  Even a EDP call right now with you
18          would be different from the one I went five
19          seconds from now.  So you have -- your
20          discretion the police department gives you to
21          look at the general order or M.O. and try to
22          follow it the best you can, if it gives you
23          the time or gives you the ability to do so on
24          the call that you're at.
25     Q    I'm glad you mentioned that.  Because it
```

**JERALD WAYNE RIPPLE**

19

```
 1           sounds to me you're saying each call has to be
 2           treated as its own?
 3    A      Are you asking me a question?
 4    Q      I am.
 5    A      I would say that each call could be different
 6           entirely, even if it's the same call -- or
 7           type of call.
 8    Q      So there are circumstances that arise, and
 9           you, as a police officer, you expect your
10           police officers to use their training;
11           correct?
12    A      Correct.
13    Q      Use their education; correct?
14    A      Correct.
15    Q      Use the general orders; correct?
16    A      Correct.
17    Q      Use the memorandum orders; correct?
18    A      That would be correct.
19    Q      And use state law; correct?
20    A      Yes, sir.
21    Q      In dealing with the public?
22    A      Yes.
23    Q      Dealing with suspects?
24    A      Yes.
25    Q      Whether in custody or not?
```

**JERALD WAYNE RIPPLE**

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And dealing with their partners? |
| 3 | A | Yes. |
| 4 | Q | There is not a one-size-fits-all approach? |
| 5 | A | I would say no to that.  Because -- |
| 6 | Q | Do you disagree or agree with me? |
| 7 | A | Rephrase the question.  Tell me -- Because I |
| 8 | | want to make sure I'm answering it correctly. |
| 9 | Q | Me, too.  Is there a one-size-fits-all |
| 10 | | approach? |
| 11 | A | No.  I would say no to that. |
| 12 | Q | So, as a police officer, you need to be aware |
| 13 | | of, for example, signs and symptoms of |
| 14 | | somebody who is suffering from excited |
| 15 | | delirium? |
| 16 | | MS. COLLINS: |
| 17 | | Object to the form. |
| 18 | Q | Do they need to understand the signs and |
| 19 | | symptoms of that? |
| 20 | A | If the individual knows the signs and |
| 21 | | symptoms, sure, they can apply what they know |
| 22 | | to the call itself.  If they do not know all |
| 23 | | the signs and symptoms or don't know what the |
| 24 | | symptoms mean per se, each individual symptom, |
| 25 | | then I would say no.  But that really depends |

**JERALD WAYNE RIPPLE**

| | | |
|---|---|---|
| 1 | Q | You've trained people on it? |
| 2 | A | I particularly haven't trained, that I |
| 3 | | remember, anybody on it except for myself. |
| 4 | Q | Ever? |
| 5 | A | That I can recall. |
| 6 | Q | Do you recall ever getting in-service training |
| 7 | | on this M.O.? |
| 8 | A | I believe I did an in-service. |
| 9 | Q | When? |
| 10 | A | For the last two years, I believe. |
| 11 | Q | All right.  Before April/May of 2012, did you |
| 12 | | get training on this M.O. during in-service |
| 13 | | training? |
| 14 | A | I don't recall.  I'd have to look at the |
| 15 | | records. |
| 16 | Q | Can you disregard this M.O.? |
| 17 | A | Personally as a sergeant or just as an |
| 18 | | officer? |
| 19 | Q | As a sergeant now. |
| 20 | | MS. COLLINS: |
| 21 | | Object to the form. |
| 22 | A | No. |
| 23 | Q | Can your police officers, patrolmen disregard |
| 24 | | this M.O.? |
| 25 | | |

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969**

**JERALD WAYNE RIPPLE**

```
 1              MS. COLLINS:
 2                   Object to the form.
 3    A    No.
 4    Q    We got far afield from my outline.  So let me
 5         back up.
 6              Tell me where you grew up.  I told you --
 7         Okay.
 8    A    Mobile.
 9    Q    Mobile?
10    A    Yes, sir.
11    Q    All right.
12              MR. ROSSLER:
13                   You did go far.
14    Q    You grew up in Mobile.  Did you go to high
15         school here?
16    A    I did.  B.C. Rains High School.
17    Q    B.C. Rains.
18    A    Graduated in 1985.
19    Q    Did you attend college after that?
20    A    One year.
21    Q    Where did you go?
22    A    Faulkner State, across the bay.  Less than a
23         year, really.
24    Q    And what did -- Were you working during your
25         time at Faulkner?
```

**JERALD WAYNE RIPPLE**

| | | |
|---|---|---|
| 1 | A | Just that one to Desert Storm. |
| 2 | Q | What was your role in the Army? |
| 3 | A | I was a combat medic. |
| 4 | Q | Did you receive your medical training in the |
| 5 | | Army? |
| 6 | A | I did. |
| 7 | Q | Tell me what that involved. |
| 8 | A | It involved about 16 weeks of basic medical |
| 9 | | treatment at Fort Sam Houston.  And that was |
| 10 | | in 1986, I believe, sir, when I actually |
| 11 | | joined. |
| 12 | Q | Did you face enemy fire during your deployment |
| 13 | | to -- or during your time in Desert Storm? |
| 14 | A | Yes. |
| 15 | Q | Multiple times? |
| 16 | A | Multiple -- I wouldn't multiple small arms |
| 17 | | fire, but multiple scud rockets. |
| 18 | Q | Where were you -- I don't know if "stationed" |
| 19 | | is the right word.  Where were you located in |
| 20 | | Desert Storm? |
| 21 | A | I was at King Fahd International Airport, |
| 22 | | which is in Saudia Arabia.  And also I spent a |
| 23 | | short -- probably about two months in Riyadh |
| 24 | | before we actually got deployed throughout the |
| 25 | | year. |

**JERALD WAYNE RIPPLE**

```
 1            and John Jackson, for the most part.
 2    Q       Why haven't you talked to Officer McCann?
 3    A       I just don't -- I haven't seen him in passing.
 4    Q       Is he no longer underneath you?
 5    A       He's no longer.  Hasn't been underneath me for
 6            the last year, I believe -- a little over a
 7            year.
 8    Q       Okay.  When you were in high school at B.C.
 9            Rain, did you participate in any sporting or
10            any athletics, anything like that?
11    A       Yes.
12    Q       What?
13    A       I played baseball and football.
14    Q       What position did you play in football?
15    A       I played right guard in football, and I played
16            third base in baseball.
17    Q       Have you ever been disciplined for any reason
18            during your tenure as a police officer?
19    A       Yes.
20    Q       Tell me about it.
21    A       Demeanor complaints.  In other words, that
22            would be for verbiage or language.  I actually
23            got in trouble for parking in a fire zone as I
24            was working an extra job.  Which I was told to
25            work there and place my car there.  I got in
```

**JERALD WAYNE RIPPLE**

```
 1              trouble for that.  Other than that, I think
 2              that's all I remember.  I don't -- I haven't
 3              seen -- I've never seen my I.A. report.
 4    Q    Okay.  When you say I.A. report, what is that?
 5    A    Internal Affairs.
 6    Q    Is that the same thing as a personnel file, to
 7              me?
 8    A    Yes.
 9                   MS. COLLINS:
10                      Object to the form.
11    Q    How tall are you?
12    A    I am five-eleven.
13    Q    How much do you weigh?
14    A    265.
15
16                   (Exhibit Number 51 was marked for
17                      identification.)
18
19    Q    I show you what I'm marking as Exhibit 51.  Is
20              that a photograph of you?
21    A    Yes.
22    Q    Was that photograph taken the day of the
23              incident that we're here talking about,
24              May 1st?
25    A    I would assume it was, yes, sir.
```

**JERALD WAYNE RIPPLE**

44

```
 1           directly in front of Estate Drive, the
 2           victim's residence."
 3                Do you remember that?
 4    A      Yes.
 5    Q      "At that time I seen both of them.  You could
 6           tell when officers are spent.  They were
 7           spent."
 8                You could tell that by observing them?
 9    A      Yes, sir.
10    Q      You didn't have to go up and ask them, "Are
11           you tired?"
12    A      No, I could -- I could observe that.
13    Q      And you say, "All they were doing was laying
14           on top of him.  Didn't -- there wasn't no --
15           There wasn't no striking, there wasn't no
16           punching, or anything."
17                True?
18    A      True.
19    Q      "So I knew -- I didn't how big the guy was
20           until I got beside him.  When I got beside
21           him, I seen him.  I was like, wow.  Okay.  So
22           I got on top of him."
23    A      I got on his right side.  I wasn't literally
24           -- I was not on top of him.  Neither was Chris
25           or John.  Chris was more down by the legs,
```

**JERALD WAYNE RIPPLE**

1   hands, then there's no weapons, knives, guns,

2   or whatever else he might have in his hand,

3   then you know you're dealing with just a

4   person that's -- you know, with no weapons.

5   And that's the way I was trained.

6 Q Did they tell you that he didn't have any

7   weapons?

8 A They weren't able to say much of anything.

9   They were both gassed and out of wind.

10 Q So they couldn't talk?

11 A They weren't talking too much, other than

12   saying, "Help."

13 Q They were yelling, "Help"?

14 A When I got out of the car, I think I heard

15   Officer Jackson say, "Help, Sarg."  But other

16   than that, it was just me talking to Greg on

17   the ground.

18 Q You go on to say, "At that time me -- I struck

19   the subject probably three or four times, five

20   -- I don't remember -- into the solar plexus.

21   And I was from here to this -- is his side of

22   his solar plexus here and his head was right

23   here."

24    Tell me what a strike to the solar plexus

25   is.

**JERALD WAYNE RIPPLE**

| | | |
|---|---|---|
| 1 | A | Well, first off, the first time I tried to get |
| 2 | | his arm dislodged from underneath him, he had |
| 3 | | it locked in, his right arm. |
| 4 | Q | Okay. |
| 5 | A | I grabbed the back of his neck with my hands |
| 6 | | to try to control the head and neck area.  I |
| 7 | | tried with my right hand to try to get it, and |
| 8 | | he wouldn't comply.  I asked him several times |
| 9 | | to give us his arm.  He wouldn't do that.  At |
| 10 | | that time, still not knowing that he didn't |
| 11 | | have a weapon, because they didn't tell yes or |
| 12 | | no to weapons, or I didn't have a chance to |
| 13 | | even ask.  I only assumed, which is what |
| 14 | | you're supposed to, that unless you can see |
| 15 | | the hands, there could be a weapon.  And I |
| 16 | | didn't know if he had anything. |
| 17 | | That's when I moved down to the solar |
| 18 | | plexus or to the back of his -- his midsection |
| 19 | | here.  In other words, right above the hip and |
| 20 | | probably about four or five inches into the |
| 21 | | back, which is solar plexus.  And that is a |
| 22 | | stun technique that we could use. |
| 23 | Q | All right.  What does it do to the person that |
| 24 | | you hit? |
| 25 | A | It's like -- It's like getting the wind |

**JERALD WAYNE RIPPLE**

1         knocked out of you in football.  It's just a
2         stun technique that gets your mind off of what
3         you -- whether you have a weapon locked in.
4         And that gives me enough time to try to get
5         back to the arm.  And that should have made a
6         difference, but it did not.
7  Q      So you say in your statement that you did that
8         somewhere between three and five times?
9  A      I don't recall how many, but I know I struck
10         him a couple or three times.
11 Q      And when you hit the solar plexus, is it the
12         closed-fist kind of hit?
13 A      It's a closed-fist hit.
14 Q      And that's a punch?
15 A      It's a punch.  And I probably -- probably hit
16         him from maybe six to ten inches.  It was a
17         short -- Because I was leaning against his
18         side and trying to get to his -- Right here.
19         And that's what that was.
20 A      That had no effect.
21 Q      And you say the -- "The intended effect was to
22         knock the wind out of him so that he is no
23         longer focusing on keeping his arm underneath
24         him."
25

**JERALD WAYNE RIPPLE**

```
 1            individuals?
 2                 MS. COLLINS:
 3                     Object to the form.
 4    A    The police department allows us to make that
 5         decision, whether based on the individual that
 6         is being four-point restrained.
 7    Q    So if you had an individual that's having
 8         breathing difficulty, is it acceptable, in
 9         Sergeant Ripple's mind, to hog-tie them?
10                 MS. COLLINS:
11                     Object to the form.
12    A    No, I wouldn't do that.
13    Q    What is the risk -- What is your understanding
14         of the risk of hog-tying an individual that
15         has breathing difficulty?
16    A    Asphyxia, lack of oxygen, failure to expand
17         the chest cavity to get enough O2 in to make
18         sure they are able to breathe.
19    Q    And is that referred to as "positional
20         asphyxiation" --
21                 MS. COLLINS:
22                     Object to the form.
23    Q    -- when you say "asphyxia"?
24    A    Yes.
25    Q    And positional asphyxiation can cause
```

**JERALD WAYNE RIPPLE**

```
 1          someone's death?

 2     A    If not monitored.

 3               MR. GAILLARD:

 4                    Object to the form.

 5     Q    If not monitored, it could cause somebody's

 6          death?

 7     A    I'm not going to say.  I'm not trained in

 8          that.  I'm not a trained physician.  But I'm

 9          sure there's professionals that can say that.

10     Q    I'm sure there are.  But --

11               MR. ROSSLER:

12                    Is it time?  Five minutes?

13     Q    Okay.  Understanding you're not a physician,

14          you do have some medical background?

15     A    I do.

16     Q    So with -- you recognize -- Do you recognize a

17          risk with positional asphyxiation?

18     A    Yes.

19     Q    And one of those risks is when you've got a

20          person that has difficulty breathing and you

21          put them in a hog-tied position, can that

22          cause positional asphyxiation?

23               MR. GAILLARD:

24                    Object to the form.

25     A    I wouldn't put him in that position, so I
```

**JERALD WAYNE RIPPLE**

| | | |
|---|---|---|
| 1 | | MR. GAILLARD: |
| 2 | | Object to the form. |
| 3 | A | In some people's eyes, it could. |
| 4 | Q | In your eyes, can asphyxiation cause death? |
| 5 | A | Are you asking me as a police officer or the |
| 6 | | medical side that I have as a combat medic? |
| 7 | Q | I'm asking from all your education, |
| 8 | | experience, and training. |
| 9 | A | Possible.  But I'm not a doctor and can't |
| 10 | | state that for sure. |
| 11 | Q | Do you know what "hypoxia" is? |
| 12 | A | Lack of oxygen, O2. |
| 13 | Q | Do you know what "excited delirium" is? |
| 14 | A | Yes. |
| 15 | Q | Have you been trained on -- As of April/May of |
| 16 | | 2012, have you been trained on recognizing |
| 17 | | excited delirium? |
| 18 | A | Yes. |
| 19 | Q | Have you trained your officers prior to this |
| 20 | | incident with Rachel on recognizing excited |
| 21 | | delirium? |
| 22 | A | I do not recall. |
| 23 | Q | Do you expect your officers to be able to |
| 24 | | recognize excited delirium as of the date of |
| 25 | | the Rachel incident? |

### JERALD WAYNE RIPPLE

```
 1   A     If given the information, I would expect them
 2         to.
 3   Q     If the information was made available to them,
 4         would you have expected them to?
 5               MR. NEWELL:
 6                    Object to the form.
 7   A     Yes.
 8               MR. HENINGER:
 9                    Let's go ahead and stop there.  It's
10                    a good stopping point.
11                    (Off the record.)
12   BY MR. HENINGER:
13   Q     Sergeant Ripple, let's go to your statement.
14         We got off a little bit there for a moment.
15               I am looking at Page 4 now.  When you
16         guys went to move him, he's already hog-tied,
17         okay, shackled?
18   A     Shackled.
19   Q     How many officers were there to help move
20         Mr. Rachel?
21   A     Three.
22   Q     Okay.  And where were you positioned; do you
23         remember?
24   A     I was on his left side.
25   Q     All right.  Had anybody noticed whether or not
```

**JERALD WAYNE RIPPLE**

| | | |
|---|---|---|
| 1 | | he had stopped breathing at that point that |
| 2 | | you went to pick him up and move him? |
| 3 | A | Not at that point, but I monitored him. |
| 4 | Q | How did you monitor him? |
| 5 | A | By the raise of his back and chest when he was |
| 6 | | breathing.  Also, the verbiage that he was |
| 7 | | still talking, mumbling, and the snot and the |
| 8 | | mucus that were going in and out, contracting |
| 9 | | and retracting of his nose. |
| 10 | Q | All right.  So when you picked him up, was he |
| 11 | | still having the rise and fall of the chest? |
| 12 | A | I didn't notice it then, right when I picked |
| 13 | | him up.  But just prior to that, less than a |
| 14 | | minute probably, he was still breathing. |
| 15 | Q | All right.  Said that we picked him up and he |
| 16 | | was limp? |
| 17 | A | He was noncombative at the time.  Which I |
| 18 | | didn't take as -- I've put people in |
| 19 | | four-point restraints before, and they have |
| 20 | | done that to make themselves heavier for |
| 21 | | officers to have to carry them. |
| 22 | Q | So you thought that he may be doing it just to |
| 23 | | make it more difficult on the three of you? |
| 24 | A | Yes. |
| 25 | Q | You go on to say -- "We picked him up, he was |

**JERALD WAYNE RIPPLE**

| | | |
|---|---|---|
| 1 | | would complain when we picked him up. |
| 2 | Q | "So in the span of a minute or two he went |
| 3 | | unconscious." |
| 4 | | That's what you said. |
| 5 | A | Show me where that is, please. |
| 6 | Q | Yeah.  I'll show you my copy.  It's easier. |
| 7 | A | Okay. |
| 8 | Q | "So in the span of a minute or two he went |
| 9 | | unconscious." |
| 10 | A | That's what -- Before I picked him up, that's |
| 11 | | what I'm saying.  Right at a minute or less |
| 12 | | that he -- Because I checked him before then. |
| 13 | | So that minute or two would be the time that |
| 14 | | he would have went unconscious, if he did at |
| 15 | | all, because I checked him before -- before I |
| 16 | | picked him up. |
| 17 | Q | What would you have done if you had noticed |
| 18 | | that he was unconscious before you picked him |
| 19 | | up? |
| 20 | A | I would have unhandcuffed him and unshackled |
| 21 | | him at that time, checked his pulse, done CPR, |
| 22 | | if I had to, if he wasn't breathing.  Checked |
| 23 | | his "ABCs," which is airway, breathing, and |
| 24 | | circulation. |
| 25 | Q | Says, "Once we put him down, I said, 'Let me |

**JERALD WAYNE RIPPLE**

| | | |
|---|---|---|
| 1 | | check for his pulse, let me check his |
| 2 | | breathing.'  So I shined my -- I shined my |
| 3 | | light on his eyes.  His eyes were fixed and |
| 4 | | dilated, which means he's unconscious, he's |
| 5 | | not breathing." |
| 6 | | Do you remember doing that? |
| 7 | A | Yes. |
| 8 | Q | So are you the one on the scene that was |
| 9 | | supposed to be monitoring him after he had |
| 10 | | been restrained -- four-point restrained, |
| 11 | | hog-tie, whatever you want to call it? |
| 12 | A | I was the one that was supposed to and did. |
| 13 | Q | Then you say at that point -- "At that time, I |
| 14 | | said, 'Let's start paramedics.'" |
| 15 | | So is that when you made the call? |
| 16 | A | I would have made the call to paramedics. |
| 17 | | Now, the paramedic should have been called |
| 18 | | previously when Officer McCann went Code |
| 19 | | Zebra, that is standard procedure for the |
| 20 | | Mobile Police Department.  That they would |
| 21 | | have called them for that purpose, and they |
| 22 | | should have been on standby somewhere waiting |
| 23 | | for me to secure the scene. |
| 24 | Q | Were they? |
| 25 | A | I don't know. |