# EXHIBIT "K"

**EDWARD PHILLIP ELIA, JR.**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

AMY RACHEL, as Administratrix    *
of the Estate of GREGORY RACHEL, *
Deceased,                        *
                                 *
        Plaintiff,               *
                                 *
vs.                              *  CASE NUMBER:
                                 *  1:13-CV-00522-WS-M
CITY OF MOBILE, ALABAMA,         *
et al.,                          *
                                 *
        Defendants.              *

    The deposition of EDWARD PHILLIP ELIA, JR. was taken before Patsy C. Poteat, CCR, as Commissioner, on December 19, 2014, by the Plaintiff, commencing at 8:08 a.m., at the law offices of Burr & Forman, LLP, located at 11 North Water Street, Suite 22200, Mobile, Alabama.

EDWARD PHILLIP ELIA, JR.

24

```
 1             times.  "I was trying to do the brachial stun,
 2             for to hit him."
 3                    Did you actually hit Rachel twice?
 4      A      Yes, sir.
 5      Q      Where did you hit him?
 6      A      The brachial -- Right up in here, the flat of
 7             my hand.
 8      Q      All right.  So, you're showing -- We don't
 9             have video.
10      A      Okay.
11      Q      I didn't want to make you do that -- I didn't
12             want to make you do that.  But you have an
13             open palm?
14      A      Right.
15      Q      Hit him with the back of your hand?
16      A      With the back of my hand.  And I'm trying for
17             a wide area.  Okay.  So I don't want to go
18             like a bladed.  That's not -- That's knocking
19             the crap out of him.  I want to do a wide area
20             across the artery here.
21      Q      You're indicating below the ear on the side of
22             the neck?
23      A      Right.  Below -- So in that area right there
24             to -- And what it will do, it will stun them
25             and it will cause a slight blackout, very
```

```
 1           short, very limited time.  Because when
 2           Sergeant Ripple was trying to get his arm up,
 3           I was trying to slap him there in order to
 4           maybe, you know, cause him to flinch a little
 5           bit or black out, so that way he would go a
 6           little limp and he'd be able to get the arm
 7           out.
 8   Q       And you say you did that two or three times?
 9   A       I did it three times.
10   Q       Okay.  Three times.  You go on and say, "I
11           felt bad because I kept hitting Sergeant
12           Ripple.  It had no effect on him."
13                So what happened?
14   A       You know, you want a nice slap.  Well, his
15           head was, you know -- Jerry -- Jackson and
16           McCann were at his feet.  Jackson had his arm.
17           Jerry was trying to pull his arm.  So we were
18           all really close in proximity.
19   Q       Sure.
20   A       So I'm trying to get a good motion.  Thing
21           about it was, I was hitting Jerry first.
22           Which was taking a lot of the momentum out of
23           my swing.  And then it was -- just barely
24           tapping Rachel.  So I was really just hitting
25           Jerry on the shoulder when I was coming
```

```
 1         Chris put his knee into his back area.
 2   Q     When you say his back area, what part?
 3   A     Shoulder, midback -- Between midback and
 4         shoulder. I can't -- exactly inches or
 5         whatever, but upper back. And he -- Then he
 6         knelt down on him. So that way if he did try
 7         to roll at that point in time, he would have
 8         better control over him.
 9   Q     At this time, as you recall, he's handcuffed
10         with his hands behind his back?
11   A     Hands behind his back.
12   Q     Somebody has gone to get shackles. You don't
13         -- You think it might have been Ripple?
14              MR. ROSSLER:
15                  Object to the form. If you don't
16                  know, you don't know.
17   A     I don't know. Because I'm on the phone. I'm
18         actually -- I'm more involved in the phone
19         call than -- and it was kind of like a --
20         Just, I see McCann doing this, and I can just
21         picture him getting his ankle broken. And I'm
22         like, no, that's not -- that's not -- you
23         know, that wasn't -- Putting your foot on his
24         butt wasn't controlling him.
25   Q     So you told -- You told him to take his foot
```

EDWARD PHILLIP ELIA, JR.

33

|   |   |   |
|---|---|---|
| 1 |   | the effect you didn't see anybody stomping, |
| 2 |   | beating, or anything like that? |
| 3 |   | Would that be accurate? |
| 4 | A | No, I think he said, "But you didn't stomp |
| 5 |   | him, kick him, or beating him?"  I said, "No, |
| 6 |   | I didn't stomp him." |
| 7 | Q | You yourself didn't do that? |
| 8 | A | No, I didn't do it. |
| 9 | Q | Okay. |
| 10 | A | Well -- and then I said -- Okay. |
| 11 | Q | Well, let me just ask you then, did you see |
| 12 |   | anybody stomping him, kicking him, or beating |
| 13 |   | him? |
| 14 | A | No.  I saw Jerry deliver the blows to the |
| 15 |   | solar plexus.  Now, I'm not going to say |
| 16 |   | that's beating.  I'm saying that's a maneuver. |
| 17 |   | Try it like that.  What I would say beating -- |
| 18 |   | To me, if you say "beating," I would say that |
| 19 |   | would be something that would be over the top |
| 20 |   | of what -- other than the pain compliance that |
| 21 |   | we've been taught or trying to do. |
| 22 | Q | Stomping him, kicking him, beating him, as you |
| 23 |   | have classified or quantified, would be |
| 24 |   | excessive? |
| 25 |   |   |

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969

```
 1            MS. COLLINS:
 2                 Object to the form.
 3    A    Yes, that's what I took it to be, as
 4         excessive.
 5    Q    Well, let me ask you this:  Is it in your use
 6         of force, as a police officer, to stomp a
 7         suspect?
 8    A    It depends on the situation.
 9    Q    Is it within your use of force to kick a
10         suspect?
11            MS. COLLINS:
12                 Object to the form.
13    A    Yes.
14    Q    Is it within your use of force to beat a
15         suspect?
16            MS. COLLINS:
17                 Object to the form.
18    A    I'm saying beat is something that would not be
19         justified.  So the terminology -- I'm having a
20         problem with the terminology.  Depending on
21         what's going on, if I come to a use -- If I
22         come to a deadly force situation, everything's
23         -- everything is on the table.  Okay.
24            So depending on the -- The threat that's
25         on the officers at that time justifies, you
```

EDWARD PHILLIP ELIA, JR.

36

```
 1            you want me to go there after this?"
 2                  I was like, "No, no.  I'll take care of
 3            that,"  And I got in the car and left.
 4       Q    All right.  When -- So you saw them put the
 5            four-point restraints on him and then moved
 6            away from him?
 7       A    Yeah.
 8       Q    You saw that?
 9       A    (Witness nods head.)
10       Q    You need to say yes.
11       A    Yes.
12       Q    And the detective asked you if he was -- if
13            Rachel was breathing then.  And your response
14            was, "I didn't check him."
15                  So you didn't -- You personally didn't
16            look and see if he was still breathing at that
17            point?
18       A    No.
19       Q    And I think at that point in time you left to
20            go handle the other call?
21       A    Correct.
22       Q    Who is in charge of this situation once you
23            leave?
24       A    Sergeant Ripple.
25       Q    All right.  Even though it was McCann's --
```

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | Even though McCann was primary on the call,                  |
| 2  |   | Ripple is in charge of that scene?                           |
| 3  | A | Okay.  It's McCann's call to work.  And he's                 |
| 4  |   | responsible to make sure everything gets done,               |
| 5  |   | get people to help him doing things like that.               |
| 6  |   | Once a supervisor comes and we take it over,                 |
| 7  |   | which basically we did, then we're in charge                 |
| 8  |   | at that point in time.                                       |
| 9  | Q | So you've heard me ask questions about --                    |
| 10 | A | But McCann is still going to do all the work,                |
| 11 |   | as far as like following through, doing                      |
| 12 |   | whatever reports need to be filed, and stuff                 |
| 13 |   | like that.                                                   |
| 14 | Q | You heard me ask a lot of questions about                    |
| 15 |   | medical care?                                                |
| 16 | A | Um-hum.                                                      |
| 17 | Q | Say "yes."                                                   |
| 18 | A | Yes.                                                         |
| 19 | Q | And one of those questions -- Or one of the                  |
| 20 |   | policies that we looked at was after less                    |
| 21 |   | lethal force is used, there needs to be an                   |
| 22 |   | increased observation of the suspect.  Do you                |
| 23 |   | remember hearing those questions?                            |
| 24 | A | I remember y'all talking about that.                         |
| 25 | Q | Are you familiar with that general order?                    |

EDWARD PHILLIP ELIA, JR.

38

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Whose responsibility was it, once Greg Rachel |
| 3 | | was hog-tied, four-point restrained, shackled, |
| 4 | | whatever you want to call it, who was supposed |
| 5 | | to be performing the, quote unquote, increased |
| 6 | | observation? |
| 7 | A | One of the officers there. |
| 8 | Q | Is there a specific officer? |
| 9 | A | It wouldn't be a specific officer. |
| 10 | Q | So all three of them had a responsibility? |
| 11 | A | Yes.  Unless one -- Well, looking at that, if |
| 12 | | Jerry tells -- If Sergeant Ripple tells |
| 13 | | McCann, "Go get your car, bring it over here. |
| 14 | | Jackson, yes, go lay against the car because |
| 15 | | you're about to pass out."  Obviously, they're |
| 16 | | going to do what he's going to tell them to |
| 17 | | do. |
| 18 | Q | Sure.  So if he's off getting his car, he's |
| 19 | | not going to be able to have the increased |
| 20 | | observation because he's not there? |
| 21 | A | He's not there. |
| 22 | Q | Looks like, also, one of the things you |
| 23 | | offered to Detective Pears is you said, "I got |
| 24 | | in my phone log of where I -- like when I |
| 25 | | called Reggie.  You know, just how many times |

EDWARD PHILLIP ELIA, JR.

43

1  A   Yes.
2  Q   Why?
3  A   We train, so that way we know how to react.
4      We train so we can stay within the boundaries
5      of the rules that -- that protect us, as far
6      as what we do.
7  Q   Do those rules protect suspects also?
8  A   Yes.
9  Q   Do those rules protect the public?
10 A   Yes.
11 Q   Part of those rules that your police officers
12     need to stay in bounds of would include the
13     general orders?
14 A   General orders, memorandum orders, legal
15     advisories, training bulletins.
16 Q   State law?
17 A   State law, yes.  Municipal code.
18 Q   Lieutenant, you're well-respected because
19     you've traveled the ranks apparently fairly
20     quickly, it looks look.  I don't know -- I
21     don't have anything to compare it to.  But it
22     looks like you've done pretty well, as far as
23     moving up.
24         Do you consider being a police officer a
25     profession?

EDWARD PHILLIP ELIA, JR.

44

```
 1   A     I do.
 2   Q     Y'all are professionals?
 3   A     Yes, sir.
 4   Q     And do you expect your police officers,
 5         whether they're a patrolman, a sergeant, a
 6         lieutenant, a chief, it doesn't matter, all of
 7         them are expected to act like professionals?
 8               MS. COLLINS:
 9                    Object to the form.
10   A     Yes, sir.
11   Q     And as a professional, would you agree that
12         you have certain standards that you have to
13         adhere to?
14   A     Yes, sir.
15   Q     Even when it's inconvenient for you?
16   A     Yes, sir.
17   Q     Part of your professional standards include
18         the general orders and the memorandum orders,
19         don't they?
20   A     Yes, sir.
21   Q     And it sounds like, talking to how these --
22         talking about -- with you about how these
23         orders are created, they are directions
24         essentially from the top?
25   A     They are, sir.
```

```
 1   Q      Apply to all personnel?
 2   A      They do, sir.
 3   Q      Signed by the chief?
 4   A      Yes, sir.
 5   Q      I was sitting here thinking about this last
 6          night.  And tell me if you disagree with me.
 7          But as I kind of scan the professions out
 8          there, it seemed to me that the police
 9          officers are one of the few professions in
10          which its members are legally allowed to use
11          physical force to get results?
12                 MS. COLLINS:
13                      Object to the form.
14   A      Yes, sir.
15   Q      And when allowed to use that force, it needs
16          to be done responsibly?
17   A      Exactly.
18   Q      And with responsibility comes the burden of
19          doing things in the appropriate way?
20                 MS. COLLINS:
21                      Object to the form.
22   A      Yes.
23   Q      Are the general orders and memorandum orders
24          MPD's way of saying that when you're an
25          officer on our force, this is the way it
```

```
 1         should be done?
 2              MS. COLLINS:
 3                   Object to the form.
 4   A    Yes, sir.  To the best of our ability.
 5   Q    Whether it's medical aid?
 6   A    Yes, sir.
 7   Q    Whether it's use of force?
 8   A    Yes, sir.
 9   Q    Whether it's dealing with individuals with
10        mental illness?
11   A    Yes, sir.
12   Q    Whether it's responding to a domestic violence
13        call?
14   A    Yes, sir.
15   Q    They want these general orders and memorandum
16        orders saying, "This is how it's to be
17        handled"?
18              MS. COLLINS:
19                   Object to the form.
20   A    To the best of our ability, yes, sir.
21   Q    And they're supposed to be trained on these
22        orders?
23   A    Yes, sir.
24   Q    And you've sat in here, and by their own
25        admission, McCann said that he is not aware of
```

EDWARD PHILLIP ELIA, JR.

73

```
 1                  C E R T I F I C A T E
 2
 3   STATE OF ALABAMA   )
 4   COUNTY OF MOBILE   )
 5
 6        I, Patsy C. Poteat, CCR, as Commissioner,
 7   hereby certify that the above proceedings were taken
 8   down by me and transcribed by me using computer-aided
 9   transcription and that the above is a true and
10   correct transcript of said proceedings taken down by
11   me and transcribed by me.
12        I further certify that I am neither of kin nor
13   of counsel to any of the parties nor in anywise
14   financially interested in the outcome of this case.
15        I further certify that I am duly licensed by
16   the Alabama Board of Court Reporting as a Certified
17   Court Reporter as evidenced by the ACCR number
18   following my name found below.
19        So certified on this, the 19th day of December,
20   2014.
21
22
23
                                    _____
24   Commission Expires:            Patsy C. Poteat, ACCR #236
     December 18, 2016              Freelance Court Reporter
25
```

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P.O. BOX 2263, MOBILE, AL 36652  (251) 694-0950  (888) 557-2969