# EXHIBIT "T"

The Florida State University
Tallahassee, Florida 32306-1127

*College of Criminology and Criminal Justice*

September 29, 2014

Mr. Dixie Dan Powell, Esq.
Attorney at Law
602 South Main Street
Crestview, FL 32536

RE: *Rachel v. City of Mobile*

Dear Mr. Powell:

Pursuant to your request, I would like at this time to submit the following preliminary report relative to the above styled action. It is my understanding that discovery in this matter is ongoing. I, therefore, reserve the right to supplement or amend this report upon receipt of additional relevant material.

My analysis thus far is based on examination of the following:

(1) Report of Autopsy, Toxicological Analysis Report & Death Certificate;
(2) Complaint and Pleadings;
(3) Report of Sgt. Jerry Ripple to Captain Jack Dove regarding arrest of Greg Rachel;
(4) Rachel Home Alarm Log;
(5) Report of Interview of Tiffany L. Brown by Henry L. Neal;
(6) Mobile Police Dept.: Statement of Officer John Jackson;
(7) Mobile Police Dept.: Statement of Officer Chris McCann;
(8) Mobile Police Dept.: Statement of Sgt. Gerald Ripple;
(9) Mobile Police Dept.: Statement of Barbara Duff;
(10) Mobile Police Dept.: Statement of Kristie Adams;
(11) Mobile Police Dept.: Statement of Amy Rachel to Internal Affairs (5/3/12);
(12) Mobile Police Dept.: Statement of Amy Rachel on 5/1/12;
(13) Mobile Police Dept.: Statement of Robert Brown;
(14) Mobile Police Dept.: Statement of Jeremy March;
(14) Mobile Police Dept: Statement of Nicole Phillips;
(15) Mobile Police Dept.: Statement of Lamar Dixon;
(16) Mobile Police Dept.: Statement of Daniel Neese;
(17) Undated Statement of Amy Rachel regarding incident;
(18) Undated Statement of Amy Phelps regarding incident;
(19) 8X10 color photo of residence and immediate surrounding area.

Let me state at the outset that my examination of the aforementioned material reveals extremely serious violations of well established standards and procedures of the law enforcement profession by all four of the Mobile Police Department officers who were

(2)

involved in the arrest of the decedent, Greg Rachel, on May 1, 2012. The relevant standards and procedures relate to: (1) *recognizing and reacting to emotionally disturbed persons (EDPs)*; and (2) *the use of physical force;* I would like to emphasize that this conclusion remains even if one hypothetically construes all known facts and circumstances in a light most favorable to Officer Chris McCann, Officer John Jackson, Sgt. Gerald Ripple and Lt. Edward Elia.

The decedent's wife, Amy Rachel, described the bizarre behavior of her husband to Officers McCann and Jackson immediately upon their arrival at her neighbor's home. Both officers then personally observed Mr. Rachel exit his home in an obviously highly agitated and mentally confused state. According to Officer McCann, he had his hands raised toward the sky and was shouting nonsensical things such as 'Protect me from Obama...protect me from Obama!'....at this point we knew we had a genuine nut on our hands so we... commanded him to get on the ground [and] we pulled our Tasers out." (McCann MPD statement, p. 3).

Any reasonably competent and properly trained law enforcement officer would have immediately realized that Mr. Rachel was experiencing some kind of psychotic episode and reacted accordingly. For many years, professional police organizations such as the International Association of Chiefs of Police (IACP), the Police Executive Research Forum (PERF) and the Commission on Law Enforcement Accreditation (CALEA) have emphasized the importance of officers being adequately trained in basic procedures to be utilized during encounters with emotionally disturbed persons (EDPs): e.g.,

> *Take steps to calm the situation...move slowly and do not excite the person. Provide reassurance that the police are there to help...Do not threaten the person with arrest or in any other manner as this may cause additional fright, stress and potential aggression* (CALEA Standard 41.2.7).

It should be noted that at the time Officers McCann and Jackson encountered Greg Rachel he posed no imminent threat to them or anyone else in the immediate area. Despite this fact, neither officer ever made any attempt to 'calm the situation' or provide 'reassurance' to this obviously terrified man that they were there to help. In a dramatic departure from the professional standard just referenced, both officers gratuitously and recklessly escalated the situation by advancing on Greg Rachel with drawn Tasers as they began issuing commands: "[We] said 'get on the ground, get on the ground...and as we started *yelling* at him [to] 'get on the ground he was yelling back at us 'protect me, protect me, protect me'" (Ibid.). The above behavior by both officers suggests that either they never received appropriate in-service training from the Mobile Police Department regarding interacting with mentally ill persons (which they were legally required to have pursuant to provisions of the Americans With Disabilities Act), or they consciously chose to disregard such training.

As a former police crisis intervention unit officer, I have authored widely used training material that stresses the importance of officers utilizing both their *tone of voice* and *body language* to calm agitated EDPs and deescalate potentially volatile situations

(3)

(Kirkham & White: *Police Nonverbal Communication*, Florida State University and the Tallahassee Police Department, 1989).

While Greg Rachel did initially lie on the ground, when he stood and began walking, both Officer McCann and Officer Jackson repeatedly discharged their Taser electronic control devices (ECDs) into his body--using the weapon in both "probe" (neuromuscular interruption ) and "drive stun" (pain compliance) modes. It is important to realize that the Taser is a **strictly defensive instrument** whose purpose is to protect officers and others from imminent harm. Accordingly, it should never be used to effect compliance with police commands or against someone who is not responding to such commands. Taser International (T.I.,) the manufacturer, characterizes the Taser as "...a serious weapon [which] should only be deployed in situations where the alternative would be to use other force measures which carry similar or higher degrees of risk" (Taser Instruction Manual). Based on a study of conducted energy devices by the U.S. Department of Justice, the Police Executive Research Forum (PERF) concluded that "CEDs should not be used against a passive suspect." When Officer McCann was asked if Greg Rachel at any time attempted to strike either officer, he responded: "No, he never...attempted to" (Ibid, p. 8).

Notwithstanding the absence of any attempt by Greg Rachel to harm either officer, Officer McCann stated: "He was tased 4 or 5 times [sic] he was tased initially by Officer Jackson, then he was tased, then when that didn't work, when he (inaudible) he got back up, I tased him at that point. That was the second tas[sic], he fell down [sic] he got back up, at this point he started approaching us and Officer Jackson dry [sic] tased him 2 or 3 times to try to you know [sic]" (Ibid., p. 7). After the repeated tasing of the decedent, Officer McCann also delivered leg blows with his Monadnock baton.

Apart from the risks of a non-assaultive person such as Greg Rachel being seriously and needlessly injured as a result of a fall following the neuromuscular interruption (NMI) produced by a Taser probe application, in recent years numerous law enforcement and medical organizations have cautioned against excessive Taser discharges (including the U.S. Dept. of Justice, the National Institute of Justice (NIJ), the IACP, PERF and the American Academy of Emergency Medicine AAEM). Of particular concern has been the risks associated with multiple Taser applications on persons experiencing **excited delirium**--which was identified by the medical examiner in the instant case as the cause of death. A review of the use of Tasers by the Royal Canadian Mounted Police (RCMP), cautioned specifically against their use on people exhibiting symptoms of excited delirium (see, e.g., RCMP, *Crime and Misconduct Commission*, Research & Issues Paper, No. 8, November, 2008, pp. 5-8). None of the four officers involved in the fatal encounter with Greg Rachel acted in a manner indicative of an understanding of the dangers associated with **excited delirium, prolonged prone restraint of arrestees, positional asphyxia** or **Sudden In-Custody Death Syndrome (SICDS).**

If an EDP believes that the law enforcement officers attempting to gain physical control of him are actually devils, Martians, or members of the Gestapo ("Gestapo!" was reportedly the last word Greg Rachel uttered before lapsing into unconsciousness), the ensuing terror he experiences may push his cardiac rhythm and respiration to dangerous levels during a prolonged struggle of the sort involved here (which reportedly lasted

(4)

between twenty and twenty five minutes). The risks of a person who is experiencing excited delirium dying from Sudden In Custody Death Syndrome obviously increase substantially if the individual's ability to breathe normally is restricted during a prolonged struggle--as it clearly would have been in the situation of Greg Rachel by the weight of four police bodies pressing down on him: "...we had to get on top of him. We had to slam on him" (McCann, Ibid, p.8) "...we had 4 people working on him at once to try to get his hands behind his back...He was on his stomach the whole time pretty much...almost the whole time we had him on the ground we had him on his stomach" (Ibid, p. 9, 10).

Sgt. Ripple and Lt. Elia should have realized the danger to Greg Rachel from the prolonged prone struggle they witnessed after responding to the scene. Instead of seeking to de-escalate the situation, as supervisors they actively abetted and increased the excessive force that Officers McCann and Jackson were utilizing by adding their own body weight to the **high-risk prone restraint tactic** that was being employed. Sgt. Ripple also delivered several blows to the solar plexus of Greg Rachel and "hog tied" him--actions which would have further restricted Rachel's ability to breathe normally, and would have foreseeably exacerbated the panic he was experiencing (Ripple statement to MPD, p. 2).

Incredibly, after finally handcuffing and hog-tying their prisoner following such a protracted struggle, neither the two officers nor their supervisors checked Greg Rachel's physical condition. None of them noticed the classic warning sign of Sudden In-Custody Death Syndrome, i.e., prolonged resistance followed by an abrupt cessation of both speech and physical movement: "...he said Gestapo...that's the last thing he yelled and then he, then all of a sudden he just, he was out" (McCann, Ibid., p. 10). It was not until McCann brought his patrol car to where Rachel was lying and the officers began carrying him to it that they noticed he wasn't responding to questions and had stopped breathing (see R.L. O'Halloran, M.D. and Janice G, Frank, M.D., "*Asphyxial Death During Prone Restraint: A Report of 21 Cases*" American Journal of Forensic Medicine and Pathology: Volume 21 (1), March, 2000, pp. 39-52).

In conclusion, it is my considered professional opinion as a former law enforcement officer and a criminologist who has specialized in the field of police standards and procedures for over forty years that the egregious violations of widely accepted police practices discussed in this report were a significant and proximate cause of the death of Greg Rachel.

Please do not hesitate to contact me further at this time should you require any additional information. I am attaching herewith a copy of my professional vita, as well as my current fee and expense policies and a list of all attorneys who have retained my services as a case consultant and potential expert witness during the past four years.

Very truly yours,

*[signature]*

George L. Kirkham, D.Crim.