# EXHIBIT "U"

## DR. GEORGE KIRKHAM

```
        IN THE UNITED STATES DISTRICT COURT

      FOR THE SOUTHERN DISTRICT OF ALABAMA

              SOUTHERN DIVISION


  CASE NO:  1:13-CV-00522-WS-M


  AMY RACHEL, as Administratrix of

  the Estate of GREGORY RACHEL,

  Deceased,

     Plaintiff,

          vs

  CITY OF MOBILE, ALABAMA;

  MICHAEL T. WILLIAMS, individually

  and in his official capacity as

  Chief of Police of the City of

  Mobile; CHRISTOPHER MCCANN;

  JOHN JACKSON; GERALD RIPPLE;

  and EDWARD ELIA,

     Defendants.



            S T I P U L A T I O N S


    IT IS STIPULATED AND AGREED by and

  between the parties, through their respective

  counsel, that the deposition of DR. GEORGE
```

## DR. GEORGE KIRKHAM

1    Mobile Police Department's CO 2011-03, all

2    kinds of cautions in there against many

3    things that are relevant to this death.  Of

4    course, nobody is aware of them in the

5    department, apparently.  But yeah.

6         Q        Where did you get that?

7         A        Well, simply by juxtaposing the

8    MO-2011-03, its contents.  It's a seven page

9    single spaced document, taking that as a

10   template and looking at it in relation to the

11   officers testimony.  Officer after officer

12   didn't know anything about mental illness,

13   emotionally disturbed people, had never been

14   trained in it, most of them had never heard

15   of these things, Excited Delirium, sudden

16   custody death syndrome.  Acknowledged that

17   there was really no training in this.  And

18   I'm afraid that's proximally very relevant to

19   what brings us here today.

20        Q        What if your own medical expert

21   hired by Ms. Rachel has given his opinion

22   that this is not an Excited Delirium case?

23             MR. BREWSTER:  Objection.

24   BY MR. NEWELL:

25        Q        That kind of --

DR. GEORGE KIRKHAM

```
 1    that the officers knew that this guy was a
 2    certifiable nut?
 3         A       The statements on the record.  We
 4    can go to it if you would like.  Officer
 5    McCann I think uses the expression, we knew
 6    we had a certified nut on our hands when he
 7    came out and raised his arms and saying save
 8    me from Obama.
 9         Q       Had they read his medical records
10    or psychiatric records?
11         A       No.  And that's something that
12    should be considered.  In fairness, it would
13    be rare and unreasonable to hold them to an
14    expectation that they know things, for
15    example, about his blood level of alcohol, if
16    there was any, there was none, that they
17    would know his emotional history.  That's not
18    fair.  What is fair is that when you see
19    someone who is exhibiting such blatant signs
20    of mental illness, that you follow the
21    orders, regulations of your own department,
22    that you be adequately trained to know what
23    to do.  And the Mobile Police Department has
24    apparently extracted this policy that they're
25    supposed to know about and be trained in from
```

## DR. GEORGE KIRKHAM

1    some very good sources, probably from the

2    International Association of Chiefs of

3    Police, the Police Executive Research Forum,

4    the Commission on Law Enforcement

5    Accreditation, which accredits that agency,

6    as a matter of fact.  So it's good stuff here

7    that nobody knows anything about, nobody has

8    heard of it, we don't have to time to train

9    in it, and that is tragic.

10       Q       By the way, Doctor, it's

11   pronounced Mobile, not Mobile.

12       A       I'm sorry.  Like the gas station.

13   I'm sorry.

14       Q       So you've completed, now, your

15   review of what you saw in Sergeant Ripple's

16   report.  The next thing on your list is the

17   Rachel home alarm log.  Do you have that?

18       A       I do.  It's just a burglar alarm

19   thing.  I can dig it out if you want.  It's

20   not consequential.

21       Q       Did you find anything significant

22   at all to you in the Rachel home alarm log?

23       A       No.

24       Q       Then the next thing, number five,

25   is the report of the interview with Tiffany

**DR. GEORGE KIRKHAM**

```
 1      Q       Well, playing Monday morning
 2   quarterback like those reviews talked about
 3   earlier in your deposition, knowing that Mr.
 4   Rachel has tried to kill his wife, knowing
 5   that he's a big dude, what do you think the
 6   officers should have done?
 7      A       Well, some of the things they did
 8   were, again, we said before, it was correct
 9   for them to wait for the arrival of their
10   backup, they're doing that.  But the key
11   becomes once Mr. Rachel walks out in the
12   yard, we understand, and there's no dispute
13   about this, that we've got an aggravated
14   battery situation, we've got a domestic
15   violence, there's going to be an arrest, but
16   things begin to change in a significant way
17   when he walks out in a blatantly psychotic
18   state, hands raised up to the heavens,
19   speaking incoherently, talking about --
20   pleading save me, save me.  Two things a
21   trained officer would know, number one, and
22   I've dealt with this personally as a crisis
23   officer many times, the person is utterly
24   terrified, one, secondly, they're
25   disoriented, they're frightened, and they're
```

DR. GEORGE KIRKHAM

1    begging for help.  Again, the General Order

2    of the Mobile Police Department --

3        Q        Didn't you tell me earlier you're

4    not a medical expert?

5        A        I'm not a medical expert.

6        Q        Are you a psychiatrist?

7        A        I'm not a psychiatrist, but I'm a

8    crises expert.  As a criminologist, I have a

9    very strong background in mental health, and

10   I've operated a crisis unit, I've dealt with

11   large numbers of emotionally disturbed people

12   both in a prison and law enforcement context,

13   so I do have credentials to speak on these

14   issues.

15          And this is not rocket science, sir,

16   with all due respect.  A minimally trained

17   officer would know that this person is having

18   a psychotic break.  The Mobile Police

19   Department has guidelines, has orders, has

20   General Orders as to what to do and what not

21   to do that are very good that were never

22   imparted to these people.  They say things

23   like don't approach the person unless there's

24   some exigent reason.  No one is being

25   threatened.  We understand about the attack

**DR. GEORGE KIRKHAM**

```
 1   that's occurred.  We're going to take this
 2   guy into custody now.  The question is how do
 3   we do it.  One thing the Mobile Police
 4   Department says is don't threaten them.
 5   Don't frighten them.  Try to assure them that
 6   you're there to help.  They don't do that.
 7       Q       Don't they say that for
 8   non-violent people?
 9       A       They say in a situation where
10   there's no immediate need for the officers to
11   resort to the use of physical force.  And
12   there is no --
13       Q       Mr. Rachel had been violent,
14   hadn't he?
15       A       He has been.  But we're talking
16   about, we're playing the ball from where it
17   lies.  Where it lies is that he is now out in
18   the -- he's moving out towards the street.
19   He has a cell phone in one hand and a drink
20   in the other.
21       Q       And he's in a neighborhood?
22       A       He's in a neighborhood with large
23   -- these are not zero lot line houses.  You
24   can see from the photographs, big expanse of
25   open area.  There's no one else in immanent
```

**DR. GEORGE KIRKHAM**

1   danger, not officers, not anybody else.

2   There's no reason --

3       Q       That's your opinion.

4       A       No.  I think the facts speak for

5   themselves.

6       Q       What if he ran over across the

7   street to where his wife was and went about

8   trying to kill her again?

9       A       The officers would act to

10  interdict that if he tried to do that.  But

11  he's not doing that.  He's begging for help.

12  He's standing out there saying help me, help

13  me, and --

14      Q       How do they know he's not going to

15  do that?

16      A       Sir, I really wish you would let

17  me finish my answers.

18      Q       I know you want to get to all this

19  stuff about the City of Mobile.  How do you

20  know that he wasn't going to go over there

21  and start beating up his wife again?

22              MR. BREWSTER:  Object generally.

23      A       We don't know --

24              MR. BREWSTER:  I --

25              MR. NEWELL:  Hold on.  He wants to

DR. GEORGE KIRKHAM

1       A       Sir, once again, please let me.

2   They only -- McCann says we only had a few

3   seconds.  I have been in few second

4   situations even involving firearms, and

5   believe me, they had more than a few seconds.

6   They had time to do the things that they're

7   supposed to be doing per their own

8   regulations.  And they didn't do it because

9   they weren't trained in it, obviously.

10          So instead of -- not threatening him,

11  just doing something as simple as saying,

12  hey, I'm Chris, this is John, we're here to

13  help you, what are you scared of, we're going

14  to help you, we're going to protect you,

15  assure him.  That's -- there's no reason not

16  to do that.  I've done that many, many times

17  to de-escalate the situation rather than --

18  the GO again says don't yell.  They start

19  yelling right away.

20  BY MR. NEWELL:

21      Q       Didn't Mr. McCann -- excuse me,

22  did you finish with your answer?

23      A       Yes.

24      Q       Didn't Mr. Rachel at first comply

25  with what the officers asked him to do?

**DR. GEORGE KIRKHAM**

```
 1      A       Yes.  He got on the ground, laid
 2   down, dropped his glass down, threw his cell
 3   phone away.  That's initial compliance.
 4   That's a good step.  You stay well way back
 5   and you build on that by trying to get
 6   dialogue going with him.
 7      Q       Isn't that a sign to the two
 8   officers that hey, maybe this guy is going to
 9   comply, maybe we're going to be able to take
10   him in?
11      A       It would be a sign.  Compliance is
12   always a good sign.  You're not going to
13   approach the person.  Again, that's in their
14   General Orders.  Stay back, talk to him, you
15   know, communicate with him, try to calm him
16   down, we're here to help you, what's the
17   problem, tell me what's going on, Greg, so I
18   can help you.
19      Q       How would treating Mr. Rachel in
20   that situation be different than treating
21   some guy out in Bienville Square over here
22   with nobody around, nobody has been attacked
23   or he hasn't tried to kill anybody, how is
24   the situation different?
25      A       Well, it's different because --
```

DR. GEORGE KIRKHAM

```
 1     A       Sir, when you say treat them
 2  differently, they're both psychiatric or
 3  mental illness type situations, but ours here
 4  is more serious because we have a preceding
 5  serious violence.
 6     Q       Sure.  The officers know that,
 7  they know he's a violent man?
 8     A       That's why we're not going to do
 9  anything that might provoke that violence.
10  We try to calm him down, get compliance.  And
11  all of the training material emphasizes that.
12  And I've experienced this, that these people
13  are often afraid of police officers.  In this
14  case, this guy is looking to police for help,
15  Rachel is saying, help me, help me, please.
16  All it takes it we're going to help.  That's
17  all.
18     Q       Hold on.  When did Mr. Rachel say
19  help me?
20     A       I'm sorry, save me, save me were
21  the words he used.
22     Q       He wasn't asking the officers to
23  help him, was he?
24     A       Sir, with all due respect, I don't
25  think we need to quibble over semantics here.
```

**DR. GEORGE KIRKHAM**

```
1    Save me, save me is a plea for help.  He's
2    pleading for help, that's obvious.
3         Q        Who is he pleading to?
4         A        Who's there?  The police officers.
5    He's addressing the police officers.
6         Q        Isn't he yelling Gestapo?
7         A        It's unclear from the record.  He
8    says Gestapo.  Allegedly that's the last word
9    he says before he dies, but he may have said
10   Gestapo earlier.
11            A trained officer would know this is
12   someone who is exhibiting, and this is again
13   just standard police training, this is
14   someone experiencing paranoia, someone who is
15   paranoid, and that's to be taken very
16   seriously.
17        Q        But he's not asking the officers
18   to help him, he's not saying, guys, I'm
19   messed up, I need help, he's not saying
20   anything like that?
21        A        He's saying save me, save me,
22   which I think in any fair reading of it is
23   he's asking for help.  Now, he may be asking
24   globally, God, Jesus, the world.  He's asking
25   for help.  And that's what police are trained
```

**DR. GEORGE KIRKHAM**

1      Q       Do you have any facts to dispute

2    what the officers say?

3      A       No.  I'm taking it, assuming that

4    that's correct, that he jumped up, and he --

5    they say he took a combative stance by

6    clinching his fists and starting toward them.

7      Q       Yeah.

8      A       That's a changed circumstance.

9      Q       How does that change things?

10     A       Well, it obviously increases a

11   risk for the situation escalating.  The

12   officers at that point, again, you should be

13   some reactive distance back from the person.

14     Q       How far?

15     A       You know, again, without --

16   there's no calculus for it, but you want to

17   be far enough back you could communicate with

18   him but not crowd into his personal space.

19   Again, there's a lot of training material

20   available on that.  I think they're about

21   eight feet back, something like that, if I

22   recall correctly.  You have an open area, you

23   could try backing up a little bit further.

24     Q       Retreating?

25     A       No, you're not going to retreat,

**DR. GEORGE KIRKHAM**

1   you're not giving up, you're in the Harry

2   Truman buck stops here situation, you have to

3   deal with it.  The question is how you're

4   going to deal with it.  Let's say you take a

5   couple of steps back, and you've got open

6   hands, which is a non-threatening gesture,

7   and the person continues to be menacing --

8        Q      And he's eight feet away?

9        A      Yeah.

10       Q      How quickly can he close that gap

11  between eight feet between himself and those

12  officers?

13       A      He could close it very quickly.

14       Q      A second or two, right?

15       A      Couple of seconds he could, yeah.

16       Q      And then he would be all over

17  those officers, wouldn't he?

18       A      If he had an intent to.

19       Q      All 6'4", 250?

20       A      He could.

21       Q      And we already know he's tried to

22  kill someone that night?

23       A      We know that.

24              MR. NEWELL:  How are we doing?

25              MS. COLLINS:  We're doing good.

**DR. GEORGE KIRKHAM**

1  emotionally disturbed person.

2      Q      Who's also a very violent person?

3      A      Well, we know he had been violent

4  towards his wife.  We don't have any

5  indication in here -- we have some

6  contradictory statements by the officers

7  whether he did swing on them or whether he

8  did not attack them.  They say in here also

9  that he didn't attack us.

10         The Gestapo thing, you know, he shows

11  signs of paranoia, you know, he's paranoid, I

12  think somebody is going to get me, help me,

13  save me, save me would be consistent with a

14  fear of Gestapo.  I don't want to get into

15  some kind of psychiatric testimony, but

16  obviously we're dealing with a very disturbed

17  person here, and that's been evident early

18  on, even in the encounters with Amy when she

19  starts to recount how he's doing all these

20  bizarre things.  Then we see out front

21  unequivocally evidence that someone who is in

22  a psychotic episode.

23      Q      He's also somebody that we know

24  likes to fight, right?  Did you see in Amy

25  Rachel's testimony that he entered a tough

DR. GEORGE KIRKHAM

1    man competition, which is a form of mixed

2    martial arts?

3        A        I do recall that, but it's not

4    fair to hold officers to things that they

5    couldn't possibly know about.  All they know

6    is what they reasonably can see and react to.

7        Q        And they had to react to how he

8    was fighting, right?

9        A        Well see, the idea is try not to

10   get involved in a confrontation.  At one

11   point, Sergeant Ripple is asked should

12   officers always get involved in a

13   confrontation.  And he said of these facts,

14   with these facts present, I'm paraphrasing

15   here, I would be distressed if they weren't

16   in confrontation.  And that's just the

17   opposite of what police are trained in

18   dealing with somebody, violent or not, who's

19   out of their head, who's mentally ill, EDP,

20   you try to avoid a confrontation, try to talk

21   them down, calm them down.  Had those things

22   been done, we wouldn't be sitting here now.

23       Q        Did you just say that with the

24   facts that the officers knew of, that they

25   should have expected that he would be

**DR. GEORGE KIRKHAM**

1   confrontational?

2       A       No.  What I'm saying is that the

3   Sergeant, Sergeant Ripple says, when asked in

4   discovery deposition, do you expect your

5   officers to always be confrontational.  And

6   he says given the facts here, I would be

7   disappointed if they weren't confrontational.

8   You know, obviously you're going to do your

9   job, you're going to have contact with him,

10  but the term confrontational is something

11  that in the literature of law enforcement

12  training on handling EDPs is something we try

13  to avoid confrontation with them.  We're not

14  going to challenge them and threaten them,

15  we're going to try to talk them into

16  cooperating.

17      Q       Didn't Mr. Rachel initiate the

18  confrontation?

19      A       No.  Mr. Rachel, track me on this

20  if you will, Mr. Rachel comes out of the

21  place, he comes out, we know what they know

22  about him from the wife and inside, he comes

23  out there in an obviously, what any officer

24  would recognize is a psychotic state.  These

25  officers say a certified nut, we know we've

**DR. GEORGE KIRKHAM**

1    got a certified nut on our hands.  He also

2    says we don't treat mentally ill people

3    differently than we do any other criminal

4    that has committed a violent act.  It

5    shouldn't be that way.  And the training,

6    again, is so important here.  We're going to

7    take this guy into custody, how are we going

8    to do it.  Who initiates the confrontation?

9    He comes out pointing his hands to the

10   heavens and shouting incoherently, save me,

11   save me.  The officers then, and they have

12   different versions in their original

13   statements and in their depositions,

14   somewhat, but the officers then begin yelling

15   at him, something that their own General

16   Order explicitly says don't do, don't

17   frighten them, don't threaten them, they do

18   that right away, right out of the chute.  And

19   then we're pulling tasers initially, and they

20   contradict themselves here again, one place

21   they say we started yelling and we pulled our

22   tasers.  Another point they say in deposition

23   testimony, well, I think we pulled the tasers

24   later, we didn't pull them initially.  But

25   they're clearly confrontational, aggressive,

**DR. GEORGE KIRKHAM**

1    forceful, and that's not what you want to do

2    with this kind of EDP.  I say that having

3    dealt with many of them as a police officer.

4        Q       Wasn't Mr. Rachel confrontational

5    in trying to kill his wife and then taking an

6    aggressive movement towards the officers?

7        A       Well, with all respect, you're

8    trying to conflate those two things.  They

9    are two different things.  We agree he

10   confronted his wife in a crazy state.  We

11   understand that.  We're talking about looking

12   at the situation from when the police arrive,

13   what they do, and what he does.  He initially

14   comes out in this crazy state, crazy, call it

15   psychotic, whatever, they realize he's

16   mentally ill, whatever they want to call it.

17       Q       They don't know what he's going to

18   do?

19       A       They don't know what he's going to

20   do, but they observe certain things.  He gets

21   on the ground.  And I am representing to you

22   that throughout all of the training protocols

23   in this country the police are provided with,

24   put out by the U.S. Department of Justice,

25   International Association of Chiefs of

**DR. GEORGE KIRKHAM**

```
 1   Police, every professional law enforcement
 2   organization, and it's in this City's own
 3   regulations, that you don't do the things
 4   that they do.  There's no downside at all.
 5   You can always get aggressive.  There's no
 6   downside to trying to come on with a calming
 7   voice, keeping your distance, we want to help
 8   you, identifying yourself, trying to get some
 9   personal contact with him.  That's what
10   trained officers do.
11       Q      Getting back to that we don't know
12   what he was going to do, which you just
13   agreed with, he could have run back to the
14   Adams house and tried to resume the fight
15   with his wife, right?
16       A      He could have tried.  We would
17   have interdicted that.  We would have stopped
18   it.
19       Q      He could have run back in his own
20   house, right?
21       A      He could have tried to.
22       Q      And he's -- how are we going to
23   stop him if we're in front of him, the house
24   is behind him, he turns around and runs back
25   in the house?
```

**DR. GEORGE KIRKHAM**

1    So we're going --

2         Q        Sure.  He could be armed?

3         A        He could be armed.  So we're going

4    to stay back and be mindful of our safety.

5    We're going to try to do two things.  We're

6    going to get a crisis unit rolling out there,

7    somebody that has the skill to talk to

8    somebody like this.

9         Q        And instead of getting him on the

10   ground, you want to say, hey, what's wrong;

11   is that your testimony?

12        A        That's the first thing we're going

13   to do.  We can request him to get on the

14   ground.  Later on he gets on the ground on

15   his own.  The very first thing we do, we

16   don't yell, per their own GO, we don't yell

17   at him.  We don't rush into his personal

18   space.  We start to try to talk to him and

19   calm him down.  They say, one of the officers

20   says he had never been trained in this GO,

21   doesn't have any knowledge of mental illness,

22   he says we're supposed to calm the person

23   down.  Rhetorical question, how do you calm

24   somebody by yelling at them and pointing a

25   taser at them?

## DR. GEORGE KIRKHAM

123

1   City produced, did you change your opinions?

2       A       Changed in the sense of

3   supplemented or augmented my opinions.

4       Q       Have you ever prepared a written

5   supplement or change of opinions?

6       A       No.

7       Q       Any kind of letter, e-mail,

8   anything like that?

9       A       No.  Like I say, I've added some

10  additional opinions as a result of seeing

11  things I didn't have before, but my

12  fundamental opinions, there's nothing changed

13  in here.

14      Q       What is your fundamental opinion?

15      A       It's set forth in my report.  But

16  there are additional pieces of information

17  that are very important provided in these

18  depositions I just didn't have in the report

19  before.  And also information about the

20  City's policies that I didn't have before.

21      Q       Tell me what your fundamental

22  opinion is.

23      A       My fundamental opinions are that

24  mindful of anything we talked about earlier,

25  that it's my considered professional opinion

**DR. GEORGE KIRKHAM**

```
 1      A       That's true.

 2      Q       So is this your supplemental

 3  opinion?  The first question I asked you is

 4  what is your fundamental opinion, and then

 5  you went into all that stuff that you just

 6  told me about that you've learned since your

 7  initial opinion.  So what's fundamental and

 8  what's supplemental?

 9              MR. BREWSTER:  Objection.

10      A       Well, the fundamental opinion is

11  set forth in my initial material based on the

12  knowledge and information I had at that time.

13  My supplemental opinion is provided by -- is

14  made possible by the additional information I

15  received specifically from the four officers

16  depositions and the City's policies.

17  BY MR. NEWELL:

18      Q       Didn't you have the City's

19  policies before September 29th, 2014?

20      A       I had never seen the specific

21  policy I'm referring to.  There were a couple

22  of other policies that were important, but

23  no, I had not seen the policies of the -- the

24  City's policy of the CO-2011-03.

25      Q       It kind of sounds to me like when
```

**DR. GEORGE KIRKHAM**

1    you gave us your initial disclosure in

2    September 2014, your focus was on the

3    Officers conduct, and once you read the

4    Officers depositions and you saw these

5    memorandums and General Orders, your focus

6    may have become more centered around the City

7    and what their training was.  Would you agree

8    with that?

9         A      No.  I would say that my focus

10   remained on the Officers, but for the first

11   time, it was explicable, to a degree, why --

12   I say in here, they -- my original report I

13   said they acted in a manner that wasn't

14   consistent with the proper way you handle

15   this kind of call.  I now understand why from

16   their deposition testimony and from the

17   General Orders of the department pertaining

18   to mental illness and some other things,

19   monitoring people who are in the condition of

20   medical distress, and the use of force, I

21   understand now, given their own testimony and

22   these other documents, why these things

23   occurred.

24        Q      What specific standard General

25   Order, memorandum order would you point us to

DR. GEORGE KIRKHAM

1   regulation.  And I would emphasize, per the

2   testimony of the officers, I believe it's

3   McCann's, he's asked is it a regulation, must

4   you follow these.  Yes, you must.

5        Q        But doesn't that same regulation

6   give the officer some discretion?

7        A        Officers always have some

8   discretion, but -- and I mean no disrespect

9   by this, I've done some twenty-six training

10  videos for officers that are widely used

11  throughout the country, some of them deal

12  with mentally ill people.  And if I were

13  doing a video in the wake of this tragedy on

14  what not to do, I would make the video of

15  what they did and use a narrative on these

16  are things you don't do.  You don't yell, you

17  don't start pulling weapons, you don't

18  advance on the person, you don't not respond

19  to they're calling out help me, help me.

20  We're here to help you.  And that's echoed in

21  here all the way through.

22        Q        If Mr. Rachel had run across the

23  street and killed his wife, or killed Ms.

24  Adams, or somebody else, would you be making

25  a video this is what the officers should have

**DR. GEORGE KIRKHAM**

138

1  Q      I think my question had something

2  to do with what standard can you point me to

3  that the officers violated.

4  A      I can give you standards that

5  these are derived from.  I can refer you to

6  those, or I can talk to you about this

7  wonderful document here that's so important.

8  Q      Let's talk about the wonderful

9  document.

10  A      You were asking if I recall.  And

11  I have highlighted and marked through here

12  the things that they say to do that these

13  officers did not do.

14  Q      And what do you say that is?

15  A      Okay.  Some things that they did

16  do, I'll talk to you about those things, too.

17       Officers arriving on an emergency

18  call, suggesting mental illness, gather

19  information regarding the nature of the

20  problem, be aware of the events that

21  precipitated the person's behavior, and

22  presence of weapons.  They asked these

23  questions, which is important.  Now we get to

24  --

25  Q      So they did that?

**DR. GEORGE KIRKHAM**

139

```
 1      A        They did that.  And they should do
 2   that.
 3      Q        They gathered information?
 4      A        Uh-huh.
 5      Q        Of what happened?
 6      A        Okay.
 7      Q        They found out that she had been
 8   attacked by her husband and he tried to kill
 9   her, right?
10      A        Right.
11      Q        And they confirmed that by looking
12   at her --
13      A        Talking to her.
14      Q        -- talking to her, and looking at
15   her and seeing that she has broken fingers,
16   red marks around her throat, she's bleeding
17   about the face?
18                MR. BREWSTER:  Objection.
19      A        They gathered this information and
20   they listened also to her describing how
21   there's something wrong with him all the
22   sudden, he's been a good man, he's never done
23   anything like this, you know, there's
24   something out of the ordinary here.  Having
25   dealt with a lot of domestic violence,
```

DR. GEORGE KIRKHAM

1   sometimes people will have a history, they

2   beat their wife up every Saturday night.

3   This is something different.

4         But they gathered this information,

5   and they're not to be criticized about that.

6     Q       They talked to her father and

7   found out he's a big guy?

8     A       That's good.  No weapons in the

9   house.  They asked about that.

10    Q       They told her they were going to

11  arrest him?

12    A       Yes.

13    Q       They actually asked her for

14  permission to go in the house, right?

15    A       Right.  And then Officer McCann,

16  prudently, Jackson wants to go in the house,

17  McCann says let's call the Lieutenant.  He

18  does.  The Lieutenant says sit tight, wait.

19  And they then -- approaching or interacting

20  with a person with a mental illness, officers

21  should do the following.  Remain calm and

22  avoid overreacting.

23    Q       Despite the fact they're dealing

24  with someone violent who just tried to kill

25  his wife, could run away, we don't know what

**DR. GEORGE KIRKHAM**

```
 1      A      You're talking now about an

 2   individual who is believed to be armed and

 3   dangerous.  That's a totally different kind

 4   of call.

 5      Q      Okay, I just beat somebody up.

 6      A      We know, and we went around on

 7   this, I'm not arguing with you, we understand

 8   that Ms. Rachel has told them he hurt me, he

 9   tried to kill me, he choked him, I was scared

10   to death.  We know those things.  But that

11   does not preclude at all following these

12   recommendations, which is first to try to

13   calm the guy down, we're here to help you.

14   When he says, you know, save me, save me, all

15   these crazy things, try to get a wedge in

16   there and calm him down.

17          Under F, speak simply and briefly and

18   move slowly.  Move slowly.  None of these

19   things they do.  They are yelling, and that

20   is their word, we're yelling at him, we're

21   yelling at him.

22      Q      I'm sorry, getting back to my

23   hypothetical, if I have just committed

24   domestic violence by strangulation or

25   suffocation, which is a Class B Felony under
```

**DR. GEORGE KIRKHAM**

1   what you're seeing here is someone who is

2   apparently out of their mind, in the

3   vernacular, and they're giving you these

4   guidelines to operate under.

5       Q       But they still don't know

6   everything.  They don't know if he has a

7   weapon?

8       A       No.  a lot of things they don't

9   know.

10      Q       They don't know if he's going to

11  run, right?

12      A       Right.  We don't know if he was

13  going to run.

14      Q       They don't know if he's going to

15  try to get in his car and leave?

16      A       No.  And they talk about that.

17  They say suppose he gets in his truck and

18  leaves, or supposing he does any number of

19  things.  You can come up with any number of

20  fanciful things he might do.  We're going to

21  deal with it step by step, slow it down, try

22  to get a wedge in, try to talk to the person

23  in a calm, non-threatening manner.  Save me,

24  save me, we're here to help you, Greg.

25      Q       Another thing he could have done

**DR. GEORGE KIRKHAM**

145

1   is what he in fact did do, which is complied

2   with the officers request that he get down?

3       A       A good sign is initial compliance.

4   That's something we can build on.  So we

5   would try to do that.  You just stay well

6   back, and I think, by the way, we talked

7   earlier about distance.  There have been a

8   number of studies, one of them involving the

9   risk of being attacked.  The recommendation

10  is you stay out of what the FBI psychologists

11  at the Behavioral Science Center of the FBI

12  in Quantico talks about what he calls a

13  killing zone, stay out of the killing zone.

14  Another one I think you were eluding to

15  earlier, the reactionary gap, stay back

16  twenty-one feet.  You want to be able to

17  react safely.  And this is about twenty

18  something feet across here.  I would be able

19  to talk to you quite well from one end of

20  this place to the other.  I don't want to get

21  crowded up on your space.  So these are all

22  good -- be helpful, professional friendly.

23  You can be firm, professional.  Maintain safe

24  distance from subject to afford reaction

25  time.

**DR. GEORGE KIRKHAM**

1    And on that point, there's some

2  contradictory testimony of the officers.  One

3  of them says we were always within arm's

4  reach.  Then they say we were at eight feet.

5  So you know, it's kind of hard to know

6  exactly where they were.  They must have been

7  far enough back to get NMI, neuromuscular

8  reaction interference, they must have been

9  back at least seven or eight feet to get that

10  NMI effect from the probes when he went down

11  initially.

12    Realize, this is important, that the

13  person's delusional or hallucinatory

14  experience is real to him or her.

15    Announce actions before initiating.

16  That goes with the taser thing, too.  If it

17  looks like you're going to have to do that, I

18  have warned people before I've used a

19  conducted electrical device before, I don't

20  want to have to use this, but we're not going

21  to let you hurt us.  So you do that, too.

22    Q    Wait a second.  I thought you told

23  us earlier that taser wasn't even invented

24  when you —

25    A    It wasn't.  I told you I carried a

```
 1    Nova XR 5000, which is a proximal stun gun.

 2    It's kind of like a TV changer.  You've got

 3    to be in close quarters with the person to

 4    use it, though.

 5         Q        It only works in drive stun?

 6         A        Only works in drive stun, and

 7    you've to be up close and personal to use it.

 8    But even with that, I've warned the use of it

 9    more times than I ever had to use it.

10              Express anger, impatience, or

11    irritation.  Look at their statements in that

12    regard.  Do they comport with that?

13              MR. BREWSTER:  You're under the

14    section now that is behaviors the officers

15    should avoid.

16         A        Behaviors the officers should

17    avoid, pardon me.  Officer should not do the

18    following, move suddenly, give rapid orders

19    or shout.  And again, it's not fair to

20    officers --

21    BY MR. NEWELL:

22         Q        So once Mr. Rachel started taking

23    an aggressive stance and coming towards the

24    officers, they should have just stood there?

25         A        No.
```

**DR. GEORGE KIRKHAM**

```
1        Q        Don't move?
2        A        No.  Once -- if they feel
3   threatened, they can take a protective
4   stance, as seems appropriate there.  If
5   someone is coming at you and you think
6   they're going to -- you could draw your M26,
7   X26 taser and say, look, I don't want to have
8   to hurt you, but don't come any closer, don't
9   come any closer, be prepared to do that.
10       Q        It just took you about four or
11  five seconds to say that, and you told me a
12  little while ago that at eight feet away, he
13  would have been on them in about two seconds.
14       A        If he jumped up quickly, you would
15  draw -- first, you're going to be beyond that
16  kill zone, or the reactionary gap, you're
17  going to be beyond twenty-one feet.  And
18  you're not going to advance until we're
19  getting compliance, cooperation.  If he's on
20  the ground, we're going to have dialogue with
21  him on the ground from well back.  We don't
22  want to crowd up on him.  And then we would
23  avoid doing these things that they're talking
24  about, don't express anger, impatience or
25  irritation.  Don't touch the person unless
```

**DR. GEORGE KIRKHAM**

1    essential.  Don't crowd the person or move

2    into his zone of comfort.  So it goes --

3         Q       But when Rachel started coming at

4    them, you're saying they should have backed

5    up?

6         A       I'm saying that becomes a

7    discretionary decision at that point.  How is

8    he coming at them?  How quickly is he coming

9    at them?  What is --

10        Q       Doctor, isn't the whole thing a

11   discretionary decision on their part?

12        A       Those reactions are discretionary.

13   What I'm saying is, and I think this document

14   is very clear, it's not discretionary if at

15   the moment you see someone and there's no

16   exigent circumstance, and there's no threat

17   to anyone else at that time, that you

18   short-circuit or ignore these things about

19   trying to communicate calmly because he might

20   do something in the future that's reckless,

21   or crazy, or dangerous or something.  There's

22   no reason, nothing I could see in this record

23   at all that would prevent them from trying to

24   calm him down, communicate with him from a

25   safe distance.  That's not done, and it's

**DR. GEORGE KIRKHAM**

1  apparent to me as a criminologist who

2  specializes in police procedures for about

3  forty years that they didn't do this because

4  they were not trained in these things that

5  were promulgated by the U.S. Department of

6  Justice through Executive Research Forum, the

7  response to ADA back in 1994.

8      Q      You keep saying you're a

9  criminologist specializing in these matters

10  for forty years.  You did six months on the

11  Jacksonville Police Department.

12      A      And subsequently spent eighteen

13  years as a part-time fully sworn police

14  officer, five of those operating a crisis

15  intervention unit.  So it's as close to their

16  world as I could be.

17      Q      But you're working at Florida

18  State as a teacher?

19      A      As a Professor, right.

20  As a researcher.

21      Q      Professor and researcher.  Were

22  you commuting from Tallahassee to

23  Jacksonville?

24      A      No, sir.  I'm sorry if I've been

25  unclear about this.  I spent six months

**DR. GEORGE KIRKHAM**

1    tranquilizer, PCP, called Angel Dust on the

2    streets, and they're so torqued up on that,

3    maybe they've mixed it with Cocaine or

4    something else, that they're going to die.

5    And you can do everything that you're trained

6    to do, and they're going to die anyway.

7         Q     We don't know that even if the

8    officers had followed to the letter

9    everything in those protocols, that Mr.

10   Rachel still might have expired?

11        A     We can't know that with certitude.

12   But we do know certain things.  We know that

13   he was not on -- there was no drug toxicity

14   in his system, there were no chemicals acting

15   on him.

16        Q     That you've seen?

17        A     I'm not aware.  I'm taking that as

18   a hypothetical, that he's not under the

19   influence.  You mentioned Zoloft.  No

20   psychotropic drugs, or coke, or anything like

21   that.  And that he was a man -- what do we

22   know?  We know that he was terrified, he came

23   out of that house and he was terrified.

24        Q     Where did you get that?

25        A     It's evident from his save me,

**DR. GEORGE KIRKHAM**

```
 1   save me, he's reaching up to the heavens.
 2   He's frightened.  I've dealt with a lot of
 3   these people.  He's frightened.  That's what
 4   these policies are all about.  We want to try
 5   to calm him down.  We know that, and we know
 6   he's asking for help, save me, save me.
 7   That's where the police are -- instead,
 8   typically mentally ill people are frightened
 9   of the police, but he's saying save me, save
10   me, and they respond to that by yelling at
11   him to get on the ground and drawing weapons.
12        Q      Couldn't he also be saying save me
13   because I've just tried to kill my wife and I
14   really don't want to go to jail?
15        A      Well, we can't editorialize it at
16   all.  We have no idea.  They would have had
17   no idea out there what is going on inside
18   him.  All we know is we've got -- all they
19   should know is they've got an EDP, and sadly,
20   these officers, the first one, McCann, says
21   -- he thinks there's a difference between an
22   EDP and a mentally ill person.  These guys
23   are not trained at all in this critical
24   subject.  And they're supposed to be.  So you
25   know, we don't know what all was going on
```

**DR. GEORGE KIRKHAM**

1   with him.

2        Q        Let's go ahead and keep talking

3   about the unique protocol.

4        A        They go on here, and again, this

5   is stuff for training, it's not just handout

6   stuff.  Talk about the importance of

7   communication.  Communication is essential to

8   successful management and allows the officers

9   to gain valuable information regarding the

10  problem.  It also enables the officer and the

11  subject to understand each other, and in

12  turn, reduces tension that accompanies

13  encounters.

14        They talk about symptoms of mental

15  illness.  And they would be --

16        Q        Hold on.  Before you get into the

17  symptoms, go back to that first thing you

18  just said.  How are these officers supposed

19  to talk to Mr. Rachel when all he is doing is

20  screaming nonsense?

21        A        Well, it's very clear from what

22  we're talking about, what we talked about

23  earlier.  Calm, calm, helpful,

24  non-threatening manner.  That's what they

25  say, try to calm the situation.  What's the

**DR. GEORGE KIRKHAM**

```
1      A        When they're trying -- when

2   they've got him on the ground after they've

3   tackled him, which is something you don't

4   want to do.

5      Q        Isn't kicking them an attack?

6      A        Well, what they believe is an

7   attack -- again, they say he did not attack

8   them.  People who cannot breathe, who are

9   dying of hypoxia, who are under prolonged

10  prone restraint, officers commonly

11  misinterpret that, oh, he's still resisting,

12  he's still resisting, oh good, he's stopped

13  resisting, which means he's dead.  He's

14  cyanotic, now he's quit breathing.

15     Q        Wait a second, now.  You've told

16  us several times you are not a medical

17  expert.  Where did you get that he's dying of

18  hypoxia?

19     A        I'm saying that these are covered

20  in this great General Orders, which goes on

21  page after page, they talk about the risk

22  from impaired breathing from prone restraint,

23  piling on top of people, all the things that

24  are done here.

25     Q        I appreciate that, but where did
```

DR. GEORGE KIRKHAM

1   you get that Greg Rachel was dying of

2   hypoxia?

3        A        I'm talking generally about EDPs

4   who are under full restraint for long

5   prolonged restraint.  And there is medical

6   literature that has been disseminated in the

7   law enforcement community, subsequently been

8   published by prestigious law enforcement

9   organizations like the IACP and the DOJ, so

10  the police officers understand that these are

11  very real dangers.  People die from them.

12  And apparently, the Mobile Police Department,

13  someone in that department realized the

14  dangers of it.

15       Q        These may be real dangers, but

16  Greg Rachel did not die of hypoxia, did he?

17       A        According to the ME, he died of

18  Excited Delirium, and an associated factor is

19  prolonged struggle, which is typical.  You

20  get involved in a prolonged struggle, and

21  basically your cardiovascular system exceeds

22  its limits and you die.  It's fairly

23  straightforward.  And officers need to

24  understand that in the way that it's set

25  forth.  Somebody in Mobile PD authored this

**DR. GEORGE KIRKHAM**

```
 1    thing, put it together, and it's a good
 2    compilation of what we know and what we want
 3    police to do.  But they just threw it in
 4    people's boxes and say, hey, it's not our
 5    problem.  Hogtying is a dangerous thing.
 6    Certainly Sergeant Ripple knew that, and yet
 7    he went right ahead and did it after the man
 8    had stopped struggling.
 9         Q        The hogtying didn't have anything
10    to do with Mr. Rachel's death, did it?
11         A        You're asking me now a medical
12    question.  There is a -- there are a
13    synchrony of elements here that are involved
14    in restricting the person's ability to
15    breathe and leaving him in an excited
16    condition.  And I don't want to get into
17    medical testimony, but these are all
18    dangerous things that you should not do.
19    They talk about Excited Delirium here.
20         Q        Before we leave that point, the
21    expert that the attorneys for Ms. Rachel has
22    hired has testified under oath on page 200,
23    lines 22, and page 201, line four that Mr.
24    Rachel being handcuffed and shackled did not
25    cause him to have cardiac arrhythmia or
```

**DR. GEORGE KIRKHAM**

```
 1   brought along a couple of things here with
 2   me, the dangers of hogtying, the dangers of
 3   prolonged prone restraint.  And these things
 4   are all talked about here.  Presumably the
 5   Mobile Police Department person who put this
 6   together wasn't a medical expert either, but
 7   they're talking about all the things that
 8   everybody in the police community highlights
 9   as dangerous.
10        Q      But they probably also talk about
11   driving fast and not having your lights on,
12   but that doesn't have anything to do with
13   this case, does it?
14        A      Driving fast and not having your
15   lights on we can agree has nothing to do with
16   this case, and I frankly don't know why you
17   would mention that.
18        Q      I'm having a hard time, because we
19   took the deposition of the Plaintiff's
20   expert, medical expert, and he told us under
21   oath that it was his opinion that the
22   handcuffing and the shackling did not have
23   anything to do with Mr. Rachel's death.  And
24   you want to talk about it.
25        A      I can only tell you that in my
```

**DR. GEORGE KIRKHAM**

1          MR. BREWSTER:  Wait for a

2     question.

3     BY MR. NEWELL:

4          Q        Let's continue on with the

5     protocols that you say were followed.

6          A        Okay.  There's some really

7     important things that they deal with in here.

8     Going back over here to three, symptoms to be

9     aware of from subjects in custody and the

10    police response to persons in an excited

11    state.  In an excited state.  In addition to

12    effectively responding to the encounters with

13    people with mental illness, officers may

14    encounter people in an excited state.  This

15    state may be due to any or all of the factors

16    delineated formerly, or may be induced by the

17    conditions described to follow:  Cocaine

18    induced bizarre or frenzied behavior when

19    occurring while confined by restraints;

20    Cocaine induced Excited Delirium and acute

21    mental disorder characterized by impaired

22    thinking, disorientation, visual

23    hallucinations, illusions may increase the

24    subject's susceptibility to sudden death by

25    effecting an increase of a heart rate to a

DR. GEORGE KIRKHAM

1     critical level.  And of course --

2          Q        You've already told us this is not

3     a Cocaine case, so none of that has anything

4     to do with it.

5          A        No, that's not true.  Mental

6     illness, as you'll see elsewhere, mental

7     illness, if a person is terrified, believes

8     Gestapo, someone else is going to kill them,

9     they're in great danger, their cardiovascular

10    system will, like a sports car, race car

11    going up into the red, will do the same thing

12    without cocaine.  I have seen many people die

13    who had no drugs in their system, they're

14    just crazy, and they're terrified, and

15    they're in an excited state.  So that can

16    kill you.  There's a ton of literature,

17    medical literature and corresponding police

18    literature to support that.

19         Q        And he was in an excited state,

20    apparently, before he ever came out of the

21    house raising up his hands?

22         A        Exactly.

23         Q        So we don't know if he would have

24    died without us being there or not.

25         A        With all due respect, sir, his

**DR. GEORGE KIRKHAM**

1         Nobody is monitoring this guy,

2    amazingly.  Sergeant Ripple was a medic in

3    the Army overseas.  Nobody is watching this

4    guy at all.  Nobody is monitoring him.  And

5    we have people like McCann who is saying it's

6    not my job, I don't have to give CPR, I don't

7    have any duty to monitor people.

8         Q        Did you see in Sergeant Ripple's

9    deposition testimony that in fact he was

10   monitoring Mr. Rachel?

11        A        That's not my recollection.

12        Q        Okay.

13        A        Excited Delirium, E --

14        Q        If he said that, you just missed

15   that?

16        A        Really?  Because I read it several

17   times.  I've been through his deposition and

18   his statement.  He was not monitoring this

19   person's condition.  He didn't notice until

20   -- I think two minutes went by by the time

21   the person stopped struggling and moving, and

22   then another two minutes went by and they

23   were getting ready to move him to the car.

24   You got two to four minutes there, and then

25   he looks at his pupils, and so now he's

**DR. GEORGE KIRKHAM**

174

1   monitoring belatedly, but not during and

2   after this struggle.

3        Q        Go ahead with the protocol.

4        (OFF THE RECORD)

5   BY MR. NEWELL:

6        Q        Let's continue on with the

7   protocol.

8        A        Okay.  I was about to get into

9   Excited Delirium.  Item E under this General

10  Order, under three, Roman Numeral three, item

11  E. Excited Delirium is regarded as --

12       Q        Hold on.  Why are we talking about

13  Excited Delirium when your medical expert

14  says this is not an Excited Delirium case?

15       A        I'm sorry, my recollection is the

16  Medical Examiner's cause of death was Excited

17  Delirium, and an ancillary factor was

18  following a prolonged struggle.

19       Q        So once again, you disagree with

20  y'alls own expert, Dr. Carl Adams?

21             MR. BREWSTER:  Objection.

22       A        You already asked me about Dr.

23  Adams, and I told you what I have to say on

24  that subject.  I am taking it, as I think I

25  must, since it seems to be a factual

**DR. GEORGE KIRKHAM**

1    he's hyper excited.  Officers would learn in

2    training that means that his respiration, his

3    heart rate, everything is going to be way,

4    way up.  We don't want to get involved in a

5    struggle with this guy for a lot of reasons.

6         They talk about the symptoms, bizarre,

7    aggressive behavior, shouting, paranoia,

8    panic.  All these things he exhibits.

9         Q       Isn't that why they deployed their

10   M26 and their X26 in prong mode so they

11   wouldn't have to get into a physical

12   altercation with this guy?

13        A       Well, I'm taking it as a

14   hypothetical that the reason they deployed

15   the M26, X26s, actually there were four

16   deployments, apparently, two in probe and two

17   in stun mode, the reason they deployed them

18   was in response to him being aggressive and

19   coming toward them.  And they said that he --

20        Q       They didn't want to grapple

21   physically with someone that's 6'4", 250?

22        A       Exactly.  And yet when those

23   devices failed, and this isn't NFL football

24   here, they decide, Officer McCann says now we

25   knew we had to tackle him.  Bad idea.  Real

DR. GEORGE KIRKHAM

1    bad idea, because you're going to go one on

2    one or two on one with a large person who is

3    very pumped up and everything like that.

4        Q      He's got to be arrested.

5        A       He's going to be arrested.  He's

6    going to be arrested.  We've got the whole

7    Mobile Police Department as resources.  A lot

8    -- I once had a guy say well you're not going

9    to arrest me, your skinny ass, I'll beat it.

10   I said, yeah, but I got a big gang, I got the

11   whole police department here, you're going to

12   have to take them on, too.

13       Q      So the whole police department

14   should have come and arrested him?

15       A      No.  What we should have done back

16   at square one when we saw this guy was out of

17   his mind was get some crisis unit resources

18   coming to us in addition to backup officers.

19   And later on in this well-constructed General

20   Order, they talk about officers being aware.

21   But there's twenty-four hour crisis

22   management and awareness community resources.

23   And they give the contact numbers for both

24   the Mobile Mental Health Center, nights and

25   weekends.  They give the Sheriff's Department

**DR. GEORGE KIRKHAM**

1    for Mobile County, also.  They give contact

2    people there, their cell numbers, everything.

3    Nobody had any of this information.

4        Q        Do you know if there is a source

5    for the information contained in that

6    memorandum order that you've been reading

7    from?

8        A        A signature source?

9        Q        In other words, did they obtain

10   that from a standard?

11       A        Well, it does not appear to be

12   signed by anyone.  Let me go back and --

13       Q        It's a bad question.

14               MR. BREWSTER:  Are you asking did

15   the City obtain it from a third party source?

16               MR. NEWELL:  That's what I'm

17   trying to get at, Henry.  Thank you.

18       A        The best I can tell you, these

19   standards, this MO-2011-03, appears to be

20   derived from some very solid professional

21   standards material put out by the United

22   States Department of Justice, put out by the

23   International Association of Chiefs of

24   Police, put out by the Police Executive

25   Research Forum, which worked in concert with

**DR. GEORGE KIRKHAM**

1   me as trying to do that.  What I'm saying is

2   that in the totality of this material

3   properly presented, and there's training

4   modules, they're available free of charge

5   through the government, these officers

6   desperately need training in these areas,

7   because these are things they run into all

8   too often.  And they were deprived of that,

9   and they shouldn't have been.  But even

10  absent that, there were things that were done

11  at the onset.  I mean, these are experienced

12  officers.  They shouldn't have done the

13  things that they did in the very first

14  contact with him.

15      Q       Did you finish going through the

16  protocol and the standard that you say was

17  violated.

18      A       Hold on just a second.  We talk

19  about be aware of Excited Delirium symptoms,

20  thrashing, bizarre behavior, shouting,

21  paranoia, panic, unexpected physical

22  strength.  We all just have the physical

23  strength that we have, no super man, but if

24  you're mentally ill and you're terrified,

25  you'll expend -- you'll put your

**DR. GEORGE KIRKHAM**

```
 1    cardiovascular system in danger just by
 2    pushing your systems to the outer limit, and
 3    that can kill you.  We talked about that.
 4         Let's see what else we have here.
 5    Then they talk about, this is really
 6    important, and this cross-references in
 7    another General Order we can talk about, they
 8    talk about the importance of monitoring
 9    someone who is in medical distress.  But here
10    they talk about making sure safety to
11    minimize the risk of sudden in custody death.
12    None of these deponents know what that is,
13    really.  Some of them have heard of it, but
14    nobody really understands it.  Officers
15    should be aware of these symptoms.  When
16    these symptoms are recognized, Excited
17    Delirium symptoms, a medical unit shall be
18    started to the location immediately.  When
19    possible, no contact should be made with the
20    subject until the medical unit is on the
21    scene.  Just keep a distance and try to talk
22    calmly to them.
23         Here's another one.  Subject shall not
24    be transported in the hogtied prone position
25    face-down.  As soon as the subject is
```

## DR. GEORGE KIRKHAM

1  secured, get him off his stomach.

2        You'll recall from the record here

3  that Sergeant Ripple, again, the combat medic

4  trained guy, once the resistance is stopped,

5  once Mr. Rachel is handcuffed, he's totally

6  passive, he says I'm not transporting this

7  guy, I'm paraphrasing here, I want to get the

8  shackles, I want to hogtie him, which as any

9  of the literature, you'll see, I brought some

10  exemplars with me, will show you worsens a

11  person's respiration, increases the danger.

12  He goes ahead and does it anyway.

13      Q      So once again, you disagree with

14  Dr. Carl Adams who said that has nothing to

15  do with his death?

16      A      I can only tell you that Dr.

17  Adams' testimony in that regard has to be

18  considered against a massive volume of

19  medical research that has been disseminated

20  to law enforcement.  I'm talking about

21  studies by M.D.s, Ph.D.s, physiologists that

22  would appear to go in a very different

23  direction.  So I'll let doctors deal with

24  that.

25        They caution about the importance of

**DR. GEORGE KIRKHAM**

```
 1    medical testimony.  I'm telling you that --
 2        Q        What did the autopsy show?
 3        A        The autopsy shows, again, Excited
 4    Delirium, and Excited Delirium often has as
 5    components these various things.  There are
 6    no drugs involved, so how would the person
 7    get in an Excited Delirium state?
 8    Psychiatric problems and/or all of these
 9    other things that are going on.
10            And guidelines, they talk about call
11    for backup, call for a paramedic.  Hogtie is
12    a last resort for officer safety.
13            Monitor closely.  And there's another
14    General Order that cross-relates to this that
15    talks about monitoring.  There are visual
16    demonstrations in here of hogtying, but
17    there's no narrative.  I don't know if
18    they're telling them for God's sake don't do
19    it unless you have to, or what they're doing.
20        Q        Are you finished with the
21    protocol?
22        A        Yeah.  That is basically it.
23        Q        Are there any other protocols or
24    standards that you would refer us to as being
25    related to this case?
```

**DR. GEORGE KIRKHAM**

```
 1     A      The only others that would relate

 2  to it would be, and I'd have to dig it out of

 3  here, and I'm happy to do that, is the

 4  protocol that deals with monitoring,

 5  monitoring of persons in medical distress

 6  that cross-relates to this, obviously.  And

 7  the other one is use of force.  You know,

 8  again, it's pretty standard, no more force

 9  than is reasonably necessary.  This level of

10  force used here would be, in my professional

11  opinion, excessive and unreasonable.

12            MR. BREWSTER:  Doctor, if there's

13  Orders he's asked about, why don't you go

14  ahead and identify them and show him.

15     A      Let me try to dig out these other

16  orders here.

17            Another relevant one would be 1.3.1,

18  use of force.  Talking about exhausting

19  reasonable means before resorting to deadly

20  force.

21  BY MR. NEWELL:

22     Q      What standard is that

23     A      1.3.1.

24     Q      Of what?

25     A      I'm sorry, of --
```

DR. GEORGE KIRKHAM

218

1   was never any supplementation of those done,

2   how would we know that you had changed any of

3   your ideas or changed what you relied upon?

4        A        Well, I would have completed any

5   expert interrogatories that were sent to me.

6   I don't have any recollection of anything

7   specific in this case.

8        Q        So going back to the scientific

9   method and evidence that -- and I understand

10  you are saying that there actually is not any

11  evidence whatsoever to the contrary of your

12  opinions; is that right?

13       A        I don't see any compelling

14  evidence, any significant evidence that would

15  suggest that the violations of standard

16  police protocol that I've described here as

17  reflected in your own General Order and in

18  police literature, standards literature

19  throughout the company, that there was any

20  justification for short-circuiting or not

21  following these procedures.

22       Q        Okay Dr. Kirkham, that wasn't

23  exactly the question I asked.  You have given

24  a four-page single-spaced report, and you've

25  also given quite a bit of testimony today.  I

**DR. GEORGE KIRKHAM**

221

1  monitoring him as he should have been early

2  on in the situation.

3      Q      Okay, let's unpack that response.

4  The word carefully.  What is your definition

5  of carefully monitoring?

6      A      In this situation, we can

7  certainly go to Sergeant Ripple's deposition

8  and track along his comments.  In this it

9  means that you know that you have been

10  involved in a prolonged prone struggle, your

11  officers are exhausted, he uses the word

12  spent, I believe, with someone who is now in

13  a face-down prone position, and that that

14  should, in the case of a reasonable officer,

15  reasonable supervisor who professes to have

16  some awareness of sudden in custody death

17  syndrome, and  Excited Delirium risks, all

18  the things we've been talking about, that

19  that should occasion, all the more so because

20  this man is a trained combat medic,

21  monitoring of this person.

22      Q      But that's circular reason, isn't

23  is it, Doctor, because I asked you what you

24  would do to carefully monitor, and you told

25  me that he should monitor.  So here's what

**DR. GEORGE KIRKHAM**

```
 1    over there?
 2                    MR. BREWSTER:  Did you say four
 3    men?
 4                    MS. COLLINS:  Four men.
 5                    MR. BREWSTER:  Objection.
 6        A         Three men.
 7    BY MS. COLLINS:
 8        Q         Three men fifteen feet?
 9        A         First we've got a minute not
10    attending him.  Do you know how long,
11    rhetorical question, for brain death?  About
12    three minutes.  You've got three men now,
13    because the Lieutenant has left, you've got
14    three men that are carrying him fifteen feet
15    now to the patrol car, and nobody is noticing
16    anything.
17        Q         So what are you trying to -- what
18    conclusion are you trying to draw?
19        A         That they're not monitoring him
20    per your own General Order requirement.
21        Q         Despite the fact that Sergeant
22    Ripple said that he was monitoring him?
23        A         Counsel, we can agree that he was
24    monitoring him earlier when he describes
25    mucus coming from his nose and he sees the
```

**DR. GEORGE KIRKHAM**

1   rise and fall of his chest, yes, you know

2   he's breathing there.  But then after that,

3   there's no indication anyone is monitoring

4   him.

5        Q       Let's go on to page 61.

6        A       Okay.

7        Q       Line eight.  So in the span of a

8   minute or two, he went unconscious.  That's

9   what -- before I picked him up, that's what

10  I'm saying, right, at a minute or less, that

11  he, because I checked on him before then, so

12  that minute or two would be the time that he

13  would have went unconscious, if he did at

14  all, because I checked him before, before I

15  picked him up.

16       A       Okay.

17       Q       Question, what would you have done

18  if you had noticed that he was unconscious

19  before you picked him up?  Answer, I would

20  have unhandcuffed him and unshackled him at

21  that time, checked his pulse, done CPR if I

22  had to, if he wasn't breathing, checked his

23  ABCs, which is airway, breathing, and

24  circulation.

25       A       If he had noticed.

**DR. GEORGE KIRKHAM**

229

1    the guy died?

2        A        I think it's clear from the

3    context of my commentary in my report, I said

4    he was not adequately monitored.  I've been

5    talking about that.  I've added the word

6    adequately.  The notion is that someone like

7    this is like an air traffic control screen,

8    anyone who has experience with these cases,

9    you have to watch them constantly because

10   they can stop breathing instantly.  And

11   here's a guy that's a trained combat

12   paramedic who didn't do that.

13       Q        So are you telling me that what

14   he's supposed to do is sit down on the

15   sidelines and stare at the guy without taking

16   his eyes off of him and without doing one

17   other single task even if that task is

18   picking him up and carrying him?

19       A        One person needs to be watching

20   him constantly.  Now, Lieutenant Elia is

21   asked that question, who should be doing

22   that.  He says, well, one of them, but he

23   doesn't really say who.

24       Q        Sergeant Ripple said it was him,

25   he said it was his responsibility at that

DR. GEORGE KIRKHAM

230

1    point?

2        A        He's the Sergeant, he's the first

3    line Sergeant, he's the supervisor when Elia

4    leaves the scene, and it's his responsibility

5    to be watching this guy.  In the same way,

6    it's his responsibility to not do anything

7    further to impair his breathing like putting

8    hogtie on him.

9        Q        The primary responsibility of an

10   officer is to protect himself first, isn't

11   that right?

12       A        Protect the public, protect

13   himself, and then protecting a suspect.

14       Q        So you say the public is first?

15       A        The primary responsibility of a

16   police officer is to protect the citizens.

17       Q        Well, I must have misread your

18   testimony in some of these earlier things,

19   because I could have sworn that you said that

20   the primary responsibility would be to first

21   protect yourself as an officer?

22       A        Of course.  I'm talking about

23   generally in terms of your duties, your oath

24   of office is certainly to protect the public.

25   But in talking about specific situations, of

**DR. GEORGE KIRKHAM**

```
 1                MR. BREWSTER:  Let her finish the
 2    question.
 3    BY MS. COLLINS:
 4        Q        But he lays down on the ground, is
 5    it reasonable if one officer looks at the
 6    other one and says, oh, he's down on the,
 7    ground, we'll go arrest him now?
 8                MR. BREWSTER:  Objection.
 9    BY MS. COLLINS:
10        Q        Is that reasonable?
11                MR. BREWSTER:  Objection.
12        A        That would not be a reasonable
13    thing to do.
14    BY MS. COLLINS:
15        Q        Why?
16        A        Because of the following, the
17    things that you know, recently know from the
18    conversation you've had with the victim, the
19    injuries that she sustained, the seriousness,
20    battery, and the fact that this is a large
21    person, you've just been told prudently by
22    Lieutenant to stand by and wait for backup.
23    And you know, or should know that this is an
24    EDP, emotionally disturbed person of some
25    type.  And those things, by the way, should
```

**DR. GEORGE KIRKHAM**

1   tell you to immediately apprise your

2   communications, training, we need crisis

3   intervention assistance out here, we've got

4   numbers for the Sheriff's office and other

5   resources.  Not reasonable to go forward.  If

6   you go forward with someone like that and

7   start yelling at them, there's a very good

8   chance you're going to wind --

9        Q     Let's back up.

10            MR. BREWSTER:  He is really

11   getting to the point now.  Finish your

12   sentence.

13       A      If you rush forward at that point,

14   whether the two of them have a conversation

15   or not, let's do it by ourselves, let's take

16   this guy, you are cruising for a bruising.

17   You are inviting a physical altercation,

18   which you really don't want to do.

19   BY MS. COLLINS:

20       Q      That really wasn't my

21   hypothetical.

22       A      I'm sorry.

23       Q      My hypothetical is the guy is on

24   the ground.

25       A      Laying on his back, apparently.

**DR. GEORGE KIRKHAM**

296

1                    CERTIFICATION

2

3    STATE OF ALABAMA

4    CITY OF MOBILE

5

6        I do hereby certify that the above and

7    foregoing transcript of proceedings in the

8    matter aforementioned was taken down by me in

9    machine shorthand, and the questions and

10   answers thereto were reduced to writing under

11   my personal supervision, and that the

12   foregoing represents a true and correct

13   transcript of the proceedings given by said

14   witness upon said hearing

15       I further certify that I am neither of

16   counsel nor of kin to the parties to the

17   action, nor am I anywise interested in the

18   result of said cause.

19

20              /s/ Margaret C. Turner

21             Margaret C. Turner, CCR, RPR

22             ACCR NO. 128

23

24

25