# EXHIBIT "V"

## DECLARATION OF DR. GEORGE L. KIRKHAM

My name is DR. GEORGE L. KIRKHAM.  I am over the age of 19 and resident of Palm Beach County, Florida.  The following information is based upon my personal information:

### Credentials and Qualifications

1.      My name is Dr. George Kirkham.  I am presently Professor Emeritus at the Florida State University College of Criminology and Criminal Justice. During my twenty years of teaching and conducting research at Florida State University, my professional responsibilities were primarily in the field of law enforcement. I have authored extensive police training material which has been used for many years throughout the nation to instruct law enforcement officers, including material on the use of force and the handling of crisis situations, including those involving emotionally disturbed individuals.

2.      I have functioned as a lecturer, consultant and trainer with some fifty law enforcement agencies at the federal, state and local level. I have also personally served as a law enforcement officer with four different municipal agencies in the state of Florida.

3.      I hold a bachelor's, master's and doctoral degree in the field of criminology and have been the recipient of numerous awards and honors for

Initials *RK*

contributions to the field of law enforcement. I attach herewith a current copy of my professional vita which sets forth my qualifications in greater detail.

4.    I have been qualified on numerous occasions throughout my professional career as an expert on the subject of law enforcement standards and procedures in federal and state courts throughout the nation, including the state of Alabama.  I have been retained by both plaintiffs and defendants in excess of one thousand times in civil and criminal actions to examine the conduct of law enforcement personnel for purposes of determining their conformity to established standards and procedures of the law enforcement profession. Many of these cases have involved the use of excessive force by officers.

5.    My background and qualifications are reflected in the attachments to my letter to Mr. Dixie Dan Powell, Esq. of September 29, 2014 (attached as Ex. 1).  I understand that letter and the attachments were provided to the Defendants as the Plaintiff's Rule 26(b) Expert's Disclosure. I have reviewed for this case at least the documents reported in that letter of September 29, 2014, as well as the following policies of the Mobile Police Department: MO-2011-03 "Recognizing and Handling Persons with Mental Illness" (attached as Ex. 2).

Opinion

6.    Based upon the information I have reviewed, including the testimony of the defendants, it is my professional opinion as a former law enforcement officer and a

Initials 

criminologist who has specialized in the field of police standards and procedures for over forty years that: (1) Officer Christopher McCann failed to employ universally accepted police practices designed to minimize the risk of a violent confrontation with a mentally ill individual in his encounter with Gregory Rachel on May 1, 2012; (2) Officer James Jackson failed to employ universally accepted police practices designed to minimize the risk of a violent confrontation with a mentally ill individual in his encounter with Gregory Rachel on May 1, 2012; (3) the City of Mobile's policy MO-2011-03 accurately and adequately states the universally accepted police practices designed to minimize the risk of a violent confrontation with a mentally ill individual; (4) the specific requirements under the City's policy MO-2011-03 state mandatory duties of a reasonable law enforcement officer and, in fact, both that Policy and police practices I hereinafter enumerate must be followed by any reasonably prudent law officer when encountering a mentally ill or emotionally disturbed person; (5) McCann's conduct in the course of encountering and seizing Gregory Rachel was not objectively reasonable in light of the facts and circumstances confronting him, given that he was not performing as a reasonably prudent law enforcement officer; (6) Jackson's conduct in the course of encountering and seizing Gregory Rachel was not objectively reasonable in light of the facts and circumstances confronting him given that he was not performing as a reasonably prudent law enforcement officer; (7) McCann violated the clear and mandatory City policy MO-2011-03 and that those

Initials *GK*

violations, based upon my experience and training, provoked the violence that inevitably led to Gregory Rachel's death; (8) Jackson violated the clear and mandatory City policy MO-2011-03 and that those violations, based upon my experience and training, provoked the violence that inevitably led to Gregory Rachel's death; (9) Gerald Ripple failed to employ universally accepted police practices designed to monitor the health and safety of a restrained suspect after a prolonged struggle; (10) Ripple's conduct in the course of encountering and seizing Gregory Rachel was not objectively reasonable in light of the facts and circumstances confronting him in the course of monitoring Gregory Rachel's serious medical condition.

Excessive Force

7.    In my original September 29, 2014, letter, it was my opinion that at the time Officers McCann and Jackson encountered Greg Rachel, he did not immediately pose a threat to them or to anyone else in the immediate area. Despite this fact, neither officer ever made any attempt to 'calm the situation' or provide 'reassurance' to this obviously terrified man. In a dramatic departure from the professional standard just referenced, both officers gratuitously and recklessly escalated the situation by advancing on Greg Rachel with drawn Tasers as they began issuing commands: [we] said 'get on the ground, get on the ground and as they started *yelling* at him [to] 'get on the ground' he was yelling back at us 'protect me, protect me, protect me.'

8.    I have reviewed the Mobile City Police Department's MO-2011-03,

Initials

"Recognizing and Handling Persons with Mental Illness." (hereinafter MO-2011-03 or Policy) It appears to be derived from very solid professional standards material put out by the United States Department of Justice, the International Association of Chiefs of Police, the Police Executive Research Forum, all of which work in concert with the United States Department of Justice to develop standards enacted by the Commission on Law Enforcement Accreditation.

9.      MO-2011-03 is a solid and comprehensive recitation of universally accepted police practices that are designed to minimize the risk of a violent confrontation with a mentally ill individual or suspect.

10.     Even without the specific written policy promulgated by the Department, the following rules and directions would be ones that any reasonable prudent law enforcement officer would carry out when encountering a citizen or suspect who presents symptoms of mental illness or an emotionally disturbed person (EDP).

11.     The Policy is very clear and it is not discretionary.  It puts in words the non-discretionary requirements for a reasonable and prudent officer on how they should respond to an emergency call that involves a person who exhibits symptoms of mental illness, how they should gather information, how they should approach and interact with the person who has mental illness, and specifically the behaviors they should not do.

12.     Failing to follow those directions would not only be a violation of the

Initials _____

Policy, but it would violate universally accepted police practices designed to minimize the risk of a violent confrontation with a mentally ill individual.

13.    It is my professional opinion that McCann and Jackson's egregious violations of the widely accepted police practices discussed herein were a significant proximate cause of the death of Greg Rachel.

14.    McCann and Jackson did not handle this call in the manner that a reasonably competent law officer should handle such a call, given what they knew, and mindful of the circumstances. They needlessly provoked the situation which escalated into a violent confrontation and Rachel's death.

15.    In reviewing the testimony of McCann and Jackson and the other witnesses, it appeared that when they first responded to the call, they acted appropriately and in conformity with the Policy MO-2011-03 by becoming aware of events, and of Rachel's prior behavior, gathering information, discovering that he was a good man who had not done anything like this before, but that he was acting very abnormally, that he had no weapons, that he was large, and that he was currently in his house.

16.    The neighborhood was a semi-rural subdivision with large lot lines and the front of Rachel's house appeared to be relatively well-lit.

17.    McCann and Jackson also appropriately contacted their superior who told them to hold their position and await the arrival of both shift supervisors.

Initials _Cy_

18.    At that point, McCann and Jackson were across the street from the Rachel

house speaking to Mrs. Rachel and gathering information on Rachel's behavior, both

prior to that evening and at the time of the assault. It was clear the officers would have

to arrest Rachel for his assault on his wife.

19.    At that point, as they watched, Rachel appeared from his house and acted

in a manner that any reasonable officer would have identified as blatantly psychotic

and paranoid. He had his hands to the heavens. He was speaking incoherently. He

was shouting, "Save me, save me!" "Save me from Obama!" "Gestapo!" He was

obviously utterly terrified, disoriented, frightened, and he was begging for help.

20.    Both universally accepted police practices as well as Policy MO-2011-03

would require that even a minimally trained officer know that Rachel was having a

psychotic break and was exhibiting symptoms (well identified in the City's Policy) of

serious emotional problems, as well as impairment of cognition and perception--all of

which were major indicators of an extremely mentally ill person.

21.    When a reasonable law enforcement officer sees a person or suspect who

is exhibiting blatant signs of mental illness, they are required to follow the orders and

regulations of their own department.

22.    There was at this point no emergency situation. Rachel was in the middle

of the yard with his hands up, he put his glass down and at  some point lay down.

There was no one around him. The officers had protective equipment and sufficient

Initials *ClK*

knowledge of the nature of the person they were dealing with.    While they unquestionably had a duty to take him into custody, they failed to follow the established methodology for doing that which is set forth in the city's General Order, MO-2011-03.

23.    Universally accepted police practices, as well as the City policy MO-2011-03 require that an officer in this circumstance do the following things:

a.    Maintain a "reactionary gap" of sufficient distance (usually 21 feet or more) to allow them to communicate with the suspect without being placed in a position of potential danger.

b.    Slow down the action and go step-by-step.   Communicate with the individual in a helpful, professional, and friendly manner and by announcing intended actions before initiating them.

c.    Do not do anything to frighten or threaten the suspect by yelling, displaying weapons, advancing on the person, or provoking them. Instead they should advise the suspect, especially one asking for help, that the officers are there to help him.

d.    Through these actions, get the compliance and cooperation of the person by speaking to them in a calm manner and not crowding him.

e.    Do not provoke violence and do not escalate the situation.   Do not provoke a confrontation.  Do not rush into a suspect's personal space, but

Initials

try to talk to them and calm them down.

24.     McCann and Jackson did exactly the opposite of what a reasonably prudent officer would do when faced with an emotionally disturbed person. According to Chris McCann's original statement to the Department, after viewing Rachel screaming and realizing that he was "acting extremely a Signal 31," (i.e., like a mentally disturbed person), McCann and Jackson started approaching Rachel across the lawn. McCann and Jackson should have stood by and waited for backup as ordered by their lieutenant because by rushing in and forcing a confrontation, they invited a physical altercation.

25.     They heard him yelling, "Protect me, protect me, protect me from Obama, protect me from Obama." They realized they "had a genuine nut on their hands" but they commanded him to get on the ground. The officers precipitously pulled out their Tasers, which would have been foreseeably frightening to Rachel. They commanded him repeatedly to "get on the ground, get on the ground, get on the ground," and persisted in yelling at him despite the fact that he kept pleading, "Protect me! Protect me!"

26.     McCann and Jackson's actions, in light of what they knew, and in light of the order from their lieutenant to hold their position and wait for backup, was exactly of what a reasonable and prudent officer should not do. An officer does not yell, does not unnecessarily brandish weapons, does not advance on the person, and does respond

Initials

to a person calling out for help by threatening, loudly commanding and yelling back, nor ordering them to get on the ground while advancing on them. McCann and Jackson's conduct could have only served to frighten and threaten Rachel and inevitably provoke uncooperative, resistive conduct.

27.    At the point where Rachel stopped being compliant and, in the officer's terms, took a "combative stance," McCann and Jackson had unreasonably closed the gap between themselves and Rachel to "an arm's length." This meant that the officers would be unable to react reasonably, except in self-defense, should they perceive Rachel was attacking them.

28.    All the violence that then followed (McCann and Jackson's multiple Tasering and striking, restraint, and compression of Rachel) was the natural consequence of McCann and Jackson's provocation.  McCann and Jackson's actions had unreasonably foreclosed their ability to react as reasonable and prudent officers by keeping a safe, reactionary gap between them and Rachel.

29.    I am cognizant of the concerns of McCann and Jackson.  Alerted to the fact that Rachel had recently assaulted his wife, they knew that he needed to be arrested, and they also needed to secure the area and make sure that he could not escape, nor cause further harm to either Ms. Rachel or any potential third party. Taking those reasonable concerns into account, the officers still acted imprudently by advancing on Rachel and acting in a way that was obviously threatening and

Initials

provocative. In my experience, their actions almost guaranteed the reaction by Rachel and foreclosed safer options. The area was large enough to allow a reasonable officer to ascertain the situation and cut off Rachel's escape. The officers were between Rachel and his wife, and given a reasonable reactionary gap, they could have utilized all the tools available to them to detain him, including Taser probes (with an effective range of 21 feet ) in addition to other close quarter tools.

30.     I also am cognizant of the possibility that Rachel could have retreated into his home, creating a barricade situation, but the City's Policy MO-2011-03 reflected that the Sheriff's Department at the County had a 24/7 crisis team and there were other crisis facilities in the community, including Mobile Mental Health. In addition, by slowing things down, and attempting to calm things down, McCann and Jackson could have allowed the arrival of their commanders and reinforcements which any reasonably prudent officer would know would increased their chances of successfully detaining, and if necessary, subjugating Rachel.

31.     There is no downside at all to this recommended approach, which McCann and Jackson should have taken as reasonably prudent officers: they should have maintained an adequate reactionary gap of distance from Rachel, avoided aggressiveness or threatening or commanding voices, used a calming, helpful voice , calmly sought cooperation and compliance, keep a distance, avoided drawing weapons or other engaging in other threatening behavior, seeking to help the suspect, identifying

Initials

themselves, trying to make a personal contact, while at all times monitoring the suspect and calling for backup.

32.    A reasonably prudent officer can always ramp up his force when if the need arises, but by precipitously confronting Rachel, McCann and Jackson unreasonably provoked Rachel into a struggle.

33.    The reaction I have outlined is the universally accepted approach to dealing with emotionally disturbed suspects in that it is the most likely approach to avoid injuries to the officers, the suspect, third parties, and the community. It is also the approach mandated by the City's Policy MO-2011-03.

34.    The City of Mobile's policy 1.3.1, Use of Force is a generic policy, under which the officer is expected to achieve control to the extent possible by exhausting other reasonable means before resorting to the use of force. It reflects the uniformly accepted policing protocol in that no more force should be used than is reasonably necessary to overcome resistance to arrest and take a person into custody.

<u>Failure to Monitor</u>

35.    The General Order MO-2011-03 addresses the risk from impaired breathing resulting from prolonged prone restraint and piling on top of a person, all of which was done here. There is medical literature that has been disseminated in the law enforcement community, subsequently published by prestigious law enforcement organizations like the IACP and the DOJ, so that police officers understand that these

Initials

are very real dangers to EDPs who are under full restraint during prolonged restraint. There are many well documented cases of people dying from such actions.. Apparently, the Mobile Police Department realized the dangers of it.

36.    There are vast publications on this in my profession--both regarding the dangers of "hogtying" and prolonged prone restraint.

37.    The Policy notes that subjects who have engaged in extremely violent activities may be more vulnerable to subsequent respiratory muscle failure. In other words, you can't breathe. Unresponsiveness of subjects during or immediately after a struggle may indicate cardiopulmonary arrest and the need for medical attention.

38.    Nobody was monitoring Rachel. Sergeant Ripple had been a medic in the Army overseas, yet nobody was watching Rachel at all. McCann Amazingly, McCann testified 'It's not my job, I don't have to give CPR, I don't have any duty to monitor people.' He didn't notice any respiratory problem until two minutes after the time Rachel stopped struggling and moving. Then another two minutes went by while they were getting ready to move him to the car. Belatedly, After four minutes had passed Ripple finally looked at Rachel's his pupils--eventual monitoring that came far too late.

39.    Another General Order section talks about the importance of monitoring someone who is in medical distress.  Making sure to minimize the risk of sudden in custody death, officers should be aware of these symptoms. When these symptoms are recognized, e.g. Excited Delirium symptoms, a medical unit shall be started to the

Initials *CMK*

location immediately.

40.    Another section directs that the subject shall not be transported in the "hogtied" prone position face-down. As soon as the subject is secured, one should get him off his stomach.

41.    One person should have been watching Rachel constantly. Sergeant Ripple said it was his responsibility at that point.  He was the first line Sergeant, the on-site supervisor once Lt. Elia left the scene. It was clearly his responsibility to be monitoring Rachel. In the same way, it was his duty responsibility to not do anything further to impair Rachel's breathing, such as "hogtyijng" him.

42.    Applying downward force in a prolonged prone restraint situation is also something that's very dangerous.

43.    I am critical of McCann placing his knee on Rachel's shoulder to get enough leverage to get the arm released because a reasonably trained supervisor or officer should realize that downward pressure on a person who is lying face down and who has just been involved in a struggle  putS added pressure on their diaphragm, which further limits the ability to breathe.

44.    Positions which would exacerbate the person's ability to breathe  can be very dangerous.  There's an abundance of law enforcement literature derived from medical literature on this subject. Sergeant Ripple said he was aware of the risks of Excited Delirium, positional asphyxia--all things  that are major issues in the case at

Initials _____

hand.

45.    Anything that kept Rachel on the ground face down and would impair his breathing would be a bad procedure. With four officers present they should have been getting him immediately upright to facilitate breathing.

46.    The officers should not hogtie, because in these situations it is very very dangerous.

47.    Policy MO-2011-03 states on page six, subject shall not be transported in a hogtie position face down. As soon as the subject is secured, get him off his stomach. I would interpret that reasonably as referring to the situation we're talking about now. He's restrained. He's on the ground face down. Get him off his stomach, get him standing up. There's considerable professional literature that supports this correct recommendation.

48.    The carrying of Rachel fifteen to twenty feet in a "hogtied" position when was completely unresponsive and no one was monitoring him I would represent to you was inherently dangerous. And it was just as lethal, just as dangerous as putting the person in the car and transporting them in the back seat of a car in a hogtied position.

49.    First responders, and in the case of Sergeant Ripple who had  received combat medic training in the Army, should be monitoring to see if the restrained individual is still breathing.

50.    Given the fact that Ripple knew Rachel had been involved in a  prolonged

Initials _CK_

prone restraint struggle, sufficient to exhaust the other two officers, and he himself was exhausted by this time, there should have been very close observation. A minute is a long time when you can't breathe. It takes only a few minutes for brain death to occur.

51.     Carrying Rachel to the car took some time. And that's a critical period. Why would you not have him right away up ninety degrees, per the recommendations of the General Order to get him upright?

52.     Sergeant Ripple belatedly checked Rachel's breathing but he should immediately have gotten the handcuffs off him and started the CPR.

53.     When the paramedic neighbor, Mr. Phillips, walked over to offer help, the hobble, the hogtie restraint and the handcuffs have to be taken off so he could perform CPR. This all consumed more time  that further delayed the performance of CPR.

54.     It's particularly problematic because in his sworn testimony, Ripple stated that he understood about Excited Delirium, and hypoxia, and positional asphyxia, and all these things. And he also knows about the importance of monitoring, albeit, he does it for only a very short window of time.

55.     Instead of following the recommendations of the Policy discussed, getting him up vertically at ninety degrees and trying to walk him to the car, which is normally what you do with an arrested prisoner, they elected to carry him. Had they attempted to get him up and walking on his own, they quickly would have discovered he was experiencing severe respiratory distress.

Initials

56.     When a police officer or multiple officers, put a person down, in this case in a ditch, face down, and are holding him down vigorously trying to get him handcuffed for a prolonged period of time, they enter a serious danger zone, which is evident in the law enforcement literature generally  and specifically in the Mobile General Order.


I declare under penalty of perjury that I have read the foregoing Declaration and that the information is true and correct.

Today's Date: _3/8/15_        Signature: _____

Initials _____