IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| AMY RACHEL, as Administratrix of the Estate of GREGORY RACHEL, Deceased, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CASE NO. 1:13-CV-00522-WS-M ) |
| CITY OF MOBILE, ALABAMA; CHRISTOPHER MCCANN; JOHN JACKSON; and GERALD RIPPLE, | ) ) ) ) |
| Defendants. | ) ) |

## REPLY TO PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant City of Mobile, Alabama ("the City") and submits this Reply to Plaintiff's Response to the City's previously-filed motion for summary judgment, showing unto this Court the following:

**I.    INTRODUCTION**

The City faces only a state law claim for wrongful death based solely on *respondeat superior* principles and resting therefore upon the acts or omissions of its police officers, Defendants McCann and Jackson, as Plaintiff concedes that the state law against Defendant Ripple is due to be dismissed. If the officers are exonerated by grant of summary judgment on the state law claim, the City is also entitled to such judgment. The City and its officers together are entitled to peace

23103252 v2

officer immunity conferred by ALA.CODE § 6-5-338, and the City possesses a second statutory immunity conferred by ALA.CODE § 11-47-190 from acts of its agents except those performed with "neglect, carelessness or unskillfulness" as recognized by this Court's Order of Sept. 18, 2014. (Doc. 73).

In assessing Plaintiff's multi-theoried Response, the Court should focus first on the medical testimony as to the cause of Mr. Rachel's death. Plaintiff's own medical expert, Dr. Adams, opines that the death resulted solely from a Taser-induced cardiac arrest, and from no other officer conduct. Plaintiff's other named expert, criminologist George Kirkham, testified in deposition that he had no medical opinions, was not qualified to give them, and deferred to other medical experts. To the extent Kirkham's new Declaration attempts to offer opinion testimony about other causes of death such as suffocation or asphyxiation, the City objects thereto and such testimony must be stricken or otherwise disregarded.[1]

Plaintiff's quest for new theories on the cause of death is expected, as the officer's actions concerning their Taser deployments were entirely in accord with City policy. The officers responded to a domestic violence call in the middle of the night, verified the nature of the attack and the victim's injuries, possessed

---

[1] The City objects for several reasons set forth in its Objections to Plaintiffs' Evidentiary Submission, not the least of which is that it is an untimely attempt to restate and introduce a number of Kirkham's new opinions. The City is also filing concurrently a Motion to Strike relative to Kirkham, as well as a *Daubert* challenge and other pretrial motions at the appropriate time.

2

probable cause to arrest Mr. Rachel for violently and recently inflicting those injuries, observed Mr. Rachel's unpredictable and aggressive behavior outside the home, and attempted to effect a lawful arrest of Mr. Rachel at approximately 3:30 a.m. which Plaintiff's expert opined would be "a potentially very dicey, very potentially difficult arrest." (Kirkham depo. II, p. 64, line 22 to p. 65, line 10). This situation was ideal for use of less lethal munitions such as a Taser, which the officers properly used and ceased using once it became clear that the Tasers had no effect on Mr. Rachel.

For all of the reasons set forth herein, summary judgment should be granted in favor of the City.

## II. THE ONLY MEDICAL TESTIMONY FROM AN EXPERT DESIGNATED BY PLAINTIFF IS DR. ADAMS' TESTIMONY THAT MR. RACHEL'S DEATH WAS CAUSED BY A TASER DEPLOYMENT AND BY NO OTHER OFFICER CONDUCT

### A. Plaintiffs' Expert Dr. Adams Opines That a Taser-Induced Arrhythmia Was the Cause of Death

Dr. Adams is a cardiovascular and thoracic surgeon whose opinion is that Mr. Rachel died from primary cardiac arrest induced by a Taser. (Adams depo., p. 25, line 19 to p. 26, line 1; p. 222, lines 14-20). Dr. Adams concedes that a single Taser dose up to fifteen seconds in a healthy individual doesn't cause appreciable damage, and that the theoretical risk of a Taser inducing cardiac arrest is "low,

3

depending on the patient's comorbidities. Very low."[2] (Adams depo., p. 226, lines 13-24; p. 254, lines 21-25).

Dr. Adams would not expect officers to know one's medical problems or comorbidities before using a Taser "unless they're wearing a bracelet around their neck." (Adams depo., p. 269, line 24 to p. 270, line 6). Per Dr. Adams' research, a Taser has caused documented cardiac arrest nine or ten times out of millions of uses. (Adams depo., p. 254, line 13 to p. 255, line 6).

Dr. Adams expects that Mr. Rachel had a high stress response to his struggle with his wife, and that damage could have been done to his heart system. (Adams depo., p. 279, line 11 to p. 280, line 5). Dr. Adams acknowledges that either excited delirium and psychotic delirium alone can cause a cardiac arrhythmia, asystole, and death, and that articles have shown this. (Adams depo., p. 289, line 24 to p. 290, line 7).

According to Dr. Adams, several of the officers' alleged actions as to Mr. Rachel are <u>irrelevant</u> to his death. These include use of a "hog-tie," use of a baton, and even use of the Taser in drive-stun mode. (Adams depo., p. 197, lines 2-5; p. 198, lines 12-16; p. 200, lines 22-25). Dr. Adams in fact testified that no officer conduct with the exception of the Taser deployment caused Mr. Rachel's death:

---

[2] Mr. Rachel had several comorbidities per Dr. Adams, including that he was psychotic, hypertensive, and overweight. (Adams depo., p. 202, lines 4-16).

4

Q. But other than the Taser application from the standpoint of the police actions in this case, is there anything else that you attribute to the cause of death?

A. No.

(Adams depo., p. 289, lines 5-9).

Dr. Adams also reviewed the autopsy of Mr. Rachel including photographs, and noted that there was very little bruising. (Adams depo., p. 181, line 18 to p. 182, line 9). To quote Dr. Adams: "…[T]here wasn't anything like a gigantic hematoma or ecchymosis that you would say, gee, this guy got the hell beat out of him."[3] (Adams depo., p. 183, lines 7-13). Mr. Rachel had no corporal or blunt force trauma. (Adams depo., p. 183, lines 7-24; p. 185, lines 6-16).

**B.  Kirkham Admits in Deposition that He Has No Medical Opinions**

Plaintiff's Response attempts through a new Declaration of George Kirkham, a criminologist, to advance new theories on Mr. Rachel's death to which the City, by separately-filed Objections to Plaintiff's Evidentiary Submission and a Motion to Strike, has properly objected. The new theories are directly contrary to Kirkham's deposition testimony, and are due to be stricken as inconsistent therewith and procedurally improper. *See Johnson v. Louisville Ladder*, Civil Action No. 07-764-KD-M, 2008 WL 5122261 (S.D.Ala. Nov. 14, 2008)(applying

---

[3]Similarly, Kirkham testified that had Mr. Rachel been brutally stomped, beaten and kicked, he would have expected photographs in the Medical Examiner's report to indicate that. (Kirkham depo., p. 290, lines 10-22).

sham affidavit rule to exclude certain parts of expert affidavit which contradicted prior deposition testimony).

First, Kirkham testified extensively when deposed not only that he was not offering medical opinions, but that he was not competent to offer them:

> "First, sir, I'm a criminologist, not a medical doctor. I wouldn't feel competent to comment on any medical testimony being provided by experts on either side." (Kirkham depo., p. 34, lines 14-17).
>
> "I would defer to any qualified medical specialist on medical opinions." (Kirkham depo., p. 35, lines 9-10).
>
> "… Again, I'm not going to be commenting on different medical testimony." (Kirkham depo., p. 37, lines 21-22).

When questioned about the medical opinions expressed by Dr. Adams, Plaintiff's retained medical expert, Kirkham testified:

> Q. But you don't dispute Dr. Adams' testimony and his opinion that that [a hogtie] had nothing to do with Mr. Rachel's death?
>
> A. Again, that's medical testimony, I wouldn't be prepared to be able to testify on that.

(Kirkham depo., p. 64, lines 10-15).

Further, when specifically questioned about cause of death from a lack of oxygen, asphyxia, or suffocation, Kirkham again deferred:

> Q. Did Mr. Rachel die from lack of oxygen?
>
> A. Again, you're asking me -- you know, I'm not going to get into the area of medical testimony. …

(Kirkham depo., p. 189, line 22 to p. 190, line 1).

6

Q. You're not opining here today that the medical cause of death of Mr. Rachel had anything to do with asphyxia or suffocation, are you?

A. Again, that's beyond the ambit of my expertise. No, I would not be offering any testimony in that regard.

(Kirkham depo. II, p. 52, lines 5-11).

Kirkham knows of no evidence that Mr. Rachel exhibited breathing difficulties prior to the time officers carried him to the police car, and has no way to know when Mr. Rachel went into respiratory distress or stopped breathing. (Kirkham depo. II, p. 78, lines 6-14; p. 103, line 19 to p. 104, line 10).

## III. THE OFFICERS' TASER USE WAS IN ACCORD WITH CITY POLICY ON LESS LETHAL MUNITIONS AND TASER USE

With the only medical testimony on cause of death being Dr. Adams' opinion that a Taser deployment by the officers in prong mode caused a cardiac arrhythmia, the police actions must be viewed in light of City policy. Plaintiff admits that the officers had probable cause to arrest Mr. Rachel, and the officers' testimony as to the initial moments of the encounter with Mr. Rachel in the front yard stands uncontroverted. Even Plaintiff's expert Kirkham concedes that Mr. Rachel took a combative stance against the officers just prior to being tased. (Kirkham depo., p. 101, line 19 to p. 102, line 6).

The City policy on use of a Taser by officers includes the following:

The Taser may be used to control dangerous or violent subjects when deadly physical force does not appear to be justified and/or necessary; or attempts to subdue the subject by other conventional tactics have been or will likely be ineffective in the situation, or there is reasonable

7

expectation that it will be unsafe for officers to approach within contact range of the subject.

**************

The Taser falls into the category of Less Lethal Force technology and equipment, defined as:

> ➢ Those items, when used properly, are less likely to result in death or serious physical injury than force commonly referred to as "deadly."

> ➢ Less Lethal Force is defined as force used to subdue or render a subject non-threatening, with a lower probability of effecting fatal consequences.

(Exh. A to Doc. 121-3).

The officers were trained by sworn law enforcement officers on use of the Taser. (Doc. 121-3, ¶ 8). McCann had previously used his Taser on a suspect only once, and Jackson had never had to do so. (McCann Depo, p. 97, lines 16-23; Jackson Depo, p. 55, lines 5-7). Again, Dr. Adams testified that a cardiac arrest of a suspect from a Taser had been recorded only 9-10 times in more than three million uses. (Adams depo., p. 254, line 13 to p. 255, line 6).[4]

The City policy on less lethal munitions provides as follows:

Where deadly force is not authorized, officers should assess the incident to determine which less lethal technique or weapon will best de-escalate the incident and bring it safely under control.

---

[4] The City disagrees with even this frequency and intends to challenge Dr. Adams' opinions by appropriate pre-trial motion, but assuming this statistic if accurate equates to a rate of 1 cardiac arrest per 300,000 Taser uses. There is no reasonable foreseeability to the officers that using the Taser would cause cardiac arrest or death as a matter of law.

8

> Police officers are authorized to use departmental approved less lethal force techniques and issued equipment for resolution of incidents as follows:
>
> 1. To protect themselves or another from physical harm.
> 2. To restrain or subdue a resistant individual.
> 3. To bring an unlawful situation safely and effectively under control.

(Exh. E to Doc. 121-3).

Kirkham testified that the officers had no choice but to arrest Mr. Rachel, stating: "You must arrest if there's evidence, credible evidence to an officer of domestic violence." (Kirkham depo., p. 71, lines 4-7; p. 238, lines 5-10). Further, Kirkham admits that Mr. Rachel resisted the officers, and that when a suspect has been told he is under arrest and resists the officer's efforts to arrest and handcuff him, the officers have the right to use reasonable and necessary force. (Kirkham depo., p. 82, line 21 to p. 83, line 25; Kirkham depo. II, p. 70, line 25 to p. 71, line 14). There is no evidence to controvert that the officers were justified in using their Tasers to overcome Mr. Rachel's resistance, especially when viewed in light of his undisputed violent actions inflicting injury upon his wife, and that the Taser use was entirely in accord with City policy.

Plaintiff's expert Kirkham, a retired professor who last donned a police uniform and made an arrest in 1991, attempts to overlay a whole new policy for the entire Mobile Police Department, effectively suspending other policies like the Taser policy or the Use of Force policy should the violent suspect be potentially

9

"mentally ill" or even "emotionally disturbed." (Kirkham depo. II, p. 85, lines 9-23; p. 86, line 20 to p. 87, line 3). This creation of two different protocols is one that even the Ninth Circuit, whose non-binding case law Plaintiff's Response depends on, has expressly rejected. *See Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001)("We do not adopt a per se rule [for excessive force] establishing two different classifications of suspects: mentally disabled persons and serious criminals.").

Most importantly, City of Mobile Police Chief James Barber spoke directly to this issue in his affidavit, which stands undisputed before this Court. (Doc. 121-3, ¶¶8-10). There, Chief Barber stated:

> When officers encounter an individual who they suspect may be mentally ill or emotionally disturbed, but who is subject to arrest and is violently or otherwise resisting arrest, those officers are trained to follow their training and the department's policies on use of force and restraints in order to take that person into custody and to request medical assistance to evaluate that individual. … These Memorandum Orders, General Orders, and the other training provided to officers regarding the handling of mentally ill and emotionally disturbed persons give the officers some guidance about how to identify mentally ill and emotionally disturbed persons; *however, there are times when force must be employed in order to place a suspect under arrest, and a suspect must be placed in restraints, regardless of whether that suspect is determined to be mentally ill or emotionally disturbed.* Here, where the officers had probable cause to arrest Mr. Rachel for domestic violence and attempted murder, the objective circumstances were such that a reasonable police officer would conclude that Mr. Rachel posed a danger to the officers, to the victim, to the wider community, and even to himself. *The procedural General Orders and Memorandum Orders of the Department do not prohibit the use of a Taser to aid in the arrest of, or the use of*

10

*maximum or four-point restraints to restrain, a mentally ill or an emotionally disturbed suspect when it is deemed appropriate by the arresting officers based on the behavior of the suspect.* If a suspect is resisting arrest and continues to resist arrest, law enforcement officers may within their discretion deploy a Taser against the suspect and use maximum restraints in taking such suspect into custody in order to protect themselves or another from physical harm, to restrain or subdue the suspect, and to bring the situation safely and effectively under control for the safety of the officers, the victim, the public, and the suspect being arrested.

(Doc. 121-3, ¶¶8-10)(emphasis added).

Similarly, the supervisors of the responding Officers, Lt. Elia and Sgt. Ripple, testified that because so many unanticipated situations can arise, officers have the discretion to deviate from General Orders and Memorandum Orders in handling certain situations. (Elia Depo, p. 52, line 22 to p. 53, line 14; Ripple Depo, p. 18, lines 3-8).[5] Thus, the testimony of the Officers' supervising police chief, lieutenant, and sergeant are unanimous that the officers were allowed, in arresting a suspect even if mentally ill or emotionally disturbed, to use force and employ restraints as may be needed to accomplish the arrest.

IV. **THE CITY ENJOYS IMMUNITY FROM LIABILITY FOR PLAINTIFF'S STATE LAW WRONGFUL DEATH CLAIM**

The City also enjoys immunity under ALA.CODE § 11-47-190 unless the acts of the officers are the equivalent of "negligent" -- for "neglect, carelessness or

---

[5] Plaintiff's expert Kirkham testified that ". . . every police situation in the field is unique. There's no way to anticipate exactly what you're going to run into." (Kirkham depo., p. 16, lines 1-4).

unskillfulness." In other words, the City cannot be held liable for intentional, reckless or wanton conduct. Still, Plaintiff's Response attempts to proceed under certain theories where the required standard of conduct exceeds mere negligence.

For example, Plaintiff pursues a claim of "failure to monitor" Mr. Rachel's condition against all three officers.[6] Case law governing such a claim, however, requires proof of certain elements which include that "the officer's conduct amounted to more than gross negligence." *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005). Were this Court to find a triable issue of fact on this "failure to monitor" claim as to the officers, the officer conduct would by definition be "beyond gross negligence," therefore exceeding the City's limited liability for conduct carried out with "neglect, carelessness, or unskillfulness" as mandated by ALA.CODE § 11-47-190.

If Plaintiff contends that an officer's conduct in "failing to monitor" triggers the City's liability if merely negligent, however, the statutory immunity of ALA.CODE § 6-5-338 provided the officers and City immunity for use of the

---

[6] It is important to note the lack of medical testimony of the required causation between any alleged failure to monitor and Mr. Rachel's death, i.e., testimony that had Mr. Rachel been "properly" monitored, he would have survived. *See Walker v. City of Huntsville*, 62 So. 3d 474, 493 (Ala. 2010)("[plaintiff] must show that these defendants breached a duty to provide her medical treatment and that that breach proximately caused her injury or damage").

12

23103252 v2

officer's discretion to monitor Mr. Rachel during the course of what Plaintiff concedes was a lawful arrest.[7]

Moreover, as concerns other conduct alleged by Plaintiff relative to use of force by officers in making the arrest, this Court previously recognized as correct the City's argument in its initial Brief that conduct carried out with "neglect, carelessness, or unskillfulness" is inherently incompatible with conduct meeting the exceptions from *Cranman* immunity as modified by ALA.CODE § 6-5-338.

In *Stephens v. City of Butler, Alabama*, 509 F.Supp.2d 1098 (S.D.Ala. 2007), plaintiff brought suit for federal and state law claims arising out of his detention and altercation with a Town of Butler police officer at the Choctaw County Jail. In addressing the assault and battery claim asserted against the Town of Butler arising from Officer Lovette's actions, this Court addressed such claims and the interplay between ALA.CODE §§ 6-5-338 and 11-47-190:

> As explained *supra*, with regard to the plaintiff's assault and battery claim, the plaintiff can only proceed against Officer Lovette if he demonstrates that Lovette acted willfully or maliciously. However, if the jury believes that, the Town of Butler could not be held liable for Lovette's actions because municipalities are not liable for intentional acts of their agents. *See Hilliard v. City of Huntsville*, 585 So. 2d 889 (Ala. 1991)(stating that these terms do not, given their plain meaning, encompass a claim based on wanton conduct); *Scott v. City of*

---

[7] Plaintiff points to no "checklist" detailing specific steps or standards by which an officer monitors breathing. Thus, the officers and the City are entitled to immunity. *See Walker v. City of Huntsville*, 62 So. 3d 474, 498 (Ala. 2010)(where no detailed rules, regulations or checklists governed officer conduct in failing to identify brain aneurysm, officers entitled to immunity).

13

*Mountain Brook*, 602 So. 2d 893 (Ala. 1992)(does not apply to intentional conduct); *Todd v. Kelley*, 783 So. 2d 31 (Ala.Civ.App. 2000), *rehearing denied*, certiorari denied (police officer's allegations, in wrongful discharge claim, that city officials acted maliciously, willfully, and wantonly in terminating him were allegations of intentional acts and did not support a negligence theory, as was required to recover against city for the neglect, carelessness, or unskillfulness of its agents). Plaintiff argues in his response that the Town of Butler is not immune under § 11-47-190 if Lovette's assault and battery was due to Lovette's neglect, carelessness and unskillfulness. However, municipal liability under Section 11-47-190 is based on the doctrine of *respondeat superior*. *Ott v. City of Mobile*, 169 F.Supp.2d 1301, 1314 (S.D.Ala. 2001). Thus, "[f]or the employer to be liable under that doctrine, the employee must first be liable for a tort." *Id*. "If the agent is not liable for any tort, the principal is also absolved." *Id*. (*citing Latham v. Redding*, 628 So. 2d 490, 495 (Ala. 1993)). Accordingly, since Lovette is immune under § 6-5-338 for negligent acts surrounding the arrest of plaintiff, the Town of Butler cannot be held liable for these acts.

*Stephens*, 509 F.Supp.2d at 1116.

More recent decisions of the 11th Circuit and district courts within the 11th Circuit have similarly held that a municipality cannot be liable for assault and battery by police officers as such is intentional conduct beyond ALA.CODE § 11-47-190. *See Brown v. City of Huntsville*, 608 F.3d 724 (11th Cir. 2010)(city entitled to summary judgment on excessive force claim where all evidence shows intentional acts by officers); *Struggs v. City of Birmingham*, No. 2:13-CV-338-VEH, 2015 WL 777659 (N.D.Ala. Feb. 24, 2015)(city cannot be liable for assault and battery, both of which require intent); *Fowler v. Meeks*, 569 Fed.Appx. 705

14

(11th Cir. 2014)(dismissing assault and battery claim against city on immunity grounds).

Plaintiff attempts to pursue liability theories against the officers predicated on use of excessive force in spite of the testimony of Plaintiff's medical expert that he saw no evidence of this in the autopsy and that such conduct (if it occurred) did not cause Mr. Rachel's death; however, such conduct if it happened cannot be said to have been carried out with "neglect, carelessness, or unskillfulness" by the officers. If it was carried out in such a manner, the officers and the City are entitled to the protection of ALA.CODE § 6-5-338 and its immunity for such claims arising from the course of an arrest and the use of force to effect such arrest. *See Carver v. City of Pell City*, No. 4:13-cv-00906-VEH, 2015 WL 114198, *13 (N.D.Ala. Jan. 8, 2015)("[u]nder the doctrine of state agent immunity, a public actor, such as a law enforcement official, who is exercising discretionary authority is immune from claims that merely allege negligence, unskillfulness, or carelessness with respect to injuries arising out of those functions").

## **CONCLUSION**

For all of the foregoing reasons, the City is entitled to summary judgment on the state law claim asserted against it.

Respectfully submitted,


 */s/ Michael D. Strasavich*
MICHAEL D. STRASAVICH (STRAM9557)
Email:  mstrasavich@burr.com
BETSY P. COLLINS            (COLLB9715)
Email:  bcollins@burr.com
RICARDO A. WOODS        (WOODR1019)
Email: rwoods@burr.com

Attorneys for Defendant
City of Mobile, Alabama

**OF COUNSEL:**
Burr & Forman LLP
RSA Tower
11 North Water Street
Suite 22200
Mobile, Alabama  36602
Telephone: (251) 344-5151
Facsimile: (251) 344-9696

16

23103252 v2

# **CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing document by Notice of Electronic Filing, or, if the party served does not participate in Notice of Electronic Filing, by U.S. First Class Mail, hand delivery, fax or email on this the 23rd day of March, 2015:

Erik S. Heninger, Esquire
Drew Haskins, IV, Esquire
Heninger Garrison Davis, LLC
2224 1st Avenue North
Birmingham, Alabama 35203

Dixie Dan Powell, Esquire
Powell Injury Law, P.A.
602 S. Main Street
Crestview, Florida 32536

Thomas O. Gaillard, III, Esquire
Satterwhite, Druhan, Gaillard
    & Tyler, LLC
1325 Dauphin Street
Mobile, Alabama 36604

Henry Brewster, Esquire
Henry Brewster, LLC
205 N. Conception Street
Mobile, Alabama 36603

Latisha Rhodes Davis, Esquire
Mark A. Newell, Esquire
Armbrecht Jackson LLP
63 South Royal Street
1300 Riverview Plaza
Mobile, Alabama 36602

James D. Brandyburg, Esquire
The Brandyburg Firm, P.C.
51 Tacon Street, Suite D
Mobile, Alabama 36607

          */s/ Michael D. Strasavich*
          OF COUNSEL