## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| AMY RACHEL, etc., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION  13-0522-WS-M |
| | ) |
| CITY OF MOBILE, ALABAMA, et al., | ) |
| | ) |
|     Defendants. | ) |

## ORDER

This matter is before the Court on the four remaining defendants' motions for summary judgment.  (Docs. 117, 123, 128, 133).  The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 118-21, 124-27, 129-32, 134-37, 141, 146-48, 150, 152, 155-57, 162-64), and the motions are ripe for resolution.  After careful consideration, the Court concludes that two motions for summary judgment are due to be granted in their entirety and that the other two motions are due to be granted in part and denied in part.

## BACKGROUND

In the hours before dawn on May 1, 2012, defendant police officers Christopher McCann and John Jackson responded to a domestic violence call involving Gregory Rachel ("Greg").  They were later joined by a third defendant, Sergeant Jerald Ripple, and a former defendant, Lieutenant Edward Elia.[1]  All four are employed by the defendant City of Mobile ("the City").  The encounter ended with Greg's death.  His widow ("Amy") brings this action as administratrix of his estate.

---

[1] All claims against Lt. Elia were dismissed with prejudice on the joint stipulation of the parties.  (Doc. 116).

The second amended complaint, (Doc. 115), consists of two counts.[2]  Count III alleges that the three individual defendants violated Greg's constitutional rights by using excessive force to effect his arrest and by being deliberately indifferent to his serious medical need.  Count IV is a state claim brought against all four defendants for wrongful death.

With respect to Count III, the individual defendants argue they are entitled to qualified immunity in their individual capacities.[3]  With respect to Count IV, they argue they are entitled to peace officer and/or state-agent immunity.  The City argues that it partakes of the individual defendants' peace officer immunity and that in any event the plaintiff cannot establish its liability under Alabama Code § 11-47-190.

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the

---

[2] For reasons unknown, the second amended complaint lists all four counts from the first amended complaint but simultaneously says the plaintiff dismisses those claims. (Doc. 115 at 1, 7).  The Court construes the plaintiff's unorthodox pleading as setting forth only two counts, Counts III and IV.  All parties agree that only Counts III and IV are at issue in this lawsuit.

[3] The second amended complaint purports to assert the constitutional claims against the individual defendants in both their individual and their official capacities. (Doc. 115 at 1, 7).  The plaintiff acknowledges that any constitutional claims against the officers in their official capacities "were dismissed with the dismissal of the City of Mobile on those claims," (Doc. 146 at 92), and she does not attempt to resurrect those claims.  The official capacity claims therefore are due to be dismissed with prejudice.

party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick*, 2 F.3d at 1116; *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the

nonmovant ….” *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).  This standard applies fully in the qualified immunity context. *E.g., Gilmore v. Hodges*, 738 F.3d 266, 272 (11th Cir. 2013).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[4]  Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited.[5]  Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp*., 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

## I. Evidence.

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant ….” *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).  Therefore, the plaintiff's version of the facts (to the extent supported by the record) controls, though that version can be supplemented by additional material cited by the defendants and not in tension with the plaintiff's version.[6]

---

[4] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so.").

[5] The parties cite to certain deposition pages that they have failed to include in their evidentiary submissions.  The Court cannot credit their statements in brief as to the content of the missing testimony.

[6] In particular, the plaintiff's witnesses viewed only portions of the encounter between Greg and the police.  While their version controls for present purposes as to those portions of the encounter which they witnessed, it does not preclude the defendants

### A.  Evidentiary Challenges.

The City has filed an objection to four of the plaintiff's exhibits and a motion to strike one of the four.  (Docs. 158, 159).[7]  The Court, construing the objection as a motion to exclude, provided the plaintiff an opportunity to respond to both motions, which she did.  (Docs. 176, 177).  Because the City challenges the declaration of George Kirkham in both motions, the Court considers it only under the City's motion to strike, which contains a more detailed argument.

### 1.  Motion to exclude.

The Court agrees that the plaintiff cannot rely on the recorded statement of Kristie Adams, (Doc. 148-2), because it is unsworn.  "Unsworn statements do not meet the requirements of Fed. Rule Civ. Proc. 56(e) and cannot be considered by a district court in ruling on a summary judgment motion."  *Carr v. Tartangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) (internal quotes omitted); *accord Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1248 n.8 (11th Cir. 2009).  As this Court has noted, "[w]hile these cases were decided under a previous version of Rule 56, the Eleventh Circuit has continued to apply the rule under the current version."  *Jackson v. Lee*, 2014 WL 4829552 at *2 n.5 (S.D. Ala. 2014) (citing cases).  The plaintiff, who challenges the City's hearsay objection to Adams' statement but not its objection to the statement's unsworn nature, (Doc. 176 at 1-3), has offered the Court no reason to stray from its decision in *Jackson*.

The City objects to certain portions of Tiffany Brown's declaration as hearsay.  Brown heard Greg say, "Don't do it again," and "Stop," and she heard one of the officers say, "Man, what is wrong with you?"  Brown also said to her

---

from relying on their own accounts as to those portions of the encounter which the plaintiff's witnesses did not observe.

[7] The individual defendants have filed copycat motions to strike that merely adopt the City's motion.  (Docs. 161, 165, 166).

husband, "They are beating him!"  (Doc. 148-8).  Hearsay is a statement that "the declarant does not make while testifying at the current trial or hearing" and that "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).  A statement by a party opponent offered against that party is not hearsay.  *Id*. Rule 801(d)(2)(A).  The officers are party opponents and Brown is the declarant, so their statements cannot be hearsay.  Greg's statements may be hearsay,[8] but they fall easily within the "excited utterance" exception to hearsay, since they were made "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."  Fed. R. Evid. 803(2).[9] Even if they did not, they would be admissible under Rule 807.

The City also objects to Brown's statement that, "[i]n [her] opinion, the officers were hitting the man completely unnecessarily," as an opinion she is unqualified to provide.  The plaintiff concedes that Brown is not an expert on the use of force but argues she may give a lay opinion.  (Doc. 176 at 4-5).  A lay opinion must be "helpful to clearly understanding the witness's testimony or to determining a fact in issue."  Fed. R. Evid. 701(b).  Brown's factual testimony is quite clear as to what she observed, including statements that she did not observe Greg fight, threaten, struggle with or oppose the officers, so her opinion is not helpful to clearly understanding her testimony.  Even if the "necessity" of force is a fact in issue, Brown's factual testimony provides every basis for resolving the issue, and her personal opinion as to its proper resolution does not advance its determination.

The City objects to a "report of interview" of Nicole Phillips, (Doc. 148-13 at 4), arguing it is hearsay because it is in the form of an investigator's report of

---

[8] The plaintiff does not deny offering the statement to show that the officers had struck and/or tased him.

[9] *See, e.g., United States v. Jackson*, 88 F.3d 845, 847 (10th Cir. 1996) (statement, "Kenny, don't do it," made "while the declarant witnessed the carjacker place a gun to the victim's head," was an excited utterance).

what Phillips told him.  Phillips, however, declared under penalty of perjury that the interview account is true and correct, (*id*.), making it her own statement.  At any rate, the document contains nothing that is not also contained in Phillips' declaration, (*id*. at 2-3), to which the City does not object.

In summary, the motion to exclude is **granted** with respect to the unsworn statement of Kristie Adams and the opinion of Tiffany Brown, **denied as moot** with respect to the declaration of George Kirkham, and **denied** in all other respects.

### 2.  Motions to strike.

The plaintiff has offered evidence from Kirkham, its police operations expert, in three formats:  (1) letter report; (2) deposition testimony; and (3) declaration.  (Doc. 148-20 to -22).  The City moves to strike the declaration on the grounds that it represents an untimely expansion of Kirkham's opinions and support therefor.  The plaintiff describes the declaration as presenting the opinions expressed in the report and deposition testimony, only "in a more concise and readable format."  (Doc. 177 at 8).  The plaintiff further asserts that Kirkham's report and deposition, independent of his declaration, "provid[e] support for Plaintiff's opposition brief."  (*Id*.).  Because the plaintiff represents that Kirkham's declaration does not affect the proper resolution of the motions for summary judgment, the Court will not consider it, and the motions to strike the declaration are thus **denied as moot**.

### B.  Statement of the Evidence.

McCann and Jackson were dispatched to the Rachel home at approximately 3:11 a.m. in response to Amy's request for 911 assistance.  Amy had fled to a neighbor's house across the street after Greg assaulted her, and the officers spoke with her there.  She advised them that Greg had "flipped out," was "talking crazy"

and had tried to kill her by breaking her neck.  The officers also observed marks on Amy's face and an injury to her hand.

The officers recognized that Greg was an emotionally disturbed person. They intended to enter the Rachel home and arrest Greg for the crime of second degree domestic violence.  However, Sergeant Ripple told them by telephone not to approach the residence but to secure the scene until he and Lieutenant Elia arrived.

Several minutes later, but before backup arrived, Greg exited the front door of the residence and stood in the front yard, a cell phone in one hand and a drink in the other.  He raised his hands to the sky and screamed "weird stuff," including repeatedly crying out to "protect [him] from Obama."  He then threw away his phone, set down his drink, and lay on his back in the yard, still yelling.

The officers at this point crossed the street and approached Greg, tasers drawn, loudly ordering him to stay on the ground.  But Greg returned to his feet, the officers five to ten feet away, and assumed a fighting pose or aggressive stance.  The officers yelled at Greg repeatedly to get back on the ground, but he began walking towards them purposefully and with his fists closed, still yelling crazy things, including about protecting him from Obama.  The officers, tasers still drawn, repeatedly yelled at Greg to stop where he was and to get on the ground. Greg did not comply, and Jackson tased him.  Greg went to the ground but got right back up, seemingly unfazed, and McCann quickly tased him.  Greg again went to the ground and again immediately got back up.  He began pulling out the probes as he stumbled towards the street, the officers closely following while repeatedly ordering Greg to get on the ground.  Near a ditch paralleling the street, Greg fell to the ground and was on his back.  At or about this time, McCann called in a "Code Zebra," which is required by department policy when a taser is deployed and which prompts the dispatcher to send paramedics.

From his supine position near the ditch, Greg rose to his knees, back erect, and moaned, "Don't do it again."  One of the officers responded, "Man, what is

wrong with you?"  The officers then discharged their tasers two to five times, but without apparent effect.[10]  Two of these tases were in "touch-tase" mode.[11] Jackson then tried to wrestle Greg to the ground while Greg tried to punch at him, and McCann struck Greg several times in the thighs with his baton.  Greg remained on his knees and raised his hands in a submissive manner, moaning "Stop."

At that point, one of the officers struck Greg near the shoulder blades with a baton, and Greg went down on all fours.  The officer struck Greg again in the same place, and Greg went completely prone, yelling, "Stop!"  Greg from that point was totally submissive and did not kick, struggle or do anything to get up or oppose the officers.  Nevertheless, both officers began kicking him.  They kicked him at least two or three times each, including at least once each in the head.  They also hit him many times with their fists and batons, including at least three to five times in the legs with a baton.  The officers appeared agitated by Greg's resistance.

After this, the officers attempted to handcuff Greg, but his arms were under his body and he resisted their efforts.  Using a baton for leverage, Jackson was able to force Greg's left arm out from under his body.  Jackson then handcuffed Greg's left hand and pulled his left arm behind his back.  McCann, however, could not extract Greg's right arm.  Because they were getting tired and Greg was still struggling, the officers sat, knelt or lay on the prone Greg to await the arrival of

---

[10] The parties cite no evidence whether the tasers made effective contact with Greg.

[11] *See generally Hoyt v. Cooks*, 672 F.3d 972, 975 n.4, 980 (11th Cir. 2012) *and Fils v. City of Aventura*, 647 F.3d 1272, 1276 n.2 (11th Cir. 2011) (explaining that probe (or prong) mode fires probes, attached to the weapon by wires, into the suspect's skin and administers an electric shock that overrides the central nervous system, while the "much less serious" drive (or dry) stun mode is a pain control device that requires the weapon be pressed against the person's body).  Other cases describing the operation and effect of a taser include *Oliver v. Fiorino*, 586 F.3d 898, 903 (11th Cir. 2009), *Chaney v. City of Orlando*, 483 F.3d 1221, 1223 n.1 (11th Cir. 2007), and *Draper v. Reynolds*, 369 F.3d 1270, 1273 n.3 (11th Cir. 2004).

backup.  Greg cursed the officers, yelled at them to get off him, and squirmed so forcefully as to rotate his body 180 degrees.

When Sergeant Ripple arrived, Greg was still lying prone on the ground. McCann was on Greg's legs to secure them, and Jackson was on Greg's left side. Ripple moved to the right side and tried to dislodge Greg's right arm from under his body, but Greg locked it in and refused commands to surrender it.  Ripple then punched Greg in the lower back three to five times in an effort to knock the wind out of him and distract him enough to allow Ripple to pull out his right arm. These blows had no effect on Greg.  Lieutenant Elia then arrived and tried three times to apply a brachial stun to Greg's neck, but this was ineffective because he kept hitting Ripple on his downswing.  Using his knee as leverage on Greg's right shoulder, Ripple was then able to extract Greg's right arm and complete handcuffing within a minute or so of his arrival.

Once handcuffed, Greg continued to kick and try to get the officers off him, prompting Riddle to have him hog-tied.  While McCann put his knee in Greg's upper back to keep him from rolling over, Ripple retrieved leg shackles and applied them to Greg's ankles.  He then connected the handcuffs to the leg shackles with a second set of handcuffs.  The result of this four-point restraint was to bend Greg backwards into a "U" or "V" position.

The defendants left Greg on his stomach in the hog-tied position, and one officer sat on him for several minutes in that position.  At some point Greg yelled, "Gestapo!," "seized," and went suddenly quiet and unconscious.  All three officers observed this.  Greg, who never moved again, remained passed out for five minutes, during which time none of the officers checked on him or his breathing. They then lifted him by his limbs and carried him, face down, towards a patrol car. When they set him down to rest, one of them questioned if Greg was still breathing.  Ripple checked and discovered he was not, and that his pupils were dilated.

A neighbor watching from across the street saw the officers carrying Greg and noticed he was completely limp.  She told her husband she thought Greg was "playing dead."  Her husband, an EMT,[12] left the house with no equipment, walked across the road, identified himself as an EMT, and asked the officers if they needed any help.  Greg was still lying face down.  The EMT rolled Greg on his back and checked for pulse but found none.  He asked the officers to remove the handcuffs and leg shackles, which they did.  He then began chest compressions, unsuccessfully.  After the EMT began the compressions, Ripple called for paramedics.  At no previous point did any of the officers call for medical assistance.

## II.  Qualified Immunity.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority."  *Harbert International v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). The burden then shifts to the plaintiff to show that the defendant's conduct "violated a clearly established statutory or constitutional right."  *Grayden v. Rhodes*, 345 F.3d 1225, 1231 (11th Cir. 2003).

---

[12] The defendants describe the neighbor as a paramedic, but he describes himself as an EMT.  An EMT is not a paramedic and does not have a paramedic's training. *Wouters v. Martin County*, 9 F.3d 924, 926-27 (11th Cir. 1993); *see also Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1289 (11th Cir. 2006) (paramedic supervised EMT shift); *Smith v. City of New Smyrna Beach*, 588 Fed. Appx. 965, 970 (11th Cir. 2014) (EMT subordinate to paramedic); *Usry v. Liberty Regional Medical Center, Inc.*, 560 Fed. Appx. 883, 890 (11th Cir. 2014) (EMTs paid less than paramedics).

### A.  Discretionary Authority.

"[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. ...  If, and only if, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established law." *Harbert*, 157 F.3d at 1281 (emphasis added).  The reason is that an official acting outside the scope of his discretionary authority "ceases to act as a government official and instead acts on his own behalf," so that "the policies underlying the doctrine of qualified immunity no longer support its application." *Id*.

For purposes of federal qualified immunity analysis, a defendant acts within his discretionary authority when "his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988) (internal quotes omitted).  For this inquiry, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

The first prong of this test requires that the defendant "have been performing a function that, but for the alleged unconstitutional infirmity, would have fallen within his legitimate job description." *Holloman*, 370 F.3d at 1266 (emphasis omitted).  "The inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act," but "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Harbert*, 157 F.3d at 1282 (internal quotes omitted).[13]

---

[13] For example, the issue is not whether a marshal has the authority to deliver a prisoner into unconstitutional conditions but whether he has the authority to transport and

As for the second prong, "[e]ach government employee is given only a certain 'arsenal' of powers with which to accomplish her goals." *Holloman*, 370 F.3d at 1267. "Pursuing a job-related goal through means that fall outside the range of discretion that comes with an employee's job is not protected by qualified immunity." *Id*.

The quantum and quality of evidence necessary to meet the defendant's burden "vary in proportion to the degree of discretion inherent in the defendant's office," *Harbert*, 157 F.3d at 1282 (internal quotes omitted), but ordinarily "there must be a showing by competent summary judgment materials of objective circumstances that would compel th[e] conclusion" that the defendant acted within his discretionary authority. *Id*. (internal quotes omitted). Certainly "[a] bald assertion that the acts were taken pursuant to the performance of duties and within the scope of duties will not suffice" to meet the defendant's burden of proof. *Id*. (internal quotes omitted). However, when it is "undisputed … that the [defendants] were acting within their discretionary authority," the Court can deem that element of qualified immunity established. *E.g., Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009).

"Because making an arrest is within the official responsibilities of a sheriff's deputy, [the defendant] was performing a discretionary function when he arrested [the plaintiff]," allegedly using excessive force in the process. *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004); *accord Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) ("[[I]t is clear that [a sheriff's deputy] was acting within the course and scope of his discretionary authority when he arrested [the plaintiff] and transported her to jail," during which he allegedly used excessive force). Because the conduct of which the plaintiff complains occurred

---

deliver prisoners. *Harbert*, 157 F.3d at 1282 (describing *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)).

in the course of an arrest, the individual defendants acted within the scope of their discretionary authority.

The plaintiff expressly "does not dispute that McCann was acting within his scope of discretionary authority [sic] during the incident …." (Doc. 146 at 56). It is unclear why the plaintiff did not mention Jackson and Ripple in this concession but, in any event, the plaintiff nowhere disputes that Jackson and Ripple also acted within their discretionary authority. Accordingly, the defendants have met their initial burden. *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) (where the plaintiff did not dispute that the deputy was acting within his discretionary authority at the time of arrest, the burden shifted to the plaintiff to overcome the qualified immunity defense).

### B. Violation of a Clearly Established Constitutional Right.

The lower courts have discretion whether to address first the existence of a constitutional violation or the clearly established nature of the right allegedly violated. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *accord Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). To avoid "the often more difficult question whether the purported right exists at all," *id.*, the Court addresses first the latter issue where appropriate.[14]

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "In other words, existing precedent must have placed the statutory or

---

[14] "Because qualified immunity is only a defense to personal liability for monetary awards resulting from government officials performing discretionary functions, qualified immunity may not be effectively asserted as a defense to a claim for declaratory or injunctive relief." *Ratliff v. DeKalb County*, 62 F.3d 338, 340 n.4 (11th Cir. 1995); *accord Swint v. City of Wadley*, 51 F.3d 988, 1001 (11th Cir. 1995); *D'Aguanno v. Gallagher*, 50 F.3d 877, 879 (11th Cir. 1995). Thus, had the plaintiff sought declaratory or injunctive relief, the Court could not bypass the question whether a constitutional violation occurred. But the plaintiff seeks no such relief. (Doc. 115 at 10).

constitutional question beyond debate." *Reichle*, 132 S. Ct. at 2093 (internal quotes omitted). "The salient question … is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). To attain that level, "the right allegedly violated must be established, not as a broad general proposition, … but in a particularized sense so that the contours of the right are clear to a reasonable official." *Reichle*, 132 S. Ct. at 2094. The law is clearly established if any of three situations exists.

"First, the words of the pertinent federal statute or constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances to overcome qualified immunity, even in the total absence of case law." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) (emphasis omitted). The requisite fair and clear notice can be given without case law only "[i]n some rare cases." *Williams v. Consolidated City of Jacksonville*, 341 F.3d 1261, 1270 (11th Cir. 2003).

"Second, ... some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." *Vinyard*, 311 F.3d at 1351. "For example, if some authoritative judicial decision decides a case by determining that 'X Conduct' is unconstitutional without tying that determination to a particularized set of facts, the decision on 'X Conduct' can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding 'X Conduct' are immaterial to the violation." *Id*. "[I]f a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a government official, it must do so with obvious clarity to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id*. (internal quotes omitted). "[S]uch decisions are rare," and "broad principles of law are

15

generally insufficient to clearly establish constitutional rights." *Corey Airport Services, Inc. v. Decosta*, 587 F.3d 1280, 1287 (11th Cir. 2009).

"Third, [when] the Supreme Court or we, or the pertinent state supreme court has said that 'Y Conduct' is unconstitutional in 'Z Circumstances,'" then if "the circumstances facing a government official are not fairly distinguishable, that is, are materially similar [to those involved in the opinion], the precedent can clearly establish the applicable law." *Vinyard*, 311 F.3d at 1351-52.

When case law is utilized to show that the law was clearly established, the plaintiff must "point to law as interpreted by the Supreme Court [or] the Eleventh Circuit," and such case law must pre-date the challenged conduct. *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). Moreover, "[t]he law cannot be established by dicta[, which] is particularly unhelpful in qualified immunity cases where we seek to identify clearly established law." *Santamorena v. Georgia Military College*, 147 F.3d 1337, 1342 n.13 (11th Cir. 1998) (internal quotes omitted).

## III. Excessive Force.

The plaintiff argues that the officers violated the Fourth Amendment's ban on the use of excessive force to effect an arrest both by "provoking" a confrontation with Greg and by the force they employed once the confrontation began. (Doc. 146 at 58-67, 72-73).

### A. Provocation.

The plaintiff asserts that McCann and Jackson "provoked a violent situation" by needlessly approaching a person known to be emotionally disturbed, "essentially precipitating the violence instead of heading it off." (Doc. 146 at 67). The Court need not consider whether such conduct would reflect a constitutional violation, because the plaintiff has failed to show it was clearly established before May 2012 that such conduct would violate Greg's constitutional rights.

16

The plaintiff does not suggest that the very language of the Fourth Amendment clearly establishes that provoking a confrontation with an emotionally disturbed felon is unconstitutional.  Instead, she asks the Court to look to Ninth Circuit precedent indicating that such conduct can be unconstitutional.  (Doc. 146 at 58, 65-66).[15]  "Our Court looks only to binding precedent – cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose – to determine whether the right in question was clearly established at the time of the violation."  *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc).  The plaintiff's Ninth Circuit cases thus cannot carry her burden.[16]

The plaintiff next points to *Mercado* as a case concerning "the use of force against an individual who had been reported to be despondent and threatening suicide."  (Doc. 146 at 69-70).  But *Mercado* says nothing about the propriety, much less the constitutionality, of approaching such a person; it addresses only the constitutionality of firing a projectile into his skull from a distance of six feet.  407 F.3d at 1155.  The plaintiff also discusses several Eleventh Circuit cases discussing the use of excessive force in effecting an arrest, (Doc. 146 at 70-72), but none of them speak to the constitutionality of the antecedent act of approaching the suspect or "provoking" a confrontation.

Finally, the plaintiff repairs to *Hope v. Pelzer*, 536 U.S. 730 (2002), which she believes stands for the proposition that "fair warning could come from … non-

---

[15] "We … hold that where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force."  *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002).

[16] Nor has the plaintiff explained how she could show that the defendants violated the Fourth Amendment by approaching Greg, as required by the Ninth Circuit.  This is not a case, as was discussed in *Billington*, in which the defendants "committed an independent Fourth Amendment violation by entering the man's house to arrest him without an arrest warrant, for a relatively trivial and non-violent offense."  292 F.3d at 1189.  On the contrary, the plaintiff admits that the defendants' "arrest of [Greg] was justified and lawful."  (Doc. 146 at 56).

decisional authority," such that, "[w]here an officer, by training and by internal policy, is advised as [to] the potential danger of a particular type of excessive force, they are on notice that their conduct violates clearly established law."  (Doc. 146 at 68-69).  It is true that the *Hope* Court stated that, "in light of binding Eleventh Circuit precedent, an Alabama Department of Corrections (ADOC) regulation, and a DOJ report informing the ADOC of the constitutional infirmity in its use of the hitching post, we readily conclude that the respondents' conduct violated" the petitioner's clearly established constitutional rights.  *Id*. at 741-42. But the Supreme Court did not say or suggest that a plaintiff can meet her burden of demonstrating the existence of a clearly established constitutional right by relying on "non-decisional authority."

 *Hope* involved the use of a hitching post within the Alabama prison system. The *Hope* Court first discussed a former Fifth Circuit case, "[i]n light of [which], the unlawfulness of the alleged conduct should have been apparent to the respondents."  536 U.S. at 742.  The Court then discussed an Eleventh Circuit case and concluded that it "gave fair warning to respondents that their conduct crossed the line of what is constitutionally permissible."  *Id*. at 743.  "The fair and clear warning … that these cases provided was sufficient to preclude the defense of qualified immunity at the summary judgment stage."  *Id*. at 745 (citation and internal quotes omitted).  It is thus plain that qualified immunity was denied based on decisional law, not based on "non-decisional authority."  The DOJ report merely "buttressed" the Court's conclusion, *id*. at 744, and the ADOC regulation similarly was only "[r]elevant to the question whether [the Eleventh Circuit decision] provided fair warning to respondents that their conduct violated the Constitution."  *Id*. at 743-44.[17]

---

[17] The plaintiff cites two other cases in which the Supreme Court looked to police department training and policies, (Doc. 146 at 57), but it did so only in considering, respectively, whether reasonable suspicion existed and whether a national trend in law enforcement supported declaration of a new constitutional rule.  In neither case did the

In short, the *Hope* Court's discussion of non-decisional authority does not support the proposition that such authority can carry a plaintiff's burden of showing the violation of a clearly established constitutional right in the absence of any decisional authority doing so. Certainly nothing in *Hope* can be construed as overriding the Eleventh Circuit rule that constitutional rights can be clearly established only by binding precedent, *Coffin*, 642 F.3d at 1013, or by the very words of a statute or constitutional provision. *Vinyard*, 311 F.3d at 1350-52.[18]

Within the past few days, the Supreme Court has plainly torpedoed the plaintiff's argument. The plaintiff in *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765 (2015), supported her Fourth Amendment claim with expert testimony that the defendant law enforcement officers "fell short of their training by not using practices designed to minimize the risk of violence when dealing with the mentally ill." *Id*. at 1771. The Court canvassed the case law and concluded that "the officers' failure to accommodate [the plaintiff's] illness [did not] violat[e] clearly established law." *Id*. at 1775. The Court then rejected the plaintiff's reliance on her expert's opinion: "Even if an officer acts contrary to her training, however, ... that does not itself negate qualified immunity where it would otherwise be warranted." *Id*. at 1777. There thus can be no doubt that training and policy cannot substitute for appropriate judicial precedent in the "clearly established" analysis.

_____

Court remotely suggest such materials can supply the basis for declaring that a constitutional rule is clearly established for purposes of qualified immunity analysis.

[18] It should be remembered that the three founts of clearly established law identified in *Vinyard* represent the Eleventh Circuit's understanding of the meaning of *Hope*. 311 F.3d at 1350-53. The Court therefore disagrees with those appellate courts that appear to read *Hope* more expansively. *See Morgan v. Swanson*, 659 F.3d 359, 413 (5th Cir. 2011) (the *Hope* Court "not[ed] that [ADOC] regulations and a DOJ report were capable of providing fair warning") (en banc); *Champion v. Outlook Nashville, Inc*., 380 F.3d 893, 902 (6th Cir. 2004) (under *Hope*, "[o]ther sources [beyond case law] can also demonstrate the existence of a clearly established constitutional right ...."). The Court notes that both the Fifth and Sixth Circuits, unlike the Eleventh, look to non-binding case law in determining the content of clearly established law. *Morgan*, 659 F.3d at 412-13; *Champion*, 380 F.3d at 902.

In summary, McCann and Jackson are entitled to qualified immunity with respect to any claim of excessive force based on provocation.

### B. Use of Force.

The plaintiff admits that the defendants' arrest of Greg was lawful. (Doc. 146 at 56). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest … necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (internal quotes omitted). However, "[a]ny use of force must be reasonable," *id.*, and "[i]t is clearly established that the use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment." *Davis v. Williams*, 451 F.3d 759, 767 (11th Cir. 2006). The question is whether, on May 1, 2012, it was clearly established that, under the plaintiff's version of the evidence, the amount of force used by the individual defendants was unconstitutionally excessive.

Jackson first tased Greg when Greg, ignoring repeated police commands, got to his feet and, ignoring repeated commands to return to the ground, assumed an aggressive stance, yelled crazy things, and walked towards the officers with fists closed. McCann first tased Greg when he got back up immediately after being downed by Jackson's tase. The plaintiff does not argue that this use of force was excessive, instead limiting her claim to the defendants' use of force in the face of Greg's "submissive lack of resistance," which she pegs as beginning when Greg, after falling to the ground near a ditch, rose to his knees, his back erect. (Doc. 146 at 72). The defendants' use of force after this point can be divided into three periods.

### 1.  Greg on his knees.

In the first period, according to the plaintiff's evidence, McCann and Jackson discharged their tasers several times, but Greg remained on his knees.

Jackson, with Greg trying to punch him, tried unsuccessfully to wrestle him to the ground while McCann struck him on the thighs with a baton.  One of the officers then struck him with a baton between the shoulder blades, and Greg went to all fours.  The officer repeated the maneuver, and Greg went prone.

When, as here, the plaintiff does not question the existence of probable cause to arrest, the arresting officer's subjective intent is irrelevant, and the constitutional issue is measured by whether the force employed was "'objectively reasonable' in light of the facts and circumstances [the defendant] faced at the time, 'including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight.'"  *Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  Moreover, "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Id*. at 396-97.

Domestic violence in the second degree is a Class B felony, punishable by two to 20 years incarceration.  Ala. Code §§13A-5-6(a)(2), -6-132(a).  Although Greg was not fleeing while on his knees, he had been walking away from the officers mere seconds earlier, stopped only by his falling down, and the officers could reasonably conclude he was rising in order to continue his slow-motion flight.  Moreover, the officers knew that Greg had attempted to kill his wife shortly before, and they had witnessed him talking crazily and behaving erratically, as well as approaching them with closed fists, so they could reasonably be concerned for their safety while he was not on the ground.  The officers had sought to detain Greg by repeated commands to stay down or to get back down, all

of which he ignored, and two tasings had also failed to stop him.  Nevertheless, the officers did not escalate the amount of force but again tried to gain control via taser (including in the milder, dry-stun mode).  Only when these efforts failed did the officers resort to a baton.  Even then, they employed the baton on Greg's thighs and between his shoulders (not on his head, his kidneys, or any other vulnerable area), and they did so only enough to return Greg to the ground.  The plaintiff does not acknowledge or address these circumstances, much less explain how they render the officers' use of force unconstitutional.

Instead, she says that McCann and Jackson "failed to take into account [Greg's] diminished capacity."  (Doc. 146 at 65).  But she relies only on cases from other Circuits for the proposition that an otherwise lawful use of force can become unconstitutional when exerted against a mentally or emotionally challenged individual, and she does not come to grips with *Hoyt v. Cooks*, 672 F.3d 972 (11th Cir. 2012), "a case in which we determined that police officers were entitled to qualified immunity on excessive-force claims in a situation where they repeatedly used their Tasers in an attempt to subdue a mentally unstable arrestee." *Bussey-Morice v. Gomez*, 587 Fed. Appx. 621, 630 (11th Cir. 2014).  Nor does she address *Mann v. Taser International, Inc*., 588 F.3d 1291 (11th Cir. 2009), in which the Court upheld as constitutional the multiple tasings of a violent decedent who was "disconnect[ed] from reality" and was suspected of only a minor crime. *Id*. at 1299-1300, 1307.

With a minimum of discussion, the plaintiff cites several Eleventh Circuit cases in which a defendant was deemed to have employed unconstitutionally excessive force in effecting an arrest.  (Doc. 146 at 69-72).  None, however, involved circumstances remotely similar to those in play during this portion of the officers' use of force:  a non-compliant, recently violent, recently fleeing, currently erratic felon.  The plaintiff has thus failed to show that the officers' use of force, even if it was unconstitutionally excessive (a question the Court does not decide), violated Greg's *clearly established* constitutional rights.

### 2. Greg facedown on the ground.

The plaintiff's evidence reflects that, while Greg remained prone and completely submissive, without any struggle or opposition of any kind, McCann and Jackson each kicked him several times, including in the head, and also struck him many times with their fists and batons.

"Our cases hold that a gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008). "[P]unching a non-resisting criminal suspect for no apparent reason other than malice … is not protected by our constitution." *Id*. at 1334. The defendants in *Hadley* and several other cases[19] were handcuffed when the gratuitous force was applied, but the Eleventh Circuit, in several cases cited by the plaintiff, has found the gratuitous use of force against non-resisting, unhandcuffed suspects to be unconstitutional as well.[20]

In *Reese v. Herbert*, 527 F.3d 1253 (11th Cir. 2008), the plaintiff was thrown facedown on the ground, where he remained, offering no resistance. Four defendants piled on him and kicked and beat him, with one twisting his arm behind his back and another pepper-spraying him in the face. This use of force plainly violated the Constitution, because it is clearly established that the Fourth Amendment "prohibits … a severe beating of a restrained, non-resisting suspect." *Id*. at 1274 (internal quotes omitted).

In *Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000), the plaintiff burglary suspect, when discovered hiding in a canal, complied with the

---

[19] *Saunders v. Duke*, 766 F.3d 1262, 1267 (11th Cir. 2014); *Galvez v. Bruce*, 552 F.3d 1238, 1243-45 (11th Cir. 2008); *Vinyard*, 311 F.3d at 1348-49; *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000).

[20] Any different rule would incentivize law enforcement officers not to handcuff unresisting arrestees, so as to permit them to be beaten.

defendant's instruction to lie down, without attempting to flee or resist arrest and without posing any danger, yet the defendant nevertheless released his canine and allowed it to attack and bite the plaintiff for at least two minutes.  Even without a prior factually similar case, it was clearly established that the defendant used unconstitutionally excessive force.  *Id*. at 923-24, 927.

In *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997), the plaintiff raised a baseball bat when confronted by the defendant and refused to drop it when the defendant drew his gun and ordered him to do so.  The plaintiff then dropped the bat and ran away.  When the defendant caught up with him, the plaintiff "docilely" complied with the defendant's order to get on the ground.  Once there, the defendant broke the plaintiff's arm in the process of handcuffing him.  *Id*. at 1418. The Court held that the defendant's use of such force against "a previously threatening and fleeing arrestee … after the arrestee suddenly became docile" was plainly unconstitutional.  *Id*. at 1419-20.[21]

Moreover, as support for the proposition that "a handcuffed, non-resisting defendant's right to be free from excessive force was clearly established in February 2002," the *Hadley* Court noted that, "'[b]y 1988, our precedent clearly established that government officials may not use gratuitous force against a prisoner who has already been subdued ….'"  526 F.3d at 1333 (quoting *Skrtich v. Thornton*, 280 F.3d 1295, 1303 (11th Cir. 2002)).  In *Skrtich*, the gratuitous force was applied after the prisoner was electronically shocked and rendered unable to resist but before the prisoner was handcuffed (his resistance to which had precipitated the incident).  280 F.3d at 1301-03.

As shown by *Smith*, past resistance is no excuse to exert substantial force against a suspect that has stopped resisting.  Likewise, in *Hadley*, there was

---

[21] The *Smith* Court described the case as "very close," but what was close was not whether the defendant's conduct violated the Constitution but whether the defendant's use of force "was so far beyond the hazy border between excessive and acceptable force that [the defendant] had to know he was violating the Constitution even without caselaw on point."  127 F.3d at 1419.  The Court found that it was.

evidence the plaintiff initially resisted arrest but was punched in the stomach only after he stopped resisting, which force the Court stated would be a constitutional violation.  526 F.3d at 1328, 1331; *cf. Skrtich*, 280 F.3d at 1302 ("It is not constitutionally permissible for officers to administer a beating as punishment for a prisoner's past misconduct.").

The plaintiff's evidence is that, once Greg was on the ground, he did not threaten or resist the officers in any way and that the officers appeared agitated as they kicked, punched and struck him.  Even though he was not handcuffed, and even though he had previously resisted, the cases discussed above reflect that it was clearly established in May 2012 that kicking Greg repeatedly, including in the head, and striking him many times with fists and batons, was under these circumstances gratuitous and unconstitutionally excessive.

McCann and Jackson do not admit to kicking and beating Greg on the ground in the manner described by the plaintiff's witnesses, but they do say he resisted being handcuffed by squirming and keeping his arms under his body. While some use of force (though perhaps not all of the force alleged) presumably would be permissible in order to effect the handcuffing of a prone suspect resisting handcuffing, on motion for summary judgment the Court must credit the plaintiff's evidence that Greg offered no such resistance, at least not during the period her witnesses saw him being kicked and beaten.

McCann insists the plaintiff's evidence does not really support an inference that he and Jackson kicked and beat Greg as he lay prone on the ground offering no resistance to them.  (Doc. 163 at 13-14).  He is mistaken.  The evidence concerning this period comes from the Browns, and it is clear and unequivocal. McCann notes the Browns "did not view the incident from beginning to end," and he concludes from this that they "cannot create a genuine issue of material fact as to whether Rachel resisted arrest."  (*Id.*).  But of course their firsthand observations do create such an issue with respect to the period they observed, *i.e.*, from when Greg went prone to when they turned away.  There is no requirement

25

in the law that a witness cannot testify to what he or she saw unless the witness saw everything.

Nor, contrary to McCann's assertion, does it matter for present purposes that other witnesses indicated that Greg resisted the officers earlier in the encounter or that Lieutenant Elia and Sergeant Ripple testified that Greg resisted when they arrived some time later. First, their testimony does not cover the same time period addressed by the Browns. Second, even if it did, their testimony could not negate the Browns' contrary testimony.

McCann and Jackson argue that certain other factors counteract the clearly established law discussed above. They ask the Court to consider: the need for applying force; the relationship between the need and the amount of force used; the extent of injury inflicted; and whether the force was applied in good faith or maliciously and sadistically. This is the listing of factors employed in the Eleventh Circuit prior to *Graham*. *E.g., Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986). The final, subjective factor "has been eliminated from the analysis by *Graham* and other cases." *Lee v. Ferraro*, 284 F.3d 1188, 1198 n.7 (11th Cir. 2002).[22] McCann's denial that he acted maliciously or sadistically, (Doc. 129 at 13), is therefore irrelevant. While the other three factors do survive *Graham*,[23] in May 2012 it was clearly established by extant binding precedent that they do not prevent the defendants' use of force from being unconstitutionally excessive.

The first two *Leslie* factors are but generalized statements of the *Graham* factors. As reflected in the cases discussed above, there was no need to use force against Greg once he ceased all resistance, and the force the defendants did use

---

[22] The Eleventh Circuit recently noted the error of certain panel opinions in continuing to list the subjective "maliciously and sadistically" factor despite *Graham*'s express limitation of the inquiry to one of objective reasonableness and despite prior panel precedent correctly jettisoning the subjective factor. *Mobley v. Palm Beach County Sheriff Department*, ___ F.3d ___, 2015 WL 1651850 (11th Cir. 2015).

[23] *Lee*, 284 F.3d at 1198 n.7.

was grossly disproportionate to the (non-existent) need to use force.  McCann says Greg was "delusional" and thus presented a "heightened possibility of threat" to himself and Jackson, (Doc. 129 at 11), but the plaintiff's evidence is that, at least after Jackson first tased him, Greg did not actually threaten them but simply ambled away and, after falling, stayed on his knees, eventually raising his arms in a supplicating manner while he pleaded with the officers to stop, until two blows from a baton felled him.  Any threat from Greg collapsed when he did and thus could not justify kicking and beating him as he lay non-resisting on the ground, any more than the decedent's initial struggle with an officer in *Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009), which the defendant ended by tasing the decedent one time, could justify the defendant in continuing to tase him as he lay on the pavement, non-violent and non-threatening.  *Id*. at 903, 906.

As for the extent of injury inflicted, McCann and Jackson say there is no medical or physical evidence showing they used a high degree of force.  (Doc. 162 at 6; Doc. 163 at 14-15).  But "objectively unreasonable force does not become reasonable simply because the fortuity of the circumstances protected the plaintiff from suffering more severe physical harm."  *Lee*, 284 F.3d at 1200.  "[T]he gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force," and an officer is "not entitled to use any force" when the suspect "neither resisted arrest nor posed a danger."  *Hadley*, 526 F.3d at 1330.  Thus, an officer's "single punch" to the suspect's stomach "constituted excessive force," *id*., without any consideration of whether or to what extent the suspect was injured by the blow.  If that is so, repeatedly kicking a non-resisting suspect in the head and elsewhere, and hitting him with fists and batons many times, is also sufficient force to violate the Constitution without considering the injury inflicted thereby.

In summary, accepting for present purposes the plaintiff's version of the evidence, the kicking and beating of Greg by McCann and Jackson as he lay unresisting on the ground violated his clearly established constitutional rights, and to that extent the defendants are not entitled to qualified immunity.

27

### 3.  Greg being handcuffed.

The plaintiff's witnesses stopped watching at some point, leaving uncontroverted the defendants' evidence that Greg, at least after that point, again resisted arrest by squirming and refusing to give up his hands for cuffing.  The plaintiff makes no argument that the defendant's use of force in effecting Greg's handcuffing violated Greg's Fourth Amendment rights.  Because the officers were acting within their discretionary authority, *see* Part II.A, *supra*, the burden lies with the plaintiff to show that their use of force against a resisting arrestee in order to effect the arrest violated Greg's clearly established Fourth Amendment rights. The plaintiff, however, makes no mention of this episode or of Ripple's involvement, and that silence is incapable of meeting her burden.

### C.  Summary.

Defendant Ripple is entitled to summary judgment because the plaintiff has not shown that his limited use of force was unconstitutional or that it violated Greg's clearly established rights.  McCann and Jackson are entitled to summary judgment to the extent the plaintiff's claim is based on their provoking a confrontation, their use of force before Greg went prone, and their use of force once Greg began resisting while prone, because the plaintiff cannot establish all the elements of such a claim and/or because she has failed to show that their conduct violated Greg's clearly established constitutional rights.  McCann and Jackson are not entitled to summary judgment to the extent the plaintiff's claim is based on their use of force while Greg lay prone and unresisting, because it was clearly established before May 2012 that their conduct violated Greg's constitutional rights.

## IV.  Deliberate Indifference.

The plaintiff bases her deliberate indifference claim on the defendants' acts and omissions after they handcuffed Greg.  (Doc. 146 at 30).  The parties agree this claim is to be analyzed under the standards set forth in *Mann*.  (Doc. 124 at 10; Doc. 129 at 13-14; Doc. 134 at 7; Doc. 146 at 74-75).  "To prevail on a deliberate indifference to serious medical need claim, Plaintiffs must show:  (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."  588 F.3d at 1306.

### A.  Serious Medical Need.

The state medical examiner found that the cause of Greg's death was excited delirium.  (Doc. 148-17 at 2).  The Eleventh Circuit has recognized excited delirium as a serious medical need because a delay in treatment both worsens the condition and poses a substantial risk of serious harm.  *Mann*, 588 F.3d at 1307.  There is thus evidence that Greg had a serious medical need.[24]

---

[24] Ripple argues that Greg had no serious medical need until the moment he went limp and stopped breathing.  (Doc. 124 at 11).  In the face of *Mann*, which he ignores, Ripple's argument cannot be sustained; because Greg's excited delirium episode began earlier, so did his serious medical need.

Jackson and McCann complain that the plaintiff's medical expert denied that Greg experienced excited delirium.  (Doc. 129 at 14; Doc. 134 at 7).  But Dr. Adams merely "quibbl[ed]" with the use of the term excited in the delirium" because the delirium was not caused by Greg "taking a man-made substance."  (Doc. 127-8 at 9).  Since Dr. Adams opined that Greg was experiencing a psychotic delirium and stated that an excited delirium "is a form of psychotic delirium with some sort of illegal drug superimposed on top of it," (*id*. at 18), it is unclear that he described a condition meaningfully different from that found by the state medical examiner.  Even if he did so, his disagreement with her would not erase the plaintiff's evidence that Greg experienced excited delirium.

### B.  Deliberate Indifference.

"Our circuit has held that, in order to prove that a deputy acted with deliberate indifference, Plaintiffs must show:  (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that is more than mere negligence."  *Mann*, 588 F.3d at 1307 (internal quotes omitted).

### 1.  Subjective knowledge.

In order to have "subjective knowledge of a risk of serious harm," a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Rodriguez v. Secretary for Department of Corrections*, 508 F.3d 611, 617 (11th Cir. 2007) (internal quotes omitted).[25]  The defendant's knowledge is "subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Goebert v. Lee County*, 510 F.3d 1312, 1327 (11th Cir. 2007) (internal quotes omitted).  However, "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference.  Each individual Defendant must be judged separately and on the basis of what that person knows."  *Harper v. Lawrence County*, 592 F.2d 1227, 1234 (11th Cir. 2010) (internal quotes omitted).

McCann and Jackson deny they were aware that Greg was experiencing excited delirium or that the condition posed a substantial risk of serious harm. (Doc. 129 at 15; Doc. 162 at 9).  The plaintiff, however, has offered the following evidence:  (1) that the police department issued a memorandum order ("MO") on

---

[25] Rodriguez was a state prisoner.  508 F.3d at 612.  "Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners." *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996).  "However, the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees."  *Id*.

recognizing and handling persons with mental illness; (2) that McCann and Jackson received the MO (issued in 2011) and/or its 2005 predecessor prior to May 1, 2012; (3) that they were directed by their superiors to read and follow the MO; (4) that the MO describes excited delirium as a "potentially lethal medical emergency" that "may increase a subject's susceptibility to sudden death by effecting an increase of the heart rate to a critical level"; (5) that persons experiencing excited delirium "present an unusual [sic] high risk of sudden in-custody death"; (6) that the MO lists 22 "attendant symptoms" of excited delirium; (7) that, by McCann's admission, Greg exhibited at least nine of them (bizarre and/or aggressive behavior, shouting, paranoia, hallucinations, panic, violence towards others, unexpected physical strength, yelling incoherently, and aggression towards objects); (8) that Greg also exhibited at least three other listed symptoms of excited delirium (thrashing after restraint, sudden tranquility, and seizure); (9) that Chief Barber confirms his officers are trained to recognize signs and symptoms of individuals who may be mentally ill or emotionally disturbed; and (10) that Sergeant Ripple expected his officers to know the information in the MO and be able to recognize excited delirium when encountered.   From this evidence, a properly functioning jury could find that McCann and Jackson obeyed orders to read and follow the MO; that they thus knew what excited delirium is and that it creates a substantial risk of sudden death; and that, based on their observation of many of its classic symptoms, they realized that Greg was experiencing excited delirium during their encounter.

Ripple, however, did not arrive until after Greg was on the ground and his left arm had been handcuffed.  While Greg resisted being handcuffed and struggled even after being handcuffed, the plaintiff points to no evidence that Ripple observed Greg hallucinate, yell incoherently, or act either bizarrely, paranoid, panicked or aggressively towards objects.  Nor does he identify evidence that the yelling and resistance Ripple observed exceeded that commonly observed among arrestees, much less that it exceeded those bounds to such an extent as to

31

suggest on its own an excited delirium episode.  Finally, the plaintiff identifies no evidence that McCann or Jackson related to Ripple the more obvious symptoms of excited delirium that they (but not Ripple) had observed, and Ripple denies being aware of them.  (Doc. 132-4 at 6).  Because the awareness of McCann and Jackson cannot be imputed to Ripple, the plaintiff's failure to create a fact issue as to Ripple's personal awareness that Greg was experiencing excited delirium is fatal to her case against him.

### 2. Disregard of the risk.

The MO provides that, when the symptoms of excited delirium are recognized, "a medical unit shall be started to the location immediately" and that, "[w]hen possible, no contact should be made with the subject until the medical unit is on the scene."  The MO cautions that arrestees with excited delirium are susceptible to positional asphyxia, causing brain damage or death, from compression of the abdomen, including by their own weight and by the weight of an officer sitting on them.  The MO further provides that arrestees experiencing excited delirium "shall not be transported in the hog-tied prone position face down" and that an officer "shall monitor the suspect closely and continuously" for "breathing difficulties or loss of consciousness," upon discovering which the suspect is to be "immediately transport[ed] … to a hospital emergency room." (Doc. 148-18 at 7-8).

Once Greg was handcuffed, the defendants did not summon a medical unit for immediate assistance; they did not avoid further contact with him (instead, they knelt on him, hog-tied him, and sat on him); they did not position him so as to avoid positional asphyxia (instead, they kept him on his stomach, hog-tied so that his stomach bowed towards the ground, and sat on him); they did not monitor his breathing and consciousness at all, much less closely and continuously;[26] and they

---

[26] Ripple says he did check Greg's breathing (not his consciousness) periodically, but his testimony is contradicted by McCann.

carried him in the hog-tied prone position face down.  Worst of all, the defendants, while knowing that sudden cardiac arrest is a likely result of excited delirium, witnessed Greg "seize" and fall unconscious (a clear sign of cardiac arrest), yet they made no effort to transport him to an emergency room, summon medical assistance, or even check his breathing or pulse.   Only when, more than five minutes later, they realized Greg was not breathing did they address his condition at all.  By then, it was too late.

One "disregards that risk [of serious harm] by failing to take reasonable measures to abate it."  *Chandler v. Crosby*, 379 F.3d 1278, 1296 (11th Cir. 2004) (internal quotes omitted); *accord Harper*, 592 F.3d at 1235.  While the MO may not set the minimum threshold of "reasonable steps" to abate the risk that Greg would die from his excited delirium, taking no steps – which is what the defendants did, according to the plaintiff's evidence – certainly falls below the reasonableness standard.  *See Kruse v. Corizon, Inc.*, 2013 WL 3366043 at *5 (S.D. Ala. 2013) ("It would be difficult to disregard a risk more completely than [by doing] nothing at all."); *see also Bozeman v. Orum*, 422 F.3d 1265, 1274 (11th Cir. 2005) (defendants' conduct was unconstitutional when they knew the detainee was not breathing and "did nothing").  Indeed, the defendants affirmatively enhanced the risk of Greg's death after he had been handcuffed by kneeling on him, hog-tying him, sitting on him, keeping him on his stomach and carrying him facedown while hog-tied.[27]

McCann says he took reasonable measures to abate the risk of Greg's death because his Code Zebra signaled the dispatcher to send paramedics to the scene. (Doc. 129 at 15-16).  But there is evidence that paramedics, pursuant to department policy, remain on "standby somewhere" until the officers on the scene

---

[27] Because all three officers shared responsibility for Greg's safety, (Doc. 148-11 at 10), McCann and Jackson cannot (and do not) blame Ripple for the inadequate response to Greg's risk of death.  This is especially so since there is no evidence they imparted to Ripple their awareness that Greg had exhibited the classic signs of excited delirium before Ripple's arrival.

confirm the scene is secure, (Doc. 131 at 13 n.6; Doc. 132-11 at 62), and there is no evidence the defendants sent such confirmation.  Certainly they did not alert anyone the suspect was experiencing excited delirium or a medical emergency so as to speed the arrival of such assistance.

### 3.  Culpability.

Citing *Mann*, 588 F.3d at 1307, the parties agree that the culpability standard is "more than mere negligence."  (Doc. 124 at 11; Doc. 129 at 14; Doc. 146 at 75; Doc. 162 at 8).  They do so even though the Eleventh Circuit has stated that references to "mere negligence" have been "dicta," while *Cottrell* "made clear that … a claim of deliberate indifference requires proof of more than gross negligence."  *Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010).  Under either test, the plaintiff can satisfy this element.

Given the plaintiff's evidence that McCann and Jackson knew from the MO the steps they should and should not take to abate the risk of Greg's death from excited delirium, a properly functioning jury could find their failure to match any of those steps or take any others was conscious and intentional and thus amounted to more than gross negligence.  *Gilmore*, 738 F.3d at  274 ("Under section 1983 knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference.") (internal quotes omitted); *Bozeman*, 422 F.3d at 1273 ("We also conclude that the Officers, who knew Haggard was unconscious and not breathing and who then failed for fourteen minutes to check Haggard's condition, call for medical assistance, administer CPR or do anything else to help, disregarded the risk facing Haggard in a way that exceeded gross negligence.").

### C.  Causation.

The only causation argument articulated by McCann and Jackson is that the plaintiff cannot show that excited delirium was the cause of Greg's death.  (Doc.

129 at 14; Doc. 162 at 8).  As noted in Part IV.A, however, the state medical examiner found the cause of Greg's death to be excited delirium.  To the uncertain extent the plaintiff's medical expert meaningfully disagrees with her conclusion, *see* note 24, *supra*, his dissent does not eliminate her finding from the record or preclude a properly functioning jury from agreeing with it.

Ripple's only argument regarding causation is that the plaintiff's medical expert testified that "no other act or omission of the police officers was causally related to Mr. Rachel's death" but the use of tasers against him.  (Doc. 124 at 14). What Dr. Adams actually said was that no "action" (not omission) of the officers other than the taser applications caused Greg's "cardiac arrhythmia and asystole and death."  (Doc. 127-8 at 17-18).  As is clear from his testimony, he did not opine that the defendants' post-handcuffing failure to respond to Greg's excited delirium (about which he was not asked) played no role in Greg's death.

It does not appear obvious that Greg would or even might have lived had the defendants more quickly summoned medical assistance, or had they not exposed him to positional asphyxia, or had they monitored him more adequately. The defendants, however, have advanced no argument that the plaintiff cannot produce evidence to establish the causation element, so the plaintiff is under no obligation to present such evidence in order to avoid summary judgment.

### D.  Clearly Established Right.

"The case law also had clearly established before this case arose that an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay."  *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997). However, "[t]his general statement of law ordinarily does not preclude qualified immunity in cases involving a delay in medical treatment for a serious injury," because "[t]he cases are highly fact-specific and involve an array of circumstances

pertinent to just what kind of notice is imputed to a government official and to the constitutional adequacy of what was done to help and when." *Bozeman*, 422 F.3d at 1274.[28]

The plaintiff does not rely on the general statement in *Lancaster*; instead, she relies on *Bozeman* itself. (Doc. 146 at 78-79). According to the *Bozeman* plaintiff's evidence, the defendant guards knew the decedent was not breathing, and yet for fourteen minutes they "failed to call for medical help, to administer CPR, or otherwise to help" the decedent. 422 F.3d at 1272. The Court noted that "[t]he tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay." *Id*. at 1273 (internal quotes omitted). As for length of delay, "[a] delay in care for known unconsciousness brought on by asphyxiation is especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes." *Id*. As for the reason for the delay, the defendants offered none but only denied they knew the decedent was not breathing.[29] "We conclude, therefore, that, because of the urgent nature of the medical need and because of the (lack of any) reason for the corresponding delay in care, a delay of fourteen minutes is actionable under the Constitution, given the circumstances here." *Id*.

---

[28] *Accord Youmans v. Gagnon*, 626 F.3d 557, 564 (11th Cir. 2010) ("[S]pecific cases of deliberate indifference are complicated: the threshold of deliberate indifference is connected to combinations of diverse interdependent factual elements."); *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1318 (11th Cir. 2010) ("Questions of deliberate indifference to medical needs based on claims of delay are complicated questions because the answer is tied to the combination of many facts; a change in even one fact from a precedent may be significant enough to make it debatable among objectively reasonable officers whether the precedent might not control in the circumstances later facing an officer.").

[29] "They do offer another plausible version of the facts tending to show that the Officers actually did not know of Haggard's need, but this story is not the same thing as offering a reason – if one accepts the Officers did know – for the delay in giving help." 422 F.3d at 1273.

The similarity of *Bozeman* to the plaintiff's version of the facts in this case (and the reasonable inferences therefrom) is striking.  Just as the defendants in *Bozeman* knew the decedent was not breathing, the defendants here knew Greg had "seized" and fallen unconscious.  Just as the defendants in *Bozeman* knew the decedent was unlikely to survive long if he did not breathe, McCann and Jackson knew Greg was unlikely to survive long if, as was probable, his unconsciousness accompanied by seizing reflected the cardiac arrest to which his excited delirium placed him at risk.  Like the *Bozeman* defendants, McCann and Jackson knew that swift medical assistance was essential to save Greg's life.  Nevertheless, just as in *Bozeman*, despite the urgency of the situation they did nothing for an appallingly long period. And just as in *Bozeman*, they offer no explanation for their failure to act but only deny knowing Greg had a serious medical need.

In *Bozeman*, the delay between awareness and action was fourteen minutes. Here, a properly functioning jury could easily find a delay of approximately ten minutes, a figure that includes the five minutes admitted by McCann, plus the time involved in:  (1) arranging to move Greg; (2) moving him; (3) setting him down; (4) examining him; (5) the neighbor EMT walking from his house to the scene;[30] and (6) speaking with the neighbor, rolling Greg over, and unshackling him.  The defendants do not suggest this small difference in time renders *Bozeman* insufficient to give them fair warning their conduct was unconstitutional, and they could not plausibly do so.  Nothing in *Bozeman* remotely suggests that a delay shorter than fourteen minutes in responding to an immediately life-threatening condition would be constitutional.  On the contrary, *Bozeman* acknowledged that unacceptable delay in responding to such a condition is measured "in a few

---

[30] The evidence reflects that the EMT did not begin his journey until about the time the defendants were examining Greg.  The evidence also reflects that the EMT's house was a considerable distance away, such that it would have taken significant time for him to exit his bedroom (where he was dressing), exit his house, and walk to the scene.

minutes," 422 F.3d at 1273, an indefinite period but one that clearly extends to ten minutes.[31]

In short, *Bozeman* clearly established that the conduct of McCann and Jackson once Greg seized was unconstitutional. Accordingly, they are not entitled to qualified immunity.

The plaintiff does not attempt to demonstrate that it was clearly established before May 2012 that the conduct of McCann and Jackson after Greg was handcuffed but before he seized was unconstitutional. To the extent the plaintiff's claim is based on this time period, McCann and Jackson are entitled to qualified immunity.

### E. Stopped Breathing.

It is not clear from her briefing whether the plaintiff claims the defendants were deliberately indifferent to Greg's stopped breathing, but in an exercise of caution the Court addresses any such potential claim.

The defendants do not dispute that Greg's stopped breathing was a serious medical need and that they were aware of it once Ripple checked Greg after they set him down mid-transport. The plaintiff does not argue that the defendants were aware at any earlier point that Greg had stopped breathing; instead, she faults them for *not* noticing earlier. (Doc. 146 at 76-77, 80, 81-82). Because the defendants could not have the subjective knowledge necessary to sustain a claim until they knew Greg was not breathing, *Bozeman*, 422 F.3d at 1272, the plaintiff cannot base a claim on the defendant's failure to address Greg's stopped breathing before they realized he was not breathing.

---

[31] It is also significant that *Bozeman* was not a close, borderline case, such that some minor difference in the facts of another case (such as this one) might tilt the analysis the other way. On the contrary, *Bozeman* involved such "extreme circumstances" that *Lancaster*'s general statement was itself enough to give the defendants fair warning that their conduct was unconstitutional. 422 F.3d at 1274.

The Court need not consider whether the defendants disregarded Greg's serious medical need after they became aware of it, because the plaintiff's own evidence is that Greg had expired by the time the neighbor examined him, (Doc. 146 at 82; Doc. 148-14 at 3), which eliminates the plaintiff's ability to establish that any deliberate indifference was causally connected to Greg's death.

### F.  Summary.

Defendant Ripple is entitled to summary judgment because the plaintiff cannot establish all the elements of her claim against him.  McCann and Jackson are not entitled to summary judgment to the extent the plaintiff's claim is based on their acts and omissions once Greg seized and fell unconscious, because it was clearly established before May 2012 that their conduct violated Greg's constitutional rights.  McCann and Jackson are entitled to summary judgment to the extent the plaintiff's claim is based on their acts and omissions before Greg seized or on their conduct in connection with Greg's stopped breathing, because the plaintiff cannot establish all the elements of such a claim and/or because she has failed to show that their conduct violated her clearly established constitutional rights.

### V.  Wrongful Death.

The plaintiff advances two theories in support of Count IV:  (1) that McCann and Jackson acted negligently by failing to comply with an MO regarding dealing with citizens with mental illness; and (2) that McCann and Jackson acted willfully and in bad faith in tasing, striking and kicking Greg when he was submissive and non-resistant.  (Doc. 146 at 82, 88).  The plaintiff asserts that the City is also liable under the first theory but not the second.  (*Id*. at 89 & n.20).  The plaintiff concedes that Count IV is due to be dismissed as to Ripple.  (*Id*. at 89).

## A.  Individual Defendants.

> Every peace officer … who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, … and whose duties include the enforcement of … the criminal laws of this state, and who is empowered by the laws of this state … to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Ala. Code § 6-5-338(a).  "[W]hether a qualified police officer is due § 6-5-338(a) immunity is now judged by the restatement of State-agent immunity articulated by *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000)."  *Blackwood v. City of Hanceville*, 936 So. 2d 495, 504 (Ala. 2006) (internal quotes omitted).

"A State agent asserting State-agent immunity bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity."  *Ex parte Kennedy*, 992 So. 2d 1276, 1282 (Ala. 2008) (internal quotes omitted).  "Should the State agent make such a showing, the burden then shifts to the plaintiff to show that one of the two categories of exceptions to State-agent immunity recognized in *Cranman* is applicable."  *Id*.

*Cranman*'s restatement of the law bestows immunity when the plaintiff's claim is based on the peace officer's "[e]xercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law enforcement officers' arresting or attempting to arrest persons …."  *Blackwood*, 936 So. 2d at 506-05 (internal quotes omitted).  One category of exceptions to immunity applies when "the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority."  *Kennedy*, 992 So. 2d at 1282 (internal quotes omitted).  "One of the ways in which a plaintiff can show that a State agent acted beyond his or her authority is by proffering evidence that the State agent failed to

discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." *Id.* at 1282-83 (internal quotes omitted). Mere "guidelines" are not enough to preclude immunity, but only "rules" that "*must* be followed by an officer." *Ex parte Brown*, ___ So. 3d ___, 2015 WL 3367665 at *9 (Ala. 2015) (emphasis in original).

It is uncontroverted that McCann and Jackson are "peace officers" for purposes of Section 6-5-338. It is also uncontroverted that the plaintiff's claim is based on the defendants' attempt to arrest Greg. The plaintiff, in reliance on the same MO that discusses excited delirium, argues the MO establishes "non-discretionary, … mandatory steps" that an officer "must follow" when "encountering a suspect exhibiting a mental illness." (Doc. 146 at 86). The plaintiff concludes the MO precluded the officers from "exercising judgment" in effecting Greg's arrest (specifically, in approaching and engaging Greg initially), such that they were not engaged in a function that would support immunity. She argues further that the MO imposes duties pursuant to "detailed rules or regulations," such that the defendants' failure to discharge those duties means they acted beyond their authority and thus beyond the reach of peace officer/state agent immunity. (*Id.* at 83-86).

The MO, however, is not as advertised. The MO says that officers "should" do certain things (such as remaining calm, speaking simply, maintaining a safe distance and being friendly), and that they "should not" do certain things (such as moving suddenly, shouting and maintaining eye contact), but it does not purport to make any of these steps "mandatory" or "non-discretionary." "The term 'should' indicates a recommended course of action, but does not itself imply the obligation associated with 'shall.'" *Qwest Corp. v. Federal Communications Commission*, 258 F.3d 1191, 1200 (10th Cir. 2001).[32] When the MO imparts a mandatory duty, it uses an imperative, "must" or "shall."[33]

---

[32] *Accord Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014) ("*Southern States* explains that district courts have 'broad discretion' to decide harmlessness and

The plaintiff ignores both the standard meaning of "should" and the MO's juxtaposition of that term with the mandatory "shall" and "must." Instead, she insists the defendants have admitted the MO sets forth mandatory duties and eliminates their discretion in dealing with mentally disturbed persons. (Doc. 146 at 84, 86). But all the defendants said was that they were expected to "follow" the MO rather than "disregard" it, and Sergeant Ripple made clear that this means followed "with discretion." Lieutenant Elia said only that the MO represented "the way it should be done," not the way it must be done. At most, the testimony on which the plaintiff relies supports the proposition that the defendants were required to consider the recommendations in the MO; it does not convert those recommendations into discretionless orders.

The plaintiff also proffers the opinion of her police operations expert that the MO is "not discretionary." (Doc. 148-20 at 36). Kirkham's opinion is expressed as a raw conclusion and is unsupported by any textual or other analysis, and it is thus inadequate to draw into question the plain meaning of the MO.

The failure of the plaintiff's argument means both that the defendants have carried their burden of showing they were engaged in a function (exercising judgment in effecting an arrest) that would entitle them to immunity and that the plaintiff has not carried her burden of showing the "beyond … authority" exception to immunity applies.

As noted, the plaintiff also bases her wrongful death claim on the actions of McCann and Jackson in "Tasing, striking, and kicking a submissive and non-resistant Rachel," which they deem an assault and battery. (Doc. 146 at 88). As

'should' – not 'shall' – 'be guided by' the five factors."); *United States v. Maria*, 186 F.3d 65, 70 (2nd Cir. 1999) ("[T]he common meaning of 'should' suggests or recommends a course of action, while the ordinary understanding of 'shall' describes a course of action that is mandatory.") (citing dictionary definitions).

[33] (Doc. 148-18 at 3 ("Officers must follow the law and departmental rules for verifying that any pills or capsules the person is carrying are prescribed …."); *id*. at 8 ("The Training Center shall conduct … refresher training … at least once very three years.")).

discussed previously, the earliest point at which Greg could be considered "submissive and non-resistant" is when, while on his knees, he raised his hands in a submissive manner and pleaded, "Stop."  What came before – including all tasings – thus lies outside the scope of the plaintiff's wrongful death claim.

"In making the arrest, a police officer may use reasonable force and may be held liable [for assault and battery] only if more force is used than is necessary to effectuate the arrest."  *Walker v. City of Huntsville*, 62 So. 3d 474, 494 (Ala. 2010) (internal quotes omitted).  As discussed in Part III.B.2, under the plaintiff's evidence the officers used excessive force on Greg while he lay prone and unresisting.  It may also be assumed for present purposes that the officers used more than reasonable force in striking Greg twice on the back with a baton rather than simply handcuffing his outstretched hands.

As this Court has previously noted, "[f]or purposes of the immunity issue, 'willful,' 'malicious' and 'bad faith' all require evidence that the defendant acted with the intent to injure or with ill will towards the plaintiff."  *Lawrence v. City of Fairhope*, 2010 WL 1658786 at *13 (S.D. Ala. 2010); *accord Gaillard v. City of Satsuma*, 2013 WL 1219549 at *15 (S.D. Ala. 2013), *rev'd in part on other grounds*, 526 Fed. Appx. 870 (11th Cir. 2014).  There is adequate evidence to permit a properly functioning jury to find that McCann and Jackson acted with ill will towards Greg and/or with the intent to injure him.  Force applied "intentionally, gratuitously, and in violation of [a plaintiff's] clearly established constitutional rights," as the discussion in Part III.B.2 reflects, "support[s] an inference that [the defendant] acted willfully and in bad faith."  *Brown v. City of Huntsville*, 608 F.3d 724, 742 (11th Cir. 2010).  Moreover, a witness's description of McCann and Jackson as "agitated" by Greg's resistance suggests they were operating from ill will and with an intent to retaliate against Greg for his previous resistance.

In summary, McCann and Jackson are protected by peace officer immunity except with respect to the plaintiff's claim that they assaulted and battered Greg after he became submissive and unresisting.

### B. The City.

"It is well established that, if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune." *Ex parte Dixon*, 55 So. 3d 1171, 1179 (Ala. 2010) (internal quotes omitted). The City is thus immune under Section 6-5-338(b) to all but the plaintiff's claim that Greg was assaulted and battered after he became submissive and unresisting. Because the plaintiff does not contend the City is liable for any assault and battery, (Doc. 146 at 89), the City is entitled to summary judgment in toto.

### CONCLUSION

For the reasons set forth above: (1) Sergeant Ripple's motion for summary judgment is **granted**; (2) the City's motion for summary judgment is **granted**; (3) the motions for summary judgment filed by Officers McCann and Jackson are **granted** with respect to: (a) the plaintiff's excessive force claim, except to the extent based on force applied while Greg lay facedown and unresisting; (b) the plaintiff's deliberate indifference claim, except to the extent based on their acts and omissions once Greg seized and fell unconscious; and (c) the plaintiff's wrongful death claim, except to the extent based on their kicking and striking Greg after he became submissive and unresisting. In all other respects, their motions for summary judgment are **denied**.

All claims against Sergeant Ripple and the City, and all official capacity claims against the individual defendants, are **dismissed with prejudice**.  Judgment shall be entered accordingly by separate order.

DONE and ORDERED this 5th day of June, 2015.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE